MISTY A. MURRAY (SBN 196870 )
Misty.Murray@maynardcooper.com
OPHIR JOHNA (SBN 228193 )
OJohna@maynardcooper.com
KAREN T. TSUI (SBN 305869)
KTsui@maynardcooper.com
MAYNARD COOPER & GALE LLP
10100 Santa Monica Boulevard, Suite 550
Los Angeles, CA 90067
Telephone:  310.596.4500

Attorneys for Defendants Hibbett Inc.,
and Hibbett Retail, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| ANTHONY KAMEL, individually and on behalf of a class of other similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>HIBBETT, INC., a Delaware corporation, and HIBBETT RETAIL, INC., a Delaware corporation,<br><br>Defendants. | Case No.  2:22-3726<br><br>**DECLARATION OF OPHIR JOHNA IN SUPPORT OF DEFENDANTS' NOTICE OF REMOVAL**<br><br>[Filed concurrently with Notice of Removal]<br><br>Complaint Filed:  April 29, 2022 |

## DECLARATION OF OPHIR JOHNA

I, Ophir Johna, hereby declare as follows:

1. I am an attorney licensed to practice in this Court and in the State of California, and am an Partner with the law firm of Maynard Cooper & Gale LLP, counsel of record for Defendants Hibbett, Inc., and Hibbett Retail, Inc. ("Hibbett"). I am one of the attorneys with responsibility for the handling of this matter. I have personal knowledge of the matters set forth below and, if necessary, could and would competently testify as to such matters.

2. Attached as **Exhibit A** hereto are true and correct copies of the Summons and Complaint filed on or about April 29, 2022 in the Superior Court of the State of California for the County of Orange, entitled *Anthony Kamel, individually and on behalf of a class of other similar situated individuals, Plaintiffs, v. Hibbett, Inc., a Delaware Corporation, and Hibbett Retail, Inc., a Delaware corporation, Defendants*, Case No. 30-2022-01257316-CU-NP-CXC, and all other documents that were served upon Defendants on May 3, 2022 or are on file with the Orange County Superior Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of June, 2022, at Los Angeles, California.

/s/ Ophir Johna
Ophir Johna

# EXHIBIT A

Electronically Filed by Superior Court of California, County of Orange, 04/29/2022 12:14:44 PM.
30-2022-01257316-CU-NP-CXC - ROA # 4 - DAVID H. YAMASAKI, Clerk of the Court By Georgina Ramirez, Deputy Clerk.

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

|  | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

HIBBETT, INC., a Delaware corporation,
and HIBBETT RETAIL, INC., a Delaware

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

ANTHONY KAMEL, individually and on behalf of a class of other
similarly situated individuals

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

---

The name and address of the court is:
*(El nombre y dirección de la corte es)*  Orange County Superior Court

Civil Complex Center, 751 W. Santa Ana Blvd, Santa Ana CA 92701

CASE NUMBER:
*(Número del Caso):*
**30-2022-01257316-CU-NP-CXC**

Judge Peter Wilson

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
John R. Habashy, Esq.; 633 W. 5th Street, 28th Floor, Los Angeles, CA 90071; (213) 223-5900

DATE: 04/29/2022       DAVID H. YAMASAKI, Clerk of the Court       Clerk, by _Georgina Ramirez_ , Deputy
*(Fecha)*                                                           *(Secr____)*                      *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* HIBBETT RETAIL, INC., a Delaware corporation

under: ☒ CCP 416.10 (corporation)             ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
       ☐ other *(specify):*
4. ☒ by personal delivery on *(date):* 5/3/2022

---

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

Date Served: 5/3/2022      **SUMMONS**      Code of Civil Procedure §§ 412.20, 465
Time Served: 2:08                            www.courtinfo.ca.gov

Page 1 of 1

CSC Server: SD     T034308

Electronically Filed by Superior Court of California, County of Orange, 04/29/2022 12:14:44 PM.
30-2022-01257316-CU-NP-CXC - ROA # 3 - DAVID H. YAMASAKI, Clerk of the Court By Georgina Ramirez, Deputy Clerk. **CM-010**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>John Habashy (SBN 236708)<br>Lexicon Law, PC<br>633 W. 5th Street, 28th Floor<br>Los Angeles, CA 90071<br>TELEPHONE NO.: (213)223-5900   FAX NO.: (888) 373-2107<br>ATTORNEY FOR *(Name):* Plaintiff, Anthony Kamel | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  ORANGE
STREET ADDRESS: 751 W. Santa Ana Blvd
MAILING ADDRESS: 751 W. Santa Ana Blvd
CITY AND ZIP CODE: Santa Ana 92701
BRANCH NAME: Civil Complex Center

CASE NAME:
ANTHONY KAMEL V. HIBBETT, INC., ET AL.

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER:<br>30-2022-01257316-CU-NP-CXC |
|---|---|---|---|
| ✓ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | Limited<br>(Amount<br>demanded is<br>$25,000 or less) | Counter ☐  Joinder ☐<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE: Judge Peter Wilson<br>DEPT: |
| | | | CX-102 |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation** |
|---|---|---|
| ☐ Auto (22) | ☐ Breach of contract/warranty (06) | **(Cal. Rules of Court, rules 3.400–3.403)** |
| ☐ Uninsured motorist (46) | ☐ Rule 3.740 collections (09) | ☐ Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property** | ☐ Other collections (09) | ☐ Construction defect (10) |
| **Damage/Wrongful Death) Tort** | ☐ Insurance coverage (18) | ☐ Mass tort (40) |
| ☐ Asbestos (04) | ☐ Other contract (37) | ☐ Securities litigation (28) |
| ☐ Product liability (24) | **Real Property** | ☐ Environmental/Toxic tort (30) |
| ☐ Medical malpractice (45) | ☐ Eminent domain/Inverse | ☐ Insurance coverage claims arising from the |
| ☐ Other PI/PD/WD (23) | condemnation (14) | above listed provisionally complex case |
| **Non-PI/PD/WD (Other) Tort** | ☐ Wrongful eviction (33) | types (41) |
| ☐ Business tort/unfair business practice (07) | ☐ Other real property (26) | **Enforcement of Judgment** |
| ☐ Civil rights (08) | **Unlawful Detainer** | ☐ Enforcement of judgment (20) |
| ☐ Defamation (13) | ☐ Commercial (31) | **Miscellaneous Civil Complaint** |
| ☐ Fraud (16) | ☐ Residential (32) | ☐ RICO (27) |
| ☐ Intellectual property (19) | ☐ Drugs (38) | ☐ Other complaint *(not specified above)* (42) |
| ☐ Professional negligence (25) | **Judicial Review** | **Miscellaneous Civil Petition** |
| ✓ Other non-PI/PD/WD tort (35) | ☐ Asset forfeiture (05) | ☐ Partnership and corporate governance (21) |
| **Employment** | ☐ Petition re: arbitration award (11) | ☐ Other petition *(not specified above)* (43) |
| ☐ Wrongful termination (36) | ☐ Writ of mandate (02) | |
| ☐ Other employment (15) | ☐ Other judicial review (39) | |

2. This case ✓ is ☐ is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties    d. ☐ Large number of witnesses
   b. ✓ Extensive motion practice raising difficult or novel    e. ☐ Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve       in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence    f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ✓ monetary  b. ✓ nonmonetary; declaratory or injunctive relief   c. ✓ punitive
4. Number of causes of action *(specify):* ONE (1) VIOLATIONS OF 15 U.S.C. § 1681(c)(g)
5. This case ✓ is ☐ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: April 29, 2022
JOHN R. HABASHY, ESQ.
(TYPE OR PRINT NAME)                                     (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed
  under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result
  in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all**
  other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

**CIVIL CASE COVER SHEET**
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courtinfo.ca.gov*

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
　Asbestos Property Damage
　Asbestos Personal Injury/
　　Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
　Medical Malpractice–
　　Physicians & Surgeons
　Other Professional Health Care
　　Malpractice
Other PI/PD/WD (23)
　Premises Liability (e.g., slip and fall)
　Intentional Bodily Injury/PD/WD
　　(e.g., assault, vandalism)
　Intentional Infliction of
　　Emotional Distress
　Negligent Infliction of
　　Emotional Distress
　Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
　Legal Malpractice
　Other Professional Malpractice
　　*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
　Breach of Rental/Lease
　　Contract *(not unlawful detainer or wrongful eviction)*
　Contract/Warranty Breach–Seller
　　Plaintiff *(not fraud or negligence)*
　Negligent Breach of Contract/
　　Warranty
　Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
　Collection Case–Seller Plaintiff
　Other Promissory Note/Collections
　　Case
Insurance Coverage *(not provisionally complex)* (18)
　Auto Subrogation
　Other Coverage
Other Contract (37)
　Contractual Fraud
　Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
　Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
　Writ of Possession of Real Property
　Mortgage Foreclosure
　Quiet Title
　Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
　Writ–Administrative Mandamus
　Writ–Mandamus on Limited Court
　　Case Matter
　Writ–Other Limited Court Case
　　Review
Other Judicial Review (39)
　Review of Health Officer Order
　Notice of Appeal–Labor
　　Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
　*(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
　Abstract of Judgment (Out of County)
　Confession of Judgment *(non-domestic relations)*
　Sister State Judgment
　Administrative Agency Award
　　*(not unpaid taxes)*
　Petition/Certification of Entry of
　　Judgment on Unpaid Taxes
　Other Enforcement of Judgment
　　Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
　Declaratory Relief Only
　Injunctive Relief Only *(non-harassment)*
　Mechanics Lien
　Other Commercial Complaint
　　Case *(non-tort/non-complex)*
　Other Civil Complaint
　　*(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
　Governance (21)
Other Petition *(not specified above)* (43)
　Civil Harassment
　Workplace Violence
　Elder/Dependent Adult
　　Abuse
　Election Contest
　Petition for Name Change
　Petition for Relief From Late
　　Claim
　Other Civil Petition

**CIVIL CASE COVER SHEET**

Electronically Filed by Superior Court of California, County of Orange, 04/29/2022 12:14:44 PM.
30-2022-01257316-CU-NP-CXC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By Georgina Ramirez, Deputy Clerk.

John R. Habashy (SBN 236708)
*John@lexiconlaw.com*
LEXICON LAW, PC
633 W. 5th St., 28th Floor
Los Angeles, CA 90071
Telephone: (213) 223-5900
Facsimile: (888) 373-2107

*Additional Counsel for Plaintiff and the
Proposed Class listed on following page.*

Attorneys for Plaintiff and the Proposed Class

Assigned for All Purposes

Judge Peter Wilson

cx-102

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

| | |
|---|---|
| ANTHONY KAMEL, individually and on behalf of a class of other similarly situated individuals,<br><br>     *Plaintiff,*<br><br>v.<br><br>HIBBETT, INC., a Delaware corporation, and HIBBETT RETAIL, INC., a Delaware corporation,<br><br>     *Defendants.* | **CASE NO:**  30-2022-01257316-CU-NP-CXC<br><br>**CLASS ACTION**<br><br>**VIOLATION OF THE FAIR AND ACCURATE CREDIT TRANSACTIONS ACT (FACTA)**<br><br>**JURY TRIAL DEMANDED** |

1

2   <u>Additional Counsel for Plaintiff and the Proposed Class:</u>

3

4   Scott D. Owens (FL 0597651)
    *Scott@scottdowens.com*

5   (pending admission *pro hac vice*)
    SCOTT D. OWENS, P.A.

6   2750 N. 29th Avenue, Suite 209A
    Hollywood, Florida 33020

7   Telephone: (954) 589-0588
    Facsimile: (954) 337-0666

8

9   Christopher W. Legg (FL 44460)
    *Chris@theconsumerlawyers.com*

10  (pending admission *pro hac vice*)
    Christopher W. Legg, P.A.

11  499 E. Palmetto Park Blvd. #228
    Boca Raton, FL 33432

12  Telephone: (954) 962-2333
    Facsimile: (954) 960-6565

13

14

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25

26

27

28

Plaintiff, Anthony Kamel (hereinafter "Plaintiff") on behalf of himself and other similarly situated individuals (hereinafter the "Class"), brings the instant action against Hibbett, Inc. (hereinafter "Defendant Hibbett") and Hibbett Retail, Inc. (hereinafter "Defendant Hibbett Retail") (collectively with Defendant Hibbett, the "Defendants"), and alleges the following:

## INTRODUCTION

1.     This action arises from Defendants' violation of the Fair and Accurate Credit Transactions Act (hereinafter "FACTA") amendment to the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, as amended (hereinafter "FCRA"), a federal statute which requires merchants to truncate certain credit and debit card information on printed receipts provided to consumers at the point-of-sale.

2.     Despite the clear language of the statute, Defendants knowingly or recklessly failed to comply with FACTA by printing more than the last five (5) digits of consumers' debit and credit card account numbers on receipts issued to them. As a result of Defendants' unlawful conduct, Plaintiff and members of the Class who have conducted business with Defendants during the time frame relevant to this action have suffered a violation of their statutory rights under 15 U.S.C. § 1681c(g), an invasion of their privacy, and have been burdened with an elevated risk of identity theft.

3.     The allegations set forth by Plaintiff herein satisfy the elements of standing in this Court because California courts are not bound by the "case and controversy" requirement of Article III. *See National Paint & Coatings Assn. v. State of California*, 58 Cal. App. 4th 753, 760-761, 68 Cal. Rptr. 2d 360 (4th Dist. 1997) ("The California Constitution does not specify, as does the United States Constitution, that the state's judicial power extends only to "cases and

controversies."); *see also Angelucci v. Century Supper Club* (2007) 41 Cal. 4th 160, 175 [59 Cal. Rptr. 3d 142, 158 P.3d 718] ("In general terms, in order to have standing, the plaintiff must be able to allege injury—that is, some 'invasion of the plaintiff's legally protected interests.'").

4.      However, *federal* courts in California hold that plaintiffs with nearly identical allegations to those in the instant action have not met the necessary elements to confer Article III standing. *See Bassett v. Parking Services, Inc.*, 883 F.3d 776 (9th Cir. 2018) ("[W]e conclude that Bassett failed to allege a concrete injury sufficient to give him standing."); *see also Noble v. Nev. Check Cab. Corp.*, 726 Fed. Appx. 582, 584 (9th Cir. Mar. 9, 2018) (Plaintiff in FACTA action failed to satisfy Article III standing requirements).

## JURISDICTION AND VENUE

5.      This court has subject matter jurisdiction because the amount in controversy is not less than the jurisdictional limit of this Court and because Plaintiff seeks to enforce his legally protected interests created by statute.

6.      Plaintiff concedes that the allegations contained herein are not sufficient to meet the requirements set forth by *federal* courts in relation to Article III standing. *See Noble*, 726 Fed.Appx. at 583 (9th Cir. 2018) ("Citing *Spokeo* we held that the plaintiff had not alleged a concrete injury sufficient to warrant Article III standing…") (quoting *Bassett*, 883 F.3d at 783 (9th Cir. 2018)).

7.      *In personam* jurisdiction over the Defendants is proper in this Court as the Defendants conduct substantial business within the State such that their affiliation is continuous and systematic.

8.      Venue is proper in this Court pursuant to sections 395 and 395.5 of the Code of Civil Procedure, as one or more Defendants conducted substantial business and/or committed

violations of law here, and Plaintiff Kamel resides within this county.

## PARTIES

9.      At all times relevant hereto, Plaintiff is and was a natural person over the age of eighteen (18) residing in Orange County, California.

10.     At all times relevant hereto, Defendant Hibbett is and was a Delaware publicly traded corporation whose principal address is located at 2700 Milan Court, Birmingham, Alabama 35211.

11.     At all times relevant hereto, Defendant Hibbett Retail is and was a Delaware privately held corporation whose principal address is located at 2700 Milan Court, Birmingham, Alabama 35211.

12.     At all times relevant hereto, Defendants operated athletic wear retail stores as a unitary enterprise under the names Hibbett Sports and City Gear in 35 states throughout the United States, including the State of California.[1]

13.     At all times relevant hereto, Defendants exercised control over the aforementioned Hibbett Sports and City Gear retail stores, including but not limited to, the type of point-of-sale (POS) systems utilized to print customer transaction receipts.

## FACTUAL ALLEGATIONS

### Background of FACTA

---

[1] *See* **Exhibit 'A'** - Hibbett, Inc. Form 10-K for the fiscal year ended January 29, 2022 (hereinafter the "2022 Annual Report") (Item 2. Properties, p. 28).

14.     Congress enacted FACTA to prevent identity theft and related harm. *See* Pub. L. No. 108-159 (December 4, 2003) ("An Act . . . to prevent identity theft . . . and for other purposes.").

15.     Upon signing FACTA into law, President George W. Bush remarked that "[s]lips of paper that most people throw away should not hold the key to their savings and financial secrets." 39 Weekly Comp. Pres. Doc. 1746, 1757 (Dec. 4, 2003). President Bush added that the government, through FACTA, was "act[ing] to protect individual privacy." *Id.*

16.     Along those lines, one such FACTA provision was specifically designed to thwart identity thieves' ability to gain sensitive information regarding a consumer's credit or bank account from a receipt provided to the consumer during a point-of-sale transaction, which, through any number of ways, could fall into the hands of someone other than the consumer.

17.     Codified at 15 U.S.C. § 1681c(g), this provision states the following:

> *Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.*

15 U.S.C. § 1681c(g) (the "Receipt Provision").

18.     The requirement was widely publicized among retailers and the FTC. For example, on March 6, 2003, in response to earlier state legislation enacting similar truncation requirements, then-CEO of Visa USA, Carl Pascarella, explained that,

> "Today, I am proud to announce an additional measure to combat identity theft and protect consumers. Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. The card's expiration date will be eliminated from receipts

altogether . . . The first phase of this new policy goes into effect July 1, 2003 for all new terminals."[2]

Within 24 hours, MasterCard and American Express announced they were imposing similar requirements.

19.    Card-issuing organizations proceeded to require compliance with FACTA by contract, in advance of FACTA's mandatory compliance date. For example, the publication, *Rules for Visa Merchants*, which is distributed to and binding upon all merchants that accept Visa cards, expressly requires that "only the last four digits of an account number should be printed on the customer's copy of the receipt" and "the expiration date should not appear at all."[3]

20.    However, because of apparent confusion surrounding the otherwise straightforward requirements of FACTA, a handful of large retailers failed to comply with their contractual obligations to the card companies and with FACTA. Accordingly, Congress passed *The Credit and Debit Card Receipt Clarification Act of 2007*, extending the compliance date to June 3, 2008, and making allowances to the definition of willful noncompliance with respect to violations involving the printing of an expiration date on certain credit and debit card receipts before the date of the enactment of this Act.[4] Importantly, the Clarification Act did not amend FACTA to allow disclosure of a credit or debit card's expiration date, nor did it excuse violations for printing more than the last five digits of a card's account number. Instead, it simply provided

---

[2] Source: https://www.finextra.com/newsarticle/8206/visa-to-hide-card-numbers-in-bid-to-cut-identity-theft (Last viewed: April 15, 2022).

[3] Source: https://www.runtogold.com/images/rules_for_visa_merchants.pdf (Last viewed: April 15, 2022).

[4] Source: https://www.govinfo.gov/content/pkg/BILLS-110hr4008enr/pdf/BILLS-110hr4008enr.pdf (Last viewed: April 15, 2022).

amnesty to past violators in connection with the printing of expiration dates only, up to June 3, 2008.

21.     Meanwhile, card processing companies continued to alert their merchant clients, including Defendant, of FACTA's requirements. According to a Visa Best Practice Alert in 2010:

> Some countries already have laws mandating PAN truncation and the suppression of expiration dates on cardholder receipts. For example, the United States Fair and Accurate Credit Transactions Act (FACTA) of 2006 prohibits merchants from printing more than the last five digits of the PAN or the card expiration date on any cardholder receipt. (Please visit http://www.ftc.gov/os/statutes/fcrajump.shtm for more information on the FACTA).

> To reinforce its commitment to protecting consumers, merchants, and the overall payment system, Visa is pursuing a global security objective that will enable merchants to eliminate the storage of full PAN and expiration date information from their payment systems when not needed for specific business reasons. To ensure consistency in PAN truncation methods, Visa has developed a list of best practices to be used until any new global rules go into effect.

*Visa Best Practices for Primary Account Number Storage and Truncation.*[5]

22.     As noted above, the processing companies have required that credit card or debit card expiration dates not be shown since 2003 and still require it. For example, American Express requires:

> Pursuant to Applicable Law, truncate the Card Number and do not print the Card's Expiration Date on the copies of Charge Records delivered to Card Members. Truncated Card Number digits must be masked with replacement characters such as "x," "*," or "#," and not blank spaces or numbers.

---

[5] Source: https://www.visa.com.hk/content/dam/VCOM/global/support-legal/documents/bulletin-pan-truncation-best-practices.pdf (Last viewed: April 15, 2022).

*American Express Merchant Regulations.*[6]

23.     Similarly, MasterCard required in a section entitled Primary Account Number (PAN) truncation and Expiration Date Omission:

> A Transaction receipt generated by an electronic POI Terminal, whether attended or unattended, must not include the Card expiration date. In addition, a Transaction receipt generated for a Cardholder by an electronic POI Terminal, whether attended or unattended, must reflect only the last four digits of the primary account number (PAN). All preceding digits of the PAN must be replaced with fill characters, such as "X," "*," or "#," that are neither blank spaces nor numeric characters.

*Mastercard Acceptance Procedures.*[7]

24.     Despite FACTA, however, identity theft remains a serious issue affecting both consumers and businesses. In 2018, a Harris Poll revealed that nearly 60 million Americans have been affected by identity theft.[8] There were 16.7 million victims of identity theft in 2017, and account takeovers (when a thief opens a credit card or other financial account using a victim's name and other stolen information) tripled in 2017 form 2016, causing $5.1 billion in losses.

25.     So problematic is the crime of identity theft that the three main credit reporting agencies, Experian, Equifax, and Transunion, joined to set-up a free website (http://www.annualcreditreport.com) in order to comply with FACTA requirements and to provide the citizens of this country with a means of monitoring their credit reports for possible

------------------------

[6] Source: https://www.aexp-static.com/cdaas/merchant-interactive-content/infopros/weboutput-international-Regs-latest/index.html#t=Topics%2F2_General-Policies-6.htm (Last viewed: April 15, 2022).

[7] Source: https://www.aibms.com/wpcontent/uploads/2014/12/Transaction_Processing_Rules_13_December_2013.pdf (Last viewed: April 15, 2022).

[8] Source: https://lifelock.com/learn-identity-theft-resources-how-common-is-identity-theft.html (Last viewed: April 15, 2022).

identity theft.

26.    FACTA clearly prohibits the printing of more than the last five (5) digits of the card number, to protect persons from identity theft.

### Defendants' Corporate Structure and Operations

27.    Through byzantine corporate structures, shared resources, and the primary use of the names Hibbett Sports and City Gear, Plaintiff asserts that Defendants operate their retail athletic-inspired fashion business as a unitary enterprise throughout the United States.

28.    Founded in 1945 under the name Dixie Supply Co., Defendants' brand has numerous permutations, including: Hibbett & Company, LLC; Hibbett & Sons Sporting Goods, Inc.; Hibbett Digital Management, LLC; Hibbett Holdings, LLC; Hibbett Team Sales, Inc.; Hibbett Wholesale, Inc.; Hibbett Wholesale Warehouse, Inc Hibbett Sporting Goods, Inc.; Hibbett Sports, Inc.[9]

29.    To add to this seemingly purposeful confusion, Defendant Hibbett, a publicly traded Delaware corporation, was until recently known as Hibbett Sports, Inc.[10] and Defendant Hibbett Retail, a privately held Delaware corporation, was formerly known as Hibbett Sporting Goods, Inc.[11] Further, City Gear, LLC is a privately held Tennessee limited liability company and was formed sometime in 2006.[12]

---

[9] Sources: https://arc-sos.state.al.us/cgi/corpname.mbr/output (Alabama Secretary of State, Division of Corporations website) (Last viewed: April 15, 2022); https://icis.corp.delaware.gov/Ecorp/Entity Search/NameSearch.aspx (Delaware Secretary of State, Division of Corporations website) (Last viewed: April 15, 2022).
[10] *See* **Exhibit 'B'**- Hibbett Sports, Inc. Form 8-K dated June 23, 2021.
[11] Source: https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx (Delaware Secretary of State, Division of Corporations website) (Last viewed: April 15, 2022).
[12] Source: https://tnbear.tn.gov/Ecommerce/FilingDetail.aspx?CN=1540100541250262

30.     When transacting business throughout the country, Defendants primarily use the names "Hibbett Sports" and "City Gear", which are owned by Hibbett Holdings, LLC and City Gear, LLC respectively.[13]

31.     Defendant Hibbett openly refers to itself in public filings with the Securities and Exchange Commission as a leading athletic wear retailer with over 1,000 retail stores under the Hibbett Sports and City Gear names.[14] Specifically, Defendant Hibbett discloses that as of January 30, 2021, it operated 882 Hibbett Stores, 167 City Gear stores, and 18 Sports Addition stores.[15] Many of the aforementioned retail stores operated by Defendants are located in the state of California.[16]

32.     Through information and belief, Plaintiff avers, when a consumer transacts business at one of Defendants' retail stores using a credit or debit card, the name "Hibbett Sports" appears as the billing descriptor on the consumer's monthly statement.

33.     Defendants share common corporate officers, including without limitation, Michael Longo, Robert Volke, and David Benck.[17] Moreover, the Chairman of the Board of

180590481531192280632402470800027 (Tennessee Secretary of State, Division of Corporations website) (Last viewed: April 15, 2022).

[13] Source: https://tmsearch.uspto.gov/bin/showfield?f=doc&state=4801:w93l0d.2.4 (U.S. Patent and Trademark Office website) (Last viewed: April 15, 2022).
[14] See 2022 Annual Report (Our Company, p. 6: "Hibbett, headquartered in Birmingham, Alabama, is a leading athletic-inspired fashion retailer with approximately 1,100 stores under the Hibbett Sports and City Gear banners, primarily located in underserved communities").
[15] See Id. (Our Store Brands, p. 6).
[16] See Id. (Item 2. Properties, p. 27).
[17] See Id. (Information about our Executive Officers, p. 9); see also https://search.sunbiz.org/Inquiry CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&Search NameOrder=HIBBETTRETAIL%20F960000051442&aggregateId=forp-f96000005144-5e90b765 -631e-4d66-a85b 9fee5f1faae3&searchTerm=hibbett&listNameOrder=HIBBETTRETAIL %20F960000051442 (Florida Secretary of State, Division of Corporations website) (Last viewed: April 15, 2022).

Directors for Defendant Hibbett, Anthony Crudele, also serves as the Chief Executive Officer for Defendant Hibbett Retail.[18]

34.     According to the 2022 Annual Report and other publicly available corporate filings, Defendants also share the business address of 2700 Milan Court, Birmingham, Alabama 35211.[19]

35.     Lastly, Defendants share several integrated resources in pursuit of a single business purpose, including without limitation, a line of business credit between Defendant Hibbett and Regions Bank.[20]

### Alter Ego Liability

36.     Ordinarily a corporation is considered a separate legal entity, distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations. *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 [99 Cal. Rptr. 2d 824]. However, courts may disregard this notion "when [a corporation] is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose." *Id.*

37.     "A court may also disregard the corporate form in order to hold one corporation liable for the debts of another affiliated corporation when the latter is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation." *Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013)

---

[18] *See* 2022 Annual Report (Signatures, p. 75).
[19] *See Id.* (p. 1).
[20] *See* **Exhibit 'C'** - Hibbett, Inc. Form 8-K dated April 7, 2022; (Source: https://app.quotemedia.com/data/downloadFiling?webmasterId=90423&ref=116616910&type=PDF&symbol=HIBB&companyName=Hibbett+Inc.&formType=8K&formDescription=Current+report+pursuant+to+Section+13+or+15%28d%29&dateFiled=2022-04-12&CK=1017480).

217 Cal.App.4th 1096, 1107 [159 Cal.Rptr.3d 469, 479] (internal quotations omitted).

38. "[W]here there is 'such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal' (1 Fletcher Cyc. Corp. § 43), the affiliated corporations may be deemed to be a single business enterprise, and the corporate veil pierced. 'Under the "single business enterprise" doctrine, separate corporations may operate with integrated resources in pursuit of a single business purpose.' (Ibid.) 'The "single-business-enterprise" theory is an equitable doctrine applied to reflect partnership-type liability principles when corporations integrate their resources and operations to achieve a common business purpose.'" *Id.* At 1107–1108.

39. "California courts have recognized that 'it would be unjust to permit those who control companies to treat them as a single or unitary enterprise and then assert their corporate separateness in order to commit frauds and other misdeeds with impunity.'" *DEPCOM Power, Inc. v. CSUN Solar, Inc.* (N.D. Cal., May 13, 2019, No. 18-CV-00729-JST) 2019 WL 2088480, at *4 (quoting *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1249 (1991)). "Accordingly, 'under the single-enterprise rule, [alter ego] liability can be found between sister companies.' *Id.* (quoting *Greenspan v. LADT, LLC*, 191 Cal. App. 4th 486, 512 (2010)

40. "The essence of the alter ego doctrine is that justice be done. What the formula comes down to, once shorn of verbiage about control, instrumentality, agency, and corporate entity, is that liability is imposed to reach an equitable result." *Mesler v. Bragg Management Co., supra*, 39 Cal.3d 290, 301 [216 Cal. Rptr. 443, 702 P.2d 601] (internal quotations omitted).

41. At all relevant times, as alleged more fully herein, each Defendant acted as an agent,

servant, employee, alter-ego and/or joint venturer of the other Defendant, and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Each of the Defendant's acts alleged herein was done with the permission and consent of each of the other Defendant.

42.   At all times relevant hereto, Defendant Hibbett Retail was the alter ego of Defendant Hibbett and there exists, and at all times herein mentioned has existed, a unity of interest and ownership between Defendants such that any separateness between them has ceased to exist in that Defendant Hibbett completely controlled, dominated, managed, and/or operated the other Defendant to suit its convenience.

43.   Specifically, at all times relevant hereto, Plaintiff is informed and therefore avers Defendant Hibbett: (1) controlled the business and affairs of Defendant Hibbett Retail including any and all of its affiliates (the "Corporate Entities"); (2) disregarded legal formalities and failed to maintain arm's length relationships among itself, Defendant Hibbett Retail, and the Corporate Entities; (3) inadequately capitalized Defendant Hibbett Retail and/or the Corporate Entities; (4) used the same office or business location as Defendant Hibbett Retail and the Corporate Entities; (5) used Defendant Hibbett Retail and the Corporate Entities as a mere shells, instrumentalities or conduits for its business; (6) used Defendant Hibbett Retail and/or the Corporate Entities to procure labor, services or merchandise for its business; (7) manipulated the assets and liabilities between Defendant Hibbett Retail and/or the Corporate Entities so as to concentrate certain assets in some and certain liabilities in others; (8) used Defendant Hibbett Retail and the Corporate Entities to conceal its ownership, management, operation, financial interests, and/or business activities; (9) shared common corporate officers and directors with Defendant Hibbett Retail and the Corporate Entities; (10) comingled financial assets and funding between itself,

Defendant Hibbett Retail, and/or the Corporate Entities; and/or (11) used Defendant Hibbett Retail and the Corporate Entities to shield against liability, and in particular the liability as alleged in this Complaint.

44.   At all relevant times hereto, Defendants operated with integrated resources in pursuit of a single business purpose so that they can be deemed to be a single business enterprise.

45.   At all times relevant hereto, Defendant Hibbett Retail was not only influenced and governed by Defendant Hibbett but there was such a unity of interest, operation, and ownership that the individuality, or separateness, of Defendant Hibbett and Defendant Hibbett Retail ceased, and that the facts are such that an adherence to the fiction of the separate existence of these entities would, under the particular circumstances, allow for fraud or promote injustice.

46.   Through information and belief, Plaintiff avers, that at all relevant times mentioned herein, the acts of the business entities involved herein were performed by an employee(s), agent(s), officer(s), servant(s) and/or representative(s) of Defendant Hibbett and Defendant Hibbett Retail.

### Agency Liability

47.   Whenever in this complaint reference is made to any act or omission of a corporate defendant, enterprise, or other entity, such allegations shall be deemed to mean that the directors, officers, agents, employees, distributors, contractors, third-party vendors and/or representatives of said corporate defendant, enterprise, or other entity, did authorize, ratify, and/or command, expressly or impliedly, such act or omission while actively engaged in the management, operation, control, and/or representation of the affairs of said corporate defendant, enterprise or other entity, and while acting within the course and scope of their agency, contract, enterprise, employment, representation, and/or capacity.

48.  In their respective responsibilities, each Defendant is a person[21] responsible for (1) accepting, and does in fact accept, credit and debit cards for payment; (2) causing properly truncated receipts to be provided to consumers; and (3) complying with federal law and data-security standards, including FACTA.

49.  At all times material hereto, Plaintiff alleges that each respective Defendant is individually responsible for the occurrences alleged in this complaint, that each is the cause of the harm alleged herein, and each is individually liable for the FACTA violations alleged herein.

50.  To the extent that not every Defendant is individually responsible for the FACTA violations and the proximate cause of the alleged violations, Plaintiff asserts that, at all times material hereto, Defendants acted in concert, as an enterprise, as agents or subagents and intended to and did participate in the events, acts, omissions, practices, and courses of conduct alleged herein, and they were the proximate cause of the FACTA violations vis-à-vis Plaintiff and the putative members of the Class.

51.  To that end, at all times material hereto, Defendant Hibbett has directed, overseen, and has the authority to control Defendant Hibbett Retail in the execution of its respective duties on its behalf at retail locations throughout the country. Defendant Hibbett has the ultimate authority, the ultimate control over, and the ultimate responsibility for the subject retail locations throughout the Country, including the point-of-sale and the software systems that caused the statutory violations alleged herein.

52.  Defendant Hibbett has acknowledged, expressly or impliedly, that Defendant

---

[21] The term "person" means any natural person, corporation, partnership, limited liability company, firm, or association. Civ. Code, § 1798.3(f); *see also* 15 U.S.C. § 1681a(b).

Hibbett Retail will act on its behalf at the retail locations throughout the country, Defendant Hibbett Retail has agreed to do so, and Defendant Hibbett has authority over Defendant Hibbett Retail in performing its respective duties with respect to operation of the point-of-sale and software systems at issue and the printing of receipts.

53. Plaintiff alleges that the acts complained of, and otherwise respectively attributable to Defendant Hibbett were executed and performed by their agents or personnel who were acting within the scope and with actual or implied authority, agency, and/or control of Defendant Hibbett, making Defendant Hibbett liable for Defendant Hibbett Retail's conduct that resulted in the statutory violations at the retail locations throughout the country. It is also alleged that Defendant Hibbett and Defendant Hibbett Retail acted as a unitary enterprise with regard to the statutory violations alleged herein.

54. To the extent any Defendant claims it bears no responsibility for printing the point-of-sale receipts at issue or processing transactions at the subject retail locations throughout the country, it would stand as a party to whom sensitive cardholder account information was published without consent from the cardholder and was learned through the confidential transactions with Plaintiff and the putative members of the Class.

**Defendants' Prior Knowledge of FACTA**

55. Defendants collect and retain personally identifiable information that its customers provide to them when making purchases, including without limitation, names, addresses, phone numbers, driver license numbers, email addresses, personally identifiable

information stored on electronic devices, and credit and debit card information.[22]

56.    Plaintiff is informed and believes, and thereupon alleges Defendants had actual knowledge of FACTA's truncation requirement before they began failing to comply with said requirement *en masse*.

57.    There are numerous statutes that require Defendants to protect customer financial information when operating their retail locations, such as the Song-Beverly Credit Card Act of 1971, which like FACTA, prohibits businesses from printing transaction receipts that disclose credit and debit card expiration dates or any more than the last five digits of the card account number. *See* Cal. Civ. Code § 1747.09.

58.    Admittedly, in the 2022 Annual Report, Defendants state they are aware that they must comply with these various federal, state, and local regulations relating to consumer protection, data protection, and privacy. Defendants also explain they are aware that the unauthorized disclosure of sensitive or confidential information may present substantial liability to the company.[23]

59.    Defendants' knowledge and experience regarding federal, state, and local laws

---

[22] *See* 2022 Annual Report (Item 1A. Risk Factors, p. 18: "The protection of Company, customer and employee data is critical to us. Through our sales, …and use of third-party information, we collect and retain certain personally identifiable information that our customers provide to purchase products, …, or otherwise communicate and interact with us. This may include, but is not limited to, names, addresses, phone numbers, driver license numbers, email addresses, contact preferences, personally identifiable information stored on electronic devices, and payment account information, including credit and debit card information.").

[23] *See Id.* (Item 1A. Risk Factors, p. 17) ("We are subject to payment-related risks that could increase our operating costs, subject us to potential liability"…"state, federal, and foreign governments are increasingly enacting laws and regulations to protect consumers against identity theft and consumer privacy."); (Item 1A. Risk Factors, p. 18: "As a retailer accepting debit and credit cards for payment, we are subject to various industry data protection standards and protocols, such as payment network security operating guidelines and the Payment Card Industry Data Security Standard.").

that govern financial transactions, no doubt translates to Defendants having intimate knowledge of the requirements of FACTA.

60.     Defendants further acquired knowledge of FACTA when they received a retail trade publication from Retail Technologies Corporation which contained an entire section on FACTA in the very same issue in which Retail Technologies Corporation boasted of counting Defendants as its clients, who upon information and belief, received that and many other publications provided by that particular vendor.[24]

61.     Another retail trade publication, this time an issue of Alabama Retail Quarterly, spotlighted Mickey Newsome, the Chief Executive Officer of Hibbett Sports, Inc., in a section titled "Featured Member."[25]  The "Featured Member" write-up appeared in the same issue as a section discussing FACTA and the issue of identity theft.

62.     Defendants' knowledge about the requirement that it truncate credit and debit card digits on transaction receipts is also evidenced by the fact that in the years prior to the illegal conduct alleged herein, Defendants formerly truncated credit and debit card account numbers on transaction receipts in compliance with FACTA.

63.     Furthermore, Plaintiff is informed and believes, and thereupon alleges that Defendants' corporate officers have knowledge of FACTA's truncation requirement.

64.     For example, David M. Benck is a Senior Vice President and General Counsel for Defendants. His biography states that he is a Certified Information Privacy Professional

---

[24] Source: https://www.rtc-group.com/pdf/Newsletter11-WinterSpring2008.pdf (Last viewed: April 15, 2022).

[25] Source: https://alabamaretail.org/wp-content/uploads/Vol9No2.pdf (Last viewed: April 15, 2022).

through the International Association of Privacy Professionals ("IAPP").[26] As such, Mr. Benck would be privy to articles published by the IAPP, which include notifications about FACTA.[27] Further, in order for him to have obtained his IAPP certification, Mr. Benck would have taken multiple tests, several of which include questions and/or sections regarding FACTA compliance. Some of the materials used to prepare for these certification tests include information on FACTA.[28]

65.    Additionally, *The Privacy Advisor* is the official monthly newsletter of the IAPP. All active association members, including Mr. Benck, automatically receive a subscription to *The Privacy Advisor* as a membership benefit. Among the topics routinely addressed in the aforementioned newsletter are liabilities faced by retailers who ignore the mandates of FACTA.

66.    For example, from the May 2007 edition of *The Privacy Advisor*: "Companies should review promptly their policies related to credit card receipts, . . . They also should begin to review more aggressively the overall requirements of the FACTA law, including such broadly applicable provisions as the 'disposal rule' related to the disposal of consumer report information."[29]

67.    Also, from the October 2007 edition of *The Privacy Advisor*: "Given these

_____

[26] Source: https://investors.hibbett.com/websites/hibbett/English/4200/management-team.html (Last Viewed: April 15, 2022).
[27] Source: https://iapp.org/news/a/can-plaintiffs-lawyers-fill-the-role-of-a-dpa/ (Last Viewed: April 15, 2022).
[28] Source: *See, Glossary of Privacy Terms*, IAAP, https://iapp.org/resources/glossary/#factors-analysis-in-information-risk-fair-model (including discussion of FACTA and links to additional information and materials regarding FACTA); *U.S. Private-Sector Privacy Certification, Outline of the Body of Knowledge for the Certified Information Privacy Professional*, IAAP, Sept. 1, 2021, https://iapp.org/media/pdf/certification/CIPP_US_BoK_2.3.pdf (includes multiple sections on FACTA).
[29] Source: https://iapp.org/media/pdf/publications/May07_Advisor.pdf (Last viewed: April 15, 2022).

circumstances, privacy professionals at consumer-oriented business, whether online or offline, should investigate point-of-sale practices immediately and, if necessary, redact all but the last five digits of the credit or debit card number and the expiration date from all electronically printed customer receipts."[30]

68.     Defendants were not only clearly informed not to print more than the last five digits of credit or debit card account numbers on receipts provided to consumers at the point-of-sale, but were contractually prohibited from doing so.

69.     Defendants accept credit and debit cards from all major issuers, such as Visa, MasterCard, American Express and Discover Card. Each of these companies sets forth requirements that merchants such as (and including) Defendants must follow, including FACTA's redaction and truncation requirements found in the Receipt Provision. *See Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501, 1504 (9th Cir.1984) ("[one] who signs a written agreement generally is bound by its terms, even though he neither reads it nor considers the legal consequences of signing it.") (applying California law); Restatement 2d Contracts § 23, Comments b, e (1981); *see also McClure v. Cerati*, 86 Cal.App.2d 74, 84-85, 194 P.2d 46 (1948) (party signing a contract should be charged with knowledge of its contents).

70.     . According to figures released by the Federal Trade Commission in 2020, the reporting of the crime of identity theft has tripled in the last few years.[31] As such, companies operating in the retail sector should apply extra care in preserving customers' financial data and

---

[30] Source: https://iapp.org/media/pdf/publications/Oct07_Advisor.pdf (Last viewed: April 15, 2022).
[31] Source: https://www.aarp.org/money/scams-fraud/info-2021/ftc-fraud-report-identity-theft-pandemic.html (Last viewed: April 15, 2022).

preventing identity theft.

71.　　Plaintiff is informed and believes, and thereupon alleges, that it would take an individual less than thirty seconds to run a test receipt in order to determine whether Defendants' point-of-sale system that printed the FACTA violative receipts was in compliance with federal law.

72.　　Most of Defendants' business peers and competitors currently and diligently ensure their credit card and debit card receipt printing process remains in compliance with FACTA by consistently verifying their card machines and devices comply with the Receipt Provision. Defendants could very easily have done the same.

73.　　Given the numerous ways in which Defendants were informed about FACTA, their own acknowledgment of the risks and liability posed by laws protecting consumer privacy and combatting identity theft, their contractual prohibitions on printing more than the last five digits of credit and debit card account numbers, and their extensive involvement and knowledge in payment processing, Defendants were and are acutely aware of FACTA and the conduct it prohibits.

74.　　At a minimum, Defendants were acting with reckless disregard of the FACTA requirements and purpose when they printed the first six (6) along with the last four (4) digits of credit and debit card account numbers on the subject point-of-sale receipts.

**Plaintiff's Factual Allegations**

75.　　On or about January 24, 2022, Plaintiff used his personal credit card to make a purchase at a Hibbett Sports retail location in Fullerton, California.

76.　　After making his purchase, Plaintiff was presented with an electronically printed receipt at the point-of-sale, which disclosed the first six (6) and the last four (4) digits of his

credit card account number.

77.     As a direct and proximate result of the point-of-sale receipt disclosing a full ten (10) digits of his payment card account number, Plaintiff was required to take steps to safeguard the receipt.

78.     The printing of the first six (6) and last four (4) digits of his payment card account number invaded Plaintiff's privacy as it disclosed his personal financial information.

79.     The printing of the first six (6) and last four (4) digits of his payment card account numbers was also a breach of confidence and breach of an implied bailment.

**Defendants' Misdeeds**

80.     At all times relevant herein, Defendants were acting by and through their subsidiaries, agents, servants, representatives, and/or employees, each of which were acting within the course and scope of their agency or employment, and under the direct supervision and control of Defendants.

81.     At all times relevant herein, the conduct of Defendants, as well as that of its subsidiaries, agents, servants, representatives, and/or employees, was in willful, knowing, or reckless disregard for federal law and the rights of the Plaintiff and other members of the Class.

82.     Plaintiff is informed and believes, and thereupon alleges, Defendants implement, oversee, and maintain control over the same uniform debit and credit card payment processing policies, practices, and procedures for the transactions at issue in this case, including without limitation, negotiating, entering into, and acting pursuant to various contracts and agreements with the electronic payment processing company whose technology Defendants use to process all such transactions at its retail locations throughout the country.

83.     Upon information and belief, the point-of-sale system used by Defendants

maintains records of all payment transactions and has the ability to print duplicate copies of all payment receipts provided to customers.

84.     Notwithstanding its extensive knowledge of the requirements of FACTA and the well-documented dangers imposed upon consumers through its failure to comply, Defendants issued thousands of point-of-sale receipts containing the first six (6) and the last four (4) digits of credit and debit card account numbers.

85.     By ignoring the requirements of this important federal statute, in an environment already ripe for identity theft, Defendants uniformly invaded Plaintiff's and the other putative Class members' privacy. Defendants' conduct alleged herein resulted in the disclosure of Plaintiff's and the Class members' personal financial information to the world, including to persons who might find the receipts in the trash or elsewhere, identity thieves who thrive in environments such as Defendants' various locations, as well Defendants' employees who handled the receipts.

86.     Simply put, by printing numerous transaction receipts in wholesale violation of a well-known federal statute, Defendants have caused – to paraphrase the words of the Honorable Judge Posner (Ret.) – "an unjustifiably high risk of harm that [wa]s either known or so obvious that it should [have been] known" to Defendants. *Redman v. RadioShack Corp.*, 768 F.3d 622, 627 (7th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

## CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this class action on behalf of himself and all persons in the United States who, within the time frame relevant to this action, engaged in one or more transactions using a debit card or credit card at one or more of Defendants' retail locations in

the United States, and was thereupon provided an electronically printed receipt displaying the first six (6) and last four (4) digits of the credit or debit card account number used in connection with such transaction(s). Plaintiff is a member of this class. Excluded from the Class are the Judge to whom this case is assigned, any members of the Judge's immediate family, and counsel of record in this action.

88.     Plaintiff also brings this following sub-class on behalf of themselves and all persons in the United States who, within the time frame relevant to this action, engaged in one or more transactions using a debit card or credit card at one or more of Defendants' retail locations in the State of California and was thereupon provided an electronically printed receipt displaying the first six (6) and last four (4) digits of the credit or debit card account number used in connection with such transaction(s). Plaintiff is a member of this sub-class. Excluded from the sub-class are the Judge to whom this case is assigned, any members of the Judge's immediate family, and counsel of record in this action.

89.     Members of the Class are so numerous that joinder of all members would be impracticable.

90.     There are questions of law and fact common to all the members of the Class that predominate over any questions affecting only individual members.

91.     Plaintiff's claims are typical of the claims of other class members of the Class. Plaintiff has no interests antagonistic to those of the Class and Defendants have no defenses unique to Plaintiff.

92.     Plaintiff will fairly and adequately protect the interests of the Class, and have retained attorneys experienced in class and complex litigation.

93.     A class action is superior to all other available methods for this controversy

because: (1) the prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; (2) the prosecution of separate actions by the members of the Class would create a risk of inconsistent or varying adjudications with respect the individual members of the Class, which would establish incompatible standards of conduct for Defendants; (3) Defendants acted or refused to act on grounds generally applicable to the Class; and (4) questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

94.     Plaintiff does not anticipate any difficulty in the management of this litigation.

95.     The questions of law and fact to the class predominate over questions that may affect individual Class members, including the following:

a.     Whether, within the two (2) years prior to the filing of this Complaint, Defendants and/or their agents completed transactions by credit or debit card from any consumer and subsequently gave that consumer a printed receipt which displayed the first six (6) and last four (4) digits of the debit or credit card account number;

b.     Whether Defendants' conduct was knowing or reckless; and

c.     Whether Defendants are liable for damages, and the extent of statutory damages for each such violation.

## COUNT I – VIOLATIONS OF 15 U.S.C. § 1681(c)(g)

96.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

97.     15 U.S.C. §1681c(g) states as follows:

> *Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.*

98.     This section applies to any "device that electronically prints receipts" (hereinafter "Devices") at point of sale or transaction. 15 U.S.C. §1681c(g)(3).

99.     Defendants employ the use of said Devices for point-of-sale transactions at its retail locations in California and throughout the United States.

100.    On or before the date on which this complaint was filed, Defendants provided Plaintiff and members of the Class with receipts that failed to comply with the Receipt Provision.

101.    At all times relevant to this action, Defendants were aware, or should have been aware, of both the Receipt Provision as well as the requirement to comply with said provision.

102.    Notwithstanding the three-year period to comply with FACTA and its accompanying provisions, nor the subsequent years since FACTA became effective; and having knowledge of the Receipt Provision and FACTA as a whole; Defendants knowingly, willfully, intentionally, and/or recklessly violated, and likely continues to violate, the FCRA and the Receipt Provision.

103.    By printing the first six (6) and last four (4) digits of Plaintiff's card account number on their transaction receipts, Defendants caused Plaintiff to suffer a heightened risk of identity theft, exposed Plaintiff's personal financial information to those of Defendants' employees who handled the receipts and other third-parties, invaded Plaintiff's legally protected privacy interest, and forced Plaintiff to take action to prevent further disclosure of the private information displayed on the receipts.

104.    As a result of Defendants' willful violations of the FCRA, Plaintiff and members of the Class continue to be exposed to an elevated risk of identity theft.

105.    Defendants are liable to Plaintiff and members of the Class pursuant to 15 U.S.C. § 1681n for statutory damages, punitive damages, attorney's fees and costs.

*          *          *

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and favor of the Class against Defendants, jointly and severally, as follows:

a. Granting certification of the Class;

b. Appointing the undersigned as counsel for the Class;

b. Awarding statutory damages;

c. Awarding punitive damages;

e. Awarding attorneys' fees, litigation expenses and costs of suit; and

f. Awarding such further relief as the Court deems proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 29, 2022.

Respectfully submitted,

John R. Habashy (SBN 236708)
LEXICON LAW
633 W. 5th St., 28th Floor
Los Angeles, CA 90071
Telephone: (213) 223-5900

Scott D. Owens (FL 0597651)
(pending admission *pro hac vice*)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCOTT D. OWENS, P.A.
2750 N. 29th Avenue, Suite 209A
Hollywood, Florida 33020
Telephone: (954) 589-0588

Christopher W. Legg (FL 44460)
(pending admission *pro hac vice*)
Christopher W. Legg, P.A.
499 E. Palmetto Park Blvd. #228
Boca Raton, Florida 33432
Telephone: (954) 962-2333

Class Action Complaint | 29

# Exhibit 'A'



# HIBBETT INC

---

# FORM 10-K
### (Annual Report)

## Filed 03/25/22 for the Period Ending 01/29/22

| | |
|---|---|
| Address | 2700 MILAN COURT |
| | BIRMINGHAM, AL, 35211 |
| Telephone | 2059424292 |
| CIK | 0001017480 |
| Symbol | HIBB |
| SIC Code | 5940 - Retail-Miscellaneous Shopping Goods Stores |
| Industry | Apparel & Accessories Retailers |
| Sector | Consumer Cyclicals |
| Fiscal Year | 01/30 |

Powered By EDGAR Online

http://www.edgar-online.com

© Copyright 2022, EDGAR Online, a division of Donnelley Financial Solutions. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, a division of Donnelley Financial Solutions, Terms of Use.

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended: January 29, 2022

or ☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from: _____ to _____

**Commission file number: 000-20969**

# HIBBETT, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **█████9608** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**2700 Milan Court, Birmingham, Alabama 35211**
(Address of principal executive offices, including zip code)

**205-942-4292**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of Class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, $0.01 Par Value Per Share | HIBB | Nasdaq Global Select Market |

Securities registered pursuant to section 12(g) of the Act:    **NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes ☐    No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).
Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.  ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).

<div align="center">Yes  ☐        No  ☒</div>

The aggregate market value of the voting stock held by non-affiliates of the Registrant (assuming for purposes of this calculation that all executive officers and directors are "affiliates") was $1.3 billion on July 31, 2021, based on the closing sale price of $88.66 at July 30, 2021 for the common stock on such date on the Nasdaq Global Select Market.

The number of shares outstanding of the Registrant's common stock, as of March 22, 2022, was 13,139,364.

<div align="center">**DOCUMENTS INCORPORATED BY REFERENCE**</div>

Portions of the Registrant's Proxy Statement for the 2022 Annual Meeting of Stockholders are incorporated by reference into Part III of this Annual Report on Form 10-K.

**HIBBETT, INC.**

**INDEX**

| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business. | 6 |
| Item 1A. | Risk Factors. | 13 |
| Item 1B. | Unresolved Staff Comments. | 28 |
| Item 2. | Properties. | 28 |
| Item 3. | Legal Proceedings. | 28 |
| Item 4. | Mine Safety Disclosures. | 29 |
| | | |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities. | 29 |
| Item 6. | Reserved. | 30 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations. | 30 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk. | 40 |
| Item 8. | Financial Statements and Supplementary Data. | 41 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure. | 68 |
| Item 9A. | Controls and Procedures. | 69 |
| Item 9B. | Other Information. | 69 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 69 |
| | | |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance. | 69 |
| Item 11. | Executive Compensation. | 70 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters. | 70 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence. | 71 |
| Item 14. | Principal Accounting Fees and Services. | 71 |
| | | |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules. | 72 |
| Item 16. | Form 10-K Summary. | 74 |
| | Signatures | 75 |

*Index*

**Introductory Note**

References to "we," "our," "us," "Hibbett" and the "Company" used throughout this document refer to Hibbett, Inc. and its subsidiaries. Unless specifically indicated otherwise, any reference to the following years or fiscal years relates to:

| Year | Related Fiscal Year End | Weeks in Fiscal Period |
|---|---|---|
| 2024 or Fiscal 2024 | February 3, 2024 | 53 |
| 2023 or Fiscal 2023 | January 28, 2023 | 52 |
| 2022 or Fiscal 2022 | January 29, 2022 | 52 |
| 2021 or Fiscal 2021 | January 30, 2021 | 52 |
| 2020 or Fiscal 2020 | February 1, 2020 | 52 |

*Cautionary Statement Regarding Forward-Looking Statements*

This document contains "forward-looking statements" as that term is used in the Private Securities Litigation Reform Act of 1995. Forward-looking statements address future events, developments and results and do not relate strictly to historical facts. Any statements contained herein that are not statements of historical fact may be deemed to be forward-looking statements. They include statements preceded by, followed by or including words such as "believe," "anticipate," "expect," "intend," "plan," "forecast," "guidance," "outlook," "estimate," "will," "may," "could," "possible," "potential," or other similar words, phrases or expressions. For example, our forward-looking statements include statements regarding:

- the impact of the duration and scope of the COVID-19 pandemic on our business, operations, and financial results, including the adequate production, distribution, acceptance and efficacy of vaccines and effective medical treatments for COVID-19, variant strains of the virus, additional periods of increases or spikes in the number of COVID-19 cases in areas in which we operate, and the measures that might be imposed by federal, state, or local governments in response to the pandemic, including vaccine mandates and restrictions impacting school closures and remote learning requirements, sporting events, and local sports leagues and programs;
- the uncertainty of future stimulus payments and unemployment benefits, if any, and the related effects on consumer demand for our products and our overall business;
- the potential impact of new trade, tariff and tax regulations on our profitability;
- our ability to accurately forecast consumer demand for our products and manage our inventory in response to changing demands;
- our cash needs, including our ability to fund our future capital expenditures, working capital requirements, recurring quarterly dividends and repurchases of Company common stock under our stock repurchase program (the "Repurchase Program");
- our relationships with vendors and the loss of key vendor support;
- the possible effects of inflation, market decline and other economic changes on our costs and profitability;
- our ability to retain key personnel and other employees at Hibbett and City Gear due to current labor challenges or otherwise;
- our anticipated net sales, comparable store net sales changes, net sales growth, gross margins, expenses and earnings;
- our business strategy, omni-channel platform, logistics structure, target market presence and the expected impact of such factors on our net sales growth;
- our store growth, including our plans to add, expand, relocate or close stores, our markets' ability to support such growth, expected changes in total square footage, our ability to secure suitable locations for new stores and the suitability of our wholesale and logistics facility;
- our expectations regarding the growth of our online business and the role of technology in supporting such growth;
- the future reliability of, and cost associated with, disruptions in the global supply chain and the potential impacts on our domestic and international sources of product, including the actual and potential effect of tariffs on international goods imposed by the United States and other potential impediments to imports;
- our policy of leasing rather than owning stores and our ability to renew or replace store leases satisfactorily;
- the cost of regulatory compliance, including the costs and possible outcomes of pending legal actions and other contingencies and new or additional legal, legislative and regulatory requirements to reduce or mitigate the effects of climate change;
- our analysis of our risk factors and their possible effect on financial results;
- our seasonal sales patterns and assumptions concerning customer buying behavior;
- our ability to retain new customers;
- our expectations regarding competition;

- our estimates and assumptions as they relate to preferable tax and financial accounting methods, accruals, inventory valuations, long-lived assets, carrying amount and liquidity of financial instruments, fair value of options and other stock-based compensation, economic and useful lives of depreciable assets and leases, income tax liabilities, deferred taxes and uncertain tax positions;
- our expectations concerning future stock-based award types and the exercise of outstanding stock options;
- our assessment of the materiality and impact on our business of adopting recent accounting pronouncements issued by the Financial Accounting Standards Board;
- the possible effects of uncertainty within the capital markets, on the commercial credit environment and on levels of consumer confidence;
- our analyses of trends as related to marketing, sales and earnings performance;
- our ability to receive favorable brand name merchandise and pricing from key vendors;
- the impact of technology on our operations and business, including cyberattacks, cyber liability, or potential liability for breaches of our privacy or information security systems; and
- our ability to mitigate the risk of possible business interruptions, including, without limitation, from political or social unrest and armed conflicts.

A forward-looking statement is neither a prediction nor a guarantee of future results, events or circumstances. You should not place undue reliance on forward-looking statements. Our forward-looking statements are based on currently available operational, financial, and business information and speak only as of the date of this Annual Report on Form 10-K. Our business, financial condition, results of operations, and prospects may have changed since that date. For a discussion of the risks, uncertainties, and assumptions that could affect our future events, developments, or results, you should carefully review and consider the "Risk Factors" as well as "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this Annual Report on Form 10-K.

We cannot assure you that the results, events, and circumstances reflected in the forward-looking statements will be achieved or occur, and actual results, events or circumstances could differ materially from those described in the forward-looking statements. Moreover, new risks and uncertainties emerge from time to time and it is not possible for us to predict all risks and uncertainties that could have an impact on our forward-looking statements.

We do not undertake to publicly update or revise any forward-looking statements after the date of this Annual Report on Form 10-K, whether as a result of new information, future events, or otherwise, and you should not expect us to do so.

Investors should also be aware that while we do, from time to time, communicate with securities analysts and others, we do not, by policy, selectively disclose to them any material non-public information in connection with any statement or report issued by any analyst regardless of the content of the statement or report. We do not, by policy, confirm forecasts or projections issued by others. Thus, to the extent that reports issued by securities analysts contain any projections, forecasts or opinions, such reports are not our responsibility.

## PART 1

### Item 1.  Business.

#### Our Company

Hibbett, headquartered in Birmingham, Alabama, is a leading athletic-inspired fashion retailer with approximately 1,100 stores under the Hibbett and City Gear banners, primarily located in underserved communities. Founded in 1945, Hibbett has a rich history of convenient locations, personalized customer service and access to coveted footwear, apparel and equipment from top brands like Nike, Jordan and adidas.

#### Our Business Strategy

We target underserved markets with branded products and provide a high level of customer service. This market strategy establishes greater customer, vendor and landlord recognition as a leading specialty retailer in these communities. We believe our ability to align our merchandising mix to local preferences and trends differentiates us from our national competitors and delivers incremental sales opportunities for our vendor partners. We use information systems to maintain tight controls over inventory and operating costs and continually search for ways to improve efficiencies and the customer experience through information system upgrades.

#### Our Store Brands

We operated the following store brands as of January 29, 2022:

| | | Location | | |
|---|---|---|---|---|
| Brand | Average Square Footage | Strip Center[1] | Mall | Total |
| Hibbett | 5,800 | 720 | 180 | 900 |
| City Gear | 5,100 | 142 | 37 | 179 |
| Sports Additions[2] | 2,900 | 3 | 14 | 17 |

*(1) Strip centers include free-standing stores and, for our Hibbett locations, are usually near a major chain retailer.*
*(2) Approximately 90% of the merchandise carried in our Sports Additions stores is athletic footwear.*

In selecting retail locations, we consider the size, demographics, quality of real estate and competitive conditions in each market. Our stores offer a core merchandising mix of premium athletic branded footwear, apparel, accessories and team sports equipment designed to appeal to the GEN-Z customers within each market. We strive to meet the fashion and technical demands of our customers.

#### Our Growth Strategy

We identify markets for our stores under a clustered expansion program. This approach primarily focuses on opening new stores within close proximity of existing locations, allowing us to take advantage of efficiencies in logistics, marketing and regional management. It also aids us in building a better understanding of appropriate merchandise selection for the local market. In addition to proximity to existing stores, we also consider population, economic conditions, local competitive dynamics, availability of suitable real estate and potential for return on investment when evaluating potential markets.

*Omni-channel strategy:* We recognize that even though our core customer is in underserved markets, they are digitally savvy. Our customer has high expectations that are constantly evolving including the ability to engage with us in multiple ways. As a result, we continue to make investments in omni-channel as well as our core e-commerce experience.

Our goal is to provide a completely frictionless digital and omni-channel experience. In essence, this means customers can shop for what they want and can get those items quicker. To achieve this goal, we continue to invest in the user experience for our website and apps and add fulfillment capabilities and speed. In Fiscal 2023, we intend to invest in next generation omni-channel capabilities that will take us beyond traditional retail programs, which will allow us to offer greater shopping flexibility and convenience than ever before.

## Our Logistics

We maintain a full-line wholesale and logistics facility in Alabaster, Alabama (a suburb of Birmingham) where we receive and ship most of our merchandise. In addition, we utilize a third-party logistics facility in Memphis, Tennessee to increase efficiencies and to improve time to market. For key products, we maintain backstock at the Alabaster and Memphis facilities. This product is allocated and shipped to stores through an automatic replenishment system based on inventory levels and sales. Merchandise is delivered to stores, and transferred between stores, via small package carriers, Company operated vehicles or third-party logistics providers (which also deliver initial new store inventories). In Fiscal 2021, we increased our delivery frequency to every store in the chain and improved our store-to-store transfer capabilities to further enhance our speed-to-market and in-store product availability for our customers. We believe strong logistics support for our stores is a critical element of our business strategy and that our current logistics structure will support our growth over the next several years.

## Our Merchandise

Our merchandising strategy emphasizes a TOE-TO-HEAD™ approach. We provide a broad assortment of premium brand name footwear, apparel, accessories and team sports equipment at competitive prices in a full service omni-channel environment. We believe that the assortment of brand name merchandise we offer consistently exceeds the merchandise selection carried by most of our competitors, particularly in our underserved markets and neighborhood centers. Many of these brand name products have limited availability and/or are technical in nature requiring considerable sales assistance. We coordinate with our vendors to educate the sales staff at the store level on new products and trends.

Although the core merchandise assortment tends to be similar for each store, it is somewhat differentiated by the Hibbett or City Gear brands. Each brand utilizes important demographic, local and/or regional considerations. Accordingly, we offer products that reflect preferences for particular demographics as well as interests from each community. Our knowledge of these interests, combined with access to leading brands, enables our merchandising staff to react quickly to emerging trends or fashion shifts or athletic events.

Our merchandising staff, operations staff and management analyze current trends primarily through the lens of our store typing strategy. Information is largely gathered and analyzed utilizing business intelligence tools. Other strategic measures we utilize to recognize trends or changes in our industry include:

- maintaining close relationships with vendors and other retailers;
- studying other retailers for best practices in merchandising;
- attending various trade shows, both in our industry and outside as well as reviewing industry trade publications; and
- actively participating in industry associations.

The merchandising staff works closely with store personnel to meet the requirements of individual stores for appropriate merchandise in sufficient quantities.

## Our Vendor Relationships

The athletic specialty and city specialty retail businesses are brand-name-driven. Accordingly, we maintain positive relationships with a number of well-known vendors to satisfy customer demand. We believe that we offer a best-in-class omni-channel experience through physical locations, mobile apps and website and that we are among the primary retail distribution avenues for brand name vendors that seek to engage with consumers in underserved markets. As a result, we are able to attract considerable vendor interest and establish long-term partnerships with vendors. As our vendors expand their product lines and grow in popularity, we expand sales of these products. In addition, as we continue to increase our store base and enter new markets, our vendors increase their brand presence within these regions. We also work with our vendors to establish favorable pricing and to receive cooperative marketing funds.

*Index*

**Our Information Systems**

We use technology as an enabler of our business strategies. We implement and maintain systems targeted at improving financial control, cost management, inventory control, merchandise planning, logistics, replenishment and product allocation. Our systems are designed to be flexible to meet the unique needs of each specific store location. We continue to evolve our digital channel experience and to develop further channel integration for a more seamless and frictionless set of capabilities aimed at enhancing our customer's shopping experience in-store, online and through our mobile solutions.

Our communications networks send and receive critical business data to and from stores, third-party cloud providers and managed hosting facilities (data centers). Our Company's information is processed in a secure environment to protect both the actual data and the physical assets. We attempt to mitigate the risk of cyber-security threats and business interruptions by maintaining strong security protocols, threat monitoring, regular risk reviews and a detailed disaster recovery plan. In early Fiscal 2021, we consolidated the City Gear data center into our St. Louis hosted facility, which accomplished the alignment of controls over data. We completed the integration of all core systems during Fiscal 2021.

We strive to maintain highly qualified and motivated third-party partners and teams of individuals to support our information systems, which includes security, help desk, network, platform engineering, operations, quality assurance, compliance, business analysis, solution development, analytics and project management. Our systems are monitored 24 hours a day, and management believes that our current systems and practice of implementing regular updates will continue to support current needs and future growth. We use a strategic information systems planning process that involves senior management and is integrated into our overall business planning and enterprise risk management. Information systems projects are prioritized based upon strategic, financial, regulatory and other business criteria.

**Our Marketing and Promotion**

We focus on marketing opportunities that drive traffic and sales to our stores and digital business. For the last few years, digital marketing has been the major growth area for our marketing investments. We continue to see opportunities in personalization as well as hyper-local marketing efforts, including events and local store social media accounts. We have also maintained more traditional elements of our portfolio to drive store traffic.

Our Rewards program represented a significant portion of overall sales in Fiscal 2022. Loyalty sales increased in Fiscal 2022, driven by the relaunch of our existing loyalty program and expansion of the program into our City Gear stores. In Fiscal 2023, we intend to continue to improve our Rewards program to drive member acquisition and retention.

**Our Competition**

The business in which we are engaged is highly competitive. The marketplace for athletic specialty merchandise is highly fragmented as many different brick and mortar and online retailers compete for market share by utilizing a variety of formats and merchandising strategies. We compete with specialty shoe stores, department stores, traditional shoe stores, mass merchandisers, e-commerce retailers and, in some of our large and mid-size markets, national sporting goods superstores. In addition, we face competition from vendors that sell directly to consumers.

Although we face competition from a variety of competitors, we believe that our stores are able to compete effectively by providing a premium assortment of footwear, apparel, accessories and team sports equipment. Additionally, we differentiate our store experience through extensive product knowledge, customer service and convenient locations. We believe we compete favorably with respect to these factors in the underserved markets and neighborhood centers predominantly in the South, Southwest, Mid-Atlantic and Midwest regions of the United States.

**Information about our Executive Officers**

The following table and accompanying narrative sets forth the name, age and business experience of our current executive officers:

| Name | Age | Position |
|---|---|---|
| Michael E. Longo | 60 | President and Chief Executive Officer |
| Jared S. Briskin | 49 | Executive Vice President, Merchandising |
| Robert J. Volke | 58 | Senior Vice President and Chief Financial Officer |
| David M. Benck | 54 | Senior Vice President, General Counsel |
| Ronald P. Blahnik | 63 | Senior Vice President, Chief Information Officer |
| Benjamin A. Knighten | 51 | Senior Vice President, Store Operations |
| Michael C. McAbee | 51 | Senior Vice President, Supply Chain and Store Development |
| William G. Quinn | 46 | Senior Vice President, Marketing and Digital |
| Jonalin S. Smith | 48 | Senior Vice President, Merchandising |

***Michael E. Longo*** joined the Company as our Chief Executive Officer and President in December 2019. Formerly, he served as Chief Executive Officer for City Gear, LLC from October 2006 to November 2018, where he oversaw the successful acquisition of the company in 2018 by Hibbett Sporting Goods, Inc. (n/k/a Hibbett Retail, Inc.). Prior to City Gear, he worked in positions of increasing responsibility and leadership with AutoZone, Inc. starting as a Vice President of Supply Chain in 1996 to Executive Vice President of Supply Chain, IT, Development, Mexico in 2005. Mr. Longo holds a Bachelor of Science degree in Engineering from the United States Military Academy and an MBA from Harvard University.

***Jared S. Briskin*** was appointed our Executive Vice President of Merchandising in September 2021. Previously, he served as Senior Vice President and Chief Merchant from September 2014 through September 2021. He has served in roles of increasing responsibility and leadership in various merchandising positions across multiple categories since joining the Company in April 1998, including Vice President/Divisional Merchandise Manager of Footwear and Equipment from March 2010 through September 2014 and Vice President/Divisional Merchandise Manager of Apparel and Equipment from June 2004 through March 2010.

***Robert J. Volke*** was appointed to serve as our Senior Vice President of Accounting and Finance in April 2020, and was named our Chief Financial Officer shortly thereafter. Mr. Volke most recently served as Interim Chief Financial Officer of Fleet Farm LLC (Fleet Farm), a position he held since March 2020, and as its Vice President, Accounting and Corporate Controller from August 2018 to February 2020. Prior to his service at Fleet Farm, Mr. Volke held various positions of increasing responsibility with Tractor Supply Company (Nasdaq: TSCO), including as its Vice President and Controller from March 2017 to August 2018, Vice President – Accounting and Reporting from February 2014 to February 2017, Director of General Accounting and Financial Reporting from February 2009 to January 2014, and Manager of General Accounting and Financial Reporting from May 2007 to February 2009. Mr. Volke earned his Bachelor of Science degree in Accounting from Indiana University.

***David M. Benck*** was appointed Senior Vice President and General Counsel in March 2020. He also serves as our Chief Privacy Officer, Chair of the Enterprise Risk Committee, Assistant Secretary and Chief Risk Assessor. Mr. Benck joined the Company in March 2005, and in April 2008 was appointed Vice President and General Counsel. In addition to his role with the Company, Mr. Benck serves on the Board of Directors for the Federal Reserve Bank of Atlanta, Birmingham Branch appointee, as a Council Member for the American Arbitration Association, as a member of the Court of Arbitration for Sport (Lausanne, Switzerland) and as a member of the NCAA's Independent Resolution Panel. Additionally, he is a Fellow in the National Association of Corporate Directors and an IAPP Certified Information Privacy Professional (CIPP/US and CIPM).

***Ronald P. Blahnik*** was appointed to serve as our Senior Vice President and Chief Information Officer in April 2019. Mr. Blahnik joined the Company in November 2016 as our Vice President and Chief Information Officer. Before joining our Company, he served as managing partner of Blahnik Consulting Services, LLC from April 2011 to November 2016. Mr. Blahnik is a retired

Army officer and has worked in the information technology field for more than 40 years. He holds a Bachelor of Science degree in Information Technology.

*Benjamin A. Knighten* was appointed to serve as our Senior Vice President of Operations in March 2020. Mr. Knighten previously served as Chief Operating Officer of City Gear, LLC from July 2018 to March 2020 and as Vice President of Store Operations of City Gear from November 2006 to July 2018.

*Michael C. McAbee* was appointed to serve as our Senior Vice President, Supply Chain and Store Development in March 2022. Mr. McAbee joined our Company in September 2002 as a Merchant/Planner and during his tenure has held various positions of increasing responsibility and leadership including Vice President, Merchandise Planning and Replenishment from April 2008 to June 2012, Vice President, Merchandise Planning and Corporate Strategy from July 2012 to September 2014, Vice President, Merchandise Planning, Inventory Management and Corporate Strategy from October 2014 to April 2019, Vice President, Merchandise Operations and Planning from May 2019 to March 2020, Vice President, Store Development and Merchandise Operations from April 2020 to April 2021, and most recently, Vice President, Supply Chain and Store Development from May 2021 to March 2022. Mr. McAbee earned in Bachelor of Arts degree in History from the University of Alabama.

*William G. Quinn* was appointed to serve as our Senior Vice President of Marketing and Digital in April 2019. Mr. Quinn joined the Company in February 2016 as our Vice President of Digital Commerce. Prior to joining the Company, he served as Vice President, Digital for David's Bridal and as Executive Vice President, Chief Marketing Officer for 24 Hour Fitness. Mr. Quinn earned his Bachelor of Arts degree at Vanderbilt University, his MBA at Duke University and also holds a Certificate of Web Design from Temple University.

*Jonalin S. Smith* was appointed to serve as our Senior Vice President, Merchandising in March 2022. Ms. Smith joined the Company in October 2020 as our Vice President, General Merchandising Manager. Prior to joining the Company, she spent almost 28 years at Nike, Inc. where she held a variety of positions with increasing levels of responsibility and leadership, serving most recently as their Vice President of North American Sales for Converse. In addition, she was General Manager and Global Vice President of Nike's Skateboarding Category. Her tenure at Nike included service throughout North America, as well as Europe, the Middle East and Africa. Ms. Smith earned her Bachelor of Science Degree at Atlanta Christian College in Atlanta, Georgia.

**Human Capital**

*Human Capital Management*

At Hibbett, our key human capital management objectives are to attract, retain and develop the highest quality talent. Our inclusive culture inspires leadership, encourages innovative thinking and supports advancement opportunities for all team members. Our human resources programs are central to our long-term strategy and are designed to develop talent in preparation for critical roles and leadership positions for the future; reward and support team members through competitive pay and benefits; enhance the Company's culture through efforts aimed at making the workplace more engaging and inclusive; acquire talent and facilitate internal talent mobility to create a high-performing, diverse workforce; engage team members as brand ambassadors of the Company's products and experiences; and evolve and invest in technology, tools and resources to enable team members at work.

As of January 29, 2022, we employed approximately 11,000 team members, of which approximately 3,600 were full-time team members and over 92% of the total population work in our retail locations. None of our team members are represented by a labor union. The number of full-time and part-time team members fluctuates depending on seasonal needs. We have a long history of providing competitive compensation and benefits and providing meaningful experiences and career-development opportunities to our team members. As a result, we have not experienced significant interruptions in our operations due to labor disagreements or team member dissatisfaction.

*COVID-19*

We are committed to the health and safety of our team members and their families. In response to the COVID-19 pandemic, we supported our team members by expanding remote work; broadening benefit offerings such as increasing paid-time-off for our retail team members and providing health care premium forgiveness. Our Chief Executive Officer has provided updates to our team members, including field leadership, every month since the onset of the COVID-19 pandemic and we offer Associate Assistance Program counseling sessions to assist with team member needs.

*Our Diversity and Inclusion Statement:*

Diversity, inclusion and belonging are at the heart of who we are as a Company. We've cultivated an authentic representation of our communities through thoughtful local hiring, often from our customer base. Our teams' unique backgrounds, perspectives and skills improve us all, creating a competitive advantage that positively impacts our business and contributes to our success. We intentionally foster a culture of belonging and inspiring self-expression in our team members and our customers.

We are committed to doing our part to improve our inclusion and increase our diversity. We are driving important change through specific actions, including continuing our relationship with the Office of Diversity, Equity and Inclusion at the University of Alabama at Birmingham to provide diversity and inclusion education sessions. In addition, we have fostered a culture where team members are encouraged and empowered to be leaders through our Leadership Academy professional development program and we recently formed our first employee resource group focused on supporting and engaging women in our workforce.

*Talent Acquisition/Talent Development/Team Member Engagement*

Investing in our team members is one of our core strategies. We aim to provide best-in-class training and development opportunities, while creating innovative programs that enable a vibrant and engaged learning culture to flourish. In addition to our Leadership Academy, we utilize LinkedIn Learning as our e-learning platform, and we introduced a professional development series consisting of various monthly educational sessions for leadership positions at our Store Support Center. We also support and encourage continued education with a competitive tuition reimbursement program for our team members.

We recognize that maintaining an inclusive and high-performance culture requires an engaged workforce, where team members are motivated to do their best work every day. Our engagement approach centers on communication and recognition. We communicate with our team members in a variety of ways, including monthly live CEO updates that include Q&A sessions with team members and regular communications to all our retail locations. We conduct periodic team member engagement surveys at our Store Support Center to understand and respond to team member needs. In February 2022, we expanded our annual survey company-wide to provide all team members a channel for feedback on a variety of topics, including company direction and strategy, individual growth and development, diversity, health and well-being and meaningful work.

We continuously strive to be an employer of choice. In 2021, Forbes recognized Hibbett as one of "America's Best Employers", "Best Employers for Diversity," "Best Employers for Women," "America's Best Employers for New Grads" and "America's Best Employers by State."

*Community and Social Impact - Building Connections*

We believe that building connections between our team members, their families and our communities creates a more meaningful, fulfilling, and enjoyable workplace. We are committed to providing comfort to those in need through our ongoing relationship with the United Way of Central Alabama. Team members make contributions to this organization that supports 71 partner agencies, and we match 100% of all team member contributions. We support a number of organizations through financial and in-kind giving, including the Leukemia and Lymphoma Society, Children's Hospital of Alabama, Alabama Sheriff's Youth Ranch, UAB O'Neal Comprehensive Cancer Center and the Jefferson County, Alabama Board of Education. Our retail store team members engage with local community partners across our vast store footprint by hosting events such as free haircuts for back to school and holiday food drives.

SOLE SCHOOL® is the main focus for community engagement in our local retail districts. In Fiscal 2022, we partnered with over 85 schools, one school from each Hibbett and City Gear sales districts, to participate in the program. Highlights of SOLE SCHOOL® include product donations, engagement programs, career coaching, academic incentives and monetary donations. Our retail team members lead focus groups where student athletes are encouraged to excel in school and are introduced to various career paths that may be available to them after high school and college. Additionally, the student athletes get a first look at some of the newest product releases and selections and can provide feedback, potentially influencing future product selection.

At our Store Support Center, we continue our partnership with Holy Family Cristo Rey High School, an organization that supports inner-city education for students from families of limited economic means. Students participated in a Corporate Work-Study Program to gain real-world work experience at our corporate headquarters. We also support our local disabled community through our partnership with United Ability of Alabama and its Job Exploration Training Services ("JETS") program. Through the JETS program, we enabled 10 high school students with varying abilities to receive on-the-job training, mentoring and work experience at our Wholesale and Logistics Facility.

**Environmental Sustainability**

*Index*

We have recently partnered with a third party to develop a science-based methodology of measuring, monitoring and reporting on sustainability. Our current focus is on reduction of waste and sustainable product offerings. We also understand the importance of reducing our energy consumption and aim to monitor and report on our efforts in the future.

Our LED Lighting Initiative, which we adopted in 2016, reduces store energy use by about 30%, and the majority of our stores are either fully or partially supplied with LED lights. Other energy efficient initiatives such as upgrades of our older HVAC units have further reduced our energy use.

Additionally, we aim to divert waste from landfills by increasing our existing recycling programs. In order to reduce waste, we recycle corrugated boxes and strive to reuse cartons and pallets in our logistics facility. Our recycling efforts are further complemented by our shopping bags, which contain 15% of recycled materials.

Finally, we continue to collaborate with certain vendors to increase sustainable product offerings. We support Nike's Move to Zero®, a closed-loop process that uses manufacturing scrap, unsellable products, and worn-out shoes to make new products, by significant marketing and social media effort and in-store displays. We also offer other sustainable products from a number of other vendors, and we expect to increase sustainable product offerings in the future.

**Environmental, Sustainability & Governance Report**

Additional information about how we invest in our team members, our communities and our environment can be found in our most recent Environmental, Sustainability & Governance Report ("ESG Report"), which is available on our website, www.hibbett.com, under "Investor Relations." Nothing on our website, including our ESG Report, documents or sections thereof, shall be deemed incorporated by reference into this Annual Report on Form 10-K or incorporated by reference into any of our other filings with the U.S. Securities and Exchange Commission (the "SEC").

**Our Trademarks**

Our Company, by and through subsidiaries, is the owner or licensee of trademarks that are very important to our business. Generally, trademarks are valid as long as they are in use and/or their registrations are properly maintained. Registrations of trademarks can generally be renewed indefinitely as long as the trademarks are in use.

Following is a list of active trademarks registered and owned by the Company:

- HIBBETT SPORTS, Registration No. 2717584
- SPORTS ADDITIONS, Registration No. 1767761
- HIBBETT, Registration No. 3275037
- SOLE SCHOOL, Registration No. 6549068
- City G.E.A.R, Registration No. 4398655
- City G.E.A.R., Registration No. 4413864
- CITY GEAR, Registration No. 4675462
- City GEAR, Registration No. 5008316
- DEVEROES, Registration No. 3479737
- GRINDHOUSE, Registration No. 5107399
- GRINDHOUSE DENIM, Registration No. 5107398

**Governmental Regulations**

We must comply with various federal, state and local regulations, including regulations relating to consumer products and consumer protection, advertising and marketing, labor and employment, data protection and privacy, intellectual property, the environment and tax. In addition, we must comply with United States customs laws and similar laws of other countries associated with the import and export of merchandise. Ensuring our compliance with these various laws and regulations, and keeping abreast of changes to the legal and regulatory landscape present in our industry, requires us to expend considerable resources. For additional information, see "Risk Factors" under the sub-captions "Risks Related to Our Business and Industry" and "Risks Related to Governance, Regulatory, Legislative and Legal Matters."

**Seasonality**

We have historically experienced seasonal fluctuations. We typically experience higher net sales in early spring due to spring sports and annual tax refunds, late summer due to back-to-school shopping and winter due to holiday shopping. In addition, our quarterly results of operations may fluctuate significantly as a result of a variety of factors, including the timing of new store openings, the amount and timing of net sales contributed by new stores, weather fluctuations, merchandise mix, demand for merchandise driven by local interest in sporting events and the timing of sales tax holidays and annual tax refunds.

**Available Information**

Our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the Exchange Act), are available free of charge through our website www.hibbett.com, as soon as reasonably practicable after such material is electronically filed with, or furnished to, the SEC. Our website is the primary source of publicly disclosed news about Hibbett, Inc. In addition to accessing copies of our reports online, you may request a copy of our Annual Report on Form 10-K for the fiscal year ended January 29, 2022, at no charge, by writing to: Investor Relations, Hibbett, Inc., 2700 Milan Court, Birmingham, Alabama 35211.

In addition, we make available, through our website, the Company's Code of Business Conduct and Ethics, Corporate Governance Guidelines and the written charters of the Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee. Information contained on our website is not included as part of, or incorporated by reference into, this Annual Report on Form 10-K.

**Item 1A. Risk Factors.**

You should carefully consider the following risks, as well as the other information contained in this Annual Report on Form 10-K. The occurrence of one or more of the circumstances or events described in this section could have a material adverse effect on our business, financial condition, results of operations, cash flows or on the trading prices of our common stock. The risks and uncertainties described in this Annual Report on Form 10-K are not the only ones we face. Additional risks and uncertainties not known to us at this time or that we currently believe are immaterial also may adversely affect our business and operations.

*Risks Related to Our Business and Industry*

*The continuing impacts of the COVID-19 pandemic are highly unpredictable, volatile, and uncertain, and have materially affected, and could continue to materially affect, our business operations, demand for our products and services, our costs of doing business, availability and cost of labor, access to inventory, supply chain operations, our ability to predict future performance, our exposure to litigation, and our financial performance, among other things.*

The COVID-19 pandemic has created significant public health concerns as well as economic disruption, uncertainty, and volatility, all of which have impacted and may continue to impact our business, results of operations, liquidity, cash flow and financial condition. While we have taken numerous steps to mitigate any adverse impacts of the COVID-19 pandemic on our results of operations, there can be no assurance that these efforts will be successful.

Due to numerous uncertainties and factors beyond our control, we are unable to predict the impact that the COVID-19 pandemic will have going forward on our business, results of operations, liquidity, cash flows and financial condition. These factors and uncertainties include, but are not limited to:

- the severity and duration of the pandemic, including the severity and duration of any additional periods of increases or spikes in the number of COVID-19 cases in future periods in the communities or states we operate;
- the rapidly changing and fluid circumstances caused by the pandemic and our ability to respond quickly enough or appropriately to those circumstances;
- the duration and degree of governmental, business or other actions in response to the pandemic, including but not limited to quarantine, shelter-in-place, or social distancing measures; vaccine mandates; restrictions on our operations up to and including complete or partial closure of our stores and logistics and distribution facilities; economic measures; access to unemployment compensation; fiscal policy changes; or additional measures that may yet be effected;
- the adequate production, distribution, acceptance and efficacy of vaccines and effective medical treatments for COVID-19;
- the effect of the pandemic on our team members and our ability to maintain staffing needs to effectively operate our business;
- our ability to enter into rent deferral or abatement arrangements or other lease modifications, including lease term extensions, with our landlords;
- our ability to attract customers to our stores, given the risks, or perceived risks, of gathering in public places;

- the impact on demand for school-related products or athletic gear caused by the periodic cancellation or delay of in-person school instruction and activities;
- any disproportionate impact experienced by our target customer demographic;
- unknown consequences on our business performance and strategic initiatives stemming from the substantial investment of time and other resources to the pandemic response, including potential delays in or adjustments to our strategic investments;
- the incremental costs and long-term impact of doing business during and after the pandemic;
- volatility in the credit and financial markets during and after the pandemic; and
- the potential effects on our internal control environment as a result of remote work environments.

The above factors and uncertainties, or others of which we are not currently aware, may result in additional adverse impacts to our business, results of operations, cash flows, and financial condition. In addition to the factors above, the COVID-19 pandemic has subjected our business to a number of risks, including, but not limited to those discussed below:

*Team Member and Customer Safety-Related Risks.* In response to the COVID-19 pandemic, we have taken a number of actions across our business to help protect our team members, customers and others in the communities we serve. These measures have included, among other things, adjusted store hours; remote working opportunities for our Store Support Center; increased cleaning and sanitizing measures; limits on customer traffic in stores to maintain physical and social distancing protocols; other physical and social distancing efforts such as markings on floors, signage, plexiglass shields and providing masks to team members in our stores, Store Support Center and logistics facility; offering curbside pick-up from stores; and instituting contactless payment in all stores.

We have also taken other steps to support our team members, including expanding our paid time off policy to help alleviate some of the challenges our team members are facing as a result of COVID-19 and expanding health care benefits. The actions that we have taken in response to the pandemic have resulted in incremental costs, and we expect that we will continue to incur additional costs due to the pandemic going forward.

The health and safety of our team members and customers are of primary concern to our management team. However, due to the unpredictable nature of the ongoing COVID-19 pandemic and the consequences of our actions, we may see unexpected outcomes from our added safety measures. Furthermore, any failure to appropriately respond, or the perception of an inadequate response, could cause reputational harm to our brand and/or subject us to claims and litigation from team members, customers, suppliers, regulators or other third parties. Additionally, any outbreak of confirmed cases of COVID-19 in our stores, Store Support Center or logistics facility could result in temporary or sustained workforce shortages or facility closures, which would negatively impact our business and results of operations.

Additionally, some jurisdictions have taken measures intended to expand the availability of workers compensation or to change the presumptions applicable to workers compensation measures. These actions may increase our exposure to workers compensation claims and increase our cost of insurance.

*Information Technology-Related Risks.* As a result of the pandemic and due to pent-up demand, market disruption and government stimulus during calendar 2021, we experienced increased demand for online purchases of products. While we managed this increased volume without interruption, there are no assurances that we will continue to be able to do so. We also rapidly modified certain technology to support our interconnected offerings in connection with the pandemic, such as the addition of curbside pick-up. Our systems are not fully redundant, and disruptions, improper access or disclosures, failures or other performance or security issues with our customer-facing technology systems, either due to the increased volume or other factors, could impair the benefits they provide, adversely impact our sales, and negatively affect our relationship with our customers. In addition, as more business activities have shifted online due to COVID-19 restrictions, and as many of our store support team members are working remotely, we face an increased risk from potential failure of internal or external information technology infrastructure and from potential security risks from team members using their own mobile devices and computing devices outside our network, as well as increased cybersecurity threats and attempts to breach our security networks.

*Supply Chain-Related Risks.* Circumstances related to the COVID-19 pandemic have significantly impacted the global supply chain with restrictions and limitations on business activities causing disruption and delay. These disruptions and delays are placing strains on the domestic and international supply chain, which has affected and could continue to negatively affect the flow or availability of certain products. Customer demand for certain products has also fluctuated as the pandemic has progressed and customer behaviors have changed, which has challenged our ability to anticipate and/or adjust inventory levels to meet that demand. Additionally, supply chain challenges due to the COVID-19 pandemic have made it more difficult to obtain certain in-demand products. These factors have challenged our management of inventory positions as well as some delays in delivering

products to our logistics and distribution facilities, stores or customers. Increased demand for online purchases of products has impacted our fulfillment operations and, if it continues, could result in delays in delivering products to customers. The operation of our logistics and distribution facilities and stores as fulfillment centers is crucial to our business operations.

If our logistics and distribution facilities or a significant number of stores experience closures or labor shortages, whether temporary or sustained, we could face adverse impacts related to the flow or availability of products to our stores and customers. Any of these circumstances could impair our ability to meet customer demand for products and result in lost sales, increased supply chain costs, or damage to our reputation.

*Financial and Liquidity Risks.* In an effort to strengthen our liquidity position while navigating the ongoing COVID-19 pandemic, we took proactive steps during the second quarter of Fiscal 2022, including replacing our Second Amended and Restated Note with Regions Bank with a new Credit Agreement with Regions Bank (the "2021 Credit Facility") that provides an unsecured line of credit up to $100 million and is effective through July 9, 2026. We also continued working with merchandise and non-merchandise vendors ramping up inventory allocation systems and distribution infrastructure to support increased online demand and managing the flow of goods in collaboration with our vendor partners.

Additionally, changes in our capital allocation strategy could have adverse impacts, both short- and long-term, on our results of operations and financial position. If we choose not to acquire shares under our Repurchase Program, our earnings per share and return on invested capital may be impacted, which in turn could adversely impact our stock price.

We believe that the COVID-19 pandemic has, at times, led to increased revenue growth relative to historic trends, and has particularly accelerated our e-commerce growth. These results, as well as those of other metrics such as net sales and other financial and operating data, may not be indicative of results for future periods. Once the impact of the COVID-19 pandemic subsides, a failure by us to continue capitalizing on growth opportunities may cause our revenue or revenue growth to decline. Further, there can be no assurances that this increase in demand will be sustained through the remainder of the COVID-19 pandemic or in subsequent periods. In addition, dependence on our e-commerce business subjects us to certain other risks, including: the failure to successfully implement new systems, system enhancements and internet platforms; the failure of our technology infrastructure or the computer systems that operate our website, causing, among other things, website downtimes; telecommunications issues or other technical failures; over-reliance on third-parties; and an increase in credit card fraud.

To the extent the COVID-19 pandemic continues to adversely affect the U.S. and global economies and/or adversely affect our business, results of operations, cash flows, or financial condition, it may also have the effect of heightening other risks described in this "Risk Factors" section in this Annual Report on Form 10-K, including but not limited to those related to consumer behavior and expectations, competition, brand reputation, implementation of strategic initiatives, cybersecurity threats, technology systems disruption, supply chain disruptions, inflation, labor availability and cost, litigation, and regulatory requirements.

***Disruptions in the economy and in financial markets could adversely affect consumer purchases of discretionary items, which could reduce our net sales.***

In general, our sales represent discretionary spending by our customers. Discretionary spending is affected by many factors that are outside our control, including, among others, general business conditions, interest rates, prices of non-discretionary consumer goods, inflation, household income, consumer debt levels, the availability of consumer credit, tax rates and tax refunds, sales tax holidays, energy prices, geopolitical conflicts, widespread health emergencies, such as the ongoing COVID-19 pandemic, unemployment and underemployment trends, and consumer confidence and spending. Disruptions in the U.S. economy, financial markets or other economic conditions affecting disposable consumer income may reduce the level of consumer spending and inhibit consumers' use of credit, which may adversely affect our revenues, profits, liquidity and capital resources. In recessionary periods or periods of slow growth, we may have to increase the number of promotional sales or otherwise dispose of inventory for which we have previously paid to manufacture or committed to purchase and/or increase our marketing and promotional expenses in response to lower than anticipated levels of demand for our products, which could adversely affect our profitability. Additionally, a reduction in customer traffic to our stores or a shift in customer spending to products other than those sold by us or to products sold by us that are less profitable could result in lower net sales, decreases in inventory turnover or a reduction in profitability due to lower margins. Our financial performance may also be particularly susceptible to economic and other conditions in regions or states where we have a significant number of stores.

***If we lose any of our key vendors or any of our key vendors fail to supply us with quality brand name merchandise at competitive prices, we may not be able to meet the demand of our customers and our net sales and profitability could decline.***

We are a retailer of manufacturers' branded items and are thereby dependent on the availability of key products and brands. Our business is dependent upon close relationships with our vendors and our ability to purchase brand name merchandise at competitive prices. Our top two vendors accounted for approximately 70% of our total inventory purchases during Fiscal 2022. During Fiscal 2022, approximately 61% of our inventory was purchased from one vendor, Nike, who accounted for approximately 64% of our net sales. Our inability to obtain merchandise in a timely manner from major suppliers as a result of business decisions by suppliers, including the expansion of direct-to-consumer programs by our vendors, or disruptions in the global transportation network, such as port strikes and backlogs, geopolitical conflicts, weather conditions, the emergence of widespread health emergencies or pandemics such as the COVID-19 pandemic, work stoppages, labor shortages or other labor unrest could have a material adverse effect on our business, financial condition, and results of operations. Because of our strong dependence on Nike, any adverse development in Nike's distribution strategy, financial condition, or results of operations, or the inability of Nike to develop and manufacture products that appeal to our target customers, could also have an adverse effect on our business, financial condition, and results of operations. As a retailer, we cannot control the supply, design, function or cost of many of the products we offer for sale. Moreover, certain merchandise that is in high demand may be allocated by vendors based upon the vendors' internal criteria, which is beyond our control.

As a result, our sales could decline if we are not provided with a sufficient allocation of high demand merchandise from one or more of our key vendors, including in the event one or more of our key vendors chooses to sell such merchandise in their online business, or if our key vendors' merchandise were to decline in quantity, quality or desirability to our customers. Our profits could decline if we are unable to pass along any increases in the cost of brand merchandise from our key vendors, including costs resulting from higher tariffs or taxes on imported merchandise. In addition, many of our vendors provide us with return privileges, volume purchasing allowances and cooperative marketing funds such that any changes to such benefits could have an adverse effect on our business.

We believe that we have long-standing and strong relationships with our vendors and that we have adequate sources of brand name merchandise on competitive terms. However, the loss or decline of key vendor support could have a material adverse effect on our business, financial condition and results of operations. There can be no assurances that we will be able to acquire such merchandise at competitive prices or on competitive terms in the future.

We also rely on services and products from non-merchandise vendors. A disruption in these services or products due to the financial condition or inefficient operations of these vendors could adversely affect our business operations.

***Security threats, including physical and cyber-security threats, and unauthorized disclosure of sensitive or confidential information could cause us to incur substantial expenses, result in litigation or other legal actions, adversely affect our operating results, and harm our business and reputation with our consumers.***

The protection of Company, customer, and employee data is critical to us. Through our sales, marketing activities, and use of third-party information, we collect and retain certain personally identifiable information that our customers provide to purchase products, enroll in promotional programs, register on our website, or otherwise communicate and interact with us. This may include, but is not limited to, names, addresses, phone numbers, driver license numbers, email addresses, contact preferences, personally identifiable information stored on electronic devices, and payment account information, including credit and debit card information. We also gather and retain information about our employees in the normal course of business. Furthermore, our online operations depend upon the secure transmission of confidential information over public networks, such as information permitting cashless payments. We rely on commercially available systems, software, tools, and monitoring, including those controlled by third-party providers, to provide security for processing, transmission, and storage of all such data, including confidential information.

Cyber threats are rapidly evolving and becoming increasingly sophisticated. Ever-evolving threats mean we must continually evaluate and adapt our systems and processes. We have security measures designed to protect against the misappropriation or corruption of our systems, intentional or unintentional disclosure of confidential information or disruption of our operations. Our risk remediation procedures include an annual IT risk assessment based on the SANS Institute Critical Security Controls framework, which prioritizes security functions that are effective against the latest advanced targeted threats while emphasizing security controls that have demonstrated real world effectiveness. While we maintain insurance coverage that may, subject to policy terms and exclusions, cover certain aspects of our cyber risks, such insurance coverage may be insufficient to cover our losses or all types of claims that may arise in the continually evolving area of cyber risk.

These security measures may be compromised as a result of third-party breaches, burglaries, cyber-attacks, computer viruses, worms, bot attacks, ransomware, other destructive or disruptive software, errors or malfeasance by employees or employees of third-party vendors, faulty password management, social engineering, misappropriation by third parties, or other irregularity, and

result in persons obtaining unauthorized access to our data or accounts, data loss, or data theft or alteration. Despite implementing safeguards for the protection of such information, we cannot be certain that all of our systems and those of our vendors and unaffiliated third parties are entirely free from vulnerability to attack or compromise. During the normal course of our business, we and the businesses with which we interact have experienced and we expect to continue to experience attempts to breach our systems. There is no assurance that our security controls and practices will prevent the improper disclosure, access or use of confidential, proprietary or sensitive data, data loss or alteration, and we may be unable to protect sensitive data and the integrity of our systems or to prevent fraudulent purchases. Moreover, an alleged or actual security breach that affects our systems or results in the unauthorized release of personally identifiable information could:

- materially damage our reputation and negatively affect customer sales, satisfaction and loyalty;
- expose us to negative publicity, individual claims or consumer class actions, administrative, civil or criminal investigations or actions, including liability under privacy, security and consumer protection laws or enforcement actions, fines, or regulatory proceedings; and
- cause us to incur substantial costs, including but not limited to, costs associated with remediation for stolen assets or information, costs for sending legally required notifications to customers or other affected individuals, litigation costs, lost revenues resulting from disruption in our systems or business, unauthorized use of proprietary information or the failure to retain or attract customers following an attack, and increased cyber protection costs.

There are relatively new State Privacy Laws (as defined further below), as well as additional laws that are coming into effect or are contemplated, that could impose additional liability on us for any failure to maintain certain security standards.

***If we are unable to identify and capitalize on retail trends or provide an omni-channel experience for our customers that is comparable to our competitors, we may not be able to compete effectively, and our sales and profitability may be adversely affected.***

Competition in the e-commerce market continues to intensify as the internet continues to facilitate competitive entry into the market and comparison shopping by consumers. As a result, a growing portion of total consumer expenditures with retailers is occurring through digital platforms rather than traditional retail stores as consumers increasingly embrace shopping online and through mobile commerce applications. Our future success could be materially and adversely affected if we are unable to identify and capitalize on retail trends, including technology, e-commerce and other process efficiencies, to gain market share and better service our customers, or if we are unable to provide an omni-channel experience for our customers that is comparable to our competitors, including larger, more established e-commerce companies such as Amazon.

Our omni-channel platform integrates digital commerce with our stores to provide a seamless experience for our customers. Our mobile apps, buy online pickup in store (BOPIS) and reserve online pickup in store (ROPIS) complement our e-commerce site and provide our customers with customized advanced features and shopping experiences. We cannot give any assurances that our omni-channel platform, including our mobile apps, BOPIS and ROPIS, will perform in a manner that will give us the ability to attract and retain customers, increase sales and successfully compete with other online retailers. Moreover, to make available our omni-channel platform, we rely on various technology systems and services, some of which are provided and managed by third-party service providers. To the extent such third-party components do not perform or function as anticipated, such failure can significantly interfere in our ability to meet our customers' changing expectations. If we do not successfully provide a relevant and up-to-date digital experience or cannot attract online buyers through our omni-channel platform, or are unable to do so in a cost-efficient manner, our sales and profitability could be adversely affected.

We continue to increase the use of social media as a means of interacting and enhancing the shopping experiences of our customers. If we are unable to attract and retain team members, in particular IT professionals, or contract third parties with the specialized skills to support our omni-channel platform or are unable to implement improvements to our customer-facing technology in a timely manner, our ability to compete and our results of operations could be adversely affected. In addition, if our website and our other customer-facing technology systems do not function as designed, the customer experience could be negatively affected, resulting in a loss of customer confidence and satisfaction, as well as lost sales, which could adversely affect our reputation and results of operations.

*Index*

***Our inability or failure to recognize, respond to and effectively manage the accelerated impact of social media could adversely impact our business.***

In recent years, there has been a marked increase in the use of social media platforms, including blogs, chat platforms, social media websites, and other forms of internet-based communications that allow individuals access to a broad audience of consumers and other persons. The popularity of social media and other consumer-oriented technologies has increased the speed and accessibility of information dissemination. The dissemination of negative information via social media could harm our business, brand, reputation, marketing partners, financial condition, and results of operations, regardless of the information's accuracy. If we are unable to quickly and effectively respond to occurrences of negative publicity through social media or otherwise, the Company may suffer declines in customer loyalty and traffic, vendor relationship issues, diversion of management's time to respond and other adverse effects, all of which could negatively impact the Company's operations, financial results and reputation.

In addition, we frequently use social media to communicate with consumers and the public in general. Failure to use social media effectively or properly, or misuse of social media by our employees or vendors, could lead to a decline in brand value and revenue. Other risks associated with the use of social media include improper disclosure of proprietary information, exposure of or improper use of personally identifiable information, fraud, hoaxes or malicious dissemination of false information.

***Pressure from our competitors may force us to reduce our prices or increase our spending on marketing and promotion, which could lower our net sales, gross profit and operating income.***

The business in which we are engaged is a highly competitive and evolving market. The marketplace for athletic specialty merchandise is highly fragmented as many different brick and mortar and online retailers compete for market share by utilizing a variety of formats and merchandising strategies. We compete directly and indirectly with specialty stores, department stores, traditional shoe stores, mass merchandisers, e-commerce retailers and, in some of our large and mid-size markets, national sporting goods superstores. In addition, we face increasing competition from vendors that sell directly to consumers, especially Nike. Increased competition from key vendors' direct to consumer programs may adversely affect our market share and reduce our revenues, as well as adversely impact our future product allocation from vendors.

Many of our competitors have greater financial, marketing, distribution, and delivery resources than we do, which enable them to spend significantly more on marketing and other initiatives. In addition, many of our competitors employ price discounting policies that, if intensified, may make it difficult for us to reach our sales goals without reducing our prices. Should our competitors increase spending on marketing and other initiatives such as additional discounting, if our marketing funds decrease for any reason, or should our marketing, promotions or initiatives be less effective than our competitors, there could be a material adverse effect on our results of operations and financial condition. As a result, we may also need to spend more on marketing, promotions, and initiatives than we anticipate. Inadequate marketing that is less effective than our competitors could inhibit our ability to maintain relevance in the market place and drive increased sales.

We cannot guarantee that we will continue to be able to compete successfully against existing or future competitors. Expansion into markets served by our competitors, entry of new competitors or expansion of existing competitors into our markets could be detrimental to our business, financial condition, and results of operations.

***Our inability to identify and anticipate changes in consumer demands and preferences and our inability to respond to such consumer demands in a timely manner could reduce our net sales or profitability.***

Our products appeal to a broad range of consumers whose preferences cannot be predicted with certainty and are subject to rapid change. Our success depends on our ability to identify product trends as well as to anticipate and respond to changing merchandise trends and consumer demand in a timely manner. We cannot assure you that we will be able to continue to offer assortments of products that appeal to our customers or that we will satisfy changing consumer demands in the future. Accordingly, our business, financial condition and results of operations could be materially and adversely affected if:

- we are unable to identify and respond to emerging trends, including shifts in the popularity of certain products;
- we miscalculate either the market for the merchandise in our stores and on our website or our customers' purchasing habits; or
- consumer demand unexpectedly shifts away from athletic footwear or our more profitable apparel lines.

In addition, we must maintain sufficient inventory levels to operate our business successfully. However, we also must guard against accumulating excess inventory. If we fail to accurately anticipate either the market for the merchandise in our stores and on our website or our customers' purchasing habits, we may be forced to rely on markdowns or promotional sales to dispose of

excess or slow moving inventory, which could have a material adverse effect on our business, financial condition, and results of operations, by, for example, decreasing our profitability.

***The industry in which we operate is dependent upon fashion trends, customer preferences, product innovations, and other fashion-related factors.***

The athletic footwear and apparel industry, especially at the premium end of the price spectrum, is subject to changing fashion trends and customer preferences. In addition, retailers in the athletic industry rely on their suppliers to maintain innovation in the products they develop. We cannot guarantee that our merchandise selection will accurately reflect customer preferences when it is offered for sale or that we will be able to identify and respond quickly to fashion changes, particularly given the long lead times for ordering much of our merchandise from suppliers. Our failure to anticipate, identify, or react appropriately in a timely manner to changes in fashion trends that would make athletic footwear or athletic apparel less attractive to our customers could have a material adverse effect on our business, financial condition, and results of operations.

***We depend on key personnel, the loss of which may adversely affect our ability to run our business effectively and our results of operations.***

We benefit from the leadership and performance of our senior management team and other key employees. If we lose the services of any of our principal executive officers or other skilled and experienced personnel, we may not be able to fully implement our business strategy or run our business effectively and operating results could suffer. The Compensation Committee of our Board of Directors reviews, on a regular basis, a succession plan prepared by senior management that addresses the potential loss of key personnel positions. The goal of the succession plan is to have a contingency plan that minimizes disruptions in the workplace until a suitable replacement can be found, but no assurance can be given that we will be able to retain existing or attract additional qualified personnel when needed.

Further, as our business grows, we will need to attract and retain additional qualified personnel in a timely manner and develop, train, and manage an increasing number of management-level sales team members and other employees. We have invested, and plan to continue to invest, in an environment in which our employees can deliver their best every day, and we endeavor to empower them by providing ongoing training, growth opportunities, and competitive compensation and benefits packages. Competition for qualified employees could require us to pay higher wages and benefits to attract a sufficient number of qualified employees and increases in the minimum wage or other employee benefit costs could increase our operating expense. An inability to attract and retain personnel as needed in the future could negatively impact our net sales growth and operating results.

***We are subject to payment-related risks that could increase our operating costs, subject us to potential liability, and potentially disrupt our business.***

We collect customer data, including encrypted and tokenized credit card information, in our stores and online. For our sales channels to function successfully, we and third parties involved in processing customer transactions for us must be able to transmit confidential information, including credit card information, securely over public networks. While we have measures in place designed to prevent a breach or unauthorized use or disclosure of customer data and other sensitive personal information, we cannot guarantee that any of our security measures or the security measures of third parties with whom we work will effectively prevent others from obtaining unauthorized access to our customers' information or other personally identifiable information. As a retailer accepting debit and credit cards for payment, we are subject to various industry data protection standards and protocols, such as payment network security operating guidelines and the Payment Card Industry Data Security Standard. We cannot be certain that the security measures we maintain to protect all of our information technology systems are able to prevent, contain or detect cyber-attacks, cyber terrorism, security breaches or other compromises from known malware or ransomware or other threats that may be developed in the future. If someone is able to circumvent our data security measures or those of third parties with whom we do business, they could destroy or steal valuable information or disrupt our operations. If such a breach were to occur, customers could lose confidence in our ability to secure their information and choose not to purchase from us. Any unauthorized use of or access to customer information could expose us to data loss or manipulation, litigation and legal liability, and could seriously disrupt operations, negatively impact our marketing capabilities, cause us to incur significant expenses to notify customers of the breach and for other remediation activities, and harm our reputation and brand, any of which could adversely affect our financial condition and results of operations.

In addition, state, federal, and foreign governments are increasingly enacting laws and regulations to protect consumers against identity theft and consumer privacy, which may apply specifically to, or include, payment-related information. Many of these laws and regulations are subject to uncertain application, interpretation or enforcement standards that could result in claims, changes to our business practices, data processing and security systems, penalties, increased operation costs or other impacts on

our business. These laws and regulations will likely increase the costs of doing business, and if we fail to implement appropriate procedures, security measures, or detect and provide prompt notice of unauthorized access as required by some of these laws and regulations, we could be subject to potential claims for damages and other remedies, government enforcement actions, liability for monetary damages, fines and/or criminal prosecution, all of which could adversely affect our business and results of operations.

***We rely heavily on information systems to conduct our business. Problems with our information systems could disrupt our operations and negatively impact our financial results and materially adversely affect our business operations.***

Our ability to manage and operate our business depends significantly on information technology systems. Specifically, we rely on our information systems to effectively manage our sales, logistics, merchandise planning and replenishment, to process financial information and sales transactions and to optimize our overall inventory levels. Our systems and operations are vulnerable to damage or interruption from fire, flood and other natural disasters; failed system implementations or integrations; power loss, computer system failures, internet and telecommunications or data network failures, operator negligence, improper operation or usage error by employees or contractors; third-party vendor system failures; physical and electronic loss of data, security breaches, misappropriation, data theft and similar events; and external threats such as computer viruses, worms, Trojan horses, ransomware, denial-of-service attacks or intrusions.

Although we attempt to mitigate the risk of possible business interruptions through change control protocols and a disaster recovery plan, which includes storing critical business information off-site, the failure of these systems to operate effectively and support growth and expansion could materially adversely impact the operation of our business.

Most of our information system infrastructure is centrally located, and we rely on third-party service providers for certain system applications that are hosted remotely or on cloud-based platforms. There is a risk that we may not have adequately addressed risks associated with using third-party providers or cloud-based platforms. Such risks include security issues such as adequate encryption and intrusion detection; user access control; data separation; the impact of technical problems such as server outages or server failures; vendor disaster recovery capabilities; and transition or exit strategies. A service provider disruption or failure in any of these areas could have a material adverse effect on our business.

***Our inability or failure to protect our intellectual property rights, or any claimed infringement by us of third-party intellectual rights, could have a negative impact on our operating results.***

Our trademarks, service marks, copyrights, patents, trade secrets, domain names, social media handles, and other intellectual property are valuable assets that are critical to our success. The unauthorized reproduction or other misappropriation of our intellectual property could diminish the value of our brands or goodwill and cause a decline in our revenue. In addition, any infringement or other intellectual property claim made against us could be time-consuming to address, result in costly litigation, or result in our loss of ownership or use of the intellectual property.

***Our failure to effectively manage our real estate portfolio may negatively impact our operating results.***

Effective management of our real estate portfolio is critical to our omni-channel strategy. All of our stores are subject to leases and, as such, it is essential that we effectively evaluate a range of considerations that may influence the success of our long-term real estate strategy. Such considerations include, but are not limited to:
- changing patterns of customer behavior from physical store locations to online shopping in the context of an evolving omni-channel retail environment;
- the appropriate number of stores in our portfolio;
- the formats, sizes and interior layouts of our stores;
- the locations of our stores, including the demographics and economic data of each store;
- the local competition in and around our stores;
- the primary lease term of each store and occupancy cost of each store relative to market rents; and
- logistics considerations for each store location.

If we fail to effectively evaluate these factors or negotiate appropriate terms or if unforeseen changes arise, the consequences could include, for example:
- having to close stores and abandon the related assets while retaining the financial commitments of the leases;
- incurring costs to remodel or transform our stores;
- having stores or distribution channels that no longer meet the needs of our business; and
- bearing excessive lease or occupancy expenses.

These consequences could have a materially adverse impact on our profitability, cash flows and liquidity. The financial impact of exiting a leased location can vary greatly depending on, among other factors, the terms of the lease, the condition of the local real estate market, demand for the specific property and our relationship with the landlord. It is difficult for us to influence some of these factors, and the costs of exiting a property can be significant. In addition to rent, we could still be responsible for the maintenance, taxes, insurance and common area maintenance charges for vacant properties until the lease commitment expires or is terminated.

***Our ability to attract customers to our stores that are located in malls or other shopping centers depends heavily on the success of these malls and shopping centers, and continued decreases in customer traffic in these malls or shopping centers, whether due to the growing preference for online shopping or otherwise, could cause our net sales and our profitability to be less than expected.***

A significant number of our stores are located in malls and other shopping centers, and many of these malls and shopping centers have been experiencing declines in customer traffic. Our sales at these stores are dependent, to a significant degree, upon the volume of traffic in those shopping centers and the surrounding area; however, our costs associated with these stores are essentially fixed. In times of declining traffic and sales, our ability to leverage these costs and our profitability are negatively impacted. Our stores benefit from the ability of a shopping center's other tenants to generate consumer traffic in the vicinity of our stores and the continuing popularity of the shopping center as a shopping destination. Our sales volume and traffic has been, and we expect will continue to be, adversely affected by, among other things, the decrease in popularity of malls or other shopping centers in which our stores are located, the closing of anchor stores important to our business, declines in popularity of other stores in the malls or shopping centers in which our stores are located, and decreased traffic as a result of the COVID-19 pandemic, including due to social distancing measures and general consumer preferences to avoid crowded or enclosed spaces. Furthermore, a deterioration in the financial condition of shopping center operators or developers could, for example, limit their ability to invest in improvements and finance tenant improvements for us and other retailers and lead consumers to view these locations as less desirable. Further reduction in consumer traffic as a result of these or any other factors could have a material adverse effect on us.

***Our success depends substantially on the value and perception of the brand name merchandise we sell.***

Our success is largely dependent on our consumers' perception and connection to the brand names we carry, such as Nike, Jordan Brand, adidas, Puma, Crocs, Under Armour, Brooks, Timberland and The North Face, among others. Brand value is based in part on our consumer's perception on a variety of subjective qualities so that even an isolated incident could erode brand value and consumer trust, particularly if there is considerable publicity or litigation. Consumer demand for our products or brands could diminish significantly in the event of erosion of consumer confidence or trust, resulting in lower sales, which could have a material adverse effect on our business, financial condition and results of operations.

***We would be materially and adversely affected if all or a portion of our primary wholesale and logistics facility was disrupted.***

Our primary wholesale and logistics facility is located in Alabaster, Alabama, a suburb of Birmingham, where we receive and ship a significant portion of our merchandise. Any natural disaster or other serious disruption to this facility would damage a portion of our inventory and could impair our ability to adequately stock our stores and process returns of products to vendors and could adversely affect our net sales and profitability. In addition, we could incur significantly higher costs and longer lead times associated with shipping our products to our stores during the time it takes for us to reopen or replace the facility.

Further, because we rely heavily on our primary wholesale and logistics facility, our growth could be limited if the facility reaches full capacity. Such restraint could result in a loss of market share and our inability to execute our business strategy and could have a material adverse effect on our business, financial condition and operating results.

***A disruption in the flow of imported merchandise or an increase in the cost of those goods could significantly decrease our net sales and operating income.***

Many of our largest vendors source a majority of their products from foreign countries. Imported goods are generally less expensive than domestic goods and contribute significantly to our favorable profit margins. Our ability to provide quality imported merchandise on a profitable basis may be subject to political and economic factors and influences that we cannot control. National or international events, including geopolitical conflicts and changes in government trade or other policies, could increase our merchandise costs and other costs that are critical to our operations. If imported merchandise becomes more expensive, we may find it difficult to pass the increase on to customers. If imported merchandise becomes unavailable, the transition to alternative sources by our vendors may not occur in time to meet our demands or the demands of our

customers. Products from alternative sources may also be more expensive or may be of lesser quality than those our vendors currently import. Risks associated with reliance on imported goods include:

- increases in the cost of purchasing or shipping foreign merchandise resulting from, for example, import tariffs, taxes or other governmental actions affecting trade, including the United States imposing anti-dumping or countervailing duty orders, safeguards, remedies or compensation and retaliation due to illegal foreign trade practices; foreign government regulations; rising commodity prices; increased costs of oceanic shipping; changes in currency exchange rates or policies and local economic conditions; and trade restrictions, including import quotas or loss of "most favored nation" status with the United States; and
- disruptions in the flow of imported goods because of factors such as, raw material shortages, work stoppages, widespread health emergencies or pandemics such as the COVID-19 pandemic, labor availability and political unrest; problems with oceanic shipping, including blockages, backlogs or labor union strikes at U.S. or foreign ports; and economic crises and international disputes, including armed conflicts.

In addition, to the extent that any foreign manufacturer with whom our vendors are associated may directly or indirectly utilize labor practices that are not commonly accepted in the United States, we could be affected by any resulting negative publicity.

***Increases in transportation or shipping costs and other factors may negatively impact our results of operations.***

We rely upon various means of transportation, including ship and truck, to deliver products to our primary wholesale and logistics facility, our stores and our customers. Consequently, our results can vary depending upon the price of fuel. The price of oil has fluctuated significantly over the last few years. Any increases in fuel costs would increase our transportation costs.

In addition, general labor shortages or strikes in the transportation or shipping industries could negatively affect transportation and shipping costs and our ability to supply our stores in a timely manner. Product delivery could also be subject to disruption due to raw material shortages, political unrest, oceanic shipping, port labor issues, international disputes, geopolitical conflicts, natural disasters, disease outbreak or public health events, such as the COVID-19 pandemic or terrorism. We rely on efficient and effective operations within our primary wholesale and logistics facility to ensure accurate product delivery to our stores. Failure to maintain such operations could adversely affect net sales.

***Legislative or regulatory initiatives related to climate change concerns may negatively affect our business.***

Greenhouse gases may have an adverse effect on global temperatures, weather patterns, and the frequency and severity of extreme weather and natural disasters. Global climate change could result in certain types of natural disasters occurring more frequently or with more intense effects. Such events could make it difficult or impossible for us to deliver products to our customers, create delays and introduce inefficiencies in our supply chain. Following an interruption to our business, we could require substantial recovery time, experience significant expenditures to resume operations, and lose significant sales. Concern over climate change may result in new or additional legal, legislative, and regulatory requirements to reduce or mitigate the effects of climate change on the environment, which could result in future tax, transportation, and utility increases, which could adversely affect our business.

***Our business could be negatively impacted by the public perception of our corporate citizenship initiatives and sustainability efforts.***

There is an increased focus from U.S. and foreign governmental and nongovernmental authorities and from certain investors, customers, consumers, employees, and other stakeholders concerning corporate citizenship and sustainability matters. From time to time, we announce certain initiatives, including goals regarding our focus areas, which include environmental matters, packaging and waste, responsible sourcing, social investments and inclusion and diversity. We could fail, or be perceived to fail, in our achievement of such initiatives or goals, or we could fail in accurately reporting our progress on such initiatives and goals. Such failures could be due to changes in our business. Moreover, the standards by which citizenship and sustainability efforts and related matters are measured are developing and evolving, and certain areas are subject to assumptions, which could change over time. In addition, as the result of such heightened public focus on sustainability matters, we may face increased pressure to provide expanded disclosure, make or expand commitments, set targets, or establish additional goals and take actions to meet such goals, in connection with such matters. We could also be criticized for the scope of such initiatives or goals or perceived as not acting responsibly in connection with these matters. Any such matters, or related corporate citizenship and sustainability matters, could adversely affect our business, results of operations, cash flows and financial condition.

***Imposition of tariffs and export controls on the products we buy may have a material adverse effect on our business.***

A significant portion of the products that we purchase, including the portion purchased from domestic suppliers, as well as most of our private brand merchandise, is manufactured abroad. We may be affected by potential changes in international trade agreements or tariffs, such as new tariffs imposed on certain Chinese-made goods imported into the U.S. Furthermore, China or other countries may institute retaliatory trade measures in response to existing or future tariffs imposed by the U.S. that could have a negative effect on our business. If any of these events occur as described, we may be obligated to seek alternative suppliers for our private brand merchandise, raise prices or make changes to our operations, any of which could have a material adverse effect on our sales and profitability, results of operations and financial condition.

*We may face difficulties in meeting our labor needs to effectively operate our business.*

We are heavily dependent upon our labor workforce in the geographic areas where we conduct our business. Our compensation packages are designed to provide benefits commensurate with our level of expected service. However, within our retail and logistics operations, we face the challenge of filling many positions at wage scales that are appropriate to the industry and other competitive factors. Many of our team members in our stores are in entry-level or part-time positions that historically have high rates of turnover. We are also dependent on the team members who staff our logistics and distribution facilities, many of whom are skilled. In addition, there is the risk that prevailing wage rates for our labor workforce will increase in the future and that the costs of employee benefits will rise, resulting in increased expenses that could adversely affect our profitability. We also face other risks in meeting our labor needs, including competition for qualified personnel, overall unemployment and underemployment levels, demand for certain labor expertise, changing demographics, health and other insurance costs, adoption of new or revised employment and labor laws and regulations, and the impact of public health issues (including the ongoing COVID-19 pandemic), or natural disasters or severe weather events (including due to climate change). Changes in any of these factors, including a shortage of available workforce in areas in which we operate, could interfere with our ability to adequately service our customers or to open suitable locations and could result in increasing labor costs.

*Our operating results are subject to seasonal and quarterly fluctuations. Furthermore, our quarterly operating results, including comparable store net sales, will fluctuate and may not be a meaningful indicator of future performance.*

We experience seasonal fluctuations in our net sales and results of operations. We typically experience higher net sales in early spring due to spring sports and annual tax refunds, late summer due to back-to-school shopping and winter due to holiday shopping. Adverse events outside of our control, such as supply chain interruptions, increased labor costs and labor availability, decreased consumer traffic as a result of the COVID-19 pandemic or otherwise or deteriorating economic conditions could result in lower than expected sales during the holiday season or other periods in which we typically experience higher net sales and have and could in the future materially impact our financial condition and results of operations. In addition, our quarterly results of operations may fluctuate significantly as a result of a variety of factors, including the timing of new store openings, the amount and timing of net sales contributed by new stores, weather fluctuations, merchandise mix, demand for merchandise driven by local interest in sporting events, and the timing of sales tax holidays and annual tax refunds. Any of these events, particularly in the fourth quarter or other periods in which we typically experience higher net sales, could have a material adverse effect on our business, financial condition and operating results for the entire fiscal year.

Comparable store net sales vary from quarter to quarter, and an unanticipated decline in comparable store net sales may cause the price of our common stock to fluctuate significantly. Factors that could affect our comparable store net sales results include, reduced consumer traffic due to the COVID-19 pandemic or other widespread health emergencies or pandemics; shifts in consumer tastes and fashion trends; calendar shifts of holiday or seasonal periods; the timing of income tax refunds to customers; increases in personal income taxes paid by our customers; calendar shifts or cancellations of sales tax-free holidays in certain states; the success or failure of college and professional sports teams or the cancellation of sporting events within our core regions; changes in or lack of tenants in the shopping centers in which we are located; pricing, promotions or other actions taken by us or our existing or possible new competitors; and unseasonable weather conditions or natural disasters.

We cannot assure you that comparable store net sales will increase at the rates achieved in prior periods or that rates will not decline.

*We are subject to regional risks due to our stores within the South, Southwest, Mid-Atlantic and Midwest regions of the United States.*

Our stores are heavily concentrated in certain regions of the United States. We are subject to regional risks, such as the regional economy, population shifts from rural areas and smaller cities to urban population centers, weather conditions and natural disasters, increasing costs of electricity, oil and natural gas, as well as government regulations specific in the states and localities within which we operate. In addition, falling oil prices may adversely affect employment and consumer spending in those states

that are within our regions that rely on oil revenues as a significant part of the economies of those states. We sell a significant amount of merchandise that can be adversely affected by significant weather events that postpone the start of or shorten sports seasons or that limit participation of fans and sports enthusiasts.

Unforeseen events, including public health issues (including the ongoing COVID-19 pandemic) and natural disasters such as earthquakes, hurricanes, tornadoes, snow or ice storms, floods and heavy rains could disrupt our operations or the operations of our suppliers; significantly damage or destroy our retail locations; prohibit consumers from traveling to our retail locations; or prevent us from resupplying our stores or wholesale and logistics facility. We believe that we take reasonable precautions to prepare for such events; however, our precautions may not be adequate to deal with such events in the future. If such events occur in areas in which we have our wholesale and logistics facility or a concentration of retail stores, or if they occur during peak shopping seasons, it could have a material adverse effect on our business, financial condition and results of operations.

We sell licensed team sports merchandise, the sale of which may be subject to fluctuations based on the success or failure of such teams. The poor performance by college and professional sports teams within our core regions of operations, as well as professional team lockouts, could cause our financial results to fluctuate year-over-year.

***We have made and expect to continue to make acquisitions as a component of our growth strategy. We may not be able to identify suitable acquisition candidates or consummate acquisitions on acceptable terms, or we may be unable to successfully integrate acquisitions, which could disrupt our operations and adversely impact our business and operating results.***

A component of our growth strategy has been to acquire complementary businesses to grow our Company. In the future, we expect to continue to pursue acquisitions of complementary businesses as a component of our growth strategy. Acquisitions involve certain known and unknown risks that could cause our actual growth or operating results to differ from our expectations. For example:

- we may not be able to identify suitable acquisition candidates, in the retail space or otherwise, or to consummate such acquisitions on acceptable terms;
- we compete with others to acquire complementary businesses, which may result in decreased availability of, or increased price for, suitable acquisition candidates;
- we may not be able to obtain the necessary financing, on favorable terms or at all, to finance any or all of our potential acquisitions;
- we may ultimately fail to consummate an acquisition even if we announce that we plan to acquire a business; and
- acquired businesses may not perform as we expect and we may fail to realize anticipated revenue and profits.

In addition, our acquisition strategy may divert management's attention away from our existing business, resulting in the loss of key vendors and employees, and expose us to unanticipated problems or legal liabilities, including responsibility as a successor for undisclosed or contingent liabilities of acquired businesses or assets.

Our inability to successfully integrate future acquisitions could impede us from realizing all of the benefits of those acquisitions and could severely weaken our business operations. The integration process may disrupt our business and, if new businesses are not implemented effectively, may preclude the realization of the full benefits expected by us and could harm our results of operations. In addition, the overall integration of new businesses may result in unanticipated problems, expenses, liabilities and competitive responses. In addition, even if the operations of an acquisition are integrated successfully, we may not realize the full benefits of the acquisition, including the synergies, cost savings or growth opportunities that we expect.

**Risks Related to Our Capital Structure**

***We manage cash and cash equivalents beyond federally insured limits per financial institution and purchase investments not fully guaranteed by the Federal Deposit Insurance Corporation (FDIC), subjecting us to investment and credit availability risks.***

We manage cash and cash equivalents in various institutions at levels beyond federally insured limits per institution, and we purchase investments not guaranteed by the FDIC. Accordingly, there is a risk that we will not recover the full principal of our investments or that their liquidity may be diminished. In an attempt to mitigate this risk, our investment policy emphasizes preservation of principal and liquidity. We cannot be assured that we will not experience losses on our deposits or investments.

***Indebtedness that we may incur in the future could adversely affect our financial condition, limit our ability to obtain additional financing, restrict our operations and make us more vulnerable to economic downturns and competitive pressures. In addition, we face risk that our financial institution may fail to fulfill commitments under our 2021 Credit Facility.***

As of January 29, 2022, we had no debt outstanding under our 2021 Credit Facility, which matures on July 9, 2026 and is secured by all assets of the Company with the exception of real property. In the future, we may borrow amounts under the 2021 Credit Facility to, among other things, provide funding for our operations, share repurchases, capital expenditures and other cash requirements.

Borrowing under the 2021 Credit Facility may use London Interbank Offering Rate (LIBOR) as a benchmark for establishing the interest rate. LIBOR has been the subject of recent national, international and other regulatory guidance and proposals for reform, and the financial industry is currently transitioning away from LIBOR as a benchmark for the interbank lending market. The consequences of these developments cannot be entirely predicted, but could include an increase in the cost of our variable rate indebtedness. Given the International Exchange Benchmark Administration's announced phase-out of LIBOR, the 2021 Credit Facility includes a LIBOR phase-out provision. If, during the term of the 2021 Credit Facility, Regions Bank determines that LIBOR is unavailable, impracticable or unreliable for use, the variable interest rate will be determined based on a substitute index which may be Term Secured Overnight Financing Rate (SOFR), Daily Simple SOFR, or an alternate rate index that has been selected by Regions Bank as the replacement for LIBOR. Changing to an alternate interest index may lead to additional volatility in interest rates and could cause our debt service obligations to increase significantly.

In addition, Regions Bank is committed to continue providing loans under the 2021 Credit Facility through July 9, 2026. There is a risk that this institution cannot deliver against its obligation in a timely matter, or at all. If Regions Bank were to default on its obligation to fund the commitments under the 2021 Credit Facility, this loan would not be available to us, which could adversely affect our liquidity and financial condition. For discussion of our 2021 Credit Facility and other borrowings, see "Liquidity and Capital Resources" in Item 7 and Note 5 to our consolidated financial statements.

*Emerging technologies may create disruption to the retail industry.*

New and emerging technology may enable new approaches or choices for how our customers procure goods and services and pay for those goods and services. We may be unable to quickly adapt to rapid change resulting from artificial intelligence, blockchain and cryptocurrency, Internet of Things (IoT), including voice and smart home devices, and other advanced technologies that may result in changes to our supply chain, distribution channels, and point-of-sale capabilities.

**Risks Related to Ownership of Our Common Stock**

The market price of our common stock, like the stock market in general, has been and is likely to continue to be highly volatile, and such volatility could expose us to securities class action litigation. Factors that could cause fluctuations in the price of our common stock may include, among other things, actual or anticipated variations in quarterly operating results; changes in financial estimates by investment analysts and our inability to meet or exceed those estimates; additions or departures of key personnel; market rumors or announcements by us or by our competitors of significant acquisitions, divestitures or joint ventures, strategic partnerships, large capital commitments or other strategic initiatives; changes in retail sales data that indicate consumers may spend less on discretionary purchases; and sales of our common stock by key personnel or large institutional holders.

Many of these factors are beyond our control and may cause the market price of our common stock to decline, regardless of our operating performance.

*There can be no assurance that we will continue to repurchase our common stock or that we will repurchase our common stock at favorable prices.*

In May 2021, our Board of Directors authorized the expansion of our Repurchase Program by $500.0 million to a total of $800.0 million, as well as its extending the Repurchase Program to February 1, 2025. The purchases may be made from time to time in the open market (including, without limitation, the use of Rule 10b5-1 plans), depending on a number of factors, including our evaluation of general market and economic conditions, including with respect to the impact of the COVID-19 pandemic on our operations and financial condition, and the trading price of our common stock. The Repurchase Program may be extended, modified, suspended or discontinued at any time. We expect to fund the Repurchase Program with existing cash on hand, cash generated from operations, and/or borrowings under our credit facility then in effect. A reduction in, or the completion or expiration of, our Repurchase Program could have a negative effect on our stock price. We can provide no assurance that we will repurchase our common stock at favorable prices, or at all.

*We currently pay a quarterly cash dividend, however, there can be no assurance as to the declaration or amount of future dividends.*

We currently pay a quarterly dividend of 25 cents per share. However, any decision to declare and pay dividends in the future, and the amount of any such dividends, will be dependent on a variety of factors, including compliance with Section 170 of the Delaware General Corporation Law; changes to our capital allocation strategy and policies; our results of operation, liquidity and

cash flows; contractual restrictions in our debt agreements; economic conditions, including the impact of the ongoing COVID-19 pandemic and related macroeconomic impacts on our business and financial condition, such as inflationary pressure; and other factors the Board of Directors may deem relevant. There can be no assurance that we will continue to declare dividends in any particular amounts or at all, and changes in our dividend policy could adversely affect the market price of our common stock.

**Risks Related to Governance, Regulatory, Legislative and Legal Matters**

*Provisions in our charter documents and Delaware law might deter acquisition bids for us.*

Certain provisions of our certificate of incorporation and bylaws may be deemed to have anti-takeover effects and may discourage, delay or prevent a takeover attempt that a stockholder might consider in its best interest. These provisions, among other things:

- classify our Board of Directors into three classes, each of which serves for different three-year periods;
- provide that a director may be removed by stockholders only for cause by a vote of the holders of not less than a majority of our shares entitled to vote;
- provide that all vacancies on our Board of Directors, including any vacancies resulting from an increase in the number of directors, may be filled by a majority of the remaining directors, even if the number is less than a quorum; and
- call for a vote of the holders of not less than two-thirds of the shares entitled to vote in order to amend the foregoing provisions and certain other provisions of our certificate of incorporation and bylaws.

In addition, our Board of Directors, without further action of the stockholders, is permitted to issue and fix the terms of preferred stock, which may have rights senior to those of common stock. We are also subject to the Delaware business combination statute, which may render a change in control of us more difficult. Section 203 of the Delaware General Corporation Law would be expected to have an anti-takeover effect with respect to transactions not approved in advance by the Board of Directors, including discouraging takeover attempts that might result in a premium over the market price for the shares of common stock held by stockholders.

*Changes in federal, state or local laws, or our failure to comply with such laws, could increase our expenses and expose us to legal risks.*

Our Company is subject to numerous laws and regulatory matters relating to the conduct of our business. In addition, certain jurisdictions have taken a particularly aggressive stance with respect to certain matters and have stepped up enforcement, including fines and other sanctions. Such laws and regulatory matters include:

- The California Consumer Privacy Act (CCPA), which was significantly modified by the California Privacy Rights Act (CPRA), new comprehensive privacy legislation passed in 2021 in Virginia and Colorado, and other emerging privacy and IT security laws (together, State Privacy Laws);
- The Telephone Consumer Protection Act (TCPA) provisions that regulate telemarketing, auto-dialed and pre-recorded calls as well as text messages and unsolicited faxes;
- Labor and employment laws that govern employment matters such as minimum wage, exempt employment status, overtime, family leave mandates and workplace safety regulations, including the Fair Labor Standards Act rules and any laws related to COVID-19;
- Securities and exchange laws and regulations;
- New or changing laws relating to cyber-security, privacy, cashless payments and consumer credit, protection and fraud;
- New or changing laws and regulations concerning product safety or truth in advertising;
- The Americans with Disabilities Act and similar state laws that give civil rights protections to individuals with disabilities in the context of employment, public accommodations and other areas;
- New or changing federal and state immigration laws and regulations;
- The Patient Protection and Affordable Care Act provisions;
- New or changing environmental regulations, including measures related to climate change and greenhouse gas emissions;
- New or changing laws relating to federal, state and local taxation and licensing, including sales and use tax laws, withholding taxes and property taxes; and
- Regulations administered by various youth sports leagues and organizations.

Our operations will continue to be subject to federal, state and local governmental regulation. Potential changes that may be made in laws, regulations and policies could exacerbate the risks above. Changes in domestic policy, including significant changes in tax, trade, healthcare and other laws and regulations could affect our operations. For example, tax proposals may include changes, which could, if implemented, have an adverse or a beneficial impact on our operations, including a "border adjustment tax" or new import tariffs, which could adversely affect us because we sell imported products. Proposals to modify or repeal the Patient Protection and Affordable Care Act, if implemented, may also affect us. Unknown matters, new laws and regulations or stricter

interpretations of existing laws or regulations may affect our business or operations in the future and could lead to government enforcement and resulting litigation by private litigants. This could include broader interpretations of foreign laws with the effect of imposing obligations on companies for incidental sales or contact with relevant jurisdictions. Increasing regulations could expose us to a challenging enforcement environment or to third-party liability (such as monetary recoveries and recoveries of attorney's fees) and could have a material adverse effect on our business and results of operations.

Our corporate Legal department monitors regulatory activity and is active in notifying and updating applicable departments and personnel on pertinent matters and legislation. Our Human Resources (HR) department leads compliance training programs to ensure our field managers are kept abreast of HR-related regulatory activity that affects their areas of responsibility. We believe that we are in substantial compliance with applicable environmental and other laws and regulations, and although no assurances can be given, we do not foresee the need for any significant expenditures in this area in the near future.

***Changes in and/or failure to comply with privacy laws could materially adversely affect our reputation and market position and subject us to legal claims and litigation, cause us to incur substantial additional costs, and materially affect our business and operating results.***

We rely on a variety of direct marketing techniques, including email, text messages and postal mailings. Any new or emerging restrictions in federal or state laws regarding marketing and solicitation or data protection laws that govern these activities could adversely affect the continuing effectiveness of email, text messages and postal mailing techniques and could force changes in our marketing strategies. If this occurs, we may need to develop alternative marketing strategies, which may not be as effective and could impact the amount and timing of our revenues. Further, any new or emerging privacy laws could include onerous and expensive compliance obligations regarding notice, consent and retention as well as provide new rights for customers such as rights to notification, deletion, amendment, non-discrimination, opt-outs of marketing and sales of data and appeal rights, and such laws could require us to modify our data processing practices and policies that could lead to regulatory actions or litigation, and potentially fines and damages for non-compliance. In addition, to the extent that new or emerging laws or regulations impact our obligations with respect to our employee data, we may be required to incur substantial costs to modify our practices.

While we strive to adhere our practices and procedures to these laws, they are subject to evolving regulations, interpretations and regulator discretion. To the extent a regulator or court disagrees with our interpretation of these laws and determines that our practices are not in compliance with applicable laws and regulations, we could be subject to civil and criminal penalties that could adversely affect the continued operation of our businesses, including significant legal and financial exposure, damage to our reputation, and have a material adverse effect on our business operations, financial condition and results of operations. The State Privacy Laws also provide for civil penalties for violations, and the CCPA and CPRA also provide a private right of action for data breaches that may increase data breach litigation. We may also face audits or investigations by one or more state government agencies relating to our compliance with applicable privacy laws and regulations. We may also be exposed to litigation, regulatory fines, penalties or other sanctions if the personal, confidential or proprietary information of our customers is mishandled or misused by any of our suppliers, counterparties or other third parties, or if such third parties do not have appropriate controls in place to protect such personal, confidential or proprietary information.

***Product liability claims or product recalls can adversely affect our business reputation, expose us to lawsuits or increased scrutiny by federal and state regulators and may not be fully covered by insurance.***

We sell products, particularly athletic equipment, which entails an inherent risk of product liability and product recall and the resultant adverse publicity. We may be subject to significant claims if the purchase of a defective product from any of our stores causes injury or death. Our merchandise could be subject to a product recall, which could reflect negatively on our business reputation. We cannot be assured that product liability claims will not be asserted against us in the future. Any claims made may create adverse publicity that would have a material adverse effect on our business, reputation, financial condition and results of operations.

We and our vendors maintain insurance with respect to certain of these risks, including product liability insurance and general liability insurance, but in many cases such insurance is expensive, difficult to obtain and no assurance can be given that such insurance can be maintained in the future on acceptable terms, or in sufficient amounts to protect us against losses due to any such events, or at all. Moreover, even though our insurance coverage may be designed to protect us from losses attributable to certain events, it may not adequately protect us from liability and expenses we incur in connection with such events.

***We cannot be assured that we will not experience pressure from labor unions or become the target of labor union campaigns.***

While we believe we maintain good relations with our employees, we cannot provide any assurances that we will not experience pressure from labor unions or become the target of labor union campaigns. The potential for unionization could increase in the United States if federal legislation or regulatory changes are adopted that would facilitate labor organization. Significant union representation would require us to negotiate wages, salaries, benefits and other terms with many of our employees collectively

-27-

and could adversely affect our results of operations by increasing our labor costs or otherwise restricting our ability to maximize the efficiency of our operations.

***Changes in rules related to accounting for income taxes, changes in tax laws in any of the jurisdictions in which we operate or adverse outcomes from audits by taxing authorities could result in an unfavorable change in our effective tax rate.***

We operate our business in numerous tax jurisdictions. As a result, our effective tax rate is derived from a combination of the federal rate and applicable tax rates in the various states in which we operate. Our effective tax rate may be lower or higher than our tax rates have been in the past due to numerous factors, including the sources of our income and the tax filing positions we take. We base our estimate of an effective tax rate at any given point in time upon a calculated mix of the tax rates applicable to our Company and on estimates of the amount of business likely to be done in any given jurisdiction. Changes in rules related to accounting for income taxes, changes in tax laws in any of the jurisdictions in which we operate, expiration of tax credits formerly available, failure to manage and utilize available tax credits, or adverse outcomes from tax audits that we may be subject to in any of the jurisdictions in which we operate could result in an unfavorable change in our effective tax rate.

**Item 1B. Unresolved Staff Comments.**

None.

**Item 2.   Properties.**

We own our corporate office building in Birmingham, Alabama, and our wholesale and logistics facility in Alabaster, Alabama. In addition, we lease all our existing store locations and expect that our policy of leasing rather than owning will continue for new store openings. Our leases typically provide for terms of five to ten years with options on our part to extend. Most leases also contain a kick-out clause if projected sales levels are not met and an early termination/remedy option if co-tenancy and exclusivity provisions are violated. We believe this leasing strategy enhances our flexibility to pursue various expansion opportunities resulting from changing market conditions and to periodically reevaluate store locations.

As current leases expire, we believe we will either be able to obtain lease renewals for present store locations or to obtain leases for equivalent or better locations in the same general area. We believe our wholesale and logistics facility is suitable and adequate to support our operations for many years.

As of January 29, 2022, we operated 1,096 stores in 35 contiguous states. Of these stores, 231 are in enclosed malls, 32 are free-standing and 833 are in strip-shopping centers, which are frequently near a major chain retailer. The following shows the number of locations by state as of January 29, 2022:

| | | | | | |
|---|---|---|---|---|---|
| Alabama | 100 | Kentucky | 47 | Oklahoma | 34 |
| Arkansas | 39 | Louisiana | 62 | Pennsylvania | 4 |
| Arizona | 8 | Maryland | 4 | South Carolina | 49 |
| California | 18 | Minnesota | 1 | South Dakota | 2 |
| Colorado | 3 | Mississippi | 72 | Tennessee | 68 |
| Delaware | 1 | Missouri | 37 | Texas | 115 |
| Florida | 66 | Nebraska | 8 | Utah | 3 |
| Georgia | 124 | New Jersey | 2 | Virginia | 24 |
| Illinois | 27 | New Mexico | 14 | West Virginia | 8 |
| Indiana | 22 | New York | 3 | Wisconsin | 2 |
| Iowa | 10 | North Carolina | 58 | Wyoming | 2 |
| Kansas | 22 | Ohio | 37 | **TOTAL** | **1,096** |

**Item 3.   Legal Proceedings.**

Information relating to material legal proceedings is set forth in Note 10 to our Consolidated Financial Statements included elsewhere in this Annual Report on Form 10-K and is incorporated herein by reference.

*Index*

**Item 4.   Mine Safety Disclosures.**

Not applicable.

<center>PART II</center>

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

The principal market on which our common stock is traded is the Nasdaq Global Select Market under the symbol "HIBB." As of March 22, 2022, we had 7 stockholders of record.

**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN**

The graph below compares the cumulative five-year total shareholder return on our common stock with the cumulative total returns of the Nasdaq Composite index and the Nasdaq Retail Trade index. The graph tracks the five-year performance of a $100 investment in our common stock and in each index (with the reinvestment of all dividends) from January 31, 2017 to January 31, 2022.



Among Hibbett Sports, Inc., the Nasdaq Composite Index and the Nasdaq Retail Trade Index

|  | 1/17 | 1/18 | 1/19 | 1/20 | 1/21 | 1/22 |
|---|---|---|---|---|---|---|
| Hibbett, Inc. | 100.00 | 68.48 | 49.52 | 75.09 | 171.06 | 188.53 |
| Nasdaq Composite | 100.00 | 133.43 | 132.52 | 168.35 | 242.57 | 265.98 |
| Nasdaq Retail Trade | 100.00 | 152.24 | 161.79 | 187.53 | 298.48 | 281.88 |

*The stock price performance included in this graph is not necessarily indicative of future stock price performance.*

**Dividend Policy**

While we currently pay a quarterly dividend of $0.25 per share and expect to pay comparable cash dividends in the future, the declaration of dividends and the establishment of the per share amount, record dates and payment dates for any such future dividends are subject to the final determination of our Board of Directors and will be dependent upon our financial condition,

<center>-29-</center>

results of operations, capital requirements and such other factors as our Board of Directors deems relevant. There can be no assurance that we will continue to declare dividends in any particular amounts or at all, and changes in our dividend policy could adversely affect the market price of our common stock.

### Equity Compensation Plans

For information on securities authorized for issuance under our equity compensation plans, see Part III, Item 12, "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters."

### Issuer Repurchases of Equity Securities

The following table presents our stock repurchase activity for the thirteen weeks ended January 29, 2022:

| Period | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Programs[1] | Approximate Dollar Value of Shares that may yet be Purchased Under the Programs (in thousands) |
|---|---|---|---|---|
| October 31, 2021 to November 27, 2021 | 850 | $94.24 | — | $398,020 |
| November 28, 2021 to January 1, 2022 | 416,891 | $70.76 | 416,891 | $368,520 |
| January 2, 2022 to January 29, 2022 | — | — | — | $368,520 |
| Total | 417,741 | $70.81 | 416,891 | $368,520 |

[1] In May 2021, our Board of Directors authorized an expansion of the Repurchase Program by $500.0 million to $800.0 million and extended the date through February 1, 2025. The expansion of the Repurchase Program was announced on May 28, 2021.

### Item 6. Reserved.

### Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.

As you read the MD&A, please refer to our consolidated financial statements, included in Part II, Item 8, "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K. This Annual Report on Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. See "Cautionary Statement Regarding Forward-Looking Statements" and Part I, Item 1A, "Risk Factors."

### General Overview

Hibbett, Inc. is a leading athletic-inspired fashion retailer primarily located in underserved communities across the country. Founded in 1945, Hibbett stores have a rich history of convenient locations, personalized customer service and access to coveted footwear and apparel from top brands like Nike, Jordan, and adidas. Consumers can browse styles, find new releases, and make purchases by visiting www.hibbett.com. Purchases can be made online or by visiting their nearest store. As of January 29, 2022, we operated a total of 1,096 retail stores in 35 states composed of 900 Hibbett stores, 179 City Gear stores and 17 Sports Additions athletic shoe stores.

Our Hibbett stores average 5,800 square feet and are located primarily in strip centers, which are usually near a major chain retailer. Our City Gear stores average 5,100 square feet and are located primarily in strip centers. Our Sports Additions stores average 2,900 square feet with the majority located in malls and usually near a Hibbett store. Our store base consisted of 833 stores located in strip centers, 32 free-standing stores and 231 enclosed mall locations as of January 29, 2022.

Hibbett operates on a 52- or 53-week fiscal year ending on the Saturday nearest to January 31 of each year. The consolidated statements of operations for Fiscal 2022, Fiscal 2021 and Fiscal 2020 all included 52 weeks of operations. Fiscal 2023 will also include 52 weeks of operations.

### Business Environment

In March 2020, the World Health Organization declared the outbreak of COVID-19 as a pandemic. The pandemic has significantly impacted our business over the past two fiscal years. The initial effects of the pandemic included mass closings of parts of the national and global economy, supply chain disruptions and stay-at-home orders, all of which impacted every aspect of our business in Fiscal 2021. Throughout this challenging time, we were able to navigate a rapidly changing retail landscape by leveraging omni-channel and distribution capabilities, having access to and availability of in-demand products, taking decisive action to protect liquidity, demonstrating the ability to reopen stores quickly when circumstances allowed and servicing our customers efficiently and safely through new shopping and payment initiatives. Government stimulus and unemployment programs boosted discretionary spending and consumer demand for the products we carry, resulting in significant sales growth and improved profitability.

As the COVID-19 pandemic continued into Fiscal 2022, communities and consumers remained focused on health and safety protocols and supply chain challenges persisted, but additional government stimulus and extended unemployment benefits continued to fuel discretionary spending and consumer demand. Toward the end of Fiscal 2022, ongoing supply chain disruptions impacted our overall inventory position and had a negative impact on fourth quarter revenue and profitability. In addition, the lack of government stimulus in comparison to the prior year coupled with inflation appears to have driven slightly more conservative consumer purchasing behavior. Despite these headwinds late in Fiscal 2022, the combination of health and safety initiatives we implemented early in the pandemic, changes in the distribution and availability of high demand footwear and apparel and investments we made to improve the consumer experience allowed us to capitalize on the strong demand cycle. These factors were the main contributors to the robust revenue and profitability growth we experienced in Fiscal 2022.

## Executive Summary

Following is a highlight of our financial results over the last three fiscal years:

| | Fiscal 2022 (52-weeks) | Fiscal 2021 (52-weeks) | Fiscal 2020 (52-weeks) |
|---|---|---|---|
| Net sales (in millions) | $ 1,691.2 | $ 1,419.7 | $ 1,184.2 |
| Operating income, percentage to net sales | 13.5 % | 6.9 % | 3.0 % |
| Comparable store sales | 17.4 % | 22.2 % | 5.3 % |
| Net income (in millions) | $ 174.3 | $ 74.3 | $ 27.3 |
| Net income, percentage increase (decrease) | 134.7 % | 171.6 % | (3.8)% |
| Diluted earnings per share | $ 11.19 | $ 4.36 | $ 1.52 |

During Fiscal 2022, we opened 36 stores and closed seven stores, bringing the store base to 1,096 in 35 states as of January 29, 2022. Included in new stores and closed stores is one Sports Additions store rebranded and opened as a Hibbett store. During Fiscal 2021, we opened 28 stores and closed 42 stores. Included in new stores were 12 Hibbett stores rebranded and opened as City Gear stores. Included in closed stores in Fiscal 2021 were 10 Hibbett stores closed for rebranding to City Gear stores. Inventory on a per store basis increased 6.6% compared to Fiscal 2021 as we strove to normalize our inventory levels, despite continuing supply chain constraints.

Hibbett ended Fiscal 2022 with $17.1 million of available cash and cash equivalents on the consolidated balance sheet. Hibbett had no debt outstanding at January 29, 2022, and we had full availability of our $100.0 million 2021 Credit Facility.

In March 2020, we borrowed $50.0 million under our prior credit facilities as a precautionary measure in order to increase our cash position and preserve financial flexibility in light of the uncertainty in the global markets resulting from the COVID-19 pandemic. In April 2020, we entered into a Second Amended and Restated Note with Regions Bank (the "Amended Credit Facility") that provided for an aggregate amount of credit available to us of $75.0 million. The Amended Credit Facility superseded the Regions Bank credit agreement dated October 2018 and terminated our Bank of America credit agreement dated October 2018. In July 2021, we entered into an unsecured 2021 Credit Facility between the Company and its subsidiaries and Regions Bank. The 2021 Credit Facility, which superseded the Amended Credit Facility, provides an unsecured line of credit of up to $100.0 million and is effective through July 2026 with an interest rate of one-month LIBOR plus 1.0% to 1.8%, depending on specified leverage levels. For discussion of our 2021 Credit Facility and other borrowings, see "Liquidity and Capital Resources."

For Fiscal 2022, total company-wide square footage increased 2.9%. To supplement new store openings, we continued to expand high performing stores, increasing the square footage by an average of 29.9% in 10 existing stores in Fiscal 2022.

In Fiscal 2022, comparable store sales increased 17.4%.

*Comparable store sales* - Stores deemed as comparable stores include our Hibbett, City Gear and Sports Additions stores open throughout the reporting period and the corresponding period of the prior fiscal year, and e-commerce sales. We consider comparable store sales to be a key indicator of our current performance; measuring the growth in sales and sales productivity of existing stores. Management believes that positive comparable store sales contribute to greater leveraging of operating costs, particularly payroll and occupancy costs, while negative comparable store sales contribute to deleveraging of costs. Comparable store sales also have a direct impact on our total net sales and the level of cash flow. Comparable store sales for City Gear stores are presented in comparable store sales beginning in the fourth quarter of Fiscal 2020 and are in full year comparable store sales for Fiscal 2022 and Fiscal 2021.

For Fiscal 2022, 1,034 stores were included in comparable sales. If a store remodel, relocation, or expansion results in the store being closed for a significant period, its sales are removed from the comparable store sales base until it has been open a full 12 months. In addition, rebranded stores are treated as a new store and are not presented in comparable store sales until they have been open a full 12 months under the new brand.

**About Non-GAAP Measures**

This MD&A includes certain non-GAAP financial measures in Fiscal 2021 and Fiscal 2020. We are not presenting any non-GAAP financial measures with respect to Fiscal 2022. Management believes these non-GAAP financial measures are useful to investors to facilitate comparisons of our current financial results to historical operations and the financial results of peer companies, as they exclude the effects of items that may not be indicative of, or are unrelated to, our underlying operating results, such as expenses related to the COVID-19 pandemic in Fiscal 2021, the acquisition and integration of City Gear in both Fiscal 2021 and Fiscal 2020, and our strategic realignment plan in Fiscal 2020. Costs related to the COVID-19 pandemic include impairment charges of goodwill, tradename and other assets and net lower of cost or net realizable value (LCM) inventory reserve charges and were specific to Fiscal 2021. Costs related to acquisition and integration of City Gear include amortization of inventory step-up value, professional service fees and changes in the valuation of the contingent earnout. Costs related to the strategic realignment plan included lease and equipment impairment costs, third party liquidation fees, store exit costs and residual net lease costs.

While we use these non-GAAP financial measures as a tool to enhance our ability to assess certain aspects of our financial performance, our management does not consider these measures to be a substitute for, or superior to, the information provided by GAAP financial statements. Consistent with this approach, we believe that disclosing non-GAAP financial measures to the readers of our financial statements provides such readers with useful supplemental data that, while not a substitute for GAAP financial statements, allows for greater transparency in the review of our financial and operational performance. It should be noted as well that our non-GAAP information may be different from the non-GAAP information provided by other companies.

**Recent Accounting Pronouncements**

See Note 2 of Item 8 of this Annual Report on Form 10-K for the fiscal year ended January 29, 2022, for information regarding recent accounting pronouncements.

*Index*

**Results of Operations**

The following table sets forth the percentage relationship to net sales of certain items included in our consolidated statements of operations for the periods indicated.

| | Fiscal Year Ended | | |
|---|---|---|---|
| | January 29, 2022 (52-weeks) | January 30, 2021 (52-weeks) | February 1, 2020 (52-weeks) |
| Net sales | 100.0 % | 100.0 % | 100.0 % |
| Cost of goods sold | 61.8 | 64.5 | 67.6 |
| Gross margin | 38.2 | 35.5 | 32.4 |
| Store operating, selling and administrative expenses | 22.6 | 26.5 | 26.9 |
| Depreciation and amortization | 2.1 | 2.1 | 2.5 |
| Operating income | 13.5 | 6.9 | 3.0 |
| Interest income (expense), net | — | — | — |
| Income before provision for income taxes | 13.5 | 6.9 | 3.1 |
| Provision for income taxes | 3.2 | 1.7 | 0.8 |
| Net income | 10.3 % | 5.2 % | 2.3 % |

*Note: Columns may not sum due to rounding.*

**Fiscal 2022 Compared to Fiscal 2021**

*Net sales.* Net sales increased $271.5 million, or 19.1%, to $1.69 billion for Fiscal 2022 from $1.42 billion for Fiscal 2021. Furthermore:

- Comparable store net sales for Fiscal 2022 increased 17.4% compared to Fiscal 2021 primarily driven by continued strength in footwear, with notable growth in the women's and kids' categories, and sneaker-connected apparel and accessories. For Fiscal 2022, 1,034 stores were included in the comparable store sales comparison.
- Stores not in the comparable store net sales calculation accounted for $71.1 million of net sales.
- Brick and mortar comparable sales were up 21.4% while e-commerce sales decreased 1.6% compared to Fiscal 2021.
- We increased our overall store count by a net of 29 stores in Fiscal 2022.

*Gross margin.* Cost of goods sold includes the cost of merchandise, the related inbound and outbound freight expense, occupancy costs for stores and occupancy and operating costs for our wholesale and logistics facility. Gross margin was $646.4 million, or 38.2% of net sales, in Fiscal 2022, compared with $504.5 million, or 35.5% of net sales, in Fiscal 2021. This is the result of historically high margin performance in the first half of Fiscal 2022, which was driven by higher sell-through, a low promotional environment and a greater mix of in-store sales, which carry a higher margin than e-commerce sales. Gross margin of $646.4 million, or 38.2% of net sales compares to non-GAAP gross margin of $507.5 million, or 35.8% of net sales in Fiscal 2021, adjusted for inventory reserve adjustments.

*Store operating, selling and administrative (SG&A) expenses.* SG&A expenses, including goodwill impairment in Fiscal 2021, were $382.4 million, or 22.6% of net sales, for Fiscal 2022, compared with $376.5 million, or 26.5% of net sales, for Fiscal 2021.

Excluding certain City Gear acquisition and integration expenses and pandemic related impairment and valuation costs that occurred in Fiscal 2021, Fiscal 2022 SG&A expenses of $382.4 million, or 22.6% of net sales, reflected an improvement, compared to $336.5 million, or 23.7% of net sales, for Fiscal 2021.

A large portion of the SG&A rate decrease resulted from leverage from year-over-year revenue growth.

*Depreciation and amortization.* Depreciation and amortization was flat as a percentage of net sales for Fiscal 2022 compared to Fiscal 2021. The increase in dollars year-over-year was primarily due to increased store development, infrastructure and technology projects placed in service in Fiscal 2022.

*Index*

*Provision for income taxes.* The combined federal, state and local effective income tax rate as a percentage of pre-tax income was 23.5% for Fiscal 2022 and 24.2% for Fiscal 2021. The lower rate in Fiscal 2022 was primarily the result of additional equity compensation deductions in Fiscal 2022, resulting from the Company's increased common stock price.

*Reconciliations of Non-GAAP financial measures.* The following table provides a reconciliation of our consolidated statement of operations for the 52-weeks ended January 30, 2021, as reported on a GAAP basis, to a consolidated statement of operations for the same period prepared on a non-GAAP basis. For more information regarding our non-GAAP financial measures, see "*Executive Summary – About Non-GAAP Measures*" above.

**GAAP to Non-GAAP Reconciliation**
(Dollars in thousands, except per share amounts)

|  | 52-Weeks Ended January 30, 2021 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  |  | | Excluded Amounts | | | | | |
|  | GAAP Basis (As Reported) | | Acquisition Costs[1] | | COVID-19[2] | | Non-GAAP Basis (As Adjusted) | % of Sales |
| Cost of goods sold | $ | 915,169 | $ | — | $ | 3,043 | $ | 912,126 | 64.2 % |
| Gross margin | $ | 504,488 | $ | — | $ | 3,043 | $ | 507,531 | 35.8 % |
| SG&A expenses | $ | 356,856 | $ | 4,608 | $ | 15,743 | $ | 336,505 | 23.7 % |
| Goodwill impairment | $ | 19,661 | $ | — | $ | 19,661 | $ | — | — % |
| Operating income | $ | 98,388 | $ | 4,608 | $ | 38,447 | $ | 141,443 | 10.0 % |
| Provision for income taxes | $ | 23,686 | $ | 1,394 | $ | 11,645 | $ | 36,725 | 2.6 % |
| Net income | $ | 74,266 | $ | 3,214 | $ | 26,802 | $ | 104,282 | 7.3 % |
| Basic earnings per share | $ | 4.49 | $ | 0.19 | $ | 1.62 | $ | 6.30 | |
| Diluted earnings per share | $ | 4.36 | $ | 0.19 | $ | 1.57 | $ | 6.12 | |

1) Excluded acquisition amounts during the 52-weeks ended January 30, 2021, related to the acquisition of City Gear, LLC, consist primarily of change in the valuation of contingent earnout and accounting and professional fees.

2) Excluded amounts during the 52-weeks ended January 30, 2021, related to the COVID-19 pandemic, consist primarily of net non-cash lower of cost and net realizable value charges in cost of goods sold and impairment costs (goodwill, tradename and other assets) in SG&A.

**Fiscal 2021 Compared to Fiscal 2020**

*Net sales.* Net sales increased $235.4 million, or 19.9%, to $1.42 billion for Fiscal 2021 from $1.18 billion for Fiscal 2020. Furthermore:
- Comparable store net sales for Fiscal 2021 increased 22.2% compared to Fiscal 2020 primarily driven by strength in men's, women's and kids' footwear coupled with increased volume in sneaker-connected apparel and accessories. These strengths were partially offset by softer sales in team sports. For Fiscal 2021, 1,015 stores were included in the comparable store sales comparison.
- Stores not in the comparable store net sales calculation accounted for $244.9 million of net sales.
- E-commerce sales increased 92.1% compared to Fiscal 2020.
- Increases were noted in both average ticket and items per transaction.
- We decreased our overall store count by a net of 14 stores in Fiscal 2021 primarily as the result of accelerated closure of underperforming stores in the fourth quarter.

*Gross margin.* Cost of goods sold included the cost of merchandise, occupancy costs for stores, occupancy and operating costs for our wholesale and logistics facility, and ship-to-home freight. Gross margin was $504.5 million, or 35.5% of net sales, in Fiscal 2021, compared with $383.5 million, or 32.4% of net sales, in Fiscal 2020. Excluding inventory reserve adjustments in Fiscal 2021 and City Gear acquisition and strategic realignment costs incurred in Fiscal 2020, non-GAAP gross margin was $507.5 million, or 35.8% of net sales in Fiscal 2021, compared to $383.3 million, or 32.4% in Fiscal 2020.

Overall, GAAP gross margin improved by approximately 310 basis points as a percentage of net sales in comparison to Fiscal 2020 driven by higher sell through and leverage of store occupancy expenses. These impacts were slightly offset by a higher mix of e-commerce sales, which carry a lower margin due to incremental shipping costs, and an increase in the LCM inventory reserve. Logistics expenses were higher year over year in dollars, but decreased slightly as a percentage of net sales. The uncertainty of the COVID-19 pandemic and its impact on inventory valuations contributed to a large increase in the LCM inventory reserve in the first quarter of Fiscal 2021. Although aged inventory and the related reserve declined after the first quarter, there was still a net $3.0 million LCM expense impact in Fiscal 2021. This amount was excluded from the non-GAAP gross margin figure. Store occupancy costs decreased approximately 160 basis points as a percentage of net sales year over year due to leverage generated from increased sales revenue.

***SG&A expenses.*** SG&A expenses, including goodwill impairment, were $376.5 million, or 26.5% of net sales, for Fiscal 2021, compared with $318.0 million, or 26.9% of net sales, for Fiscal 2020.

Excluding non-GAAP adjustments, SG&A expenses were $336.5 million, or 23.7% of net sales for Fiscal 2021, compared to $298.5 million, or 25.2% of net sales, for Fiscal 2020.

A large portion of the SG&A increase resulted from impacts related to the COVID-19 pandemic. This included non-cash intangible asset impairments to goodwill in the amount of $19.7 million and the City Gear tradename of $8.9 million. Other impacts related to the COVID-19 pandemic included asset group impairments of approximately $4.1 million and other related costs of $2.8 million.

***Depreciation and amortization.*** Depreciation and amortization decreased 40 basis points as a percentage of net sales for Fiscal 2021 compared to Fiscal 2020. The decrease was mainly due to leverage from higher net sales.

***Provision for income taxes.*** The combined federal, state, and local effective income tax rate as a percentage of pre-tax income was 24.2% for Fiscal 2021 and 24.7% for Fiscal 2020. The lower rate in Fiscal 2021 was the result of executive compensation deduction limitations in Fiscal 2020 and additional equity compensation deductions in Fiscal 2021 resulting from the Company's increased stock price.

***Reconciliation of Non-GAAP financial measures.*** The following table provides a reconciliation of our consolidated statement of operations for the 52-weeks ended February 1, 2020, as reported on a GAAP basis, to a consolidated statement of operations for the same period prepared on a non-GAAP basis. For more information regarding our non-GAAP financial measures, see "*Executive Summary – About Non-GAAP Measures*" above.

**GAAP to Non-GAAP Reconciliation**
(Dollars in thousands, except per share amounts)

| | 52-Weeks Ended February 1, 2020 | | | | | |
|---|---|---|---|---|---|---|
| | | **Excluded Amounts** | | | | |
| | **GAAP Basis (As Reported)** | **Acquisition Costs[1]** | | **Strategic Realignment Costs[2]** | **Non-GAAP Basis (As Adjusted)** | **% of Sales** |
| Cost of goods sold | $ 800,783 | $ 956 | $ | (1,120) | $ 800,947 | 67.6 % |
| Gross margin | $ 383,451 | $ 956 | $ | (1,120) | $ 383,287 | 32.4 % |
| SG&A expenses | $ 318,011 | $ 17,432 | $ | 2,031 | $ 298,548 | 25.2 % |
| Operating income | $ 36,117 | $ 18,388 | $ | 911 | $ 55,416 | 4.7 % |
| Provision for income taxes | $ 8,984 | $ 4,547 | $ | 225 | $ 13,756 | 1.2 % |
| Net income | $ 27,344 | $ 13,841 | $ | 686 | $ 41,871 | 3.5 % |
| | | | | | | |
| Basic earnings per share | $ 1.54 | $ 0.78 | $ | 0.04 | $ 2.36 | |
| Diluted earnings per share | $ 1.52 | $ 0.77 | $ | 0.04 | $ 2.33 | |

1) Excluded acquisition amounts during the 52-weeks ended February 1, 2020, related to the acquisition of City Gear, LLC, consist primarily of the amortization of inventory step-up in cost of goods sold and change in the valuation of contingent earnout, legal, accounting, and professional fees.

2) Excluded amounts during the 52-weeks ended February 1, 2020, related to our strategic realignment plan, consist primarily of gain on operating leases net of accelerated amortization on right-of-use assets in cost of goods sold and professional fees, impairment costs, and loss on fixed assets in SG&A.

**Liquidity and Capital Resources**

*Analysis of Cash Flows*

Our capital requirements relate primarily to funding capital expenditures, stock repurchases, dividends, the maintenance of facilities and systems necessary to support company growth and working capital requirements. Our working capital requirements are somewhat seasonal in nature and typically reach their peak near the end of the third and the beginning of the fourth quarters of our fiscal year. Historically, we have funded our cash requirements primarily through our cash flow from operations and occasionally from borrowings under credit facilities. We use excess cash to offset bank fees.

We believe that our existing cash balances, expected cash flow from operations, funds available under the 2021 Credit Facility, operating and finance leases and normal trade credit will be sufficient to fund our operations and capital expenditures. We are not aware of any trends or events that would materially affect our capital requirements or liquidity.

Our consolidated statements of cash flows are summarized as follows (in thousands):

|  | Fiscal Year Ended | | |
|  | January 29, 2022 (52-weeks) | January 30, 2021 (52-weeks) | February 1, 2020 (52-weeks) |
|---|---|---|---|
| Net cash provided by operating activities | $ 159,488 | $ 197,716 | $ 92,289 |
| Net cash used in investing activities | (70,161) | (32,970) | (17,006) |
| Net cash used in financing activities | (281,563) | (21,534) | (70,961) |
| Net (decrease) increase in cash and cash equivalents | $ (192,236) | $ 143,212 | $ 4,322 |

*Operating Activities.*

Cash flow from operations is seasonal in our business. Typically, we use cash flow from operations to increase inventory in advance of peak selling seasons, such as winter holidays, the spring sales period and late summer back-to-school shopping. Inventory levels are reduced in connection with higher sales during the peak selling seasons and this inventory reduction, combined with proportionately higher net income, typically produces a positive cash flow.

Net cash provided by operating activities was $159.5 million for the 52-weeks ended January 29, 2022 compared with net cash provided by operating activities of $197.7 million and $92.3 million for the 52-weeks ended January 30, 2021 and February 1, 2020, respectively. Net cash provided by operating activities for January 29, 2022, January 30, 2021 and February 1, 2020 was impacted by the following:

- Net income provided cash of $174.3 million, $74.3 million and $27.3 million during Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively.
- Non-cash depreciation and amortization expense of $35.8 million, $29.6 million and $29.3 million during Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively, and stock-based compensation expense of $5.5 million, $3.8 million and $2.7 million during Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively. Depreciation expense has increased in each fiscal year due to investments in new store development, infrastructure and information technology initiatives and due to accelerated depreciation taken in Fiscal 2020 resulting from increased store closures. Fluctuations in stock-based compensation generally result from the number of the equity eligible employees, achievement of performance-based equity awards at greater or lesser than their target level, fluctuations in the price of our common stock and levels of forfeitures in any given period.
- Other non-cash adjustments to net income for Fiscal 2022 included a $13.8 million decrease in the contingent earnout valuation related to City Gear when the earnout was paid. Other non-cash adjustments to net income for Fiscal 2021 included $37.1 million of asset impairment charges with the largest impact resulting from a significant temporary decrease in the market valuation of the Company at the onset of the COVID-19 pandemic, partially offset by a $1.3 million change in the valuation of the contingent earnout related to City Gear.

- Ending inventory per store increased 6.6% and decreased 28.9% at January 29, 2022 and January 30, 2021, respectively compared to the prior year. Fiscal 2022 inventory increased as we strove to normalize our inventory levels despite continuing supply chain constraints. Fiscal 2021 inventory decreased due to the significant lift in sales volume, supply chain constraints and proactive inventory management. The change in net inventory used cash of $19.2 million during Fiscal 2022, provided cash of $86.0 million during Fiscal 2021 and used cash of $8.7 million during Fiscal 2020.
- The change in accounts payable used cash of $25.6 million in Fiscal 2022, used cash of $26.3 million in Fiscal 2021 and provided cash of $24.3 million in Fiscal 2020. Changes are due mainly to the timing of payments in relation to inventory receipts, capital expenditures and SG&A spending.

*Investing Activities.*

Cash used in investing activities in Fiscal 2022, Fiscal 2021 and Fiscal 2020 totaled $70.2 million, $33.0 million and $17.0 million, respectively. Gross capital expenditures used $71.2 million, $34.8 million and $17.3 million during Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively. Capital expenditures in all periods primarily consisted of new stores, relocations, remodels, expansions of existing stores and infrastructure projects.

We opened 36 new stores and expanded and/or relocated 16 additional existing stores during Fiscal 2022. We opened 28 new stores and expanded and/or relocated 15 additional existing stores during Fiscal 2021. We opened 24 new stores and expanded and/or relocated nine additional existing stores during Fiscal 2020.

Our anticipated capital expenditures for the fiscal year ending January 28, 2023, is approximately $60.0 million to $70.0 million, with the expenditures related to:
- Store development, including the opening of new stores and the remodeling, relocation or expansion of selected existing stores;
- Additional technology and infrastructure investments; and
- Other departmental needs for ongoing maintenance and support.

*Financing Activities.*

Net cash used in financing activities was $281.6 million in Fiscal 2022. Net cash used in financing activities was $21.5 million in Fiscal 2021 and net cash used in financing activities was $71.0 million in Fiscal 2020. Historically, the fluctuation in net financing activities between years is primarily the result of borrowing activity and repurchases of our common stock. In Fiscal 2022 and Fiscal 2021, net borrowings on our credit facilities were zero. In Fiscal 2020, we paid off $35.0 million in borrowings that carried over from Fiscal 2019. We expended $271.1 million, $17.6 million and $35.5 million on repurchases of our common stock during Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively, which included cash used to settle net share equity awards of $3.3 million, $0.9 million and $0.6 million during Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively.

Additionally, in the first quarter of Fiscal 2022 and the second quarter of Fiscal 2021, we paid $15.0 million and $10.0 million, respectively, to the former members and warrant holders of City Gear for achievement of financial goals in the first- and second-year post acquisition. Of these amounts, $1.2 million and $4.8 million were reflected as financing activities in Fiscal 2022 and Fiscal 2021, respectively, and represent the fair value of the short-term portions of the contingent earnout booked through the purchase price allocation.

On August 25, 2021, the Board instituted a quarterly cash dividend program with the first cash dividend payment made on September 9, 2021, at $0.25 per share of common stock outstanding as of the record date. During the fiscal year ended January 29, 2022, we paid cash dividends of $10.9 million under two declarations; both at $0.25 per share of common stock outstanding as of the record date.

Financing activities also consisted of proceeds from stock option exercises and employee stock plan purchases. As stock options are exercised and shares are purchased through our employee stock purchase plan, we will continue to receive proceeds and expect a tax deduction; however, the amounts and timing cannot be predicted.

At January 29, 2022, we had one unsecured credit facility, the 2021 Credit Facility, with Regions Bank, which allows for borrowings up to $100.0 million and has an expiration date of July 9, 2026. The 2021 Credit Facility includes an annual commitment fee, payable quarterly in arrears, in an amount between 15 and 20 basis points of the unused portion of the line of credit as determined on a daily basis, dependent on the amount of debt outstanding. In addition, the Company is subject to certain financial covenants which include:
- Advance limitation of 55% of the net book value of the Company's inventory;

• A Consolidated Lease-Adjusted Leverage Ratio comparing lease-adjusted funded debt (funded debt plus all lease liabilities) to EBITDAR (as defined in the 2021 Credit Facility) with a maximum of 3.5x; and
• A Consolidated Fixed Coverage Charge Ratio comparing EBITDAR to fixed charges and certain current liabilities (as defined in the 2021 Credit Facility) with a minimum of 1.2x.

As of January 29, 2022, we were in compliance with these covenants.

As of January 29, 2022, a total of $100.0 million was available to us from the 2021 Credit Facility.

Purchase obligations, which include all legally binding contracts such as software license commitments and service contracts were $28.1 million and $14.8 million at January 29, 2022 and January 30, 2021, respectively. These purchase obligations are primarily due within five years and are recorded as liabilities when goods are received or services rendered.

We issue inventory purchase orders in the ordinary course of business, which represent authorizations to purchase that are cancellable by their terms. We do not consider purchase orders to be firm inventory commitments.

**Other Economic Factors**

Our ability to provide quality imported merchandise on a profitable basis may be subject to political and economic factors and influences that we cannot control. National or international events, including changes in government trade, geopolitical conflicts or other policies, could increase our merchandise costs and other costs that are critical to our operations. Consumer spending could also decline because of economic pressures.

**Our Critical Accounting Policies**

Our significant accounting policies are described in Item 8, Note 1–Basis of Presentation and Significant Accounting Policies. Critical accounting policies are those that we believe are both (i) most important to the portrayal of our financial condition and results of operations and (ii) require our most difficult, subjective or complex judgments, often as a result of the need to make estimates about the effect of matters that are inherently uncertain. Judgments and uncertainties affecting the application of such policies may result in materially different amounts being reported under different conditions or using different assumptions.

We consider the following policies to be the most critical in understanding the judgments that are involved in preparing our consolidated financial statements. Our critical accounting policies reflected in the consolidated financial statements are detailed below.

*Revenue Recognition.* We recognize revenue in accordance with Accounting Standards Codification (ASC) Topic 606, *Revenue from Contracts with Customers,* when control of the merchandise is transferred to our customer. Sales are recorded net of expected returns at the time the customer takes possession of the merchandise. Net sales exclude sales taxes because we are a pass-through conduit for collecting and remitting these taxes.

The net deferred revenue liability for gift cards, customer orders and layaways at January 29, 2022 and January 30, 2021, was $9.6 million and $8.8 million, respectively, recognized in accounts payable on our consolidated balance sheets. In Fiscal 2022, Fiscal 2021 and Fiscal 2020, gift card breakage income was recognized in net sales in proportion to the redemption pattern of rights exercised by the customer and was immaterial for all years.

During the fiscal years ended January 29, 2022, January 30, 2021, and February 1, 2020, $1.4 million, $1.2 million and $1.7 million of gift card deferred revenue from prior periods was realized, respectively.

*Loyalty Program:* We offer the Hibbett Rewards program whereby upon registration and in accordance with the terms of the program, customers earn points on certain purchases. Points convert into rewards at defined thresholds. The short-term future performance obligation liability is estimated at each reporting period based on historical conversion and redemption patterns. The liability is included in other accrued expenses on our consolidated balance sheets and was $3.7 million and $3.4 million at January 29, 2022 and January 30, 2021, respectively.

*Return Sales:* The liability for return sales is estimated at each reporting period based on historical return patterns and is recognized at the transaction price. The liability is included in accounts payable on our consolidated balance sheets. The return asset and corresponding adjustment to cost of goods sold for our right to recover the merchandise returned by the customer is immaterial.

*Inventories.* Inventories are valued using the lower of weighted average cost or net realizable value method. Items are removed from inventory using the weighted average cost method.

*Lower of Cost and Net Realizable Value:* We regularly review inventories to determine if the carrying value exceeds net realizable value, and we record an accrual to reduce the carrying value to net realizable value as necessary. We account for obsolescence as part of our lower of cost and net realizable value accrual based on historical trends and specific identification. As of January 29, 2022 and January 30, 2021, the accrual was $5.3 million and $6.2 million, respectively. A determination of net realizable value requires significant judgment.

*Shrink Reserves:* We accrue for inventory shrinkage based on the actual historical results of our physical inventory counts. These estimates are compared to actual results as physical inventory counts are performed and reconciled to the general ledger. Physical inventory counts are performed on a cyclical basis. As of January 29, 2022 and January 30, 2021, the accrual was $0.9 million and $1.9 million, respectively.

*Inventory Purchase Concentration:* Our business is dependent to a significant degree upon close relationships with our vendors. Our largest vendor, Nike, represented 61.0%, 65.0% and 67.7% of our purchases for Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively. Our second largest vendor, adidas, represented 6.9%, 6.6% and 7.2% of our purchases for Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively.

***Goodwill and Indefinite-Lived Intangible Assets.*** Goodwill and the City Gear tradename are indefinite-lived intangible assets which are not amortized, but rather tested for impairment at least annually, or on an interim basis if events and circumstances have occurred that indicate that is more likely than not that an asset is impaired. Such events or circumstances could include, but are not limited to, significant negative industry or economic trends, unanticipated changes in the competitive environment and a significant sustained decline in the market price of our stock. If an asset is impaired, an impairment test is performed and the amount by which the carrying value exceeds the fair value is recorded as an impairment charge to current income.

Due to the macroeconomic impact of the COVID-19 pandemic, we determined that indicators of impairment were present during the first quarter of Fiscal 2021. As a result, we performed interim impairment testing on goodwill and the City Gear tradename as of April 15, 2020, using updated assumptions around prospective financial information, growth rates, discount rates applied to future cash flows and comparable multiples from publicly traded companies in our industry.

In valuing goodwill, we use a combination of the Discounted Cash Flow methodology and the Guideline Public Company methodology, which require assumptions be made related to future cash flows, discount rate and comparable public companies. In the first quarter of Fiscal 2021, we determined that goodwill of our City Gear reporting unit was fully impaired and recognized a non-cash impairment charge of $19.7 million. No impairment related to goodwill was recognized during Fiscal 2020.

A reconciliation of goodwill from February 1, 2020 to January 30, 2021 consists of the following:

| | (in thousands) |
|---|---|
| Goodwill balance at February 1, 2020 | $ 19,661 |
| Impairment losses | (19,661) |
| Goodwill balance at January 30, 2021 | $ — |

In valuing the tradename intangible, we use the Relief from Royalty method which requires assumptions related to future revenues, royalty rate and discount rate. In the first quarter of Fiscal 2021, we determined that the City Gear tradename was partially impaired and recognized a non-cash impairment charge of $8.9 million in store operating, selling and administrative expenses on our condensed consolidated statement of operations. No impairment related to the tradename was recognized during Fiscal 2022 and Fiscal 2020.

A reconciliation of tradename from February 1, 2020 to January 29, 2022 consists of the following:

| | (in thousands) |
|---|---|
| Tradename intangible asset balance at February 1, 2020 | $ 32,400 |
| Impairment losses | (8,900) |
| Tradename intangible asset balance at January 30, 2021 | $ 23,500 |
| Impairment losses | — |
| Tradename intangible asset balance at January 29, 2022 | $ 23,500 |

*Index*

**Long-Lived Assets.** Long-lived assets, including lease assets, are evaluated for impairment whenever events or circumstances indicate that the carrying value may not be recoverable. The evaluation for long-lived assets is performed at the lowest level of identifiable cash flows, which is generally the individual store level. When evaluating long-lived assets for impairment, we first compare the carrying value of the asset or asset group to its estimated undiscounted future cash flows. Our estimate of undiscounted future cash flows is based on historical operations and predictions of future profitability. Significant assumptions are required to estimate cash inflows and outflows directly resulting from the use of assets in operations, including margin on net sales, occupancy costs, payroll and related costs, and other costs to operate a store. If the estimated future cash flows are less than the carrying value of the related asset, we calculate an impairment loss. The impairment loss calculation compares the carrying value of the related asset or asset group to its estimated fair value, which may be based on an estimated future cash flow model, quoted market value, or other valuation technique, as appropriate. We recognize an impairment loss if the amount of the asset's carrying value exceeds the asset's estimated fair value. If we recognize an impairment loss, the adjusted carrying amount of the asset becomes its new cost basis. For depreciable long-lived assets, the new cost basis will be depreciated (amortized) over the remaining estimated useful life of that asset. Impairment loss calculations require significant judgment to estimate future cash flows and asset fair values.

### Item 7A.  Quantitative and Qualitative Disclosures About Market Risk.

#### Investment and Credit Availability Risk

We manage cash and cash equivalents in various institutions at levels beyond federally insured limits per institution, and we may purchase investments not guaranteed by the FDIC. Accordingly, there is a risk that we will not recover the full principal of our investments or that their liquidity may be diminished. In an attempt to mitigate this risk, our investment policy emphasizes preservation of principal and liquidity.

Additionally, Regions Bank is committed to provide loans under our 2021 Credit Facility. There is a risk that Regions Bank cannot deliver against these obligations. See "Risk Factors."

#### Interest Rate Risk

Our net exposure to interest rate risk results primarily from interest rate fluctuations on our credit facility, which bears interest at a rate that varies with LIBOR, prime or federal funds rates. At the end of Fiscal 2022 and Fiscal 2021, we had no borrowings outstanding under our credit facility. A 125-basis point increase or decrease in the interest rate on borrowings under our credit facility would not result in a material impact to our results of operations at current borrowing levels.

There were 21 days during the 52-weeks ended January 29, 2022, where we incurred borrowings against our credit facilities for an average and maximum borrowing of $2.0 million and $18.7 million, respectively, and an average interest rate of 1.3%.

There were 97 days during the 52-weeks ended January 30, 2021, where we incurred borrowings against our credit facilities for an average and maximum borrowing of $43.3 million and $50.0 million, respectively, and an average interest rate of 3.5%.

#### Quarterly and Seasonal Fluctuations

We experience seasonal fluctuations in our net sales and results of operations. We typically experience higher net sales in early spring due to spring sports and annual tax refunds, late summer due to back-to-school shopping and winter due to holiday shopping, although the COVID-19 pandemic has resulted in some shifts of normal seasonal patterns during the last two fiscal years. In addition, our quarterly results of operations may fluctuate significantly as a result of a variety of factors, including weather fluctuations, the timing of high demand footwear launches, demand for merchandise driven by local interest in sporting events, back-to-school sales and the timing of sales tax holidays and annual income tax refunds.

**Item 8.    Consolidated Financial Statements and Supplementary Data.**

The following consolidated financial statements of our Company are included in response to this item:

- Reports of Independent Registered Public Accounting Firms (PCAOB ID: 42)
- Consolidated Balance Sheets as of January 29, 2022 and January 30, 2021
- Consolidated Statements of Operations for the fiscal years ended January 29, 2022, January 30, 2021 and February 1, 2020
- Consolidated Statements of Cash Flows for the fiscal years ended January 29, 2022, January 30, 2021 and February 1, 2020
- Consolidated Statements of Stockholders' Investment for the fiscal years ended January 29, 2022, January 30, 2021 and February 1, 2020
- Notes to Consolidated Financial Statements

All other schedules are omitted because they are not applicable or the required information is shown in the consolidated financial statements or notes thereto.

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and Board of Directors of Hibbett, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Hibbett, Inc. and subsidiaries (the Company) as of January 29, 2022 and January 30, 2021, the related consolidated statements of operations, stockholders' investment and cash flows for each of the two years in the period ended January 29, 2022, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at January 29, 2022 and January 30, 2021, and the results of its operations and its cash flows for each of the two years in the period ended January 29, 2022, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of January 29, 2022, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated March 25, 2022 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

|  |  |
|---|---|
| | **Inventory Valuation** |
| *Description of the Matter* | At January 29, 2022, the Company's inventories, net balance was $221.2 million. As discussed in Note 1 of the consolidated financial statements, the Company values inventories using the lower of weighted average cost or net realizable value method. Adjustments to reduce inventories to their net realizable value are determined by management based on historical trends, specific identification, and anticipated demand. |
| | Auditing management's assessment of net realizable value for inventories was challenging due to the estimation uncertainty in determining the forecasted sales of the Company's inventory, which are impacted by a number of factors that are affected by market and economic conditions outside the Company's control, such as customer forecasts and industry supply and demand. |

*Index*

| | |
|---|---|
| *How We Addressed the Matter in our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's inventory valuation process, including controls related to the determination of the net realizable value of inventories. |
| | To test the net realizable value of inventories, our audit procedures included, among others, evaluating the reasonableness of management's key assumptions and judgments by testing the accuracy and completeness of the underlying data used to determine the amounts of inventory carrying value adjustments. We also assessed the historical accuracy of management's estimates and performed sensitivity analyses over the significant assumptions to evaluate the changes in the net realizable value inventory estimates that would result from changes in the underlying assumptions. |

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2020.
Birmingham, Alabama
March 25, 2022

-43-

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Stockholders and Board of Directors of Hibbett, Inc.

### Opinion on Internal Control over Financial Reporting

We have audited Hibbett, Inc. and subsidiaries' internal control over financial reporting as of January 29, 2022, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Hibbett, Inc. and subsidiaries (the Company) maintained, in all material respects, effective internal control over financial reporting as of January 29, 2022, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of Hibbett, Inc. as of January 29, 2022 and January 30, 2021, the related consolidated statements of operations, stockholders' investment and cash flows for each of the two years in the period ended January 29, 2022, and the related notes and our report dated March 25, 2022 expressed an unqualified opinion thereon.

### Basis for Opinion

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

### Definition and Limitations of Internal Control Over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Birmingham, Alabama
March 25, 2022

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Stockholders and Board of Directors
Hibbett, Inc.:

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated statements of operations, stockholders' investment, and cash flows of Hibbett, Inc. (formerly Hibbett Sports, Inc.) and subsidiaries (the Company) for the year ended February 1, 2020, and the related notes (collectively, the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the results of operations of the Company and its cash flows for the year ended February 1, 2020, in conformity with U.S. generally accepted accounting principles.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ KPMG LLP

We served as the Company's auditor from 2002 to 2020.

Birmingham, Alabama
April 16, 2020

-45-

*Index*

**Hibbett, Inc. and Subsidiaries**
**Consolidated Balance Sheets**
**(In thousands, except share and per share information)**

| ASSETS | | January 29, 2022 | | January 30, 2021 |
|---|---|---|---|---|
| Current Assets: | | | | |
| Cash and cash equivalents | $ | 17,054 | $ | 209,290 |
| Receivables, net | | 13,607 | | 11,905 |
| Inventories, net | | 221,219 | | 202,038 |
| Other current assets | | 25,134 | | 16,567 |
| Total current assets | | 277,014 | | 439,800 |
| Property and equipment, net | | 145,967 | | 107,159 |
| Operating right-of-use assets | | 243,751 | | 216,224 |
| Finance right-of-use assets, net | | 2,186 | | 3,285 |
| Tradename intangible asset | | 23,500 | | 23,500 |
| Deferred income taxes, net | | 7,187 | | 14,625 |
| Other assets, net | | 3,612 | | 3,573 |
| Total Assets | $ | 703,217 | $ | 808,166 |

**LIABILITIES AND STOCKHOLDERS' INVESTMENT**

| | | January 29, 2022 | | January 30, 2021 |
|---|---|---|---|---|
| Current Liabilities: | | | | |
| Accounts payable | $ | 85,647 | $ | 107,215 |
| Operating lease obligations | | 68,521 | | 58,613 |
| Finance lease obligations | | 975 | | 956 |
| Accrued payroll expenses | | 26,320 | | 29,948 |
| Other accrued expenses | | 13,401 | | 28,588 |
| Total current liabilities | | 194,864 | | 225,320 |
| Operating lease obligations | | 212,349 | | 186,133 |
| Finance lease obligations | | 1,427 | | 2,599 |
| Unrecognized tax benefits | | 546 | | 725 |
| Other liabilities | | 2,516 | | 2,353 |
| Total liabilities | | 411,702 | | 417,130 |
| Stockholders' Investment: | | | | |
| Preferred stock, $0.01 par value, 1,000,000 shares authorized, no shares issued | | — | | — |
| Common stock, $0.01 par value, 80,000,000 shares authorized, 39,611,163 and 39,379,865 shares issued at January 29, 2022 and January 30, 2021, respectively | | 396 | | 394 |
| Paid-in capital | | 202,729 | | 194,534 |
| Retained earnings | | 1,022,317 | | 858,951 |
| Treasury stock, at cost, 26,317,947 and 22,901,101 shares repurchased at January 29, 2022 and January 30, 2021, respectively | | (933,927) | | (662,843) |
| Total stockholders' investment | | 291,515 | | 391,036 |
| Total Liabilities and Stockholders' Investment | $ | 703,217 | $ | 808,166 |

See accompanying notes to consolidated financial statements.

**Hibbett, Inc. and Subsidiaries**
**Consolidated Statements of Operations**
**(In thousands, except per share information)**

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | January 29, 2022 (52-weeks) | January 30, 2021 (52-weeks) | February 1, 2020 (52-weeks) |
| Net sales | $ 1,691,184 | $ 1,419,657 | $ 1,184,234 |
| Cost of goods sold | 1,044,777 | 915,169 | 800,783 |
| Gross margin | 646,407 | 504,488 | 383,451 |
| | | | |
| Store operating, selling and administrative expenses | 382,414 | 356,856 | 318,011 |
| Goodwill impairment | — | 19,661 | — |
| Depreciation and amortization | 35,827 | 29,583 | 29,323 |
| Operating income | 228,166 | 98,388 | 36,117 |
| | | | |
| Interest income | 43 | 127 | 1,225 |
| Interest expense | (317) | (563) | (1,014) |
| Interest income (expense), net | (274) | (436) | 211 |
| Income before provision for income taxes | 227,892 | 97,952 | 36,328 |
| | | | |
| Provision for income taxes | 53,579 | 23,686 | 8,984 |
| Net income | $ 174,313 | $ 74,266 | $ 27,344 |
| | | | |
| Basic earnings per share | $ 11.63 | $ 4.49 | $ 1.54 |
| Diluted earnings per share | $ 11.19 | $ 4.36 | $ 1.52 |
| | | | |
| Weighted average shares outstanding: | | | |
| Basic | 14,993 | 16,547 | 17,746 |
| Diluted | 15,582 | 17,037 | 17,957 |

See accompanying notes to consolidated financial statements.

-47-

*Index*

**Hibbett, Inc. and Subsidiaries**
**Consolidated Statements of Cash Flows**
**(In thousands)**

| | Fiscal Year Ended | | |
|---|---|---|---|
| | January 29, 2022 (52-weeks) | January 30, 2021 (52-weeks) | February 1, 2020 (52-weeks) |
| **Cash Flows From Operating Activities:** | | | |
| Net income | $ 174,313 | $ 74,266 | $ 27,344 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 35,827 | 29,583 | 29,323 |
| Contingent earnout, net | (13,761) | (1,296) | 15,057 |
| Impairment charges | 2,915 | 37,109 | 1,011 |
| Amortization of inventory step-up | — | — | 956 |
| Deferred income taxes and unrecognized income tax benefit, net | 7,259 | (5,774) | (5,143) |
| (Gain) loss on disposal of assets, net | (1,501) | (3,076) | 518 |
| Stock-based compensation | 5,540 | 3,799 | 2,653 |
| Other non-cash adjustments | — | (135) | (2,578) |
| Changes in operating assets and liabilities: | | | |
| Receivables, net | (1,694) | (3,768) | 1,938 |
| Inventories, net | (19,181) | 85,973 | (8,680) |
| Prepaid expenses and other | (2,078) | (2,763) | (662) |
| Other assets | 1,092 | 1,493 | (570) |
| Accounts payable | (25,580) | (26,261) | 24,347 |
| Accrued expenses and other | (3,663) | 8,566 | 6,775 |
| Net cash provided by operating activities | 159,488 | 197,716 | 92,289 |
| **Cash Flows From Investing Activities:** | | | |
| Capital expenditures | (71,153) | (34,760) | (17,326) |
| Proceeds from sale of property and equipment | 1,147 | 841 | 530 |
| Other | (155) | 949 | (210) |
| Net cash used in investing activities | (70,161) | (32,970) | (17,006) |
| **Cash Flows From Financing Activities:** | | | |
| Proceeds under credit facilities | 38,259 | 117,535 | 81,780 |
| Repayments under credit facilities | (38,259) | (117,535) | (116,780) |
| Stock repurchases | (267,826) | (16,717) | (34,904) |
| Payment of cash dividends | (10,939) | — | — |
| Payment of contingent earnout | (1,239) | (4,761) | — |
| Payments of finance lease obligations | (960) | (1,017) | (977) |
| Settlement of net share equity awards | (3,257) | (897) | (555) |
| Proceeds from options exercised and purchase of shares under the employee stock purchase plan | 2,658 | 1,858 | 475 |
| Net cash used in financing activities | (281,563) | (21,534) | (70,961) |
| Net (decrease) increase in cash and cash equivalents | (192,236) | 143,212 | 4,322 |
| Cash and cash equivalents, beginning of year | 209,290 | 66,078 | 61,756 |
| Cash and cash equivalents, end of year | $ 17,054 | $ 209,290 | $ 66,078 |

-48-

**Hibbett, Inc. and Subsidiaries**
**Consolidated Statements of Cash Flows (continued)**
**(In thousands)**

| | Fiscal Year Ended | | |
|---|---|---|---|
| | January 29, 2022 (52-weeks) | January 30, 2021 (52-weeks) | February 1, 2020 (52-weeks) |
| **Supplemental Disclosures of Cash Flow Information:** | | | |
| Cash paid during the year for: | | | |
| Interest | $ 243 | $ 560 | $ 993 |
| Income taxes, net of refunds | $ 52,899 | $ 33,654 | $ 15,438 |
| Operating cash flows from operating leases | $ 76,400 | $ 77,439 | $ 74,992 |
| Operating cash flows from finance leases | $ 136 | $ 179 | $ 223 |
| Financing cash flows from finance leases | $ 960 | $ 1,017 | $ 977 |
| | | | |
| **Supplemental Schedule of Non-Cash Activities:** | | | |
| Non-cash accruals for capital expenditures | $ 4,012 | $ 1,814 | $ — |
| Operating leases obtained in exchange for lease liabilities, net | $ 91,325 | $ 57,357 | $ 46,890 |
| Finance leases obtained in exchange for lease liabilities, net | $ (407) | $ 1,985 | $ 574 |

See accompanying notes to consolidated financial statements.

-49-

*Index*

**Hibbett, Inc. and Subsidiaries**
**Consolidated Statements of Stockholders' Investment**
**(in thousands)**

| | Common Stock | | Paid-In Capital | Retained Earnings | Treasury Stock | | Total Stockholders' Investment |
|---|---|---|---|---|---|---|---|
| | Number of Shares | Amount | | | Number of Shares | Amount | |
| Balance–February 2, 2019 | 38,983 | $   390 | $   185,752 | $   759,677 | 20,686 | $   (609,770) | $   336,049 |
| Net income | — | — | — | 27,344 | — | — | 27,344 |
| Issuance of shares through the Company's equity plans | 158 | 1 | 474 | — | — | — | 475 |
| Adjustment for adoption of accounting standard[1] | — | — | — | (2,079) | — | — | (2,079) |
| Purchase of shares under the stock repurchase program | — | — | — | — | 1,565 | (34,904) | (34,904) |
| Settlement of net share equity awards | — | — | — | — | 29 | (555) | (555) |
| Stock-based compensation | — | — | 2,653 | — | — | — | 2,653 |
| Balance–February 1, 2020 | 39,141 | 391 | 188,879 | 784,942 | 22,280 | (645,229) | 328,983 |
| Net income | — | — | — | 74,266 | — | — | 74,266 |
| Issuance of shares through the Company's equity plans | 239 | 3 | 1,855 | — | — | — | 1,858 |
| Adjustment for adoption of accounting standard[2] | — | — | — | (256) | — | — | (256) |
| Purchase of shares under the stock repurchase program | — | — | — | — | 578 | (16,717) | (16,717) |
| Settlement of net share equity awards | — | — | — | — | 43 | (897) | (897) |
| Stock-based compensation | — | — | 3,799 | — | — | — | 3,799 |
| Balance–January 30, 2021 | 39,380 | 394 | 194,534 | 858,951 | 22,901 | (662,843) | 391,036 |
| Net income | — | — | — | 174,313 | — | — | 174,313 |
| Issuance of shares through the Company's equity plans | 231 | 2 | 2,656 | — | — | — | 2,658 |
| Declaration of dividends ($0.25 per common share) | — | — | — | (10,949) | — | — | — |
| Purchase of shares under the stock repurchase program | — | — | — | — | 3,371 | (267,826) | (267,826) |
| Settlement of net share equity awards | — | — | — | — | 46 | (3,257) | (3,257) |
| Stock-based compensation | — | — | 5,540 | — | — | — | 5,540 |
| Balance–January 29, 2022 | 39,611 | $   396 | $   202,729 | $   1,022,317 | 26,318 | $   (933,927) | $   291,515 |

(1) Adoption of ASU 2016-02, Topic 842, *Leases*. See Note 2, Recent Accounting Pronouncements, in our Annual Report on Form 10-K filed on April 16, 2020.
(2) Adoption of ASU 2016-13, Topic 326, *Financial Instruments - Credit Losses: Measurement of Credit Losses on Financial Instruments*. See Note 2, Recent Accounting Pronouncements, in our Annual Report on Form 10-K filed on April 7, 2021.

**See accompanying notes to consolidated financial statements.**

**Hibbett, Inc. and Subsidiaries**
**Notes to Consolidated Financial Statements**

## NOTE 1. BASIS OF PRESENTATION AND SUMMARY OF CRITICAL AND SIGNIFICANT ACCOUNTING POLICIES

### Business

Hibbett, Inc. is a leading athletic-inspired fashion retailer primarily located in small and mid-sized communities across the country. References to "we," "our," "us," "Hibbett" and the "Company" refer to Hibbett, Inc. and its subsidiaries as well as its predecessors. Our fiscal year ends on the Saturday closest to January 31 of each year. The consolidated statements of operations for Fiscal 2022, Fiscal 2021 and Fiscal 2020 all include 52-weeks of operations. Our merchandise assortment features a core selection of brand name merchandise emphasizing athletic footwear, athletic and fashion apparel, related accessories, and team sports equipment. We complement this core assortment with a selection of localized footwear, apparel, and accessories designed to appeal to a wide range of customers within each market.

### Principles of Consolidation

The consolidated financial statements of our Company include its accounts and the accounts of all wholly owned subsidiaries. All significant intercompany balances and transactions have been eliminated in consolidation. Occasionally, certain reclassifications are made to conform previously reported data to the current presentation. Such reclassifications have no impact on total assets, total liabilities, net income or stockholders' investment in any of the years presented.

### Use of Estimates in the Preparation of Consolidated Financial Statements

The preparation of consolidated financial statements in conformity with U.S. Generally Accepted Accounting Principles (U.S. GAAP) requires management to make certain estimates and assumptions that affect the reported amount of assets and liabilities, revenues and expenses, and the disclosure of intangible assets and contingent liabilities at the date of the financial statements. We believe our estimates are reasonable; however, the assumptions used by management could change significantly in future estimates due to changes in circumstances and actual results could differ materially from those estimates.

### Reportable Segments

Hibbett, Inc., through its subsidiaries, has approximately 1,100 stores operating under the Hibbett and City Gear brands and an omni-channel platform. We identify our operating segments according to how our business activities are managed and evaluated by our chief executive officer, who is our chief operating decision maker. Our shopping channels primarily include store locations, website, and mobile apps. Store sales are primarily filled from the store's inventory but may also be shipped from a different store location or our logistics network if an item is not available at the original store. Direct-to-consumer orders are generally shipped to our customers from a store, our logistics network, or some combination thereof, depending on the availability of the desired item.

Given the economic similarity of the store formats, the products offered for sale, the type of customers, the methods of distribution, and how our Company is managed, our operations constitute only one reportable segment.

### Vendor Arrangements

We enter into arrangements with some of our vendors that entitle us to a partial refund of the cost of merchandise purchased during the year or reimbursement of certain costs we incur to advertise or otherwise promote their product. Volume-based rebates, supported by vendor agreements, are estimated throughout the year and reduce the cost of inventories and cost of goods sold during the year. This estimate is regularly monitored and adjusted for sales activity and current or anticipated changes in purchase levels.

We also receive consideration from vendors through a variety of other programs, including markdown reimbursements, vendor compliance charges, and defective merchandise credits. If the payment is a reimbursement for costs incurred, it is recognized as an offset against those related costs; otherwise, it is treated as a reduction to the cost of merchandise. Markdown reimbursements related to merchandise that has been sold are negotiated by our merchandising teams and are credited directly to cost of goods sold in the period received. If vendor funds are received prior to merchandise being sold, they are recorded as a reduction of merchandise cost. Vendor compliance charges and defective merchandise credits reduce the cost of inventories.

-51-

*Index*

**Marketing**

We expense marketing costs when incurred. We participate in various marketing cooperative programs with our vendors, who, under these programs, reimburse us for certain costs incurred.

The following table presents the components of our marketing expense (in thousands):

| | Fiscal Year Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | January 29, 2022 (52-weeks) | | January 30, 2021 (52-weeks) | | February 1, 2020 (52-weeks) | |
| Gross marketing costs | $ | 32,964 | $ | 23,576 | $ | 18,408 |
| Marketing reimbursements | | (4,525) | | (1,524) | | (2,938) |
| Net marketing costs | $ | 28,439 | $ | 22,052 | $ | 15,470 |

**Cost of Goods Sold**

We include merchandise costs, store occupancy costs, logistics-related occupancy and operating costs, and ship-to-home freight in cost of goods sold.

**Stock Repurchase Program**

On May 26, 2021, our Board of Directors (the "Board") authorized the expansion and extension of our existing Stock Repurchase Program (the "Repurchase Program") by $500.0 million to a total of $800.0 million to repurchase our common stock through February 1, 2025. The Repurchase Program's original authorization was approved in November 2015 in the amount of $300.0 million and prior to the Board's action, was scheduled to expire on January 29, 2022.

The Repurchase Program authorizes repurchases of our common stock in open market or negotiated transactions, with the amount and timing of repurchases dependent on market conditions and at the discretion of our management. In addition to the Repurchase Program, we also acquire shares of our common stock from holders of restricted stock unit awards to satisfy withholding tax requirements due at vesting. Shares acquired from holders of restricted stock unit awards to satisfy tax withholding requirements do not reduce the authorized amounts of repurchases under the Repurchase Program.

The number of shares repurchased under the Repurchase Program and acquired from holders of restricted stock unit awards to satisfy tax withholding requirements were as follows:

| | 52-Weeks Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | January 29, 2022 | | January 30, 2021 | | February 1, 2020 | |
| Common stock repurchased under the Repurchase Program | | 3,370,751 | | 620,785 | | 1,594,074 |
| Aggregate cost of repurchases under the Repurchase Program (in thousands) | $ | 267,826 | $ | 17,615 | $ | 35,459 |
| Shares acquired from holders of restricted stock unit awards to satisfy tax withholding requirements | | 46,095 | | 42,449 | | 29,432 |
| Tax withholding requirements from holders of restricted stock unit awards (in thousands) | $ | 3,257 | $ | 897 | $ | 555 |

Historically, under all stock repurchase authorizations and including shares acquired from holders of restricted stock unit awards to satisfy tax withholding requirements, we have repurchased a total of 26.3 million shares of our common stock at an approximate cost of $933.9 million as of January 29, 2022 and had approximately $368.5 million remaining under the Repurchase Program authorization. Shares acquired from holders of restricted stock unit awards to satisfy tax withholding requirements do not reduce the authorization.

Subsequent to January 29, 2022, we repurchased 0.3 million shares of our common stock as of March 22, 2022 at a cost of $12.6 million, including 8,277 shares acquired from holders of restricted stock unit awards to satisfy tax withholding requirements of $0.4 million.

## Dividends

On August 25, 2021, the Board instituted a quarterly cash dividend program with the first cash dividend payment made on September 9, 2021. During the fiscal year ended January 29, 2022, we paid cash dividends of $10.9 million under three declarations at $0.25 per share of common stock outstanding as of the record date.

While we currently pay a quarterly dividend of $0.25 per share and expect to pay comparable cash dividends in the future, the declaration of dividends and the establishment of the per share amount, record dates and payment dates for any such future dividends are subject to the final determination of our Board of Directors and will be dependent upon our financial condition, results of operations, capital requirements and such other factors as our Board of Directors deems relevant. There can be no assurance that we will continue to declare dividends in any particular amounts or at all, and changes in our dividend policy could adversely affect the market price of our common stock.

Subsequent to January 29, 2022, the Board declared a cash dividend of $0.25 per common share, payable on March 29, 2022, to stockholders of record at the close of business on March 17, 2022. The estimated payment is expected to be $3.3 million.

## Cash and Cash Equivalents

We consider all short-term, highly liquid investments with original maturities of 90 days or less, including commercial paper and money market funds, to be cash equivalents. Amounts due from third-party credit card processors for the settlement of debit and credit card transactions are included as cash equivalents as they are generally collected within three business days. Cash equivalents related to credit and debit card transactions at January 29, 2022 and January 30, 2021 were $6.6 million and $6.9 million, respectively.

## Inventories

Inventories are valued using the lower of weighted average cost or net realizable value method. Items are removed from inventory using the weighted average cost method.

*Lower of Cost and Net Realizable Value:* We regularly review inventories to determine if the carrying value exceeds net realizable value, and we record an accrual to reduce the carrying value to net realizable value as necessary. We account for obsolescence as part of our lower of cost and net realizable value accrual based on historical trends and specific identification. As of January 29, 2022 and January 30, 2021, the accrual was $5.3 million and $6.2 million, respectively. A determination of net realizable value requires significant judgment.

*Shrink Reserves:* We accrue for inventory shrinkage based on the actual historical results of our physical inventory counts. These estimates are compared to actual results as physical inventory counts are performed and reconciled to the general ledger. Physical inventory counts are performed on a cyclical basis. As of January 29, 2022 and January 30, 2021, the accrual was $0.9 million and $1.9 million, respectively.

*Inventory Purchase Concentration:* Our business is dependent to a significant degree upon close relationships with our vendors. Our largest vendor, Nike, represented 61.0%, 65.0%, and 67.7% of our purchases for Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively. Our second largest vendor, adidas, represented 6.9%, 6.6%, and 7.2% of our purchases for Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively.

## Property and Equipment

Property and equipment are recorded at cost. Finance lease assets are shown as right-of-use (ROU) assets and are excluded from property and equipment. (See Note 6, Leases).

Property and equipment consists of the following (in thousands):

| | January 29, 2022 | January 30, 2021 |
|---|---|---|
| Land | $ 7,277 | $ 7,277 |
| Buildings | 22,247 | 21,505 |
| Equipment | 119,505 | 104,431 |
| Furniture and fixtures | 59,137 | 42,448 |
| Leasehold improvements | 137,279 | 109,220 |
| Construction in progress | 4,086 | 1,470 |
| Total property and equipment | 349,531 | 286,351 |
| Less: accumulated depreciation and amortization | 203,564 | 179,192 |
| Total property and equipment, net | $ 145,967 | $ 107,159 |

Depreciation on property and equipment utilizes the straight-line method generally over the following estimated service lives:

| | |
|---|---|
| Buildings | 39 years |
| Leasehold improvements | 3 – 10 years |
| Furniture and fixtures | 7 years |
| Equipment | 3 – 7 years |

In the case of leasehold improvements, we calculate depreciation using the shorter of the term of the underlying leases or the estimated economic lives of the improvements. The term of the lease includes option periods when exercise of the option is reasonably certain. We continually reassess the remaining useful life of leasehold improvements in light of store closing plans.

Construction in progress has historically been comprised primarily of property and equipment related to unopened stores and amounts associated with technology upgrades.

Maintenance and repairs are charged to expense as incurred. The cost and accumulated depreciation of assets sold, retired or otherwise disposed of are removed from property and equipment and the related gain or loss is credited or charged to net income, net of proceeds received.

**Goodwill and Indefinite-Lived Intangible Assets**

Goodwill and the City Gear tradename are indefinite-lived intangible assets which are not amortized, but rather tested for impairment at least annually, or on an interim basis if events and circumstances have occurred that indicate that is more likely than not that an asset is impaired. Such events or circumstances could include, but are not limited to, significant negative industry or economic trends, unanticipated changes in the competitive environment and a significant sustained decline in the market price of our stock. If an asset is impaired, the amount that the carrying value exceeds the fair value is recorded as an impairment charge to current income.

Due to the macroeconomic impact of the COVID-19 pandemic, we determined that indicators of potential impairment were present during the first quarter of Fiscal 2021. As a result, we performed interim impairment testing on goodwill and the City Gear tradename as of April 15, 2020, using updated assumptions around prospective financial information, growth rates, discount rates applied to future cash flows, and comparable multiples from publicly traded companies in our industry.

In valuing goodwill, we use a combination of the Discounted Cash Flow methodology and the Guideline Public Company methodology, which require assumptions related to future cash flows, discount rate, and comparable public company entities. In the first quarter of Fiscal 2021, we determined that goodwill of our City Gear reporting unit was fully impaired and recognized a non-cash impairment charge of $19.7 million. No impairment related to goodwill was recognized during Fiscal 2022 or Fiscal 2020.

A reconciliation of goodwill is as follows (in thousands):

| | | |
|---|---|---:|
| Goodwill balance at February 1, 2020 | $ | 19,661 |
| Impairment losses | | (19,661) |
| Goodwill balance at January 30, 2021 | $ | — |

In valuing the tradename intangible, we use the Relief from Royalty method which requires assumptions related to future revenues, royalty rate, and discount rate. In the first quarter of Fiscal 2021, we determined that the City Gear tradename was partially impaired and recognized a non-cash impairment charge of $8.9 million in store operating, selling, and administrative expenses. No impairment related to the tradename was recognized during Fiscal 2022 or Fiscal 2020.

A reconciliation of the tradename intangible for Fiscal 2021 is as follows (in thousands):

| | | |
|---|---|---:|
| Tradename intangible asset balance at February 1, 2020 | $ | 32,400 |
| Impairment losses | | (8,900) |
| Tradename intangible asset balance at January 30, 2021 | $ | 23,500 |

**Long-Lived Assets**

Long-lived assets, including lease assets, are evaluated for impairment whenever events or circumstances indicate that the carrying value may not be recoverable. The evaluation for long-lived assets is performed at the lowest level of identifiable cash flows, which is generally the individual store level. When evaluating long-lived assets for impairment, we first compare the carrying value of the asset or asset group to its estimated undiscounted future cash flows. Our estimate of undiscounted future cash flows is based on historical operations and predictions of future profitability. Significant assumptions are required to estimate cash inflows and outflows directly resulting from the use of assets in operations, including margin on net sales, occupancy costs, payroll and related costs, and other costs to operate a store. If the estimated future cash flows are less than the carrying value of the related asset, we calculate an impairment loss. The impairment loss calculation compares the carrying value of the related asset or asset group to its estimated fair value, which may be based on an estimated future cash flow model, quoted market value, or other valuation technique, as appropriate. We recognize an impairment loss if the amount of the asset's carrying value exceeds the asset's estimated fair value. If we recognize an impairment loss, the adjusted carrying amount of the asset becomes its new cost basis. For depreciable long-lived assets, the new cost basis will be depreciated (amortized) over the remaining estimated useful life of that asset. Impairment loss calculations require significant judgment to estimate future cash flows and asset fair values.

**Revenue Recognition**

We recognize revenue in accordance with Accounting Standards Codification (ASC) Topic 606, *Revenue from Contracts with Customers*, when control of the merchandise is transferred to our customer which is at delivery. Sales are recorded net of expected returns at the time the customer takes possession of the merchandise. Net sales exclude sales taxes because we are a pass-through conduit for collecting and remitting these taxes.

The net deferred revenue liability for gift cards, customer orders, and layaways at January 29, 2022 and January 30, 2021 was $9.6 million and $8.8 million, respectively, recognized in accounts payable on our consolidated balance sheets. We recognize revenue when a gift card is redeemed by the customer and recognize gift card breakage income in net sales in proportion to the redemption pattern of rights exercised by the customer. In Fiscal 2022, Fiscal 2021 and Fiscal 2020, gift card breakage income was immaterial for all years.

During the fiscal years ended January 29, 2022, January 30, 2021, and February 1, 2020, $1.4 million, $1.2 million and $1.7 million of gift card deferred revenue from prior periods was realized, respectively.

*Loyalty Program:* We offer the Hibbett Rewards program whereby upon registration and in accordance with the terms of the program, customers earn points on certain purchases. Points convert into rewards at defined thresholds. The short-term future performance obligation liability is estimated at each reporting period based on historical conversion and redemption patterns. The liability is included in other accrued expenses on our consolidated balance sheets and was $3.7 million and $3.4 million at January 29, 2022 and January 30, 2021, respectively.

*Return Sales:* The liability for return sales is estimated at each reporting period based on historical return patterns and is recognized at the transaction price. The liability is included in accounts payable on our consolidated balance sheets. The return

asset and corresponding adjustment to cost of goods sold for our right to recover the merchandise returned by the customer is immaterial.

Revenues disaggregated by major product categories are as follows (in thousands):

| | Fiscal 2022 (52-weeks) | Fiscal 2021 (52-weeks) | Fiscal 2020 (52-weeks) |
|---|---|---|---|
| Footwear | $ 1,044,191 | $ 911,789 | $ 735,613 |
| Apparel | 483,236 | 384,431 | 307,600 |
| Equipment | 163,757 | 123,437 | 141,021 |
| | $ 1,691,184 | $ 1,419,657 | $ 1,184,234 |

**Store Opening and Closing Costs**

New store opening costs, including pre-opening costs, are charged to expense as incurred. Store opening costs primarily include payroll expenses, training costs and straight-line rent expenses. All pre-opening costs are included in store operating, selling and administrative expenses as a part of operating expenses.

We generally consider individual store closings to be a normal part of operations and regularly review store performance against expectations. Costs associated with store closings are recognized at the time of closing or when a liability has been incurred. These costs were not material in Fiscal 2022, Fiscal 2021 or Fiscal 2020.

## NOTE 2. RECENT ACCOUNTING PRONOUNCEMENTS

*Standards that were adopted*

In December 2019, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2019-12, "*Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes*," as part of its overall simplification initiative. ASU 2019-12 was issued in order to reduce costs and complexity of applying accounting standards while maintaining or improving the usefulness of the information provided to financial statement users. The amendments remove certain exceptions to the general provisions of Topic 740 and provide simplification in other areas of Topic 740. We adopted ASU 2019-12 on January 31, 2021, with no material impact to our consolidated financial statements.

We adopted ASU 2016-13, Topic 326, *Financial Instruments - Credit Losses: Measurement of Credit Losses on Financial Instruments*, as of February 2, 2020. ASU 2016-13 revised the measurement of credit losses for financial assets measured at amortized cost from an incurred loss methodology to an expected loss methodology. Historical experience, current economic conditions and reasonable supportable forecasts are considered in establishing an allowance for credit losses which is shown on the consolidated balance sheet in receivables, net. The adoption of ASU 2016-13 did not have a material impact on our consolidated financial statements.

*Standards that are not yet adopted*

We continuously monitor and review all current accounting pronouncements and standards from the FASB for applicability to our operations. As of January 29, 2022, there were no other new pronouncements or interpretations that had or were expected to have a significant impact on our operations.

## NOTE 3. STOCK-BASED COMPENSATION

At January 29, 2022, we had four stock-based compensation plans:

(a) The Amended and Restated 2015 Equity Incentive Plan (EIP) provides that the Board may grant equity awards to certain employees of the Company at its discretion. The EIP was adopted effective July 1, 2015 and subsequently amended and restated effective May 28, 2020. Including shares added in the amendment and restatement, the EIP authorizes grants of equity awards of up to 2,500,000 authorized but unissued shares of common stock. At January 29, 2022, there were 1,510,547 shares available for grant under the EIP.

(b) The 2015 Employee Stock Purchase Plan (ESPP) allows for qualified employees to participate in the purchase of up to 300,000 shares of our common stock at a price equal to 85% of the lower of the closing price at the beginning or end of each quarterly stock purchase period. The ESPP was adopted effective July 1, 2015. At January 29, 2022, there were 152,096 shares available for purchase under the ESPP.

(c) The 2015 Director Deferred Compensation Plan (Deferred Plan) allows non-employee directors an election to defer all or a portion of their fees into stock units or stock options. The Deferred Plan was adopted effective July 1, 2015 and authorizes grants up to 150,000 authorized but unissued shares of common stock. At January 29, 2022, there were 121,194 shares available for grant under the Deferred Plan.

(d) The 2012 Non-Employee Director Equity Plan (DEP) provides for grants of equity awards to non-employee directors. The DEP was adopted effective May 24, 2012 and authorizes grants of equity awards of up to 500,000 authorized but unissued shares of common stock. At January 29, 2022, there were 104,828 shares available for grant under the DEP.

Our plans allow for a variety of equity awards including stock options, restricted stock awards, stock appreciation rights and performance awards. As of January 29, 2022, we had only granted awards in the form of stock options, restricted stock units (RSUs) and performance-based units (PSUs) to our employees. The annual grants made for Fiscal 2022, Fiscal 2021 and Fiscal 2020 to employees consisted solely of RSUs. We have also awarded PSUs to our Named Executive Officers (NEOs) and expect the Compensation Committee of the Board will continue to grant PSUs to our NEOs in the future. Due to the economic uncertainties at the onset of the COVID-19 pandemic, coupled with the timing of our annual equity awards , the Board elected to award only service-based units to our NEOs in Fiscal 2021.

As of January 29, 2022, we had only granted awards in the form of stock, stock options and deferred stock units (DSUs) to our Board members. Under the DEP, Board members currently receive an annual value of $75,000 worth of equity in the form of stock options or RSUs upon election to the Board and a value of $110,000 worth of equity in any form allowed within the DEP, for each full year of service, pro-rated for Directors who have served less than one full year. The Chairman of the Board receives an annual value of $135,000 of equity in any form allowed within the DEP. Due to the economic uncertainties at the onset of the COVID-19 pandemic, coupled with the timing of our annual equity awards, the Board elected to reduce the value of the annual equity award to each applicable Director in Fiscal 2021.

The terms and vesting schedules for stock-based awards vary by type of grant and generally vest upon time-based conditions. Under the DEP, Directors have the option with certain equity forms to set vesting dates. Upon exercise, stock-based compensation awards are settled with authorized but unissued company stock. All of our awards are classified as equity awards.

The compensation cost for these plans was as follows (in thousands):

| | Fiscal Year Ended | | |
|---|---|---|---|
| | January 29, 2022 (52-weeks) | January 30, 2021 (52-weeks) | February 1, 2020 (52-weeks) |
| Stock-based compensation expense by type: | | | |
| Stock options | $ 174 | $ 90 | $ 92 |
| Restricted stock units | 5,111 | 3,495 | 2,370 |
| Employee stock purchases | 199 | 120 | 97 |
| Director deferred compensation | 56 | 94 | 94 |
| Total stock-based compensation expense | 5,540 | 3,799 | 2,653 |
| Income tax benefit recognized | 1,316 | 882 | 622 |
| Stock-based compensation expense, net of income tax | $ 4,224 | $ 2,917 | $ 2,031 |

Stock-based and deferred stock compensation expenses are included in store operating, selling and administrative expenses. There is no capitalized stock-based compensation cost.

The income tax benefit recognized in our consolidated financial statements, as disclosed above, is based on the amount of compensation expense recorded for book purposes. The actual income tax benefit realized in our income tax return is based on the intrinsic value, or the excess of the market value over the exercise or purchase price, of stock options exercised and restricted stock unit awards vested during the period. The actual income tax benefit realized for the deductions considered on our income

-57-

*Index*

tax returns for Fiscal 2022, Fiscal 2021 and Fiscal 2020 was from option exercises and restricted stock unit releases and totaled $3.2 million, $1.0 million and $0.6 million, respectively.

***Stock Options***

Stock options are granted with an exercise price equal to the closing market price of our common stock on the business day immediately preceding the date of grant. Vesting and expiration provisions vary between equity plans, but options granted to employees under the EIP typically vest over a four or five-year period in equal installments beginning on the first anniversary of the grant date and typically expire on the eighth or tenth anniversary of the date of grant. Grants awarded to tenured outside directors under the DEP and Deferred Plan vest immediately upon grant. Grants awarded to outside directors upon appointment to our Board under the DEP vest in full on the first anniversary of the date of grant. Grants awarded to outside directors upon appointment to our Board under the Deferred Plan vest immediately upon grant. All grants awarded to outside directors expire on the tenth anniversary of the date of grant.

During Fiscal 2022, we had one stock option grant dated March 22, 2021 to directors. A total of 4,384 stock options were granted at an exercise price of $76.04 per share. The fair value of the grants was $39.73 per share, which was estimated on the date of grant using the Black-Scholes pricing model assuming an expected life of 4.63 years, expected volatility of 64.75%, a risk-free interest rate of 0.77% with no dividend yield.

We calculate the expected term for our stock options based on the historical exercise behavior of our participants. The volatility used to value stock options is based on historical volatility. We calculate historical volatility using an average calculation methodology based on daily price intervals as measured over the expected term of the option. We have consistently applied this methodology since our adoption of the provisions of ASC Topic 718, *Stock Compensation*. In accordance with ASC Topic 718, we base the risk-free interest rate on the annual continuously compounded risk-free rate with a term equal to the option's expected term. The dividend yield was zero since we had not historically declared dividends when the award was granted.

Activity for our option plans during Fiscal 2022 was as follows:

| | Number of Shares | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | | Aggregate Intrinsic Value ($000's) |
|---|---|---|---|---|---|---|
| Options outstanding at January 30, 2021 | 227,258 | $ | 37.15 | 4.39 | $ | 4,407 |
| Granted | 4,384 | | 76.04 | | | |
| Exercised | (65,716) | | 29.45 | | | |
| Forfeited, cancelled or expired | — | | — | | | |
| Options outstanding at January 29, 2022 | 165,926 | $ | 41.28 | 3.66 | $ | 3,106 |
| Exercisable at January 29, 2022 | 165,926 | $ | 41.28 | 3.66 | $ | 3,106 |

The weighted average grant-date fair value of options granted during Fiscal 2022, Fiscal 2021 and Fiscal 2020 was $39.73, $3.33 and $5.46, respectively.

The total intrinsic value of stock options exercised during Fiscal 2022, Fiscal 2021 and Fiscal 2020 was $2.7 million, $0.8 million and $9.6 thousand, respectively. The total cash received from these stock option exercises during Fiscal 2022, Fiscal 2021 and Fiscal 2020 was $4.7 million, $1.8 million and $0.1 million, respectively. As of January 29, 2022, there was no unamortized unrecognized compensation cost related to stock options.

***Restricted Stock and Performance-Based Units***

RSUs and PSUs are granted with a fair value equal to the closing market price of our common stock on the date of grant. All PSUs have been awarded in the form of restricted stock units. An award may vest completely at a point in time (cliff-vest) or in increments over time (graded-vest). The majority of awards, including PSUs, are subject to cliff-vest provisions. A small portion of awards to our executive officers are subject to graded vest provisions. Generally, RSUs vest over two to four years with the exception of awards to our Board of Directors who can choose the vest date for their annual award. PSUs provide for awards

based on achievement of certain predetermined corporate performance goals and typically cliff-vest in three years from the date of grant after achievement of stated performance criterion and upon meeting stated service conditions.

Compensation cost is recognized on a straight-line basis over the vesting period for cliff-vest awards and, in the case of PSUs, at the estimated percentage of achievement. For graded-vest awards, the award is divided into vesting tranches and the compensation cost is recognized on a straight-line basis for each tranche separately.

The following table summarizes the restricted stock unit awards activity under all our plans during Fiscal 2022:

| | RSUs | | PSUs | | Totals | |
|---|---|---|---|---|---|---|
| | Number of Awards | Weighted Average Grant-Date Fair Value | Number of Awards | Weighted Average Grant-Date Fair Value | Number of Awards | Weighted Average Grant-Date Fair Value |
| Nonvested at January 30, 2021 | 655,031 | $ 17.98 | 19,060 | $ 19.56 | 674,091 | $ 18.02 |
| Granted | 62,031 | 76.28 | 22,492 | 76.04 | 84,523 | 76.22 |
| PSU adjustment (1) | — | — | 3,900 | 22.55 | 3,900 | 22.55 |
| Vested | (140,075) | 22.23 | (10,335) | 22.55 | (150,410) | 22.25 |
| Forfeited, cancelled or expired | (21,489) | 21.43 | — | — | (21,489) | 21.54 |
| Nonvested at January 29, 2022 | 555,498 | $ 23.28 | 35,117 | $ 55.19 | 590,615 | $ 25.18 |

(1) PSU adjustment represents the net RSUs awarded to our NEOs above or below their target grants resulting from the achievement of performance goals above or below the performance targets established at grant. One grant goal was achieved at 200% of its target based on Fiscal 2019 through Fiscal 2021 financial results.

The weighted average grant date fair value of our RSUs granted was $76.22, $12.42 and $18.68 for Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively. There were 84,523, 337,749 and 296,583 RSUs awarded during Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively.

During Fiscal 2022, 150,410 RSU awards, including 10,335 PSU awards, vested with an intrinsic value of $10.5 million. The total intrinsic value of our RSU awards outstanding and unvested at January 29, 2022, January 30, 2021 and February 1, 2020 was $35.2 million, $38.1 million and $14.5 million, respectively. As of January 29, 2022, there was approximately $7.0 million of total unamortized unrecognized compensation cost related to RSU awards. This cost is expected to be recognized over a weighted average period of 2.0 years.

### Employee Stock Purchase Plan

The Company's ESPP allows eligible employees the right to purchase shares of our common stock, subject to certain limitations, at 85% of the lesser of the market value at the end of each calendar quarter (purchase date) or the beginning of each calendar quarter. Our employee purchases of common stock and the average price per share through the ESPP were as follows:

| Fiscal Year Ended | Shares Purchased | Average Price Per Share |
|---|---|---|
| January 29, 2022 | 14,447 | $ 50.01 |
| January 30, 2021 | 36,059 | $ 11.99 |
| February 1, 2020 | 26,116 | $ 15.02 |

The assumptions used in the option pricing model were as follows:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | January 29, 2022 | January 30, 2021 | February 1, 2020 |
| Weighted average fair value at date of grant | $14.33 | $4.18 | $4.18 |
| Expected life (years) | 0.25 | 0.25 | 0.25 |
| Expected volatility | 49.2% - 50.4% | 41.4% - 50.2% | 34.3% - 36.5% |
| Risk-free interest rate | 0.11% - 0.33% | 0.20% - 3.60% | 4.24% - 5.73% |
| Dividend yield | 1.12% - 1.41% | None | None |

The expense related to the ESPP was determined using the Black-Scholes option pricing model and the provisions of ASC Topic 718 as it relates to accounting for certain employee stock purchase plans with a look-back option. The compensation expense included in store operating, selling and administrative expenses and recognized during each of Fiscal 2022, Fiscal 2021 and Fiscal 2020 was $0.2 million, $0.1 million, and $0.1 million, respectively.

### Director Deferred Compensation

Under the Deferred Plan, non-employee directors can elect to defer all or a portion of their Board and Board Committee fees into cash, stock options or deferred stock units. Those fees deferred into stock options are subject to the same provisions as provided for in the DEP and are expensed and accounted for accordingly. Director fees deferred into stock units are calculated and expensed each calendar quarter by taking deferred fees earned during the calendar quarter and dividing by the closing price of our common stock on the last day of the calendar quarter, rounded to the nearest whole share. Director fees deferred into stock units are calculated and expensed each calendar quarter by taking deferred fees earned during the calendar quarter and dividing by the closing price of our common stock on the business day immediately preceding the last day of the calendar quarter, rounded to the nearest whole share. The total annual retainer, Board and Board Committee fees for non-employee directors that are not deferred into stock options, but which includes amounts deferred into stock units under the Deferred Plan, are expensed as incurred in all periods presented. A total of 729, 4,368 and 4,174 stock units were deferred under this plan in Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively. One director has elected to defer all or a portion of her compensation into stock units in calendar 2022.

### NOTE 4. EARNINGS PER SHARE

The computation of basic earnings per share (EPS) is based on the number of weighted average common shares outstanding during the period. The computation of diluted EPS is based on the weighted average number of shares outstanding plus the incremental shares that would be outstanding assuming exercise of dilutive stock options and issuance of restricted stock. The number of incremental shares is calculated by applying the treasury stock method. The following table sets forth the computation of basic and diluted earnings per share in thousands:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | January 29, 2022 (52-weeks) | January 30, 2021 (52-weeks) | February 1, 2020 (52-weeks) |
| Net income | $ 174,313 | $ 74,266 | $ 27,344 |
| | | | |
| Weighted average number of common shares outstanding | 14,993 | 16,547 | 17,746 |
| Dilutive stock options | 130 | 77 | 11 |
| Dilutive restricted stock units | 459 | 413 | 200 |
| Weighted average number of common shares outstanding and dilutive shares | 15,582 | 17,037 | 17,957 |
| | | | |
| Basic earnings per share | $ 11.63 | $ 4.49 | $ 1.54 |
| Diluted earnings per share | $ 11.19 | $ 4.36 | $ 1.52 |

In calculating diluted earnings per share, no options to purchase shares of common stock outstanding as of the end of the period were excluded in the computations of diluted earnings per share due to their anti-dilutive effect in Fiscal 2022. In calculating diluted earnings per share, 95,724 and 148,821 options to purchase shares of common stock outstanding as of the end of the period were excluded in the computations of diluted earnings per share due to their anti-dilutive effect in Fiscal 2021 and Fiscal 2020, respectively.

At January 29, 2022, we excluded 55,084 non-vested stock awards granted to certain employees from the computation of diluted weighted average common shares and common share equivalents outstanding, because they are subject to performance-based annual vesting conditions which had not been achieved by the end of Fiscal 2022. Assuming the performance criteria had been achieved at target as of January 29, 2022, the incremental dilutive impact would have been 20,757 shares.

### NOTE 5. DEBT

In October 2018, we entered into amended agreements with Bank of America, N.A. and Regions Bank providing for an aggregate amount of credit available to us under each line of credit of $50.0 million.

On April 16, 2020, we entered into the Second Amended and Restated Note with Regions Bank (the "Amended Credit Facility") that provides for an aggregate amount of credit available to us of $75.0 million. The Amended Credit Facility superseded the Regions Bank credit agreement dated October 2018, with a maturity date of April 19, 2021, and was secured by all assets of the Company with the exception of real property. Simultaneous to the execution of the Amended Credit Facility, the $50.0 million outstanding under the previous credit agreements was paid in full, the Bank of America credit agreement dated October 2018, was terminated and we incurred borrowings under the Amended Credit Facility of $50.0 million. On June 5, 2020, we entered into a Note Modification Agreement that extended the maturity date of the Amended Credit Facility from April 19, 2021 to July 18, 2021. No other provisions of the Amended Credit Facility were affected.

On July 9, 2021, we executed a new unsecured Credit Agreement (the "2021 Credit Facility") between the Company and its subsidiaries and Regions Bank, which supersedes the Amended Credit Facility, provides an unsecured line of credit of up to $100.0 million. The 2021 Credit Facility is effective through July 9, 2026 with an interest rate of one-month LIBOR plus 1.0% to 1.8% depending on specified leverage levels.

The 2021 Credit Facility includes an annual commitment fee, payable quarterly in arrears, in an amount between 15 and 20 basis points of the unused portion of the line of credit as determined on a daily basis, dependent on the amount of debt outstanding. In addition, the Company is subject to certain financial covenants which include:

- Advance limitation of 55% of the net book value of the Company's inventory;
- A Consolidated Lease-Adjusted Leverage Ratio comparing lease-adjusted funded debt (funded debt plus all lease liabilities) to EBITDAR (as defined in the 2021 Credit Facility) with a maximum of 3.5x; and
- A Consolidated Fixed Coverage Charge Ratio comparing EBITDAR to fixed charges and certain current liabilities (as defined in the 2021 Credit Facility) with a minimum of 1.2x.

As of January 29, 2022, we were in compliance with these covenants.

Given the International Exchange Benchmark Administration's announced phase-out of LIBOR, the 2021 Credit Facility includes a LIBOR phase-out provision. If, during the term of the 2021 Credit Facility, the lender determines that LIBOR is unavailable, impracticable or unreliable for use, the variable interest rate will be determined based on a substitute index which may be Term SOFR, Daily Simple SOFR, or an alternate rate index that has been selected by the Lender as the replacement for LIBOR. The replacement index will then become the operative interest rate index for borrowings under the 2021 Credit Facility, subject to provisions set forth in the 2021 Credit Facility.

There were 21 days during the 52-weeks ended January 29, 2022, where we incurred borrowings against our credit facility for an average and maximum borrowing of $2.0 million and $18.7 million, respectively, and an average interest rate of 1.35%. At January 29, 2022, a total of $100.0 million was available to us from the 2021 Credit Facility.

There were 97 days during the 52-weeks ended January 30, 2021, where we incurred borrowings against our prior credit facilities for an average and maximum borrowing of $43.3 million and $50.0 million, respectively, and an average interest rate of 3.45%.

### NOTE 6. LEASES

We lease our retail store locations, nearly all of which are operating leases. Store leases typically provide for initial terms of five to ten years. Many of our leases contain the following provisions:

- scheduled increases in rent payments over the lease term;
- tenant inducements;
- free rent periods;
- contingent rent based on net sales in excess of stipulated amounts;
- one or more renewal options at our discretion; and

- payments for common area maintenance, insurance and real estate taxes, most of which are variable in nature.

Most of our store leases contain provisions that allow for early termination between the third and fifth year of the term if predetermined sales levels are not met, or upon the occurrence of other specified contingent events. When we have the option to extend the lease term (including by not exercising an available termination option) or purchase the leased asset, and it is reasonably certain that we will do so, we consider these options in determining the classification and measurement of the lease. However, generally at lease commencement, it is not reasonably certain that we will exercise an extension or purchase option. For contingent termination provisions, we consider both the likelihood of the contingency occurring in addition to the economic factors we consider when assessing any other termination or renewal option.

We also lease certain office, transportation and technology equipment under operating and finance leases. Generally, these leases have initial terms of two to six years.

We determine whether an arrangement is a lease at inception. We have lease agreements that contain both lease and non-lease components. For store leases, we account for the lease components together with the non-lease components, such as common area maintenance. For office and transportation equipment leases, we separate the non-lease components from the lease components.

Operating lease liabilities are recognized based on the present value of remaining fixed lease payments over the lease term. Operating lease ROU assets are recognized based on the calculated lease liability, adjusted for lease prepayments, initial direct costs and tenant inducements. Because the implicit rate is generally not readily determinable for our leases, we use our estimated incremental borrowing rate, on a collateralized basis over a similar term, as the discount rate to measure operating lease liabilities. Due to the absence of an independently published credit rating, our estimated incremental borrowing rate is determined based on a synthetic credit rating. We use a blend of a financial ratio analysis and a Z-spread analysis to calculate our synthetic credit rating. Our most recent debt instrument terms and interest rates are also considered. The collateralized synthetic credit rating is then used to determine the yield most consistent with the tenor of our portfolio lease term and is adjusted on an ongoing basis by the movement in the market rates. The collateralized synthetic credit rating is reevaluated periodically as needed based on company-specific and market conditions. Operating lease cost for fixed lease payments is recognized on a straight-line basis over the lease term. Variable lease payments are generally expensed as incurred.

ROU lease assets are periodically reviewed for impairment losses. We use the long-lived assets impairment guidance in ASC Subtopic 360-10, *Property, Plant, and Equipment - Overall*, to determine when to evaluate assets and asset groups, including ROU assets, for impairment and to calculate any impairment loss to be recognized. Asset group impairment charges of approximately $2.9 million, $8.5 million and $1.5 million were recognized during Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively.

In April 2020, FASB issued interpretive guidance to respond to some frequently asked questions about accounting for lease concessions related to the effects of the COVID-19 pandemic. Under current U.S. GAAP, subsequent changes to lease payments that are not stipulated in the original lease are generally accounted for as lease modifications under ASC Topic 842. The interpretive guidance grants relief by allowing companies to make an accounting policy election to not evaluate lease concessions related to the effects of the COVID-19 pandemic as lease modifications. We elected not to utilize this exception and accounted for the COVID-19 pandemic related lease concessions as modifications triggering lease remeasurement.

Store operating lease cost and logistics-related transportation equipment operating lease cost are included in cost of goods sold in the consolidated statements of operations. Office equipment and other transportation equipment operating lease cost is included in store operating, selling and administrative expenses in the consolidated statements of operations.

| | January 29, 2022 (52-weeks) | | January 30, 2021 (52-weeks) | | February 1, 2020 (52-weeks) |
|---|---|---|---|---|---|
| Operating lease cost | $ | 68,359 | $ | 67,030 | $ | 71,096 |
| Finance lease cost: | | | | | | |
| Amortization of assets | | 849 | | 913 | | 943 |
| Interest on lease liabilities | | 136 | | 179 | | 223 |
| Variable lease cost [1] | | 18,379 | | 13,328 | | 11,757 |
| | $ | 87,723 | $ | 81,450 | $ | 84,019 |

[1] Includes rent based on a percent of sales, common area maintenance, insurance and property tax.

Short-term leases are not recorded on our consolidated balance sheet and short-term lease cost is immaterial.

Finance right-of-use assets on the consolidated balance sheet at January 29, 2022 and January 30, 2021 are shown net of accumulated amortization of $2.5 million and $1.7 million, respectively.

The following table provides supplemental balance sheet information related to leases:

| | January 29, 2022 (52-weeks) | January 30, 2021 (52-weeks) |
|---|---|---|
| Weighted average remaining lease term (in years): | | |
| Operating leases | 5 | 5 |
| Finance leases | 3 | 4 |
| | | |
| Weighted average discount rate: | | |
| Operating leases | 3.0 % | 3.5 % |
| Finance leases | 5.1 % | 5.5 % |

Maturities of lease liabilities (in thousands):

| | January 29, 2022 (52-Weeks) | | |
|---|---|---|---|
| | Operating | Finance | Total |
| Fiscal 2023 | $ 75,809 | $ 1,060 | $ 76,869 |
| Fiscal 2024 | 66,530 | 992 | $ 67,522 |
| Fiscal 2025 | 53,542 | 282 | $ 53,824 |
| Fiscal 2026 | 39,749 | 201 | $ 39,950 |
| Fiscal 2027 | 28,173 | — | $ 28,173 |
| Thereafter | 39,058 | — | $ 39,058 |
| Total minimum lease payments | 302,861 | 2,535 | 305,396 |
| Less amount representing interest | 21,991 | 133 | 22,124 |
| | $ 280,870 | $ 2,402 | $ 283,272 |

As of January 29, 2022, we have entered into operating leases of approximately $7.7 million related to future store locations that have not yet commenced.

**NOTE 7. DEFINED CONTRIBUTION BENEFIT PLANS**

We maintain the Hibbett, Inc. 401(k) Plan (the "401(k) Plan") for the benefit of our employees. The 401(k) Plan covers all employees who have completed one year of service. Participants of the 401(k) Plan may voluntarily contribute from 1% to 100% of their compensation subject to certain yearly dollar limitations as allowed by law. These elective contributions are made under the provisions of Section 401(k) of the Internal Revenue Code, which allows deferral of income taxes on the amount contributed to the 401(k) Plan and which operates under the Safe Harbor provisions. For Fiscal 2022, Fiscal 2021 and Fiscal 2020, we matched 100% of the first 3% of eligible compensation and 50% of the next 3% of eligible compensation for a total possible match of 4.5% of the first 6% of eligible compensation. Contribution expense incurred under the 401(k) Plan for Fiscal 2022, Fiscal 2021 and Fiscal 2020 was $2.0 million, $2.1 million and $1.6 million, respectively.

We maintain the Hibbett, Inc. Supplemental 401(k) Plan (the "Supplemental Plan") for the purpose of supplementing the employer matching contribution and salary deferral opportunity available to highly compensated employees whose ability to receive Company matching contributions and defer salary under the 401(k) Plan was limited because of certain restrictions applicable to qualified plans. The non-qualified deferred compensation Supplemental Plan allows participants to defer up to 40% of their compensation. Contributions to the Supplemental Plan are not subject to matching provisions; therefore no contribution

expense was incurred under the Supplemental Plan for Fiscal 2022, Fiscal 2021 and Fiscal 2020. The Supplemental Plan is intended to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended.

We maintain a Flexible Spending Account Plan ("FSA") that allows employees to set aside pre-tax amounts for out-of-pocket health care and dependent care expenses. The health care FSA is subject to ERISA, whereas the dependent care FSA is not. Employees are eligible to participate in the FSA upon meeting eligibility requirements or upon a defined qualifying event, and may enroll annually during an open enrollment period. Plan amounts are determined annually by the employee in advance and are subject to IRS dollar limitations. Employee elections, in general, cannot be increased, decreased or discontinued during the election period. Under the health care FSA, participants can rollover up to $500 of unused amounts at the end of the plan year. Under the dependent care FSA, unused amounts at the end of the plan year are subject to forfeiture and such forfeitures can be used to offset administrative expenses. Pursuant to the Consolidated Appropriations Act 2021, participants can rollover any unused amounts from their health care and dependent care FSAs at the end of the plan year for Fiscal 2022 and Fiscal 2021.

## NOTE 8. RELATED-PARTY TRANSACTIONS

The Company leases one store under a lease arrangement with Preferred Growth Properties, LLC (formerly AL Florence Realty Holdings 2010, LLC), a wholly owned subsidiary of Books-A-Million, Inc. ("BAMM"). One of our Directors, Terrance G. Finley is an executive officer of BAMM. Minimum annual lease payments are $0.1 million, if not in co-tenancy, and the lease termination date is February 2022. In August 2021, the Company exercised an option to extend the term of the lease by five years, with the new term commencing on March 1, 2022 and terminating on February 28, 2027. The minimal annual lease payment of $0.1 million did not change. In each of Fiscal 2022, Fiscal 2021 and Fiscal 2020, minimum lease payments were $0.1 million. Minimum lease payments remaining under this lease at January 29, 2022 were $0.6 million.

The Company honored certain contracts in place for its wholly owned subsidiary, City Gear, LLC, upon acquisition in Fiscal 2019. The following listing represents those contracts of which Michael E. Longo, the Company's President and CEO, has an interest in, either directly or indirectly.

*Memphis Logistics Group ("MLG")*
MLG provided logistics and warehousing services to City Gear. Mr. Longo owned a majority interest in MLG and the initial contract term was effective through June 2020 but has been extended to June 2021. Effective January 29, 2021, Mr. Longo fully divested his ownership interest in MLG and he no longer has any involvement with its management. MLG subsequently reorganized as Riverhorse Logistics, LLC. In Fiscal 2021 and Fiscal 2020, payments to MLG under the contract were $7.9 million and $7.2 million, respectively. The amount outstanding to MLG at January 30, 2021 was $0.3 million, and is included in accounts payable on our consolidated balance sheets.

*T.I.G. Construction ("TIG")*
TIG historically performed the majority of new store and store remodel construction for City Gear and is owned by a close relative of Mr. Longo. In Fiscal 2022, Fiscal 2021 and Fiscal 2020, payments to TIG for their services were $6.7 million, $6.1 million and $3.8 million, respectively. The amount outstanding to TIG at January 29, 2022 and January 30, 2021 was $0.6 million and $26,000, respectively, and is included in accounts payable on our consolidated balance sheets.

*Merchant's Capital ("MC")*
Merchant's Capital owned the office building where City Gear had its corporate offices in Memphis, Tennessee. Mr. Longo is a 33.3% partner in MC. The initial lease term ended on December 31, 2019 but was extended to April 30, 2020 to allow for the transition of City Gear's corporate office to the Company's Birmingham, Alabama location. In Fiscal 2022, there were no minimum lease payments to MC. In Fiscal 2021 and Fiscal 2020, minimum lease payments to MC were $0.1 million and $0.3 million, respectively. There were no amounts outstanding to MC at January 29, 2022 or January 30, 2021.

*Retail Security Gates, LLC ("RSG")*
During the second quarter of Fiscal 2022, a close relative of Mr. Longo purchased a 50% interest in an existing Company vendor, which was reorganized as RSG. We utilize RSG for specially manufactured store front security gates. In Fiscal 2022, payments to RSG for their services were $0.3 million. There were no amounts outstanding to RSG at January 29, 2022.

In addition to the related party interests listed above, Mr. Longo also had a membership interest in two contingent earnouts ("Earnouts") related to the acquisition of City Gear based on City Gear's achievement of certain EBITDA thresholds for the 52-weeks ended February 1, 2020 and January 30, 2021, respectively. The Earnouts were in addition to the aggregate consideration payable to the sellers of City Gear, LLC in November 2018.

Pursuant to the Membership Interest and Warrant Purchase Agreement dated October 29, 2018 and based on Fiscal 2020 and Fiscal 2021 financial results, former members and warrant holders of City Gear were entitled to and paid both Earnouts amounting to a payment of $10.0 million in June 2020 and a payment of $15.0 million in April 2021. Mr. Longo's share of the earnout payments was approximately 22.8% or approximately $2.3 million of the initial earnout payment and approximately $3.4 million of the second earnout payment.

**NOTE 9. INCOME TAXES**

A summary of the components of the provision (benefit) for income taxes is as follows (in thousands):

| | Fiscal Year Ended | | |
|---|---|---|---|
| | January 29, 2022 (52-weeks) | January 30, 2021 (52-weeks) | February 1, 2020 (52-weeks) |
| Federal: | | | |
| Current | $ 37,013 | $ 23,651 | $ 11,724 |
| Deferred | 7,142 | (4,191) | (4,265) |
| | 44,155 | 19,460 | 7,459 |
| State: | | | |
| Current | 9,128 | 5,580 | 1,975 |
| Deferred | 296 | (1,354) | (450) |
| | 9,424 | 4,226 | 1,525 |
| Provision for income taxes | $ 53,579 | $ 23,686 | $ 8,984 |

A reconciliation of the statutory federal income tax rate to the effective tax rate as a percentage of income before provision for income taxes follows:

| | Fiscal Year Ended | | |
|---|---|---|---|
| | January 29, 2022 (52-weeks) | January 30, 2021 (52-weeks) | February 1, 2020 (52-weeks) |
| Tax provision computed at the federal statutory rate | 21.00 % | 21.00 % | 21.00 % |
| Effect of state income taxes, net of federal benefits | 3.50 | 3.47 | 3.60 |
| Federal income tax credits | (0.40) | (0.70) | (1.99) |
| Executive compensation limitations | 0.52 | 0.09 | 1.47 |
| Equity compensation tax (excess) deficiencies | (0.97) | 0.17 | 1.71 |
| Other, net | (0.14) | 0.15 | (1.06) |
| | 23.51 % | 24.18 % | 24.73 % |

*Index*

Deferred income taxes on the consolidated balance sheets result from temporary differences between the amount of assets and liabilities recognized for financial reporting and income tax purposes. The components of the deferred income taxes, net, are as follows (in thousands):

| | January 29, 2022 (52-weeks) | January 30, 2021 (52-weeks) |
|---|---|---|
| Rent | $ 72,452 | $ 64,369 |
| Inventories | 2,795 | 2,362 |
| Accruals | 8,175 | 11,546 |
| Stock-based compensation | 2,704 | 2,398 |
| Other | 85 | 152 |
| Total deferred tax assets | 86,211 | 80,827 |
| Rent | (66,056) | (57,776) |
| Accumulated depreciation and amortization | (10,440) | (6,226) |
| Prepaid expenses | (2,336) | (1,747) |
| State taxes | (192) | (453) |
| Total deferred tax liabilities | (79,024) | (66,202) |
| Deferred income taxes, net | $ 7,187 | $ 14,625 |

Deferred tax assets represent items that will be used as a tax deduction or credit in future tax returns or are items of income that have not been recognized for financial statement purposes but were included in the current or prior tax returns for which we have already properly recorded the tax benefit in the consolidated statements of operations. At least quarterly, we assess the likelihood that the deferred tax assets balance will be recovered. We take into account such factors as prior earnings history, expected future earnings, carryback and carryforward periods and tax strategies that could potentially enhance the likelihood of a realization of a deferred tax asset. To the extent recovery is not more likely than not, a valuation allowance is established against the deferred tax asset, increasing our income tax expense in the year such determination is made. We have determined that no such allowance is required.

We apply the provisions of ASC Subtopic 740-10 in accounting for uncertainty in income taxes. In accordance with ASC Subtopic 740-10, we recognize a tax benefit associated with an uncertain tax position when, in our judgment based on technical merits, it is more likely than not that the position will be sustained upon examination by a taxing authority. For a tax position that meets the more-likely-than-not recognition threshold, we initially and subsequently measure the tax benefit as the largest amount that we judge to have a greater than 50% likelihood of being realized upon ultimate settlement with a taxing authority. Our liability associated with unrecognized tax benefits is adjusted periodically due to changing circumstances, such as the progress of tax audits, case law developments and new or emerging legislation. Such adjustments are recognized entirely in the period in which they are identified. Our effective tax rate includes the net impact of changes in the liability for unrecognized tax benefits and subsequent adjustments as considered appropriate by management.

We file income tax returns in the U.S. federal and various state jurisdictions. A number of years may elapse before a particular matter for which we have recorded a liability related to an unrecognized tax benefit is audited and finally resolved. Generally, we are not subject to changes in income taxes by the U.S. federal taxing jurisdiction for years prior to Fiscal 2019 or by most state taxing jurisdictions for years prior to Fiscal 2018. While it is often difficult to predict the final outcome or the timing of resolution of any particular tax matter, we believe our liability for unrecognized tax benefits is adequate. Favorable settlement of an unrecognized tax benefit could be recognized as a reduction in our effective tax rate in the period of resolution. Unfavorable settlement of an unrecognized tax benefit could increase the effective tax rate and may require the use of cash in the period of resolution. Our liability for unrecognized tax benefits is generally presented as non-current. However, if we anticipate paying cash within one year to settle an uncertain tax position, the liability is presented as current.

A reconciliation of the unrecognized tax benefit, excluding estimated interest and penalties, under ASC Subtopic 740-10 follows (in thousands):

| | January 29, 2022 (52-weeks) | January 30, 2021 (52-weeks) | February 1, 2020 (52-weeks) |
|---|---|---|---|
| Unrecognized tax benefits - beginning of year | $ 616 | $ 818 | $ 1,245 |
| Gross increases - tax positions in prior period | — | 3 | — |
| Gross decreases - tax positions in prior period | (51) | — | (234) |
| Gross increases - tax positions in current period | — | — | — |
| Settlements | — | — | — |
| Lapse of statute of limitations | (110) | (205) | (193) |
| Unrecognized tax benefits - end of year | $ 455 | $ 616 | $ 818 |

We classify interest and penalties recognized on unrecognized tax benefits as income tax expense. We have accrued interest and penalties in the amount of $0.1 million, $0.1 million and $0.1 million as of January 29, 2022, January 30, 2021 and February 1, 2020, respectively. During Fiscal 2022, Fiscal 2021 and Fiscal 2020, we recorded $(18,000), $(28,000) and $(19,000), respectively, for the accrual of interest and penalties in the consolidated statement of operations.

Of the unrecognized tax benefits as of January 29, 2022, January 30, 2021 and February 1, 2020, $0.3 million, $0.4 million and $0.6 million, respectively, if recognized, would affect our effective income tax rate.

## NOTE 10. COMMITMENTS AND CONTINGENCIES

### Annual Bonuses and Equity Incentive Awards

Specified officers and corporate employees of our Company are entitled to annual bonuses, primarily based on measures of Company operating performance. At January 29, 2022 and January 30, 2021, there was $13.0 million and $10.6 million, respectively, of annual bonus-related expense included in accrued payroll expenses.

In addition, the Compensation Committee (Committee) of the Board of Directors places performance criteria on awards of PSUs made in the form of RSUs to our NEOs under the EIP. The performance criteria are tied to performance targets with respect to future sales and operating income over a specified period of time. These PSUs are expensed under the provisions of ASC Topic 718 and are evaluated each quarter to determine the probability that the performance conditions set within will be met. We expect the Committee to continue to place performance criteria on awards of RSUs to our NEOs in the future.

### Legal Proceedings and Other Contingencies

We are a party to various legal proceedings incidental to our business. Where we are able to reasonably estimate an amount of probable loss in these matters based on known facts, we have accrued that amount as a current liability on our balance sheet. We are not able to reasonably estimate the possible loss or range of loss in excess of the amount accrued for these proceedings based on the information currently available to us, including, among others, (i) uncertainties as to the outcome of pending proceedings (including motions and appeals) and (ii) uncertainties as to the likelihood of settlement and the outcome of any negotiations with respect thereto. We do not believe that any of these matters will, individually or in the aggregate, have a material effect on our business or financial condition. We cannot give assurance, however, that one or more of these proceedings will not have a material effect on our results of operations for the period in which they are resolved. At January 29, 2022 and January 30, 2021, the estimated liability is immaterial.

The estimates of our liability for pending and unasserted potential claims do not include litigation costs. It is our policy to accrue legal fees when it is probable that we will have to defend against known claims or allegations and we can reasonably estimate the amount of the anticipated expense.

From time to time, we enter into certain types of agreements that require us to indemnify parties against third-party claims under certain circumstances. Generally, these agreements relate to: (a) agreements with vendors and suppliers under which we may provide customary indemnification to our vendors and suppliers in respect to actions they take at our request or otherwise on our

*Index*

behalf; (b) agreements to indemnify vendors against trademark and copyright infringement claims concerning merchandise manufactured specifically for or on behalf of the Company; (c) real estate leases, under which we may agree to indemnify the lessors from claims arising from our use of the property; and (d) agreements with our directors, officers and employees, under which we may agree to indemnify such persons for liabilities arising out of their relationship with us. We have director and officer liability insurance, which, subject to the policy's conditions, provides coverage for indemnification amounts payable by us with respect to our directors and officers up to specified limits and subject to certain deductibles.

If we believe that a loss is both probable and estimable for a particular matter, the loss is accrued in accordance with the requirements of ASC Topic 450, *Contingencies*. With respect to any matter, we could change our belief as to whether a loss is probable or estimable, or its estimate of loss, at any time.

## NOTE 11. FAIR VALUE MEASUREMENTS

ASC Topic 820, *Fair Value Measurement*, establishes a three-level fair value hierarchy that prioritizes the inputs used to measure fair value. The three levels of inputs used to measure fair value are as follows:
- Level I – Quoted prices in active markets for identical assets or liabilities.
- Level II – Observable inputs other than quoted prices included in Level I.
- Level III – Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

The table below segregates all financial assets and liabilities that are measured at fair value on a recurring basis (at least annually) into the most appropriate level within the fair value hierarchy based on the inputs used to determine the fair value (in thousands):

| | January 29, 2022 | | | January 30, 2021 | | |
| | Level I | Level II | Level III | Level I | Level II | Level III |
|---|---|---|---|---|---|---|
| Short-term investments | $ 129 | $ — | $ — | $ 219 | $ — | $ — |
| Long-term investments | 2,352 | | | 2,107 | | |
| Short-term contingent earnout | — | | — | — | — | 15,000 |
| Total | $ 2,481 | $ — | $ — | $ 2,326 | $ — | $ 15,000 |

Short-term investments are reported in other current assets while long-term investments are reported in other assets, net, in our consolidated balance sheets. Short-term contingent earnout is reported in other accrued expenses on our consolidated balance sheets.

The short-term contingent earnout represents the fair value of an additional payment outlined in the Purchase Agreement to the members and warrant holders of City Gear if certain financial goals were achieved in Fiscal 2021. The earnout was valued using a Monte Carlo simulation analysis in a risk-neutral framework with assumptions for volatility, risk-free rate and dividend yield. The earnout was re-valued each quarter and any change in valuation flowed through our statements of operations. As a result of the revaluation for the 52-weeks ended January 30, 2021, an increase of $3.9 million was recognized in store operating, selling and administrative expenses.

The table below are reconciliations of the contingent earnout balance for each period presented (in thousands):

| | January 29, 2022 (52-Weeks) | | January 30,2021 (52-Weeks) | |
| | Short-term | Long-term | Short-term | Long-term |
|---|---|---|---|---|
| Beginning balance | $ 15,000 | $ — | $ 9,958 | $ 11,099 |
| Change in valuation | — | — | 3,943 | — |
| Payment of year one earnout | (15,000) | — | (10,000) | — |
| Reclassification from long-term, net | — | — | 11,099 | (11,099) |
| Ending balance | $ — | $ — | $ 15,000 | $ — |

## Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.

Not applicable.

**Item 9A. Controls and Procedures.**

**(a)  Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including the Chief Executive Officer and President (principal executive officer) and Senior Vice President and Chief Financial Officer (principal financial officer), as appropriate, to allow timely decisions regarding the required disclosures.

As of January 29, 2022, our management, under the supervision and with the participation of our principal executive officer and principal financial officer, performed an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rule 13a and 15d-15(e) under the Exchange Act). Based upon this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective as of January 29, 2022.

**(b)  Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Exchange Act). Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of January 29, 2022, based on the *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our evaluation under the framework in *Internal Control – Integrated Framework (2013)*, our management concluded that our internal control over financial reporting was effective as of January 29, 2022.

Ernst & Young LLP, our independent registered public accounting firm, has issued an audit report on the Company's internal control over financial reporting as of January 29, 2022 included in Item 8 herein.

**(c)  Changes in Internal Control Over Financial Reporting**

There has been no change in our internal control over financial reporting during the fourth quarter of Fiscal 2022 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information.**

Not applicable.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections.**

Not applicable.

<div align="center">

**PART III**

</div>

With the exception of the information specifically incorporated by reference from our Proxy Statement for the 2022 Annual Meeting of Stockholders (2022 Proxy Statement) in Items 10, 11, 12, 13 and 14 of Part III of this Annual Report on Form 10-K, our 2022 Proxy Statement shall not be deemed to be a part of, or incorporated by reference into, this Annual Report on Form 10-K.

**Item 10.   Directors, Executive Officers and Corporate Governance.**

The following information required by this Item is incorporated by reference from the 2022 Proxy Statement:
*   Information regarding our directors is found under the heading "The Board of Directors and Corporate Governance Matters."
*   Information regarding compliance with Section 16 of the Securities Exchange Act of 1934, as amended, related person transactions and legal proceedings is found under the heading "Delinquent Section 16(a) Reports, Related Person Transactions and Legal Proceedings."
*   Information regarding the Company's Audit Committee financial expert(s) is found under the heading "Committees of the Board of Directors-Audit Committee-Audit Committee Financial Experts."

- Information regarding the members of the Audit Committee is found under the heading "Committees of the Board of Directors-Audit Committee."

We have adopted a Code of Business Conduct and Ethics (the "Code") for all Company employees, including our Named Executive Officers as determined for our 2022 Proxy Statement. We have also adopted a set of Corporate Governance Guidelines (the "Guidelines") and charters for all of our Board Committees, including the Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee. We intend to make all required disclosures regarding any amendment to, or a waiver of, a provision of the Code for senior executive and financial officers as well as any change or amendments to our Guidelines or committee charters by posting such information on our website. The Code, Guidelines and charters are posted on our website, www.hibbett.com under "Investor Relations." Reference to our website does not constitute incorporation by reference of the information contained on the site and should not be considered part of this Annual Report on Form 10-K.

The information concerning our executive officers required by this Item is included in Part I, Item 1 of this Annual Report on Form 10-K under the heading "Information about our Executive Officers," which is included therein in accordance with Instruction to Item 401 of Regulation S-K. Each of our executive officers is elected annually.

### Item 11. Executive Compensation.

The following information required by this Item is incorporated by reference from the 2022 Proxy Statement:
- Information regarding executive compensation is found under the headings "Compensation Discussion and Analysis" and "Annual Compensation of Named Executive Officers."
- Information regarding the report of the Compensation Committee on executive compensation is found under the heading "Compensation Committee Report."
- Information regarding Compensation Committee interlocks is found under the heading "Compensation Committee Interlocks and Insider Participation."
- Information regarding director compensation is found under the heading "Compensation of Non-Employee Directors."

**Item 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

The information required by this Item regarding the stock ownership of directors, executive officers and five percent beneficial owners is found under the heading "Security Ownership of Certain Beneficial Owners and Management" in the 2022 Proxy Statement and is incorporated herein by reference.

**Equity Compensation Plan Information**

The following table provides information on the equity securities of the Company that are authorized for issuance under its equity compensation plans as of January 29, 2022:

| Plan Category | (a)<br>Number of securities<br>to be issued upon<br>exercise of<br>outstanding options,<br>warrants and rights<br>(1) | (b)<br>Weighted<br>average<br>exercise price<br>of outstanding<br>options | (c)<br>Number of securities<br>remaining available for<br>future issuance under<br>equity compensation<br>plans (excluding<br>securities reflected in<br>column (a)) (2) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 769,355 | $ 41.28 | 1,888,665 |
| Equity compensation plans not approved by security holders | — | — | — |
| TOTAL | 769,355 | $ 41.28 | 1,888,665 |

(1)    Includes 87,092 RSUs and 12,814 DSUs that will be awarded at a future date elected by the participant. It also includes 468,406 RSUs that may be awarded if service periods are met and 35,117 PSUs that may be awarded if specified targets and service periods are met. The weighted average exercise price of outstanding options does not include these awards.

(2)    Includes 152,096 shares remaining under our ESPP and 121,194 shares remaining under our Deferred Plan without consideration of shares subject to purchase in the purchasing period ending March 31, 2022.

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

The information regarding related party transactions and director independence required by this Item is found under the headings "Related Person Transactions" and "Our Board of Directors and Corporate Governance Matters-Board Composition-Director Independence" in the 2022 Proxy Statement and is incorporated herein by reference.

**Item 14. Principal Accounting Fees and Services.**

The information regarding principal accountant fees and services required by this Item is found under the headings "Audit Matters-Fees Paid to Independent Registered Public Accounting Firm" and "Audit Matters-Policy on Pre-Approval of Audit and Permissible Non-Audit Services" in the 2022 Proxy Statement and is incorporated herein by reference.

# PART IV

**Item 15. Exhibits, Financial Statement Schedules.**

(a)   Documents filed as part of this report:

| Number | Description | Page |
|---|---|---|
| 1. | *Financial Statements.* | |
| | The following Consolidated Financial Statements and Supplementary Data of the Company and Independent Registered Public Accounting Firm's Report on such Consolidated Financial Statements are included in Part II, Item 8 of this report: | |
| | Report of Independent Registered Public Accounting Firm | 43 |
| | Consolidated Balance Sheets as of January 29, 2022 and January 30, 2021 | 45 |
| | Consolidated Statements of Operations for the fiscal years ended January 29, 2022, January 30, 2021 and February 1, 2020 | 46 |
| | Consolidated Statements of Cash Flows for the fiscal years ended January 29, 2022, January 30, 2021 and February 1, 2020 | 47 |
| | Consolidated Statements of Stockholders' Investment for the fiscal years ended January 29, 2022, January 30, 2021 and February 1, 2020 | 48 |
| | Notes to Consolidated Financial Statements | 49 |
| 2. | *Financial Statement Schedules.* | |
| | All schedules for which provision is made in the applicable accounting regulations of the Securities and Exchange Commission are not required under the related instructions or are not applicable, and therefore have been omitted. | |
| 3. | *Exhibits.* | |
| | The Exhibits listed below are the exhibits of Hibbett, Inc. and its wholly owned subsidiaries and are filed as part of, or incorporated by reference into, this report. | |
| | **Certificates of Incorporation and By-Laws** | |
| 3.1 | Certificate of Incorporation of the Registrant; incorporated herein by reference to Exhibit 3.1 of the Registrant's Form 8-K filed with the Securities and Exchange Commission on May 31, 2012. | |
| 3.2 | Certificate of Amendment to the Certificate of Incorporation of the Registrant; incorporated herein by reference to Exhibit 3.1 of the Registrant's Form Current Report on Form 8-K filed with the Securities and Exchange Commission on June 24, 2021. | |
| 3.3 | Bylaws of the Registrant, as amended; incorporated herein by reference to Exhibit 3.2 of the Registrant's Form 8-K filed with the Securities and Exchange Commission on June 24, 2021. | |
| | **Instruments Defining the Rights of Securities Holders** | |
| 4.1 | Form of Stock Certificate; attached as Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed on June 24, 2021. | |
| 4.2    * | Description of Securities. | |
| | **Material Contracts** | |
| 10.1 | Membership Interest and Warrant Purchase Agreement; incorporated herein by reference to Exhibit 2.1 of the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on October 30, 2018. | |
| 10.2    *† | Hibbett, Inc. 2012 Non-Employee Director Equity Plan. | |
| 10.3    *† | Hibbett, Inc. Non-Employee Director Non-Qualified Option Agreement (Initial Grant, Service Requirement). | |
| 10.4    *† | Hibbett, Inc. Non-Employee Director Restricted Stock Unit Award Agreement (Initial Grant, Service Requirement). | |

| Number | | Description | Page |
|--------|---|-------------|------|
| 10.5 | *† | Hibbett, Inc. Non-Employee Director Non-Qualified Option Agreement (Annual Grant; Fully Vested). | |
| 10.6 | *† | Hibbett, Inc. Non-Employee Director Restricted Stock Unit Award Agreement (Annual Grant; Fully Vested). | |
| 10.7 | | Amended and Restated Agreement of Lease between Hibbett Sporting Goods, Inc. (n/k/a/ Hibbett Retail, Inc.) and AL Florence Realty Holdings 2010, LLC, dated October 3, 2011; incorporated herein by reference to Exhibit 10.1 to the Registrant's Annual Report on Form 10-K filed with the Securities and Exchange Commission on March 26, 2012. | |
| 10.8 | *† | Change in Control Severance Agreement. | |
| 10.9 | *† | Hibbett, Inc. Amended and Restated 2015 Equity Incentive Plan. | |
| 10.10 | *† | Hibbett, Inc. 2016 Executive Officer Cash Bonus Plan. | |
| 10.11 | *† | Hibbett, Inc. Executive Voluntary Deferral Plan. | |
| 10.12 | *† | Hibbett, Inc. 2015 Employee Stock Purchase Plan. | |
| 10.13 | *† | Hibbett, Inc. 2015 Director Deferred Compensation Plan. | |
| 10.14 | *† | Standard Restricted Stock Unit Award Agreement. | |
| 10.15 | *† | Executive Restricted Stock Unit Award Agreement. | |
| 10.16 | † | Employment Agreement between Hibbett Sporting Goods, Inc. (n/k/a Hibbett Retail, Inc.) and Michael E. Longo, effective December 16, 2019; incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on December 19, 2019. | |
| 10.17 | † | Change in Control Severance Agreement, between Hibbett Sports, Inc. (n/k/a Hibbett, Inc.) and Michael E. Longo, effective December 16, 2019; incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on December 19, 2019. | |
| 10.18 | | Credit Agreement, dated as of July 9, 2021, among Hibbett, Inc. as Borrower, subsidiaries of Borrower, as Guarantors, and Regions Bank, as Lender; incorporated by reference to Exhibit 10.1 of the Registrant's Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission on September 7, 2021. | |
| | | **Subsidiaries of the Registrant** | |
| 21 | | List of Company's Subsidiaries: | |
| | | 1)   Hibbett Retail, Inc., a Delaware Corporation | |
| | | 2)   City Gear, LLC, a Tennessee Limited Liability Company | |
| | | 3)   Hibbett Digital Management, LLC, an Alabama Limited Liability Company | |
| | | 4)   Gift Card Services, LLC, a Virginia Limited Liability Company | |
| | | 5)   Hibbett Wholesale, Inc., an Alabama Corporation | |
| | | 6)   Hibbett Holdings, LLC, an Alabama Limited Liability Company | |
| | | **Consents of Experts and Counsel** | |
| 23.1 | * | Consent of Ernst & Young LLP, Independent Registered Public Accounting Firm | |
| 23.2 | * | Consent of KPMG LLP, Independent Registered Public Accounting Firm | |
| | | **Certifications** | |
| 31.1 | * | Rule 13a-14(a)/15d-14(a) Certification of Principal Executive Officer | |
| 31.2 | * | Rule 13a-14(a)/15d-14(a) Certification of Principal Financial Officer | |
| 32.1 | * | Section 1350 Certification of Chief Executive Officer and Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | |

*Index*

| Number | | Description | Page |
|--------|---|-------------|------|
| | | **Interactive Data Files** | |
| 101.INS | * | XBRL Instance Document | |
| 101.SCH | * | XBRL Taxonomy Extension Schema Document | |
| 101.CAL | * | XBRL Taxonomy Extension Calculation Linkbase Document | |
| 101.DEF | * | XBRL Taxonomy Extension Definition Linkbase Document | |
| 101.LAB | * | XBRL Taxonomy Extension Label Linkbase Document | |
| 101.PRE | * | XBRL Taxonomy Extension Presentation Linkbase Document | |
| 104 | * | The cover page for the Registrant's Annual Report on Form 10-K for the fiscal year ended January 29, 2022, has been formatted in Inline XBRL. | |
| | * | Filed Within | |
| | † | Management Contract or Compensatory Plan or Arrangement | |

**Item 16. Form 10-K Summary.**

Not applicable.

*Index*

**SIGNATURES.**

Pursuant to the requirements of Section 13 or 15(d) of the Exchange Act, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**HIBBETT, INC.**

Date:  March 25, 2022

By:   /s/ Robert Volke
Robert Volke
SVP and Chief Financial Officer (*Principal Financial and Accounting Officer*)

Pursuant to the requirements of the Exchange Act, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Michael E. Longo<br>Michael E. Longo | Chief Executive Officer, President and Director<br>(*Principal Executive Officer*) | March 25, 2022 |
| /s/ Robert Volke<br>Robert Volke | SVP and Chief Financial Officer<br>(*Principal Financial and Accounting Officer*) | March 25, 2022 |
| /s/ Anthony F. Crudele<br>Anthony F. Crudele | Chairman of the Board | March 25, 2022 |
| /s/ Karen S. Etzkorn<br>Karen S. Etzkorn | Director | March 25, 2022 |
| /s/ Terry G. Finley<br>Terry G. Finley | Director | March 25, 2022 |
| /s/ Dorlisa K. Flur<br>Dorlisa K. Flur | Director | March 25, 2022 |
| /s/ James A. Hilt<br>James A. Hilt | Director | March 25, 2022 |
| /s/ Linda Hubbard<br>Linda Hubbard | Director | March 25, 2022 |
| /s/ Lorna E. Nagler<br>Lorna E. Nagler | Director | March 25, 2022 |
| /s/ Jamere Jackson<br>Jamere Jackson | Director | March 25, 2022 |
| /s/ Alton E. Yother<br>Alton E. Yother | Director | March 25, 2022 |

*Exhibit 4.2*

**Description of Securities**
**of**
**Hibbett, Inc.**

The following description of the securities of Hibbett, Inc., a Delaware corporation ("us," "our," "we," "Hibbett" or the "Company"), is a summary of the rights of our common stock, par value $0.01 per share ("Common Stock"), and preferred stock, par value $0.01 per share ("Preferred Stock "), and certain provisions of our certificate of incorporation ("Certificate of Incorporation"), bylaws ("Bylaws"), and the Delaware General Corporation Law (the "DGCL"), as currently in effect. This summary does not purport to be complete and is qualified in its entirety by the provisions of our Certificate of Incorporation, which is incorporated by reference as Exhibit 3.1 and Exhibit 3.2, and our Bylaws, which are incorporated by reference as Exhibit 3.3, in each case to the Annual Report on Form 10-K of which this Exhibit 4.2 is a part. We encourage you to read our Certificate of Incorporation and Bylaws and the applicable provisions of the DGCL for additional information.

**Authorized Capital Stock**

Pursuant to the Certificate of Incorporation, our authorized capital stock consists of 81,000,000 shares, consisting of 80,000,000 shares of Common Stock, and 1,000,000 shares of Preferred Stock. All outstanding shares of our Common Stock are fully paid and nonassessable. There are no outstanding shares of Preferred Stock.

**Common Stock**

*Voting Rights*: Each outstanding share of our Common Stock is entitled to one vote on all matters submitted to a vote of shareholders. Our board of directors (the "Board") consists of three classes, with the term of office of one class expiring each year. Accordingly, each of our directors is elected by a plurality vote to serve for a term of three years. The holders of our outstanding Common Stock do not have the right to cumulate their votes with respect to the election of directors or any other matters.

*Dividends*: Subject to the rights of holders of outstanding shares of Preferred Stock, if any, the holders of Common Stock are entitled to receive dividends, if any, as may be declared from time to time by the Board in its discretion out of funds legally available for the payment of dividends.

*Liquidation*: In the event of a liquidation, dissolution or winding-up of Hibbett, the holders of Common Stock are entitled to share equally and ratably in the assets of Hibbett, if any, remaining after the payment of all debts and liabilities of Hibbett and the liquidation preference of any outstanding Preferred Stock.

*Other Rights and Preferences*: Our Common Stock has no preemptive rights and no redemption, sinking fund or conversion provisions. Holders of Common Stock may act by unanimous written consent.

**Preferred Stock**

The Board is granted the authority to, from time to time, issue the Preferred Stock as Preferred Stock of one or more series and in connection with the creation of any such series to fix by resolution the designation, voting powers, preferences, and relative, participating, optional, or other special rights of such series, and the qualifications, limitations, or restrictions thereof. The rights, preferences, privileges and restrictions or qualifications of different series of Preferred Stock may differ with respect to dividend rates, amounts payable on liquidation, voting rights, conversion rights, redemption provisions, sinking fund provisions and other matters. The issuance of Preferred Stock could decrease the amount of earnings and assets available for distribution to holders of Common Stock, adversely affect the rights and powers, including voting rights, of holders of Common Stock, and have the effect of delaying, deterring or preventing a change in control of us.

No shares of our Preferred Stock are currently issued and outstanding and we currently have no plans to issue any of the 1,000,000 authorized shares of Preferred Stock.

**Our Certificate of Incorporation and Bylaws Contain Provisions That May Have an Anti-Takeover Effect**

Certain provisions of our Certificate of Incorporation and Bylaws may be deemed to have anti-takeover effects and may discourage, delay or prevent a takeover attempt. These provisions, among other things:

    a.   classify our Board into three classes, each of which serves for different three-year periods;

    b.   provide that a director may be removed by stockholders only for cause by a vote of the holders of not less than a majority of our shares entitled to vote;

    c.    provide that all vacancies on our Board, including any vacancies resulting from an increase in the number of directors, may be filled by a majority of the remaining directors, even if the number is less than a quorum;

    d.    provide that special meetings of the common stockholders may only be called by the Board, the Chairman of the Board or upon the demand of the holders of a majority of the total voting power of all outstanding securities of the Company entitled to vote at any such special meeting; and

    e.    call for a vote of the holders of not less than two-thirds of the shares entitled to vote in order to amend the foregoing provisions and certain other provisions of our Certificate of Incorporation and Bylaws.

In addition, our Board, without further action of the stockholders, is permitted to issue and fix the terms of Preferred Stock, which may have rights senior to those of Common Stock.

**Delaware Anti-Takeover Statutes**

In addition to certain of the Certificate of Incorporation and Bylaws provisions discussed above, certain provisions of the DGCL may make it more difficult for someone to acquire us through a tender offer, proxy contest or otherwise.

Section 203 of the DGCL provides that, subject to certain stated exceptions, an "interested stockholder" is any person (other than the corporation and any direct or indirect majority-owned subsidiary) who owns 15% or more of the outstanding voting stock of the corporation or is an affiliate or associate of the corporation and was the owner of 15% or more of the outstanding voting stock of the corporation at any time within the three-year period immediately prior to the date of determination, and the affiliates and associates of such person. A corporation may not engage in a business combination with any interested stockholder for a period of three years following the time that such stockholder became an interested stockholder unless:

    a.    prior to such time the board of directors of the corporation approved either the business combination or transaction which resulted in the stockholder becoming an interested stockholder;

    b.    upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding shares owned by (i) persons who are directors and also officers and (ii) employee stock plans in which participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer; or

    c.    at or subsequent to such time, the business combination is approved by the board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 2/3% of the outstanding voting stock which is not owned by the interested stockholder.

The effect of these provisions may make a change in control of our business more difficult by delaying, deferring or preventing a tender offer or other takeover attempt that a stockholder might consider in its best interest. This includes attempts that might result in the payment of a premium to stockholders over the market price for their shares. These provisions also may promote the continuity of our management by making it more difficult for a person to remove or change the incumbent members of the board of directors.

**Market Listing**

Our Common Stock is listed on the Nasdaq Global Select Market under the trading symbol "HIBB".

**Transfer Agent and Registrar**

The transfer agent and registrar for our Common Stock is Computershare, Inc.

*End of Exhibit 4.2*

*Exhibit 10.2*

**HIBBETT, INC.**
**2012 NON-EMPLOYEE DIRECTOR EQUITY PLAN**
**Adopted May 24, 2012**

**1. Purpose of the Plan**

The purpose of the Plan is to promote the interests of the Company by attracting and retaining qualified and experienced individuals for service as Non-Employee Directors, and to motivate these individuals to exercise their best efforts on the Company's behalf.

**2. Definitions**

2.1  "Award" means a grant of an Option, Stock Appreciation Right, Restricted Stock, or Restricted Stock Unit under the Plan.

2.2  "Award Agreement" means the agreement or agreements between the Company and a Holder pursuant to which an Award is granted and which specified the terms and conditions of that Award, including the vesting requirements applicable to that Award, if any.

2.3  "Board" means the Board of Directors of the Company.

2.4  "Change in Control" means any of the following described in clauses (a) through (d) below: (a) the sale, lease, exchange or other transfer of all or substantially all of the assets of the Company (in one transaction or in a series of related transactions) to a corporation that is not controlled by the Company, (b) the approval by the shareholders of the Company of any plan or proposal for the liquidation or dissolution of the Company, (c) a successful tender offer for the Common Stock of the Company, after which the bidding party holds more than 50% of the issued and outstanding Common Stock of the Company, or (d) a merger, consolidation, share exchange, or other transaction to which the Company is a party pursuant to which the holders of all of the shares of the Company outstanding prior to such transaction do not hold, directly or indirectly, more than 50% of the outstanding shares of the surviving company after the transaction.

2.5  "Code" means the Internal Revenue Code of 1986, as amended.

2.6  "Common Stock" means the common stock of the Company, par value $0.01 per share, or such other class or kind of shares or other securities resulting from the application of Section 9.

2.7  "Company" means Hibbett, Inc., a Delaware corporation, and any successor thereto.

2.8  "Corresponding SAR" means a SAR that is granted in relation to a particular Option and that can be exercised only upon surrender to the Company, unexercised, of that portion of the Option to which the SAR relates.

2.9  "Fair Market Value" as of any date shall be determined in accordance with the following rules:

    (a)  If the principal market for the Common Stock is a national securities exchange or the NASDAQ Stock Market, then the "Fair Market Value" as of that date shall be the closing sale price of the Common Stock on the principal exchange or market on which the Common Stock is then listed or admitted to trading on such date.

    (b)  If sales prices are not available or if the principal market for the Common Stock is not a national securities exchange and the Common Stock is not quoted on the NASDAQ Stock Market, the average between the highest bid and lowest asked prices for the Common Stock on such day as reported on the NASDAQ OTC Bulletin Board Service or by the National Quotation Bureau, Incorporated or a comparable service or on a reasonable basis using actual transactions in such Common Stock as reported in such market and consistently applied.

    (c)  If the day is not a business day, and as a result, paragraphs (a) and (b) next above are inapplicable, the Fair Market Value of the Common Stock shall be determined as of the next earlier business day. If paragraphs (a) and (b) next above are otherwise inapplicable, then the Fair Market Value of the

Common Stock shall be determined in accordance with the Treasury Regulations promulgated pursuant to Section 409A of the Code.

2.10 "Holder" means a Non-Employee Director who receives an Award.

.11 "Initial Value" means, with respect to a Corresponding SAR, the option price per share of the related Option and, with respect to an SAR granted independently of an Option, the price per share of Common stock as determined by the Board on the date of the grant; provided, however, that the price per share of Common Stock encompassed by the grant if an SAR shall not be less than Fair Market Value on the date of grant. Repricing of SARs after the date of grant is not permitted.

2.12 "1934 Act" means the Securities Exchange Act of 1934, as amended.

2.13 "Non-Employee Director" means a member of the Board who is not an employee of the Company or its subsidiaries.

2.14 "Non-Qualified Option" means an Option not intended to be an incentive stock option as defined in Section 422 of the Code.

2.15 "Option" means the right granted from time to time under Section 6 of the Plan to purchase Common Stock for a specified period of time at a stated price.

2.16 "Plan" means the Hibbett, Inc. 2012 Non-Employee Director Equity Plan set forth, as amended from time to time.

2.17 "Restricted Stock" means Common Stock subject to a Restriction Period awarded by the Board under Section 8 of the Plan.

2.18 "Restricted Stock Units" (RSUs) means an Award granted pursuant to Section 9, in the amount determined by the Board, stated with reference to a specified number of shares of Common Stock or a specified dollar value, that in accordance with the terms of an Award Agreement entitles the holder to receive shares of Common Stock, upon the lapse of any Restriction Period.

2.19 "Restriction Period" means the period during which an Award of Restricted Stock awarded under Section 8 of the Plan or an Award of a Restricted Stock Unit awarded under Section 9 of the Plan is subject to forfeiture and is non-transferable. The Restriction Period shall not lapse with respect to any Restricted Stock or Restricted Stock Unit until any and all conditions, imposed under this Plan or under the Award Agreement, have been satisfied. The restrictions may be based upon years of service or performance goals or both.

2.20 "SAR" means an Award granted pursuant to Section 7, in an amount to be determined by the Board, that in accordance with the terms of an Award Agreement entitles the Holder to receive, with respect to each share of Common Stock encompassed by the exercise of such SAR, the excess, if any, of the Fair Market Value at the time of exercise over the Initial Value. References to "SARs" include both Corresponding SARS and SARs granted independently of Options, unless the context requires otherwise.

3. **Eligibility**

All Non-Employee Directors are eligible to receive grants of Awards under the Plan.

4. **Administration and Implementation of Plan**

4.1 The Plan shall be administered by the Board, which shall have full power to interpret and administer the Plan and full authority to act in selecting the Non-Employee Directors to whom Awards will be granted, in determining whether, and to what extent, Awards may be transferable by the Holder, in determining the amount and type of Awards to be granted to each such Non-Employee Director, in determining whether the Award is designated as a dollar value or in shares, in determining the terms and conditions of Awards granted under the Plan and in determining the terms of the Award Agreements that will be entered into with Holders. Notwithstanding the discretion granted to the Board herein, the Board shall not make an annual Award to a continuing Non-Employee Director which exceeds more than $150,000 during a Company's fiscal year. The Board may make an additional Award of up to $150,000 to a Non-Employee Director during his or her first year of service. For purposes of valuing Awards subject to the forgoing limitations, an Option shall be

deemed to have a value equal to thirty-three percent (33%) of the Fair Market Value of the underlying shares on the date of grant. Unless the Board determines otherwise, the grant date of Awards under this Plan shall be: (a) for annual Awards, the same date as the annual grant of awards under the Company's equity plan for awards to employees and (b) for new Non-Employee Directors, one (1) month after the date of the first board meeting attended by such director. Any interpretation by the Board of the terms and provisions of the Plan and the administration thereof, and all action taken by the Board, shall be final, binding and conclusive for all purposes and upon all Holders.

4.2   The Board's powers shall also include, but not be limited to, the power to determine whether, to what extent and under what circumstances an Option may be exchanged for cash, Restricted Stock, or some combination thereof; to determine whether a Change in Control of the Company has occurred; and to determine, in accordance with Section 10, the effect, if any, of a Change in Control of the Company upon outstanding Awards.

4.3   The Board may grant the Non-Employee Director the discretion to choose the form of the Award, provided that such discretion complies with Code Section 409A and the applicable Treasury regulations including, in the case of RSUs, that such choice is made prior to the start of the calendar year in which the grant is made, if required.

4.4   The Board shall have the power to adopt regulations for carrying out the Plan and to make changes in such regulations as it shall, from time to time, deem advisable. The Board may amend any outstanding Awards without the consent of the Holder to the extent it deems appropriate; provided however, that in the case of amendments adverse to the Holder, the Board must obtain the Holder's consent to any such amendment, except that such consent shall not be required if, as determined by the Board in its sole discretion, such amendment is required to either (a) comply with Section 409A of the Code or (b) prevent the Holder from being subject to any excise tax or penalty under Section 409A of the Code.

4.5   Except to the extent prohibited by applicable law or the applicable rules of a stock exchange, the Board may allocate all or any portion of its responsibilities and powers to any of its committees or to one or more of its members and may delegate all or any part of its responsibilities and powers to any person or persons selected by it. Any such allocation or delegation may be revoked by the Board at any time.

**5.   Shares of Stock Subject to the Plan**

5.1   <u>Shares Subject to Plan</u>: Subject to adjustment as provided in Section 10, the total number of shares of Common Stock available for the grant of Awards under the Plan shall be equal to 500,000 shares of Common Stock. The Company's 2006 Non-Employee Director Equity Plan for Outside Directors, as amended, shall terminate on the date this Plan becomes effective. Any shares issued hereunder may consist, in whole, or in part, of authorized and unissued shares or treasury shares. If any shares subject to any Award granted hereunder are forfeited or such Award otherwise terminates without the issuance of such shares, the shares subject to such Award, to the extent of any such forfeiture or termination, shall not be available for grant under the Plan.

5.2   <u>Assumed Plans</u>: Any shares issued by the Company through the assumption or substitution of outstanding grants or shares from an acquired company shall not reduce the shares available under the Plan.

**6.   Options**

Options give a Non-Employee Director the right to purchase a specified number of shares of Common Stock from the Company for a specified time period at a fixed price. Options granted under the Plan will be Non-Qualified Stock Options and shall be subject to the following terms and conditions:

6.1   <u>Option Grants</u>: Options shall be evidenced by a written Award Agreement. Such Award Agreement shall conform to the requirements of the Plan, and may contain such other provisions or restrictions as the Board shall deem advisable. If the Award is designated as a dollar value, the number of Options issued to a Non-Employee Director shall equal (i) the dollar amount of the Award which is to be paid in Options divided by (ii) thirty-three percent (33%) of the Fair Market Value of the Common Stock on the date of grant.

6.2   Option Price: The price per share at which Common Stock may be purchased upon exercise of an Option shall be determined by the Board, but shall be not less than the Fair Market Value of a share of Common Stock on the date of grant. Repricing of Options after the date of grant is not permitted.

6.3   Term of Options: An Award Agreement shall specify when an Option may be exercisable and the terms and conditions applicable thereto. The term of an Option shall in no event be greater than ten years. The Option shall also expire, be forfeited and terminate at such times and in such circumstances as otherwise provided hereunder or under the Award Agreement.

6.4   Vesting of Options: The Option may be subject to such terms and conditions on the time or times when it may be exercised as the Board may deem appropriate. The vesting provisions of individual Options, as provided in the Award Agreement may vary. Unless otherwise determined by the Board, no Option shall become exercisable until such Option becomes vested.

6.5   Payment of Option Price: The full price for shares of Common Stock purchased upon the exercise of any Option shall be paid at the time of such exercise; provided however that the Board may permit a Holder to elect to pay the exercise price by irrevocably authorizing a third party to sell shares of Common Stock acquired upon exercise of the Option and remit as soon as practicable to the Company a sufficient portion of the proceeds to pay the entire exercise price and any tax withholding resulting from such exercise. The exercise price shall be payable in cash or by tendering, by either actual delivery of shares or by attestation, already-owned shares of Common Stock to the Board, and valued at Fair Market Value as of the day of exercise, or in any combination thereof, or by delivering to the Company a properly executed notice electing a net exercise of an Option for Fair Market Value as of the date of exercise in the manner as determined by the Board. Shares of Common Stock surrendered in connection with a net exercise shall not be available for grant under the Plan.

## 7.   Stock Appreciation Rights

Stock Appreciation Rights give a Non-Employee Director the right to receive, with respect to each share of Common Stock encompassed by the exercise of such SAR, the excess, if any, of the Fair Market Value at the time of exercise over the SARs Initial Value. SARs granted under the Plan shall be subject to the following terms and conditions:

7.1   SAR Awards: SARs shall be evidenced by a written Award Agreement. Such Award Agreement shall conform to the requirements of the Plan, and may contain such other provisions or restrictions as the Board shall deem advisable.

7.2   Number of SARs: All grants of SARs under the Plan shall be made by the Board. The Board will designate each Non-Employee Director to whom SARs are granted and will specify the number of shares of Common Stock covered by each Award.

7.3   Term of SARs: An Award Agreement shall specify when an SAR may be exercisable and the terms and conditions applicable thereto. The term of an SAR shall in no event be greater than ten years. The SAR shall also expire, be forfeited and terminate at such times and in such circumstances as otherwise provided hereunder or under the Award Agreement.

7.4   Vesting of SARs: The SAR may be subject to such terms and conditions on the time or times when it may be exercised as the Board may deem appropriate. The vesting provisions of individual SARs, as provided in the Award Agreement may vary. Unless otherwise determined by the Board, no SAR shall become exercisable until such SAR becomes vested.

7.5   Exercise of SARs: Subject to the provisions of this Plan and applicable Award Agreement, an SAR may be exercised in whole at any time or in part from time to time at such times and in compliance with such requirements as the Board shall determine. An SAR granted under this Plan may be exercised with respect to any number of whole shares less than the full number for which the SAR could be exercised. A partial exercise of an SAR shall not affect the right to exercise the SAR from time to time in accordance with this Plan and the applicable Award Agreement with respect to the remaining shares subject to the SAR. The

exercise of a Corresponding SAR shall result in the termination of the related Option to the extent of the number of shares with respect to which the SAR is exercised.

7.5   Settlement of SARs: In accordance with the Agreement, the amount payable as a result of the exercise of an SAR may be settled in cash, or a combination of cash and Common Stock. No fractional share will be deliverable upon the exercise of an SAR but a cash payment will be made in lieu thereof.

## 8.   Restricted Stock

An Award of Restricted Stock is a grant by the Company of a specified number of shares of Common Stock to a Non-Employee Director, which shares may be subject to forfeiture during a Restriction Period upon the happening of events or other conditions as specified in the Award Agreement. Such an Award of Restricted Stock shall be subject to the following terms and conditions:

8.1   Restricted Stock shall be evidenced by a written Award Agreement. Such Award Agreement shall conform to the requirements of the Plan and may contain such other provisions as the Board shall deem advisable. At the time of grant of an Award of Restricted Stock, the Board will determine the price, if any, to be paid by the Holder for each shares of Common Stock subject to the Award, and such price, if any, shall be set forth in the Award Agreement.

8.2   Unless otherwise provided by the Board, upon determination of the number of shares of Restricted Stock to be granted to the Holder, the Board shall direct that a certificate or certificates representing that number of shares of Common Stock be issued to the Holder with the Holder designated as the registered owner. The certificate(s), if any, representing such shares shall bear appropriate legends as to sale, transfer, assignment, pledge or other encumbrances to which such shares are subject during the Restriction Period, and shall be deposited by the Holder together with a stock power endorsed in blank, with the Company, to be held in escrow during the Restriction Period.

8.3   During the Restriction Period, the Holder shall have the right to receive the Holder's allocable share of any cash dividends declared and paid by the company on its Common Stock and to vote the shares of Restricted Stock.

8.4   The Board may condition the expiration of the Restriction Period upon the Holder's continued service over a period of time with the Company or upon any other criteria, as specified in the Award Agreement. If the specified conditions are not attained, the Holder shall forfeit the portion of the Award with respect to which those conditions are not attained, and the underlying Common Stock shall be forfeited to the Company. Notwithstanding any provision contained herein to the contrary, the Board, in its sole discretion, may grant Awards of Restricted Stock under this Section 8 that are not subject to any Restriction Period.

8.5   At the end of the Restriction Period, if all such conditions have been satisfied, the restrictions imposed hereunder shall lapse with respect to the applicable number of shares of Restricted Stock as determined by the Board, and any legend described in Section 8.2 that is then no longer applicable, shall be removed and such number of shares delivered to the Holder (or, where appropriate, the Holder's legal representative). Subject to Section 4, the Board may, in its sole discretion, accelerate the vesting and delivery of shares of Restricted Stock.

## 9.   Restricted Stock Units

An Award of Restricted Stock Units is a grant by the Company of a specified number of shares of Common Stock to a Non-Employee Director, which upon lapse of a Restriction Period as specified in the applicable Award Agreement, shall entitle the Holder to a share of Common Stock to the following terms and conditions:

9.1   Restricted Stock Units shall be evidenced by a written Award Agreement. Such Award Agreement shall conform to the requirements of the Plan and may contain such other provisions as the Board shall deem advisable.

9.2   During the Restriction Period, the Holder shall not have any rights as a shareholder with respect to any shares of Common Stock underlying the Restricted Stock Units until such time as the shares of Common Stock have been so issued.

9.3   The Board may condition the expiration of the Restriction Period with respect to a grant of Restricted Stock Units upon (i) the Holder's continued service over a period of time with the Company or (ii) any other criteria, as specified in the Award Agreement. If the specified conditions are not attained, the Holder shall forfeit the portion of the Award with respect to which those conditions are not attained, and the underlying Common stock shall be forfeited to the Company.

9.4   At the end of the Restriction Period, if all such conditions have been satisfied, the Holder shall be entitled to receive a share of Common Stock for each share underlying the Restricted Stock Unit Award that is now free from restriction and such number of shares delivered to the Holder (or, where appropriate, the Holder's legal representative). The Board may, in its sole discretion, accelerate the vesting of Restricted Stock Units.

**10.   Changes in Capitalization; Changes of Control; Settlement of Awards**

10.1   <u>Adjustment for Changes in Capitalization</u>: To prevent the dilution or enlargement of benefits or potential benefits intended to be made available under the Plan, in the event of any corporate transaction or event such as a stock dividend, recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, spin-off, combination or other similar corporate transaction or event affecting the Common Stock with respect to which Awards have been or may be issued under the Plan (any such transaction or event, a "Transaction"), then the Board shall, in such manner as the Board deems equitable: (A) make a proportionate adjustment in 1) the maximum number and type of securities as to which awards may be granted under this Plan, 2) the number and type of securities subject to outstanding Awards; 3) the grant or exercise price with respect to any such Award; and 4) the per individual limitations on the number of securities that may be awarded under the Plan (any such adjustment, an "Antidilution Adjustment"); provided, in each case, that with respect to all Options, no such adjustment shall be authorized to the extent that such adjustment violates the provisions of Treasury Regulation 1.424-1 and Section 409A of the Code or any successor provisions; and the number of shares of Common stock subject to any Award denominated in shares shall always be a whole number; or (B) cause any Award outstanding as of the effective date of the Transaction to be cancelled in consideration of a cash payment or alternate Award (whether from the Company or another entity that is a participant in the Transaction) or a combination thereof made to the holder of such cancelled Award substantially equivalent in value to the fair market value of such cancelled Award. The determination of fair market value shall be made by the Board, as the case may be, in their sole discretion. Any adjustments made hereunder shall be binding on all Holders.

10.2   <u>Change of Control</u>: In the event of a Change of Control of the Company, the Board may, on a Holder by Holder basis, take any of the following actions, either singly or in combination:

(a)   accelerate the vesting of all outstanding Options issued under the Plan that remain unvested and terminate the Option immediately prior to the date of any such transaction;

(b)   fully vest and/or accelerate the Restriction Period of any Awards;

(c)   terminate the Award prior to any such Change of Control;

(d)   cancel and/or redeem any outstanding Awards with respect to all Common Stock for which the Award remains unexercised or for which the Award is subject to forfeiture in exchange for a cash payment of an amount determined by the Board;

(e)   require that the Award be assumed by any successor corporation or that awards for shares of other interests in the Company or any other entity be substituted for such Award; or

(f)   take such other action as the Board shall determine to be reasonable under the circumstances provided, however, that no action shall be taken with respect to any Option or SAR that would create a modification, extension or renewal of such Option or SAR, except as may be permitted in applicable Treasury Regulations.

The application of the foregoing provisions, including, without limitation, the issuance of any substitute Awards, shall be determined in good faith by the Board in its sole discretion.

10.3 <u>Limitation on Change of Control Payments</u>: Notwithstanding anything in Section 10.2 above to the contrary, if, with respect to a Holder, the acceleration of the exercisability and/or vesting of an Award or the payment of cash in exchange for all or part of an Award as provided in Section 10.2 above (which acceleration or payment could be deemed a "payment" within the meaning of Section 280G(b)(2) of the Code), together with any other payments which such Holder has the right to receive from the Company or any corporation which is a member of an "affiliated group" (as defined in Section 1504(a) of the Code without regard to Section 1504(b) of the Code) of which the Company is a member, would constitute a "parachute payment" (as defined in Section 280(G)(b)(2) of the Code), then the acceleration of exercisability and/or vesting and the payments to such Holder pursuant to Section 9.2 above shall be reduced to the extent or amount as, in the sole judgment of the Board, will result in no portion of such payments being subject to the excise tax imposed by Section 4999 of the Code.

## 11. Effective Date, Termination and Amendment

The Plan is effective upon its approval by the shareholders of Hibbett, Inc. on May 24, 2012. The Plan shall remain in full force and effect until the tenth anniversary of such date or, if earlier, the date it is terminated by the Board. The Board shall have the power to amend, suspend or terminate the Plan at any time. Termination of the Plan pursuant to this Section 10 shall not affect Awards outstanding under the Plan at the time of termination. Amendments to this Plan shall be subject to shareholder approval to the extent such approval is required by applicable law or applicable requirements of any securities exchange or similar entity.

## 12. Transferability

Except as otherwise permitted by the Board,

(a) Awards under the Plan are not transferable except as designated by the Holder by will, by the laws of descent and distribution or by a beneficiary form filed with the Company.

(b) Awards may be exercised or claimed on behalf of a deceased Holder or other person entitled to benefits under the Plan by the beneficiary of such Holder or other person if the Company has a valid designation of such beneficiary on file, or otherwise by the personal legal representative of such Holder or other person.

## 13. General Provisions

13.1 <u>No Implied Rights</u>: Nothing in the Plan or any Award granted pursuant to the Plan shall be deemed to create any obligation on behalf of the Board to nominate any Non-Employee Director for re-election to the Board by the Company's shareholders. Neither a Holder nor any other person shall, by reason of participation in the Plan, acquire any right in or title to any assets, funds or property of the Company whatsoever, including, without limitation, any specific funds, assets, or other property which the Company, in its sole discretion, may set aside in anticipation of a liability under the Plan. A Holder shall have only a contractual right to the Common Stock or amounts, if any, payable under the Plan, unsecured by any assets of the Company, and nothing contained in the Plan shall constitute a guarantee that the assets of the Company shall be sufficient to pay any benefits to any person. Except as otherwise provided in the Plan, no Award under the Plan shall confer upon the Holder any rights as a shareholder of the Company prior to the date on which the individual fulfills all conditions of for the receipt of such rights.

13.2 <u>Settlement of Awards</u>: The obligation to make payments and distributions with respect to Awards may be satisfied through cash payments, the delivery of shares of Common Stock, the granting of replacement Awards, or combination thereof as the Board shall determine. In lieu of issuing a fraction of a share upon any exercise of an Award, the Company will be entitled to pay to the Holder an amount equal to the fair market value of such fractional share. Satisfaction of any obligations under an Award, which is sometimes referred to as "settlement" of the Award, may be subject to such conditions, restrictions and contingencies as the Board shall determine. The Board may permit or require the deferral of any Award payment, subject to such rules and procedures as it may establish, which may include provisions for the payment or crediting of interest or dividend equivalents, and may include converting such credits into deferred Common Stock

equivalents provided that such rules and procedures satisfy the requirements of Section 409A of the Code. No deferral is permitted for Options or SARs.

13.3   Withholding: Holders shall be responsible to make appropriate provision for all taxes required to be withheld in connection with any Award or the transfer of shares of Common Stock pursuant to this Plan. Such responsibility shall extend to all applicable Federal, state, local or foreign withholding taxes. The Board may condition the delivery of any discretion and subject to such requirements as the Board may impose prior to the occurrence of such withholding, may permit such withholding obligations to be satisfied through cash payment by the Holder, through surrender of shares of Common Stock which the Holder already owns, or through the surrender of shares of Common Stock to which the Holder is otherwise entitled under the Plan, in which latter case such surrendered shares shall not be available for grant under the Plan.

13.4   Governing Law: To the extent that Federal laws do not otherwise control, the Plan and all determinations made and actions taken pursuant hereto shall be governed by the law of the State of Delaware and construed accordingly.

13.5   Award Agreement: An Award under the Plan shall be subject to such terms and conditions, not inconsistent with the Plan, as the Board shall, in its sole discretion, prescribe. The terms and conditions of any Award to any Holder shall be reflected in such form of written documents as is determined by the Board. A copy of such document shall be provided to the Holder, and the Board may, but need not require that the Holder sign a copy of such document. Such document is referred to in the Plan as an "Award Agreement" regardless of whether any Holder signature is required.

13.6   Application of Code Section 409A: Any Award granted under this Plan shall be provided or made in a manner and at such time, in such form and subject to such election procedures (if any), as complies with the applicable requirements of Section 409A of the Code to avoid a plan failure described in Section 409A(a)(1). Notwithstanding any other provision hereof or document pertaining hereto, the Plan shall be so construed and interpreted to meet the applicable requirements of Section 409A of the Code to avoid a plan failure described in Section 409A(a)(1) of the Code.

*End of Exhibit 10.2*

*Exhibit 10.3*

<div align="center">

**HIBBETT, INC.**
**NON-EMPLOYEE DIRECTOR**
**NON-QUALIFIED OPTION AGREEMENT**
**(INITIAL GRANT, SERVICE REQUIREMENT)**

</div>

**NOTE: This document incorporates the accompanying Grant Letter, and together they constitute a single Agreement which governs the terms and conditions of your Option in accordance with the Hibbett, Inc. 2012 Non-Employee Director Equity Plan.**

THIS AGREEMENT ("Agreement") is effective as of the Grant Date specified in the accompanying Grant Letter, by and between the Participant and Hibbett, Inc. ("Company").

A. The Company maintains the Hibbett, Inc. 2012 Non-Employee Director Equity Plan ("NEDEP" or "Plan").

B. The Participant has elected to receive an Option Award under the Plan.

C. Key terms and important conditions of the Award are set forth in the cover letter ("Grant Letter") which was delivered to the Participant at the same time as this document. This Agreement contains general provisions relating to the Award.

IT IS AGREED, by and between the Company and the Participant, as follows:

1. <u>Terms of Award</u>. The following terms used in this Agreement shall have the meanings set forth in this paragraph 1:

(a) The "Participant" is the individual named in the Grant Letter.
(b) The "Grant Date" is the date of the Grant Letter.
(c) The "Covered Shares" is that number of shares of the Company's Stock specified in the Grant Letter.
(d) The "Exercise Price" is the price per common share set forth in the Grant Letter.
(e) The "Service Requirement" shall begin on the Grant Date and extend until the first anniversary of the Grant Date. A Participant must serve as a Board member during the entire period of the Service Requirement.

Other terms used in this Agreement are defined pursuant to paragraph 8 or elsewhere in this Agreement or Plan.

2. <u>Award and Exercise Price</u>. This Agreement specifies the terms of the option (the "Option") granted to the Participant to purchase the number of Covered Shares at the Exercise Price per share. The Option is not an "incentive stock option" as that term is used in Code section 422.

3. <u>Date of Exercise</u>. Subject to his Section 3, the Option shall be exercisable at any time following completion of the Service Requirement and prior to expiration set forth in Section 4 hereof. The Option shall not be exercisable if the Participant ceases serving as a Director, for any reason, prior to the end of the Service Requirement; provided, however, that the Option shall accelerate and become exercisable with respect to all Covered Shares if the following occurs during such Service Period, irrespective of the Participant's continued service as a Director:

(i) If the Participant ceases to serve on the Board by reason of the Participant's death; or

(ii) If (x) a Change in Control occurs prior to the end of the one-year Service Requirement, (y) the Participant's termination of service does not occur before the Change in Control date, and (z) the Board determines to accelerate such vesting.

4. <u>Expiration</u>. The Option shall not be exercisable after the Company's close of business on the last business day prior to the Expiration Date. The "Expiration Date" shall be the tenth (10th) anniversary of the Grant Date.

5. <u>Method of Option Exercise</u>.

(a)     Subject to the terms of this Agreement and the Plan, the Option may be exercised in whole or in part by filing a written notice with the Chief Financial Officer (or such other party as the Company may designate) of the Company at its corporate headquarters prior to the Company's close of business on the last business day that occurs prior to the Expiration Date. Such notice shall specify the number of Covered Shares which the Participant elects to purchase, and shall be accompanied by payment of the Exercise Price for such shares of Stock indicated by the Participant's election.

(b)     Payment shall be by cash or by check payable to the Company. Except as otherwise provided by the Board before the Option is exercised; (i) all or a portion of the Exercise Price may be paid by the Participant by delivery of shares of Stock that have been owned by the Participant for at least six (6) months and are otherwise acceptable to the Board having an aggregate Fair Market Value (valued as of the date of exercise) that is equal to the amount of cash that would otherwise be required; and (ii) the Participant may pay the Exercise Price by authorizing a third party to sell shares of Stock (or a sufficient portion of the shares) acquired upon exercise of the Option and remit to the Company a sufficient portion of the sale proceeds to pay the entire Exercise Price and any tax withholding resulting from such exercise.

(c) The Option shall not be exercisable if and to the extent the Company determines that such exercise would violate applicable state or Federal securities laws or the rules and regulations of any securities exchange on which the Stock is traded. If the Company makes such a determination, it shall use all reasonable efforts to obtain compliance with such laws, rules and regulations. In making any determination hereunder, the Company may rely on the opinion of counsel for the Company.

6.     <u>Withholding</u>. All deliveries and distributions under this Agreement are subject to withholding of all applicable taxes. The Company is entitled to (a) withhold and deduct from future fees of the Participant (or from other amounts due to Participant) or make other arrangements for the collection of all legally required amounts necessary to satisfy such withholding or (b) require the Participant promptly to remit such amounts to the Company. Subject to such rules and limitations as may be established by the Board from time to time, the withholding obligations described in this Section 6 may be satisfied through the surrender of shares of Stock which the Participant already owns, or to which the Participant is otherwise entitled under the Plan, including shares of Stock to be settled under this Agreement.

7.     <u>Transferability</u>. The Option is not transferable and, during the Participant's life, may be exercised only by the Participant. Transfers at death are governed by paragraph 9(c) below.

8.     <u>Definitions</u>. Except where the context clearly implies or indicates the contrary, a word, term, or phrase used in the Plan is similarly used in this Agreement.

9.     <u>Binding Effect; Heirs and Successors</u>.

(a) The terms and conditions of this Agreement shall be effective upon delivery to the Participant, with or without execution by the Participant.

(b)     This Agreement shall be binding upon, and inure to the benefit of, the Company and its successors and assigns, and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Company's assets and business.

(c) If any rights exercisable by the Participant or benefits deliverable to the Participant under this Agreement have not been exercised or delivered, respectively, at the time of the Participant's death, such rights shall be exercisable by the Designated Beneficiary, and such benefits shall be delivered to the Designated Beneficiary, in accordance with the provisions of this Agreement and the Plan. The "Designated Beneficiary" shall be the beneficiary or beneficiaries designated by the Participant in a writing filed with the Board in such form and at such time as the Board shall require. If a deceased Participant fails to designate a beneficiary, or if the Designated Beneficiary does not survive the Participant, any rights that would have been exercisable by the Participant and any benefits distributable to the Participant shall be exercised by or distributed to the legal representative of the estate of the Participant. If a deceased Participant designates a beneficiary and the Designated Beneficiary survives the

Participant but dies before the Designated Beneficiary's exercise of all rights under this Agreement or before the complete distribution of benefits to the Designated Beneficiary under this Agreement, then any rights that would have been exercisable by the Designated Beneficiary shall be exercised by the legal representative of the estate of the Designated Beneficiary, and any benefits distributable to the Designated Beneficiary shall be distributed to the legal representative of the estate of the Designated Beneficiary.

10.    Administration. The authority to manage and control the operation and administration of this Agreement shall be vested in the Board, and the Board shall have all powers with respect to this Agreement as it has with respect to the Plan. Any interpretation of the Agreement by the Board and any decision made by it with respect to the Agreement is final and binding on all persons. Such powers or decision-making may be delegated, to the extent permitted by the Plan, to one or more of Board members or any other person or persons selected by the Board.

11.    Plan Governs. Notwithstanding anything in this Agreement to the contrary, the terms of this Agreement shall wholly incorporate and be subject to the terms of the Plan, a copy of which may be obtained from the Chief Financial Officer of the Company (or such other party as the Company may designate); and this Agreement is subject to all interpretations, amendments, rules and regulations promulgated by the Board from time to time pursuant to the Plan.

12. No Implied Rights.

(a) The Option will not confer on the Participant any right with respect to continuance of any service with the Company or any Subsidiary, nor will it interfere in any way with any right the Company or any Subsidiary would otherwise have to terminate or modify the terms of such Participant's service at any time.

(b) The Participant shall not have any rights of a shareholder with respect to the shares subject to the Option, until a stock certificate has been duly issued following exercise of the Option as provided herein.

13.    Notices. Any written notices provided for in this Agreement or Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, at the Company's principal executive office.

14.    Fractional Shares. In lieu of issuing a fraction of a share upon any exercise of the Option, resulting from an adjustment of the Option pursuant to Section 4.2(f) of the Plan or otherwise, the Company will be entitled to pay to the Participant an amount equal to the fair market value of such fractional share.

15.    Amendment. This Agreement may be amended by written agreement of the Participant and the Company, without the consent of any other person.

16.    Governing Law; Jurisdiction. This Agreement shall be governed by the law of the State of Alabama without giving effect to the choice-of-law provisions thereof. The Circuit Court of the City of Birmingham and the United States District Court, Northern District of Alabama, Birmingham Division shall be the exclusive courts of jurisdiction and venue for any litigation, special proceeding or other proceeding as between the parties that may be brought, or arise out of, in connection with, or by reason of this Agreement. The parties hereby consent to the jurisdiction of such courts.

*End of Exhibit 10.3*

*Exhibit 10.4*

**HIBBETT, INC.**
**NON-EMPLOYEE DIRECTOR**
**RESTRICTED STOCK UNIT AWARD AGREEMENT**
**(INITIAL GRANT, SERVICE REQUIREMENT)**

**NOTE: This document incorporates the accompanying Grant Letter, and together they constitute a single Agreement which governs the terms and conditions of your Award in accordance with the Hibbett, Inc. 2012 Non-Employee Director Equity Incentive Plan.**

THIS AGREEMENT ("Agreement") is effective as of the Grant Date specified in the accompanying Grant Letter, by and between the Participant and Hibbett, Inc. (together with its subsidiaries, "Company").

A.   The Company maintains the Hibbett, Inc. 2012 Non-Employee Director Equity Incentive Plan ("Plan").

B. The Participant has elected to receive a Restricted Stock Unit Award under the Plan.

C. Key terms and important conditions of the Award are set forth in the cover letter ("Grant Letter") which was delivered to the Participant at the same time as this document. This Agreement contains general provisions relating to the Award.

IT IS AGREED, by and between the Company and the Participant, as follows:

1.   Terms of Award. The following terms used in this Agreement shall have the meanings set forth in this paragraph 1:

(a) The "Participant" is the individual named in the Grant Letter.

(b) The "Grant Date" is the date of the Grant Letter.

(c) The "Units" means an award denominated in shares of the Company's Stock as specified in the Grant Letter.

(d) The "Service Requirement" shall begin on the Grant Date and extend until the first anniversary of the Grant Date. A Participant must serve as a Board member during the entire period of the Service Requirement.

(e) The "Restricted Period" shall begin on the Grant Date and extend until the dates and/or events specified in any applicable election form completed by the Participant.

Other terms used in this Agreement are defined elsewhere in this Agreement or in the Plan.

2.   Award. Subject to the terms and conditions of this Agreement, the Participant is hereby granted the number of Units set forth in paragraph 1.

3.   Settlement of Awards. The Company shall deliver to the Participant one share of Stock for each vested Unit, as determined in accordance with the provisions of Grant Letter and this Agreement.

4.   Time of Payment. Except as otherwise provided in this Agreement, payment of Units vested in accordance with the provisions of paragraph 5 will be delivered as soon as practicable after the end of the Restricted Period; provided that any delivery of shares shall occur within the period permitted under applicable Treasury Regulations pursuant to Section 409A of the Code.

5. Vesting and Forfeiture of Units. Units shall vest upon the completion of the Service Requirement, and the Participant shall be entitled to settlement on Units, when the Restricted Period, if any, has ended. In the

absence of a Restricted Period, the Participant shall be entitled to settlement on Units following the completion of the Service Requirement. Except in the situations described below, if the Participant does not complete the Service Requirement, then Units shall be forfeited.

(b) Units shall vest prior to the end of the one year Service Requirement, in the following situations:

(i) If the Participant's ceases to serve on the Board by reason of the Participant's death; or

(ii) If (x) a Change in Control occurs prior to the end of the one-year Service Requirement, (y) the Participant's termination of service as a Director does not occur before the Change in Control date, and (z) the Board determines to accelerate such vesting, then the Units vest as of the date of the Change of Control.

6.      Withholding. All deliveries and distributions under this Agreement are subject to withholding of all applicable taxes. The Company is entitled to (a) withhold and deduct from future fees of the Participant (or from other amounts due to Participant) or make other arrangements for the collection of all legally required amounts necessary to satisfy such withholding or (b) require the Participant promptly to remit such amounts to the Company. Subject to such rules and limitations as may be established by the Committee from time to time, the withholding obligations described in this Section 6 may be satisfied through the surrender of shares of Stock which the Participant already owns, or to which the Participant is otherwise entitled under the Plan, including shares of Stock to be settled under this Agreement.

7.      Transferability. Units may not be sold, assigned, transferred, pledged or otherwise encumbered. Transfers at death are governed by paragraph 8(c) below.

8. Binding Effect; Heirs and Successors.

(a) The terms and conditions of this Agreement shall be effective upon delivery to the Participant, with or without execution by the Participant.

(b) This Agreement shall be binding upon, and inure to the benefit of, the Company and its successors and assigns, and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Company's assets and business.

(c) If any rights exercisable by the Participant or benefits deliverable to the Participant under this Agreement have not been exercised or delivered, respectively, at the time of the Participant's death, such rights shall be exercisable by the Designated Beneficiary, and such benefits shall be delivered to the Designated Beneficiary, in accordance with the provisions of this Agreement and the Plan. The "Designated Beneficiary" shall be the beneficiary or beneficiaries designated by the Participant in a writing filed with the Committee in such form and at such time as the Committee shall require. If a deceased Participant fails to designate a beneficiary, or if the Designated Beneficiary does not survive the Participant, any rights that would have been exercisable by the Participant and any benefits distributable to the Participant shall be exercised by or distributed to the legal representative of the estate of the Participant. If a deceased Participant designates a beneficiary and the Designated Beneficiary survives the Participant but dies before the Designated Beneficiary's exercise of all rights under this Agreement or before the complete distribution of benefits to the Designated Beneficiary under this Agreement, then any rights that would have been exercisable by the Designated Beneficiary shall be exercised by the legal representative of the estate of the Designated Beneficiary, and any benefits distributable to the Designated Beneficiary shall be distributed to the legal representative of the estate of the Designated Beneficiary.

9.      Administration. The authority to manage and control the operation and administration of this Agreement shall be vested in the Board, and the Board shall have all powers with respect to this Agreement as it has with respect to the Plan. Any interpretation of the Agreement by the Board and any decision made by it with respect to the Agreement is final and binding on all persons. Such powers or decision-making may be delegated, to the extent permitted by the Plan, to one or more Board members or any other person or persons selected by the Board.

10.    Plan Governs. Notwithstanding anything in this Agreement to the contrary, the terms of this Agreement shall wholly incorporate and be subject to the terms of the Plan, a copy of which may be obtained from the Chief Financial Officer of the Company (or such other party as the Company may designate); and this Agreement is subject to all interpretations, amendments, rules and regulations promulgated by the Board from time to time pursuant to the Plan.

11. No Implied Rights.

(a) The award of Units will not confer on the Participant any right with respect to continuance of service with the Company or any Subsidiary, nor will it interfere in any way with any right the Company or any Subsidiary would otherwise have to terminate or modify the terms of such Participant's service at any time.

(b) The Participant shall not have any rights of a shareholder with respect to the Units until shares of Stock have been duly issued following settlement of the Award as provided herein.

12.    Notices. Any written notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, at the Company's principal executive office.

13.    Amendment. This Agreement may be amended by written agreement of the Participant and the Company, without the consent of any other person.

14.    Governing Law; Jurisdiction. This Agreement shall be governed by the laws of the State of Alabama without giving effect to the choice-of-law provisions thereof. The Circuit Court of the City of Birmingham and the United States District Court, Northern District of Alabama, Birmingham Division shall be the exclusive courts of jurisdiction and venue for any litigation, special proceeding or other proceeding as between the parties that may be brought, or arise out of, in connection with, or by reason of this Agreement. The parties hereby consent to the jurisdiction of such courts.

*End of Exhibit 10.4*

*Exhibit 10.5*

**HIBBETT, INC.**
**NON-EMPLOYEE DIRECTOR NON-QUALIFIED OPTION AGREEMENT**
**(ANNUAL GRANT, FULLY VESTED)**

**NOTE: This document incorporates the accompanying Grant Letter, and together they constitute a single Agreement which governs the terms and conditions of your Option in accordance with the Hibbett, Inc. 2012 Non-Employee Director Equity Plan.**

THIS AGREEMENT ("Agreement") is effective as of the Grant Date specified in the accompanying Grant Letter, by and between the Participant and Hibbett, Inc. ("Company").

A. The Company maintains the Hibbett, Inc. 2012 Non-Employee Director Equity Plan ("NEDEP" or "Plan").

B. The Participant has elected to receive an Option Award under the Plan.

C. Key terms and important conditions of the Award are set forth in the cover letter ("Grant Letter") which was delivered to the Participant at the same time as this document. This Agreement contains general provisions relating to the Award.

IT IS AGREED, by and between the Company and the Participant, as follows:

1. <u>Terms of Award</u>. The following terms used in this Agreement shall have the meanings set forth in this paragraph 1:

      (a) The "Participant" is the individual named in the Grant Letter.
      (b) The "Grant Date" is the date of the Grant Letter.
      (c) The "Covered Shares" is that number of shares of the Company's Stock specified in the Grant Letter.
      (d) The "Exercise Price" is the price per common share set forth in the Grant Letter.

Other terms used in this Agreement are defined pursuant to paragraph 8 or elsewhere in this Agreement.

2. <u>Award and Exercise Price</u>. This Agreement specifies the terms of the option (the "Option") granted to the Participant to purchase the number of Covered Shares at the Exercise Price per share. **The Option is not an "incentive stock option" as that term is used in Code section 422.**

3. <u>Date of Exercise</u>. Subject to the limitations of this Agreement, the Option shall be exercisable according to the schedule set forth on the Grant Letter.

4. <u>Expiration</u>. The Option shall not be exercisable after the Company's close of business on the last business day prior to the Expiration Date. The "Expiration Date" shall be the tenth (10th) anniversary of the Grant Date.

5.   <u>Method of Option Exercise</u>.

      (a) Subject to the terms of this Agreement and the Plan, the Option may be exercised in whole or in part by filing a written notice with the Chief Financial Officer (or such other party as the Company may designate) of the Company at its corporate headquarters prior to the Company's close of business on the last business day that occurs prior to the Expiration Date. Such notice shall specify the number of Covered Shares which the Participant elects to purchase, and shall be accompanied by payment of the Exercise Price for such shares of Stock indicated by the Participant's election.

      (b) Payment shall be by cash or by check payable to the Company. Except as otherwise provided by the Board before the Option is exercised; (i) all or a portion of the Exercise Price may be paid by the

Participant by delivery of shares of Stock that have been owned by the Participant for at least six (6) months and are otherwise acceptable to the Board having an aggregate Fair Market Value (valued as of the date of exercise) that is equal to the amount of cash that would otherwise be required; and (ii) the Participant may pay the Exercise Price by authorizing a third party to sell shares of Stock (or a sufficient portion of the shares) acquired upon exercise of the Option and remit to the Company a sufficient portion of the sale proceeds to pay the entire Exercise Price and any tax withholding resulting from such exercise.

(c) The Option shall not be exercisable if and to the extent the Company determines that such exercise would violate applicable state or Federal securities laws or the rules and regulations of any securities exchange on which the Stock is traded. If the Company makes such a determination, it shall use all reasonable efforts to obtain compliance with such laws, rules and regulations. In making any determination hereunder, the Company may rely on the opinion of counsel for the Company.

6. Withholding. All deliveries and distributions under this Agreement are subject to withholding of all applicable taxes. The Company is entitled to (a) withhold and deduct from future fees of the Participant (or from other amounts due to Participant) or make other arrangements for the collection of all legally required amounts necessary to satisfy such withholding or (b) require the Participant promptly to remit such amounts to the Company. Subject to such rules and limitations as may be established by the Board from time to time, the withholding obligations described in this Section 6 may be satisfied through the surrender of shares of Stock which the Participant already owns, or to which the Participant is otherwise entitled under the Plan, including shares of Stock to be settled under this Agreement.

7. Transferability. The Option is not transferable and, during the Participant's life, may be exercised only by the Participant. Transfers at death are governed by paragraph 9(c) below.

8. Definitions. Except where the context clearly implies or indicates the contrary, a word, term, or phrase used in the Plan is similarly used in this Agreement.

9. Binding Effect; Heirs and Successors.

(a) The terms and conditions of this Agreement shall be effective upon delivery to the Participant, with or without execution by the Participant.

(b) This Agreement shall be binding upon, and inure to the benefit of, the Company and its successors and assigns, and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Company's assets and business.

(c) If any rights exercisable by the Participant or benefits deliverable to the Participant under this Agreement have not been exercised or delivered, respectively, at the time of the Participant's death, such rights shall be exercisable by the Designated Beneficiary, and such benefits shall be delivered to the Designated Beneficiary, in accordance with the provisions of this Agreement and the Plan. The "Designated Beneficiary" shall be the beneficiary or beneficiaries designated by the Participant in a writing filed with the Board in such form and at such time as the Board shall require. If a deceased Participant fails to designate a beneficiary, or if the Designated Beneficiary does not survive the Participant, any rights that would have been exercisable by the Participant and any benefits distributable to the Participant shall be exercised by or distributed to the legal representative of the estate of the Participant. If a deceased Participant designates a beneficiary and the Designated Beneficiary survives the Participant but dies before the Designated Beneficiary's exercise of all rights under this Agreement or before the complete distribution of benefits to the Designated Beneficiary under this Agreement, then any rights that would have been exercisable by the Designated Beneficiary shall be exercised by the legal representative of the estate of the Designated Beneficiary, and any benefits distributable to the Designated Beneficiary shall be distributed to the legal representative of the estate of the Designated Beneficiary.

10. Administration. The authority to manage and control the operation and administration of this Agreement shall be vested in the Board, and the Board shall have all powers with respect to this Agreement as it has with respect to the Plan. Any interpretation of the Agreement by the Board and any decision made by it with respect to the Agreement is final and binding on all persons. Such powers or decision-making may be delegated, to the

extent permitted by the Plan, to one or more of Board members or any other person or persons selected by the Board.

11. <u>Plan Governs</u>. Notwithstanding anything in this Agreement to the contrary, the terms of this Agreement shall wholly incorporate and be subject to the terms of the Plan, a copy of which may be obtained from the Chief Financial Officer of the Company (or such other party as the Company may designate); and this Agreement is subject to all interpretations, amendments, rules and regulations promulgated by the Board from time to time pursuant to the Plan.

12. <u>No Implied Rights</u>.

(a) The Option will not confer on the Participant any right with respect to continuance of any service with the Company or any Subsidiary, nor will it interfere in any way with any right the Company or any Subsidiary would otherwise have to terminate or modify the terms of such Participant's service at any time.

(b) The Participant shall not have any rights of a shareholder with respect to the shares subject to the Option, until a stock certificate has been duly issued following exercise of the Option as provided herein.

14. <u>Notices</u>. Any written notices provided for in this Agreement or Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, at the Company's principal executive office.

15. <u>Fractional Shares</u>. In lieu of issuing a fraction of a share upon any exercise of the Option, resulting from an adjustment of the Option pursuant to Section 4.2(f) of the Plan or otherwise, the Company will be entitled to pay to the Participant an amount equal to the fair market value of such fractional share.

16. <u>Amendment</u>. This Agreement may be amended by written agreement of the Participant and the Company, without the consent of any other person.

17. <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by the law of the State of Alabama without giving effect to the choice-of-law provisions thereof. The Circuit Court of the City of Birmingham and the United States District Court, Northern District of Alabama, Birmingham Division shall be the exclusive courts of jurisdiction and venue for any litigation, special proceeding or other proceeding as between the parties that may be brought, or arise out of, in connection with, or by reason of this Agreement. The parties hereby consent to the jurisdiction of such courts.

***End of Exhibit 10.5***

*Exhibit 10.6*

**HIBBETT, INC.**
**NON-EMPLOYEE DIRECTOR**
**RESTRICTED STOCK UNIT AWARD AGREEMENT**
**(ANNUAL GRANT, FULLY VESTED)**

**NOTE: This document incorporates the accompanying Grant Letter, and together they constitute a single Agreement which governs the terms and conditions of your Award in accordance with the Hibbett, Inc. 2012 Non-Employee Director Equity Incentive Plan.**

THIS AGREEMENT ("Agreement") is effective as of the Grant Date specified in the accompanying Grant Letter, by and between the Participant and Hibbett, Inc. (together with its subsidiaries, "Company").

A.   The Company maintains the Hibbett, Inc. 2012 Non-Employee Director Equity Incentive Plan ("Plan").

B. The Participant has elected to receive a Restricted Stock Unit Award under the Plan.

C. Key terms and important conditions of the Award are set forth in the cover letter ("Grant Letter") which was delivered to the Participant at the same time as this document. This Agreement contains general provisions relating to the Award.

IT IS AGREED, by and between the Company and the Participant, as follows:

1.   Terms of Award. The following terms used in this Agreement shall have the meanings set forth in this paragraph 1:

(a) The "Participant" is the individual named in the Grant Letter.
(b) The "Grant Date" is the date of the Grant Letter.
(c) The "Units" means an award denominated in shares of the Company's Stock as specified in the Grant Letter.
(d) The "Restricted Period" shall begin on the Grant Date and extend until the dates and/or events specified in any applicable election form completed by the Participant.

Other terms used in this Agreement are defined elsewhere in this Agreement or Plan.

2.   Award. Subject to the terms and conditions of this Agreement, the Participant is hereby granted the number of Units set forth in paragraph 1.

3.   Settlement of Awards. The Company shall deliver to the Participant one share of Stock for each vested Unit, as determined in accordance with the provisions of Grant Letter and this Agreement.

4.   Time of Payment. Except as otherwise provided in this Agreement, payment of Units will be delivered as soon as practicable after the end of the Restricted Period; provided that any delivery of shares shall occur within the period permitted under applicable Treasury Regulations pursuant to Section 409A of the Code.

5.   Withholding. All deliveries and distributions under this Agreement are subject to withholding of all applicable taxes. The Company is entitled to (a) withhold and deduct from future fees of the Participant (or from other amounts due to Participant) or make other arrangements for the collection of all legally required amounts necessary to satisfy such withholding or (b) require the Participant promptly to remit such amounts to the Company. Subject to such rules and limitations as may be established by the Committee from time to time, the withholding obligations described in this Section 6 may be satisfied through the surrender of shares of Stock which the Participant already owns, or to which the Participant is otherwise entitled under the Plan, including shares of Stock to be settled under this Agreement.

6.    Transferability. Units may not be sold, assigned, transferred, pledged or otherwise encumbered until the expiration of the Restricted Period or, if earlier, until the Participant is vested in the Units. Transfers at death are governed by paragraph 9(c) below.

7.    Binding Effect; Heirs and Successors.

(a) The terms and conditions of this Agreement shall be effective upon delivery to the Participant, with or without execution by the Participant.

(b) This Agreement shall be binding upon, and inure to the benefit of, the Company and its successors and assigns, and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Company's assets and business.

(c) If any rights exercisable by the Participant or benefits deliverable to the Participant under this Agreement have not been exercised or delivered, respectively, at the time of the Participant's death, such rights shall be exercisable by the Designated Beneficiary, and such benefits shall be delivered to the Designated Beneficiary, in accordance with the provisions of this Agreement and the Plan. The "Designated Beneficiary" shall be the beneficiary or beneficiaries designated by the Participant in a writing filed with the Committee in such form and at such time as the Committee shall require. If a deceased Participant fails to designate a beneficiary, or if the Designated Beneficiary does not survive the Participant, any rights that would have been exercisable by the Participant and any benefits distributable to the Participant shall be exercised by or distributed to the legal representative of the estate of the Participant. If a deceased Participant designates a beneficiary and the Designated Beneficiary survives the Participant but dies before the Designated Beneficiary's exercise of all rights under this Agreement or before the complete distribution of benefits to the Designated Beneficiary under this Agreement, then any rights that would have been exercisable by the Designated Beneficiary shall be exercised by the legal representative of the estate of the Designated Beneficiary, and any benefits distributable to the Designated Beneficiary shall be distributed to the legal representative of the estate of the Designated Beneficiary.

8.    Administration. The authority to manage and control the operation and administration of this Agreement shall be vested in the Board, and the Board shall have all powers with respect to this Agreement as it has with respect to the Plan. Any interpretation of the Agreement by the Board and any decision made by it with respect to the Agreement is final and binding on all persons. Such powers or decision-making may be delegated, to the extent permitted by the Plan, to one or more Board members or any other person or persons selected by the Board.

9.    Plan Governs. Notwithstanding anything in this Agreement to the contrary, the terms of this Agreement shall wholly incorporate and be subject to the terms of the Plan, a copy of which may be obtained from the Chief Financial Officer of the Company (or such other party as the Company may designate); and this Agreement is subject to all interpretations, amendments, rules and regulations promulgated by the Board from time to time pursuant to the Plan.

10.    No Implied Rights.

(a) The award of Units will not confer on the Participant any right with respect to continuance of service with the Company or any Subsidiary, nor will it interfere in any way with any right the Company or any Subsidiary would otherwise have to terminate or modify the terms of such Participant's service at any time.

(b) The Participant shall not have any rights of a shareholder with respect to the Units until shares of Stock have been duly issued following settlement of the Award as provided herein.

11.    Notices. Any written notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, at the Company's principal executive office.

12.    Amendment. This Agreement may be amended by written agreement of the Participant and the Company, without the consent of any other person.

13.    Governing Law; Jurisdiction. This Agreement shall be governed by the laws of the State of Alabama without giving effect to the choice-of-law provisions thereof. The Circuit Court of the City of Birmingham and the United States District Court, Northern District of Alabama, Birmingham Division shall be the exclusive courts of jurisdiction and venue for any litigation, special proceeding or other proceeding as between the parties that may be brought, or arise out of, in connection with, or by reason of this Agreement. The parties hereby consent to the jurisdiction of such courts.

*End of Exhibit 10.6*

Exhibit 10.8

## CHANGE IN CONTROL SEVERANCE AGREEMENT

This Change in Control Severance Agreement (this "Agreement") made this ___ day of _____, 20__, by and between _____ ("Executive") and Hibbett, Inc. (the "Company").

WHEREAS, the Compensation Committee of the Board of Directors of the Company (the "Board") has determined that it is in the best interest of the Company to assure that the Company will have the continued dedication of the Executive, notwithstanding the possibility of a Change in Control of the Company.

NOW, THEREFORE, in consideration of the mutual promises and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Change in Control Payments. If Executive's employment with the Company is terminated by the Company without Cause or by the Executive for Good Reason within: (i) two years following a Change in Control; or (ii) within a six-month period prior to a Change in Control if Executive's termination or resignation is also directly related to or occurs in connection with a Change in Control, the Company shall pay Executive, within thirty (30) days of Executive's termination date or the Change in Control date, whichever is later, severance in the amount equal to one and one-half (1.5) times the sum of Executive's Covered Salary and Executive's Covered Bonus.

To the extent that Executive has been granted options, stock awards or other equity compensation under the Company's equity compensation plan, Executive's interest in such awards shall be fully exercisable, vested and nonforfeitable as of the Change in Control date, to the extent not already exercisable or vested as of such date.

2. Definitions.

(a) "Cause," for purposes of this Agreement, means felony conviction or plea to same, fraud or dishonesty, willful misconduct or failure to perform duties, intentional acts resulting in material injury to the Company or acts of moral turpitude.

(b) "Change in Control," for purposes of this Agreement, occurs if:

(i) The individuals who, as of the date of this Agreement, constitute the Board of Directors of the Company (the "Incumbent Board"), cease for any reason to constitute at least a majority of the Board; or

(ii) The acquisition by any individual, entity or group (as defined in Section 13(d)(3) of the Securities Exchange Act of 1934), of beneficial ownership of 50% or more of either (i) the then outstanding shares of common stock of the Company (the "Outstanding Company Common Stock") or (ii) the combined voting power of the then outstanding voting securities of the Company that may be cast for the election of the Company's directors (the "Outstanding Company Voting Securities") other than as a result of an issuance of securities initiated by the Company, or open market purchases approved by the Board, as long as the majority of the Board approving the purchases is a majority at the time the purchases are made; provided, however, that for purposes of this Section 2(b)(ii), the following acquisitions shall not constitute a Change in Control: (i) any acquisition directly from the Company, (ii) any acquisition by the Company or (iii) any acquisition by any Executive benefit plan (or related trust) sponsored or maintained by the Company; or

(iii) The merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company (a "Business Combination"), in each case, unless, following such Business Combination, (i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation a corporation which as a result of such transaction owns the Company or

all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be, (ii) no Person (excluding any corporation resulting from such Business Combination or any Executive benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination and (iii) at least a majority of the members of the board of directors of the corporation resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board, providing for such Business Combination; or

(iv) The dissolution or liquidation of the Company.

(c) "Covered Bonus," for purposes of this Agreement, shall mean the average of the actual cash bonuses paid to the Executive for the five years prior to the year of the Executive's employment termination from the Company (but in no event greater than the target bonus for the year in which the termination or resignation of employment occurs). Covered Bonus will be calculated over a shorter period if the Executive has been employed for a shorter period.

(d) "Covered Salary," for purposes of this Agreement, shall mean the highest annual rate of base salary paid to the Executive by the Company prior to the termination of Executive's employment or resignation from the Company.

(e) "Good Reason," for purposes of this Agreement, means the occurrence of any of the following, without the prior written consent of the Executive: (i) a change in the location of the Executive's principal place of employment to a location more than 50 miles from the Executive's initial work site with the Company, (ii) reduction in Executive's annual base salary or bonus opportunity, (iii) material, adverse change in the Executive's duties or responsibilities, other than in connection with the termination of Executive's employment for Cause; provided, however, that the Executive shall not be deemed to have Good Reason pursuant to this provision unless the Executive gives the Company written notice that the specified conduct or event has occurred and making specific reference to this Section 2(e) and the Company fails to cure such conduct or event within thirty (30) days of receipt of such notice.

3.    Limitation on Change in Control Payments. Anything in Section 1 above to the contrary notwithstanding, if, with respect to Executive, the payments that Executive has a right to receive under this Agreement plus any other payments from the Company including but not limited to the acceleration of the exercisability and/or vesting of any awards of Common Stock options to purchase Common Stock, together with any other payments which such Participant has the right to receive from the Company or any other affiliated entity, would constitute an "excess parachute payment" (as defined in Section 280G of the Code), then the payments under this Agreement shall be reduced to (but not below zero) to the largest amount that will result in no portion of such payments being subject to the excise tax imposed by Section 4999 of the Code. The determination of any reduction pursuant to this Section must be made by the Company in good faith, before any payments are due and payable to Executive.

4.    Nonqualified Deferred Compensation Omnibus Provision. The payments and benefits under this Agreement are intended to satisfy the exclusion from Section 409A of the Code for payments made upon an involuntary separation from service. However, to the extent that any payment or benefit which is provided pursuant to or in connection with this Agreement which is considered to be nonqualified deferred compensation subject to Section 409A of the Code, it shall be paid and provided in a manner, and at such time and in such form, as complies with the applicable requirements of Section 409A of the Code to avoid the unfavorable tax consequences provided therein for non-compliance. In connection with effecting such compliance with Section 409A of the Code, the following shall apply:

(a) Notwithstanding any other provision of this Agreement, the Company is authorized to amend this Agreement, to delay the payment of any monies and/or provision of any benefits in such manner as may be determined by it to be necessary or appropriate to comply, or to evidence or further evidence required compliance, with Section 409A of the Code (including any transition or grandfather rules thereunder).

(b) Neither the Executive nor the Company shall take any action to accelerate or delay the payment of any monies and/or provision of any benefits in any manner which would not be in compliance with Section 409A of the Code (including any transition or grandfather rules thereunder). Notwithstanding the foregoing:

(i) Payment may be delayed for a reasonable period in the event the payment is not administratively practical due to events beyond the recipient's control such as where the recipient is not competent to receive the payment, there is a dispute as to amount due or the proper recipient of such payment, additional time is needed to calculate the amount payable, or the payment would jeopardize the solvency of the Company.

(ii) Payments shall be delayed in the following circumstances: (1) where the Company reasonably anticipates that the payment will violate the terms of a loan agreement to which the Company is a party and that the violation would cause material harm to the Company; or (2) where the Company reasonably anticipates that the payment will violate Federal securities laws or other applicable laws; provided that any payment delayed by operation of this clause (B) will be made at the earliest date at which the Company reasonably anticipates that the payment will not be limited or cause the violations described.

(iii) If the Executive is a specified Executive of a publicly traded corporation as required by Section 409A(a)(2)(B)(i) of the Code, and any payment or provision of any benefit hereunder is subject to Section 409A any payment or provision of benefits in connection with a separation from service payment event (as determined for purposes of Section 409A of the Code), as opposed to another payment event permitted under Section 409A, or an amount payable that is not subject to Section 409A shall not be made until six months after the Executive's separation from service (the "409A Deferral Period").

5. Restrictive Covenants.

(a) Non-Solicitation. During the Executive's employment with the Company and for a period of twelve (12) months after the Termination Date, Executive will not for his own benefit or for the benefit of any person or entity other than the Company, (i) solicit, or assist any person or entity to solicit, any officer, director, or employee of the Company to leave his employment, (ii) hire or cause to be hired any person who is then, or who was during the one (1) year prior to the Termination Date, an officer, director, or employee of the Company, or (iii) engage any person who is then, or who was during the one (1) year prior to the Termination Date, an officer, director, employee or independent contractor of the Company.

(b) Non-interference. During the Executive's employment with the Company and for a period of twelve (12) months after the Termination Date, Executive will not solicit, or assist any person or entity to solicit, any person or entity who, during the twelve (12) month period prior to the Termination Date, paid or engaged the Company for products or services, for the purpose of providing services or selling products where those services or products compete with the services or products offered by the Company as of the Termination Date.

(c) Blue-Penciling. If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 5 is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

6. Confidential Information.

(a) Non-Disclosure. During his employment with the Company, and at all times thereafter, Executive agrees not to disclose, communicate or divulge to any third party or use, or permit others to use, any confidential information of the Company. For the purposes of this Agreement, "confidential information" shall mean all information disclosed to Executive, or known to Executive as a consequence of or through this employment, where such information is not generally known by the public or was regarded or treated as proprietary by the Company (including, without limitation, private or sensitive information concerning any of the Company's employees and executives, business systems and procedures, suppliers, methods, systems, designs and know-how, names of referral sources, client records, client lists, pricing lists, business or strategic plans, marketing methods or

plans or any other non-public information which, if used, divulged, published or disclosed by Executive, would be reasonably likely to provide a competitive advantage to a competitor).

(b) Proprietary Rights. All rights, including without limitation any writing, discoveries, inventions, innovations, and computer programs and related documentation and all intellectual property rights therein, including without limitation copyright (collectively "Intellectual Property") created, designed or constructed by Executive during his employment with the Company, that are related in any way to Executive's work with the Company or to any of the services provided by the Company, shall be the sole and exclusive property of the Company. Executive agrees to deliver and assign to the Company all such Intellectual Property and all rights which Executive may have therein and Executive agrees to execute all documents, including without limitation patent applications, and make all arrangements necessary to further document such ownership and/or assignment and to take whatever other steps may be needed to give the Company the full benefit thereof. Executive further agrees that if the Company is unable after reasonable effort to secure the signature of Executive on any such documents, the Chairman of the Board of Directors of the Company shall be entitled to execute any such papers as the agent and attorney-in-fact of Executive and Executive hereby irrevocably designates and appoints each such officer of the Company as Executive's agent and attorney-in-fact to execute any such papers on Executive's behalf and to take any and all actions required or authorized by the Company pursuant to this Section 6(b). Without limitation to the foregoing, Executive specifically agrees that all copyrightable materials generated during the term of Executive's employment with the Company, including but not limited to, computer programs and related documentation, that are related in any way to Executive's work with the Company or to any of the services provided by the Company, shall be considered works made for hire under the copyright laws of the United States and shall upon creation be owned exclusively by the Company. To the extent that any such materials, under applicable law, may not be considered works made for hire, Executive hereby assigns to the Company the ownership of all copyrights in such materials, without the necessity of any further consideration, and the Company shall be entitled to register and hold in their own name all copyrights in respect of such materials.

7.   Notices. All notices, consents, and other communications to, upon, and between the respective parties hereto shall be in writing and shall be deemed to have been given, delivered, or made when sent or mailed by registered or certified mail, postage prepaid, and return receipt requested and addressed to the Company at its principal office in Birmingham, Alabama and to the Executive at his residence as shown upon the employment records of the Company.

8.   Modification. No provision of this Agreement, including any provision of this Section, may be modified, deleted or amended in any manner except by an agreement in writing executed by the parties hereto.

9.   Benefit. All of the terms of this Agreement shall be binding upon, inure to the benefit of and be enforceable by the Company and its successors and assigns and by the Executive and his personal representatives.

10.   Severability. In the event that any part of this Agreement shall be held to be unenforceable or invalid, the remaining parts shall nevertheless continue to be valid and enforceable as though the unenforceable or invalid portions were not a part hereof.

11.   Entire Agreement. This Agreement contains the entire understanding of Executive and Company concerning the subjects it covers and it supersedes all prior understandings and representations concerning the subjects it covers.

12.   Choice of Law. This Agreement shall be governed by the laws of the state of Alabama, without regard to its conflict of laws principles.

13.   Headings. The headings provided herein are for convenience only and shall not affect the interpretation of this Agreement.

14.   Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the day and year first above written.

Hibbett, Inc.                    Executive
By:
Its:
Dated:                    Dated:

*End of Exhibit 10.8*

*Exhibit 10.9*

**HIBBETT, INC.**
**AMENDED AND RESTATED**
**2015 EQUITY INCENTIVE PLAN**

**ARTICLE 1**
**GENERAL**

1.1    Purpose. The Hibbett, Inc. Amended and Restated 2015 Equity Incentive Plan (the "Plan") is established by Hibbett, Inc. (the "Company") to (i) attract and retain persons eligible to participate in the Plan; (ii) motivate Participants, by means of appropriate incentives, to achieve long-range goals; (iii) provide incentive compensation opportunities that are competitive with those of other similar companies; and (iv) further identify Participants' interests with those of the Company's other shareholders through compensation that is based on the Company's common stock; and thereby promote the long-term financial interest of the Company and its Member Companies, including the growth in value of the Company's equity and enhancement of long-term shareholder return.

1.2    Participation. Subject to the terms and conditions of the Plan, the Committee shall determine and designate, from time to time, from among the Eligible Recipients (including transferees of Eligible Recipients to the extent the transfer is permitted by the Plan and the applicable Award Agreement), those persons who will be granted one or more Awards under the Plan, and thereby become "Participants" in the Plan.

1.3    Operation, Administration, and Definitions. The operation and administration of the Plan, including the Awards made under the Plan, shall be subject to the provisions of ARTICLE 4 (relating to operation and administration). Capitalized terms in the Plan shall be defined as set forth in the Plan (including the definition provisions of Article 8 of the Plan).

**ARTICLE 2**
**OPTIONS AND SARS**

2.1    Definitions.

(a) The grant of an "Option" entitles the Participant to purchase shares of Stock at an Exercise Price established by the Committee. Any Option granted under this ARTICLE 2 may be either an incentive stock option (an "ISO") or a nonqualified option ("NQO"), as determined in the discretion of the Committee. An "ISO" is an Option that satisfies the requirements applicable to an "incentive stock option" described in Section 422(b) of the Code. An "NQO" is an Option that is not intended to be an ISO. ISOs may be granted only to employees of the Company or any Subsidiary that is a Member Company. The terms and conditions of each ISO shall be such that each ISO issued hereunder shall constitute and be treated as an "incentive stock option" as defined in Section 422 of the Code. To the extent required by Section 422 of the Code, the aggregate Fair Market Value (determined as of the time of grant) of the shares of Stock with respect to which ISOs granted under this Plan and any other plan of the Company or any Member Company become exercisable for the first time by a Participant during any calendar year shall not exceed $100,000. To the extent that any Option does not qualify as an ISO, it shall be deemed an NQO.

(b) A stock appreciation right ("SAR") entitles the Participant to receive, in cash or Stock, value equal to (or otherwise based on) the excess of: (a) the Fair Market Value of a specified number of shares of Stock at the time of exercise; over (b) an Exercise Price established by the Committee. The Committee may limit the amount that can be received when a SAR is exercised.

2.2    Exercise Price. The "Exercise Price" of each Option and SAR granted under this ARTICLE 2 shall be established by the Committee or shall be determined by a method established by the Committee at the time the Option or SAR is granted; except that the Exercise Price shall not be less than 100% of the Fair Market Value of a share of Stock on the date of grant. Except as set forth in Section 4.2(f) and Section 5.1, without prior stockholder approval, in no event may the Committee exercise its discretion to reduce the Exercise Price of outstanding Options or SARs or to cancel any outstanding Options or SARs in exchange for cash, Options or SARs having a lower exercise price of the original Awards, or other Awards.

2.3    Exercise. Each Option and SAR shall be exercisable in accordance with such terms and conditions and during such periods as may be established by the Committee.

2.4    Payment of Option Exercise Price. The payment of the Exercise Price of an Option granted under this ARTICLE 2 shall be subject to the following:

(a) Subject to the following provisions of this Section 2.4, the full Exercise Price for shares of Stock purchased upon the exercise of any Option shall be paid at the time of such exercise (except that, in the case of an exercise arrangement approved by the Committee and described in Section 2.4(c), payment may be made as soon as practicable after the exercise).

(b) The Exercise Price shall be payable in cash or by tendering, by either actual delivery of shares or by attestation, already-owned shares of Stock acceptable to the Committee, and valued at Fair Market Value as of the day of exercise, or in any combination thereof, as determined by the Committee.

(c) Subject to compliance with applicable law (including observance of any "blackout" period and Section 4.17), the Committee may permit a Participant to elect to pay the Exercise Price upon the exercise of an Option by irrevocably authorizing a third party to sell shares of Stock (or a sufficient portion of the shares) acquired upon exercise of the Option and remit to the Company a sufficient portion of the sale proceeds to pay the entire Exercise Price and any tax withholding resulting from such exercise. In the event the Participant chooses to pay the Exercise Price as so provided, the Participant and the broker shall comply with such procedures and enter into such agreements of indemnity and other agreements as the Company shall prescribe as a condition of such payment procedure.

(d) With respect to Options that are not ISOs, the Committee may permit payment of the Exercise Price by a "net exercise" arrangement pursuant to which the Company will reduce the number of shares of Stock issuable upon exercise by the largest whole number of shares with a Fair Market Value that does not exceed the aggregate Exercise Price.

(e) Permitted exercise methods may be limited by the terms of the individual Award Agreement or otherwise by the Committee at any time.

(f) Settlement of Award. Settlement of Options and SARs is subject to Section 4.7.

## ARTICLE 3
## OTHER STOCK AWARDS

3.1 Definitions.

(a) A "Stock Unit" Award is the grant of a right to receive shares of Stock in the future.

(b) A "Performance Share" Award is a grant of a right to receive shares of Stock or Stock Units which is contingent on the achievement of performance or other objectives during a specified period.

(c) A "Performance Unit" Award is a grant of a right to receive a designated dollar value amount of Stock which is contingent on the achievement of performance or other objectives during a specified period.

(d) A "Restricted Stock" Award is a grant of shares of Stock, and a "Restricted Stock Unit" Award is the grant of a right to receive shares of Stock in the future, with such shares of Stock or right to future delivery of such shares of Stock subject to a risk of forfeiture or other restrictions that will lapse upon the achievement of one or more goals relating to completion of service by the Participant, or achievement of performance or other objectives, as determined by the Committee.

3.2 Restrictions on Awards. Each Stock Unit Award, Restricted Stock Award, Restricted Stock Unit Award, Performance Share Award, and Performance Unit Award shall be subject to the following:

(a) Any such Award shall be subject to such conditions, restrictions and contingencies as the Committee shall determine.

(b) The Committee may designate whether any such Award being granted to any Participant is subject to performance conditions. The performance conditions that may be used by the Committee for such Award shall be based on the attainment of any performance goals, as selected by the Committee, that are related to (i) sales increases (including comparable store sales), (ii) profits and earnings on a pre-tax or post-tax basis (including operation income, EBIT and EBITDA), (iii) cash (such as cash flow, cash generation or other cash measures), (iv) shareholder value or total shareholder return (such as stock price appreciation), (v) financial condition or liquidity; (vi) financial return measures (such as return on assets, capital, equity or sales), (vii) market share measures, (viii) improvements in capital structure, (ix) expenses (such as operating expense, expense management, expense ratio, expense efficiency ratios), (x) business expansion or consolidation (such as acquisitions and divestitures), (xi)

internal rate of return or increase in net present value, (xii) working capital targets (such as those relating to inventory and/or accounts receivable), (xiii) productivity improvement, (xiv) inventory measures (such as turns, reduction or shrink) or (xv) any other quantitative or qualitative performance as may be determined by the Committee in its discretion. Such goals may be stated in absolute terms, relative to comparison companies or indices, as increases over past time periods, as ratios (such as earnings per share), or as returns on any of the foregoing measures over a period of time. If the Committee determines that a change in the business, operations, corporate structure or capital structure of the Company, or the manner in which it conducts its business, or other events or circumstances render the performance goals unsuitable, the Committee may in its discretion modify such performance goals or the acceptable levels of achievement, in whole or in part, as the Committee deems appropriate and equitable.

## ARTICLE 4
## OPERATION AND ADMINISTRATION

4.1 Effective Date. The Plan was originally effective July 1, 2015. The effective date of this Plan, as amended and restated, shall be the date of the 2020 annual meeting of shareholders (the "Amended Plan Effective Date"), subject to the approval of the Company's shareholders. The Plan shall be unlimited in duration and, in the event of Plan termination, shall remain in effect as long as any Awards under it are outstanding; provided, however, that no Awards may be granted under the Plan on or after the ten year anniversary of the Amended Plan Effective Date.

4.2  Shares Subject to Plan. The shares of Stock for which Awards may be granted under the Plan shall be subject to the following:

(a) The shares of Stock with respect to which Awards may be made under the Plan shall be shares currently authorized but unissued or currently held or subsequently acquired by the Company as treasury shares, including shares purchased in the open market or in private transactions.

(b) Subject to the following provisions of this Section 4.2, the maximum number of shares of Stock that may be delivered to Participants and their beneficiaries under the Plan shall be the sum of (i) 1,500,000 shares of Stock added to the Plan as of the Amended Plan Effective Date, and (ii) 2,954 shares of Stock remaining in the Plan as of April 13, 2020, for a cumulative total of 1,502,954 shares of Stock available for issuance after April 13, 2020 (the "Share Reserve"). All shares of Stock under the Share Reserve may be issued as ISOs.

(c) Subject to Section 4.2(d), whenever any outstanding Award or portion thereof expires, is canceled, is forfeited, is settled in cash or is otherwise terminated for any reason without having been exercised or Stock having been issued in respect of the Award (or such portion thereof to which the expiration, forfeiture, cash settlement or other termination occurs), the Stock allocable to the expired, canceled, forfeited, cash-settled or otherwise terminated portion of the Award may again be the subject of Awards granted hereunder and shall be added back to the Share Reserve.

(d) The following shares of Stock shall not be added to Share Reserve: (i) shares tendered or held back upon exercise of an Option or settlement of an Award to cover the Exercise Price or tax withholding and (ii) shares of Stock subject to a SAR that are not issued in connection with the stock settlement of the SAR upon exercise thereof. In the event the Company repurchases shares of Stock on the open market, such shares shall not be added to the shares of Stock available for issuance under the Plan.

(e) Substitute Awards shall not reduce the shares of Stock authorized for issuance under the Share Reserve. Additionally, in the event that a company acquired by the Company or any Affiliate or Subsidiary or with which the Company or any Affiliate or Subsidiary combines has shares available under a pre-existing plan approved by stockholders and not adopted in contemplation of such acquisition or combination, the shares available for issuance pursuant to the terms of such pre-existing plan (as adjusted, to the extent appropriate, using the exchange ratio or other adjustment or valuation ratio or formula used in such acquisition or combination to determine the consideration payable to the holders of common stock of the entities party to such acquisition or combination) may be used for Awards under the Plan and shall not reduce the shares of Stock authorized under the Share Reserve; provided that Awards using such available shares shall not be made after the date awards or grants could have been made under the terms of the pre-existing plan, absent the acquisition or combination, and shall only be made to individuals who were not employees or directors of the Company, an Affiliate or a Subsidiary prior to such acquisition or combination.

(f) To prevent the dilution or enlargement of benefits or potential benefits intended to be made available under the Plan, in the event of any stock dividend, recapitalization, stock split, reverse stock split, extraordinary dividend, reorganization, merger, consolidation, spin-off, combination or other similar corporate transaction or event affecting the Stock with respect to which Awards have been or may be issued under the Plan

(any such transaction or event, a "Corporate Transaction"), then the Committee shall, in such manner as the Committee deems equitable: (A) make a proportionate adjustment in (1) the maximum number and type of securities as to which awards may be granted under the Plan, (2) the number and type of securities subject to outstanding Awards, (3) the grant or Exercise Price with respect to any such Award, (4) the performance targets and goals applicable to any outstanding Awards, and (5) any other provisions or terms of an Award deemed equitable or necessary by the Committee; provided, in each case, that with respect to ISOs, no such adjustment shall be authorized to the extent that such adjustment would cause such options to fail to qualify as an "incentive stock option" under Section 422 of the Code or any successor provision, and with respect to all Options, any such adjustment shall be consistent with provisions of Treasury Regulations promulgated under Section 409A of the Code or any successor provisions; or (B) cause any Award outstanding as of the effective date of the Corporate Transaction to be cancelled in consideration of a cash payment or alternate Award (whether from the Company or another entity that is a participant in the Corporate Transaction) or a combination thereof made to the holder of such cancelled Award substantially equivalent in value to the Fair Market Value of such cancelled Award. The determination of Fair Market Value shall be made by the Committee or the Board, as the case may be, in their sole discretion. Any adjustments made hereunder shall be binding on all Participants.

    4.3   <u>General Restrictions</u>. Delivery of shares of Stock or other amounts under the Plan shall be subject to the following:

       (a) Notwithstanding any other provision of the Plan, the Company shall have no liability to deliver any shares of Stock under the Plan or make any other distribution of benefits under the Plan unless such delivery or distribution would comply with all applicable laws (including, without limitation, the requirements of the Securities Act of 1933), and the applicable requirements of any securities exchange or similar entity.

       (b) To the extent that the Plan provides for issuance of stock certificates to reflect the issuance of shares of Stock, the issuance may be affected on a non-certificated basis, to the extent not prohibited by applicable law or the applicable rules of any stock exchange.

    4.4   <u>Tax Withholding</u>. All distributions under the Plan are subject to withholding of all applicable taxes, and the Committee may condition the delivery of any shares or other benefits under the Plan on satisfaction of the applicable withholding obligations. The Committee, in its discretion, and subject to such requirements as the Committee may impose prior to the occurrence of such withholding, may permit such withholding obligations to be satisfied through cash payment by the Participant, through the surrender of shares of Stock which the Participant already owns, or through the surrender of shares of Stock to which the Participant is otherwise entitled under the Plan. In determining the procedures by which shares of Stock will be withheld for withholding taxes, to the extent required to avoid the Company's incurring an adverse accounting charge, the amount of any shares of Stock so withheld shall not exceed the amount necessary to satisfy withholding taxes determined using the maximum statutory withholding rates for federal, state, local and/or foreign tax purposes.

    4.5   <u>Grant and Use of Awards</u>. In the discretion of the Committee, a Participant may be granted any Award permitted under the provisions of the Plan, and more than one Award may be granted to a Participant. Awards may be granted as alternatives to or replacement of awards granted or outstanding under the Plan, or any other plan or arrangement of the Company or a Member Company (including a plan or arrangement of a business or entity, all or a portion of which is acquired by the Company or a Member Company). Subject to the overall limitation on the number of shares of Stock that may be delivered under the Plan, the Committee may use available shares of Stock as the form of payment for compensation, grants or rights earned or due under any other compensation plans or arrangements of the Company or a Member Company, including the plans and arrangements of the Company or a Member Company assumed in business combinations.

    4.6   <u>Dividends and Dividend Equivalents</u>. An Award may provide the Participant with the right to receive dividend payments or dividend equivalent payments with respect to Stock subject to the Award, which payments may be credited to an account for the Participant and may be settled in cash or Stock, as determined by the Committee; provided, that no such dividend payments or dividend equivalents shall be paid or accrued with respect to Options or SARs, other than pursuant to Section 4.2(f) in the event of a Corporate Transaction. Any such settlements, and any such crediting of dividends or dividend equivalents or reinvestment in shares of Stock, may be subject to such conditions, restrictions and contingencies as the Committee shall establish, including the reinvestment of such credited amounts in Stock equivalents. No Award under this Plan may provide for the payment of dividends or dividend equivalent rights unless, and only to the extent that, the underlying Award becomes fully vested.

    4.7   <u>Settlement of Awards</u>. The obligation to make payments and distributions with respect to Awards may be satisfied through cash payments, the delivery of shares of Stock, the granting of replacement Awards, or combination thereof as the Committee shall determine. In lieu of issuing a fraction of a share upon any exercise of an Award, resulting from an adjustment of the Award pursuant to Section 4.2(f) of the Plan or otherwise, the

Company will be entitled to pay to the Participant an amount equal to the Fair Market Value of such fractional share. Satisfaction of any obligations under an Award, which is sometimes referred to as "settlement" of the Award, may be subject to such conditions, restrictions and contingencies as the Committee shall determine. The Committee may permit or require the deferral of any Award payment, subject to such rules and procedures as it may establish, which may include provisions for the payment or crediting of interest or dividend equivalents, and may include converting such credits into deferred Stock equivalents provided that such rules and procedures satisfy the requirements of Section 409A of the Code. No deferral is permitted for Options or SARs. Each Member Company shall be liable for payment of cash due under the Plan with respect to any Participant to the extent that such benefits are attributable to the services rendered for that Member Company by the Participant. Any disputes relating to liability of a Member Company for cash payments shall be resolved by the Committee.

4.8    _Transferability_. Except as otherwise permitted by the Committee:

(a) During a Participant's lifetime, his or her Awards shall be exercisable only by the Participant, or by the Participant's legal representative or guardian in the event of the Participant's incapacity. No Awards shall be sold, assigned, transferred or otherwise encumbered or disposed of by a Participant other than by will or by the laws of descent and distribution or pursuant to a domestic relations order. No Awards shall be subject, in whole or in part, to attachment, execution, or levy of any kind, and any purported transfer in violation hereof shall be null and void. Notwithstanding the forgoing, the Committee, in its sole discretion, may provide either in the Award Agreement regarding a given Award or by subsequent written approval that the Participant may transfer his or her NQOs to his or her immediate Family Members, to trusts for the benefit of such Family Members, or to partnerships in which such Family Members are the only partners; provided that the transferee agrees in writing with the Company to be bound by all of the terms and conditions of this Plan and the applicable Award. In no event may an Award be transferred by a Participant for value.

(b) Awards may be exercised or claimed on behalf of a deceased Participant or other person entitled to benefits under the Plan by the beneficiary of such Participant or other person if the Company has a valid designation of such beneficiary on file, or otherwise by the personal legal representative of such Participant or other person. If no beneficiary has been designated by a deceased Participant, or if the designated beneficiaries have predeceased the Participant, the beneficiary shall be the Participant's estate.

4.9    _Form and Time of Elections_. Unless otherwise specified herein, each election required or permitted to be made by any Participant or other person entitled to benefits under the Plan, and any permitted modification, or revocation thereof, shall comply with Section 409A of the Code and be in writing filed with the Committee at such times, in such form, and subject to such restrictions and limitations, not inconsistent with the terms of the Plan, as the Committee shall require.

4.10    _Agreement with Company_. An Award under the Plan shall be subject to such terms and conditions, not inconsistent with the Plan, as the Committee shall, in its sole discretion, prescribe. The terms and conditions of any Award to any Participant shall be reflected in such form of written document as is determined by the Committee. A copy of such document shall be provided to the Participant, and the Committee may, but need not require that the Participant sign a copy of such document. Such document is referred to in the Plan as an "Award Agreement" regardless of whether any Participant signature is required.

4.11    _Action by Company or Member Company_. Any action required or permitted to be taken by the Company or any Member Company shall be by resolution of its board of directors, or by action of one or more members of the board (including a committee of the board) who are duly authorized to act for the board, or (except to the extent prohibited by applicable law or applicable rules of any stock exchange) by a duly authorized officer of such company.

4.12    _Gender and Number_. Where the context admits, words in any gender shall include any other gender, words in the singular shall include the plural and the plural shall include the singular.

4.13    _Limitation of Implied Rights_.

(a) Neither a Participant nor any other person shall, by reason of participation in the Plan, acquire any right in or title to any assets, funds or property of the Company or any Member Company whatsoever, including, without limitation, any specific funds, assets, or other property which the Company or any Member Company, in its sole discretion, may set aside in anticipation of a liability under the Plan. A Participant shall have only a contractual right to the Stock or amounts, if any, payable under the Plan, unsecured by any assets of the Company or any Member Company, and nothing contained in the Plan shall constitute a guarantee that the assets of the Company or any Member Company shall be sufficient to pay any benefits to any person.

(b) The Plan does not constitute a contract of employment, and selection as a Participant will not give any participating employee the right to be retained in the employ of the Company or any Member Company, nor any right or claim to any benefit under the Plan, unless such right or claim has specifically accrued under the terms of the Plan. Except as otherwise provided in the Plan, no Award under the Plan shall confer upon the holder thereof any rights as a shareholder of the Company prior to the date on which the individual fulfills all conditions for receipt of such rights.

4.14    <u>Evidence</u>. Evidence required of anyone under the Plan may be by certificate, affidavit, document or other information which the person acting on it considers pertinent and reliable, and signed, made or presented by the proper party or parties.

4.15    <u>Minimum Vesting Period</u>. The vesting period for each Award granted under the Plan must be at least equal to the Minimum Vesting Period; provided, however, nothing in this Section shall limit the Committee's authority to accelerate the vesting of Awards as set forth in the Plan; and, provided further, notwithstanding the foregoing, up to 5% of the Share Reserve may be utilized for Awards with a vesting period that is less than the Minimum Vesting Period (each such Award, an "Excepted Award"). In addition to Excepted Awards, the Committee may grant Awards that vest (or permit previously granted Awards to vest) within the Minimum Vesting Period (i) if such Awards are granted as substitute Awards in replacement of other Awards (or awards previously granted by an entity being acquired (or assets of which are being acquired)) that were scheduled to vest within the Minimum Vesting Period or (ii) if such Awards are being granted in connection with an elective deferral of cash compensation that, absent a deferral election, otherwise would have been paid to the Participant within the Minimum Vesting Period.

4.16    <u>Clawback Policy</u>. Each Participant's rights, payments, and benefits pursuant to any Award shall be subject to mandatory repayment by the Participant to the Company (i) to the extent set forth in any Award Agreement, or (ii) to the extent that such Participant is, or in the future becomes, subject to (A) any "clawback" or recoupment policy adopted by the Committee, including policies adopted to comply with the requirements of any applicable laws, rules or regulations, including pursuant to final rules adopted by the Securities and Exchange Commission pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, or otherwise, or (B) any applicable laws which impose mandatory recoupment, under circumstances set forth in such applicable laws, including the Sarbanes-Oxley Act of 2002.

4.17    <u>Trading Policy Restrictions</u>. Option exercises and other Awards under the Plan shall be subject to the Company's insider trading policies and procedures, as in effect from time to time.

4.18    <u>Section 409A of the Code</u>. Any Award granted under this Plan shall be provided or made in a manner and at such time, in such form and subject to such election procedures (if any), as complies with the applicable requirements of Section 409A of the Code to avoid a plan failure described in Section 409A(a)(1), including without limitation, deferring payment to a specified employee or until the occurrence of a specified event described in Section 409A(a)(2) of the Code. Notwithstanding any other provision hereof or document pertaining hereto, the Plan shall be so construed and interpreted to meet the applicable requirements of Section 409A of the Code to avoid a plan failure described in Section 409A(a)(1) of the Code. Notwithstanding this or any other provision of the Plan to the contrary, the Committee may amend the Plan or any Award granted hereunder in any manner, or take any other action, that it determines, in its sole discretion, is necessary, appropriate or advisable to cause the Plan or any Award granted hereunder to comply with Section 409A and any guidance issued thereunder. Any such action, once taken, shall be deemed to be effective from the earliest date necessary to avoid a violation of Section 409A and shall be final, binding and conclusive on all Participants and other individuals having or claiming any right or interest under the Plan. Although the Company intends to administer the Plan so that Awards will be exempt from, or will comply with, the requirements of Section 409A of the Code, the Company does not warrant that any Award under the Plan will qualify for favorable tax treatment under Section 409A of the Code or any other provision of federal, state, local or foreign law. The Company shall not be liable to any Participant for any tax, interest, or penalties that Participant might owe as a result of the grant, holding, vesting, exercise, or payment of any Award under the Plan.

<div align="center">

**ARTICLE 5**
**CHANGE OF CONTROL**

</div>

Subject to the provisions of Section 4.2(f) (relating to the adjustment of shares), and except as otherwise provided in the Plan or the Award Agreement reflecting the applicable Award, upon the occurrence of a Change of Control the following provisions shall apply:

5.1    <u>Awards Assumed</u>. Unless otherwise provided in an applicable Award Agreement, other written agreement or plan, or by the Committee at any time, in the event of a Change in Control in which the entity surviving the Change in Control (a "Successor") assumes or substitutes for an Award, the original terms of such

Award shall continue in effect as adjusted pursuant to Section 4.2(f); provided, that any performance provisions of any performance-based Awards (for which the applicable performance period has not yet ended) shall be deemed to be fully achieved at target performance levels and such Award shall revert to a solely time-based vesting award for the remainder of the performance period; provided, further, that if the Participant's employment with the Successor is terminated without Cause by the Successor, or terminates for Good Reason by the Participant or on account of the Participant's death or Disability following such Change in Control, (i) such Participant's Options and SARs outstanding as of the date of such termination will immediately vest, become fully exercisable, and may thereafter be exercised as provided in the applicable Award Agreement, and (ii) restrictions, limitations and other conditions applicable to such Participant's other Stock-based Awards outstanding as of the date of such termination shall lapse and the Stock underlying such Awards shall thereupon be fully vested and issued to the Participant free of all restrictions, limitations and conditions.

5.2     Awards Not Assumed. In the event of a Change in Control in which the Successor does not assume or substitute a substantially equivalent award for an Award, upon the effective time of the Change in Control, the Plan and all outstanding Awards hereunder shall terminate. In such case, except as otherwise provided in an applicable Award Agreement, other written agreement or plan, or by the Committee at any time, all Options and SARs that are not vested and exercisable immediately prior to the effective time of the Change in Control shall become fully vested and exercisable as of immediately prior to the effective time of the Change in Control, all other Awards with time-based vesting, conditions or restrictions shall become fully vested and nonforfeitable as of immediately prior to the effective time of the Change in Control, and all performance-based Awards shall become vested and nonforfeitable in connection with the Change in Control at target performance levels. In the event of such a termination of the Plan and the Awards hereunder, the Company shall have the option (in its sole discretion) to (i) make or provide for a payment, in cash or in kind, to Participants holding Options and SARs, in exchange for the cancellation thereof, in an amount equal to the difference between (A) the Fair Market Value of a share of Stock in the Change in Control multiplied by the number of shares subject to outstanding Options and SARs (to the extent then exercisable at prices not in excess of the Fair Market Value of a share) and (B) the aggregate Exercise Prices of all such outstanding Options and SARs; or (ii) permit each Participant, within a specified period of time prior to the consummation of the Change in Control as determined by the Committee, to exercise all outstanding Options and SARs (to the extent then exercisable) held by such Participant. The Company shall also have the option (in its sole discretion) to make or provide for a payment, in cash or in kind, to the Participants holding other Awards in an amount equal to the Fair Market Value of a share of Stock in the Change in Control multiplied by the number of vested shares under such Awards. In the case of an Option or SAR with an Exercise Price equal to or greater than the Fair Market Value of a share of Stock in the Change in Control, such Option or SAR shall be cancelled for no consideration.

5.3     No Gross Up. If, with respect to a Participant, the treatment of an Award as provided in Section 5.1 or Section 5.2 could be deemed a "payment" within the meaning of Section 280G(b)(2) of the Code, and together with any other payments which such Participant has the right to receive from the Company, any Successor or any Affiliate of any of them, would constitute a "parachute payment" (as defined in Section 280G(b)(2) of the Code), under no circumstances shall the Participant be entitled to receive a "gross up" payment from the Company to offset any applicable excise tax imposed thereon by Section 4999 of the Code.

<div align="center">

**ARTICLE 6**
**COMMITTEE**

</div>

6.1     Administration. The authority to control and manage the operation and administration of the Plan shall be vested in a committee (the "Committee") in accordance with this ARTICLE 6. The Committee shall be selected by the Board, and shall consist solely of two or more members of the Board who are not employees of the Company or any Member Company. Unless otherwise determined by the Board, the Compensation Committee of the Board shall serve as the Committee for purposes of the Plan. If at any time the Committee does not exist, or for any other reason determined by the Board, the Board may take any action under the Plan that would otherwise be the responsibility of the Committee.

6.2     Powers of Committee. The Committee's administration of the Plan shall be subject to the following:

(a) Subject to the provisions of the Plan, the Committee will have the authority and discretion to select from among the Eligible Recipients those persons who will receive Awards, to determine the time or times of receipt, to determine the types of Awards and the number of shares covered by the Awards, to establish and modify the terms, conditions, performance criteria, restrictions, and other provisions of such Awards (which terms and conditions may differ among individual Awards and Participants), and (subject to the restrictions imposed by ARTICLE 7) to cancel or suspend Awards.

(b) To the extent that the Committee determines that the restrictions imposed by the Plan preclude the achievement of the material purposes of the Awards in jurisdictions outside the United States, the Committee

will have the authority and discretion to modify those restrictions as the Committee determines to be necessary or appropriate to conform to applicable requirements or practices of jurisdictions outside of the United States.

(c) The Committee will have the authority and discretion to interpret the Plan, to establish, amend, and rescind any rules and regulations relating to the Plan, to determine the terms and provisions of any Award Agreement made pursuant to the Plan, to determine the duration and purposes for leaves of absence which may be granted to a Participant on an individual basis without constituting a termination of employment or service for purposes of the Plan, to decide all disputes arising in connection with the Plan, to otherwise supervise the administration of the Plan and to make all other determinations that may be necessary or advisable for the administration of the Plan.

(d) Any interpretation of the Plan by the Committee and any decision made by it under the Plan is final and binding on all persons.

(e) In controlling and managing the operation and administration of the Plan, the Committee shall take action in a manner that conforms to the articles and by-laws of the Company, and applicable state corporate law.

6.3     Delegation by Committee. Except to the extent prohibited by applicable law or the applicable rules of a stock exchange, the Committee may allocate all or any portion of its responsibilities and powers to any one or more of its members and may delegate all or any part of its responsibilities and powers to any person or persons selected by it. Any such allocation or delegation may be revoked by the Committee at any time.

6.4     Information to be Furnished to Committee. The Company and Member Companies shall furnish the Committee with such data and information as it determines may be required for it to discharge its duties. The records of the Company and Member Companies as to an employee's or Participant's employment, termination of employment, leave of absence, reemployment and compensation shall be conclusive on all persons unless determined to be incorrect. Participants and other persons entitled to benefits under the Plan must furnish the Committee such evidence, data or information as the Committee considers desirable to carry out the terms of the Plan.

<div align="center">

**ARTICLE 7**
**AMENDMENT AND TERMINATION**

</div>

The Board may, at any time, amend or terminate the Plan, provided that no amendment or termination may, in the absence of written consent to the change by the affected Participant (or, if the Participant is not then living, the affected beneficiary), adversely affect the rights of any Participant or beneficiary under any Award granted under the Plan prior to the date such amendment is adopted by the Board; and further provided that adjustments pursuant to Section 4.2(f) shall not be subject to the foregoing limitations of this ARTICLE 7. Amendments to this Plan shall be subject to shareholder approval to the extent such approval is required by applicable law or applicable requirements of any securities exchange or similar entity.

<div align="center">

**ARTICLE 8**
**DEFINED TERMS**

</div>

In addition to the other definitions contained herein, the following definitions shall apply:

(a) Affiliate. The term "Affiliate" means any organization (other than a Subsidiary) that would be treated as under common control with the Company under § 414(c) of the Code if "50 percent" were substituted for "80 percent" in the income tax regulations under § 414(c) of the Code.

(b) Award. The term "Award" shall mean any award or benefit granted under the Plan, including, without limitation, the grant of Options, SARs, Stock Unit Awards, Restricted Stock Awards, Restricted Stock Unit Awards, Performance Unit Awards, and Performance Share Awards.

(c) Board. The term "Board" shall mean the Board of Directors of the Company.

(d) Cause. The term "Cause" shall mean, unless otherwise provided in an applicable Award Agreement or other contractual agreement between the Participant and the Company, (i) the Participant's dishonest statements or acts with respect to the Company or any Affiliate of the Company, or any current or prospective customers, suppliers vendors or other third parties with which such entity does business; (ii) the Participant's commission of (A) a felony or (B) any misdemeanor involving moral turpitude, deceit, dishonesty or fraud; (iii) the Participant's failure to perform his assigned duties and responsibilities to the reasonable satisfaction of the Company

which failure continues, in the reasonable judgment of the Company, after written notice given to the Participant by the Company; (iv) the Participant's gross negligence, willful misconduct or insubordination with respect to the Company or any Affiliate of the Company; or (v) the Participant's material violation of any provision of any agreement(s) between the Participant and the Company relating to noncompetition, nonsolicitation, nondisclosure and/or assignment of inventions. A Participant's termination of service may also be deemed for Cause if the Company discovers grounds constituting Cause existed prior to the date of such termination.

(e) Change of Control. The term "Change of Control" shall mean (i) the sale, lease, exchange or other transfer of all or substantially all of the assets of the Company (in one transaction or in a series of related transactions) to a corporation that is not controlled by the Company, (ii) the approval by the shareholders of the Company of any plan or proposal for the liquidation or dissolution of the Company, (iii) a successful tender offer for the Common Stock of the Company, after which the tendering party holds more than 40% of the issued and outstanding Common Stock of the Company, (iv) a merger, consolidation, share exchange, or other transaction to which the Company is a party pursuant to which the holders of all of the shares of the Company outstanding prior to such transaction do not hold, directly or indirectly, at least 60% of the outstanding shares of the surviving company after the transaction, or (v) the individuals who, as of the Amended Plan Effective Date, are members of the Board (the "Incumbent Board"), cease for any reason to constitute at least a majority of the members of the Board; provided, however, that (A) if the election, or nomination for election by the Company's common stockholders, of any new director was approved by a vote of at least two-thirds of the Incumbent Board, such new director shall, for purposes of this Plan, be considered a member of the Incumbent Board and (B) that no individual shall be considered a member of the Incumbent Board if such individual initially assumed office as a result of the actual or threatened solicitation of proxies or consents by or on behalf of a person other than the Board (a "Proxy Contest") including by reason of any agreement intended to avoid or settle any Proxy Contest, in each case outside of a purported or potential "take over" context.

(f) Code. The term "Code" means the Internal Revenue Code of 1986, as amended. A reference to any provision of the Code shall include reference to any successor provision of the Code.

(g) Disability. The term "Disability" means, unless otherwise defined in an applicable Award Agreement or other contractual agreement between the Participant and the Company, a period in which the Participant is unable, by reason of a medically determinable physical or mental impairment, to engage in any substantial gainful activity, which condition, in the opinion of a physician approved by the Committee, is expected to have a duration of not less than 120 days.

(h) Eligible Recipient. The term "Eligible Recipient" shall mean any employee of the Company or a Member Company and any of those consultants and independent contractors of the Company or a Member Company who are natural persons. An Award may be granted to an employee, consultant or independent contractor in connection with the conclusion of such employee, consultant or independent contractor's performance of services and separation from the Company or its Member Companies. The effect of discontinuity in an Eligible Recipient's service with the Company or its Member Companies on any outstanding Award shall be at the discretion of the Committee.

(i) Fair Market Value. For purposes of determining the "Fair Market Value" of a share of Stock as of any date, the following rules shall apply:

(i) If the principal market for the Common Stock is a national securities exchange or the NASDAQ Stock Market, then the "Fair Market Value" as of that date shall be the closing sale price of the Common Stock on the principal exchange or market on which the Common Stock is then listed or admitted to trading on such date.

(ii) If sale prices are not available or if the principal market for the Stock is not a national securities exchange and the Stock is not quoted on the NASDAQ Stock Market, the average between the highest bid and lowest asked prices for the Stock on such day as reported on the NASDAQ OTC Bulletin Board Service or by the National Quotation Bureau, Incorporated or a comparable service.

(iii) If the day is not a business day, and as a result, paragraphs (i) and (ii) next above are inapplicable, the Fair Market Value of the Stock shall be determined as of the next earlier business day. If paragraphs (i) and (ii) next above are otherwise inapplicable, then the Fair Market Value of the Stock shall be determined in good faith by the Committee.

(j) Family Member. The term "Family Member" shall mean a Participant's child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including adoptive relationships, any person sharing the Participant's household (other than a tenant of the Participant), a trust in which these persons (or the

Participant) have more than 50 percent of the beneficial interest, a foundation in which these persons (or the Participant) control the management of assets, and any other entity in which these persons (or the Participant) own more than 50 percent of the voting interests.

(k) Good Reason. The term "Good Reason" means, unless otherwise provided in an applicable Award Agreement or other contractual agreement between the Participant and the Company, (i) a material reduction in Participant's base salary except for across-the-board salary reductions similarly affecting all or substantially all similarly situated employees of the Company, or (ii) the relocation of the office at which Participant is to perform the majority of Participant's duties following a Change in Control to a location more than fifty (50) miles from the office at which Participant worked immediately prior to the Change in Control. A Participant shall not be deemed to have Good Reason unless the Participant gives the Company written notice that the specified conduct or event has occurred and the Company fails to cure such conduct or event within thirty (30) days of receipt of such notice.

(l) Member Company. The term "Member Company" means any "parent corporation" or "subsidiary corporation" (within the meaning of Section 424 of the Code) of the Company, including a corporation that becomes a Member Company after the adoption of this Plan, that the Board or Committee designates or otherwise approves as a participating employer in the Plan, and may include for all purposes of the Plan (other than the qualification of an Option as an ISO) any Affiliate of the Company with respect to whose employees and other service providers the Stock constitutes "service-recipient stock" within the meaning of Treasury Regulation Section 1.409A-1(b)(5)(iii).

(m) Minimum Vesting Period. The term "Minimum Vesting Period" means the one-year period following the date of grant of an Award.

(n) Retirement. The term "Retirement" means, unless otherwise provided in an applicable Award Agreement or other contractual agreement between the Participant and the Company, retirement of a Participant from the employ or service of the Company after the date the Participant attains age sixty-five (65), following at least five (5) years of continuous service with the Company, or with the approval of the Committee, in conjunction with the pre-approved succession plan.

(o) Stock. The term "Stock" shall mean shares of common stock of the Company.

(p) Subsidiary. The term "Subsidiary" means a corporation which is a subsidiary corporation (within the meaning of § 424(f) of the Code) of the Company.

(q) Substitute Awards. The term "Substitute Awards" means Awards granted or shares of Stock issued by the Company in assumption of, or in substitution or exchange for, awards previously granted, or the right or obligation to make future awards, in each case by a company acquired by the Company or any Affiliate or Subsidiary or with which the Company or any Affiliate or Subsidiary combines.

*End of Exhibit 10.9*

*Exhibit 10.10*

**HIBBETT, INC.**

**2016 EXECUTIVE OFFICER CASH BONUS PLAN**

Hibbett, Inc., a Delaware corporation (the "Company") adopts this 2016 Executive Officer Cash Bonus Plan (the "Plan") for the purpose of enhancing the Company's ability to attract and retain highly qualified executives and to provide additional financial incentives to such executives to promote the success of the Company and its subsidiaries.

Remuneration payable under the Plan is intended to constitute "qualified performance-based compensation" for purposes of Section 162(m) of the Internal Revenue Code of 1986, as amended, and Section 1.162-27 of the Treasury Regulations promulgated thereunder, and the Plan shall be construed consistently with such intention. This Plan is in addition to other compensatory arrangements or plans established for highly qualified executives by the Compensation Committee. This Plan replaces the 2006 Executive Officer Cash Bonus Plan with respect to awards made on or after January 31, 2016.

Section 1. *Definitions.* As used herein, the following terms shall have the respective meanings indicated:

a. "Board" shall mean the Board of Directors of the Company.

b. "Code" shall mean the Internal Revenue Code of 1986, as amended. A reference to any provision of the Code shall include reference to any successor provision of the Code.

c. "Committee" shall mean a committee appointed by the Board to administer the Plan; provided, however, that in any event the Committee shall be comprised of not less than two directors of the Company, each of whom shall qualify in all respects as an "outside director" for purposes of Section 162(m) of the Code and Section 1.162-27(e)(3) of the Regulations. The Compensation Committee of the Board shall initially serve as the Committee for purposes of the Plan.

d. "Company" shall mean Hibbett, Inc., a Delaware corporation.

e. "Eligible Executive" shall mean the Company's Chief Executive Officer and each other executive officer of the Company or subsidiary that the Committee determines, in its discretion, is or may be a "covered employee" of the Company within the meaning of section 162(m) of the Code and Section 1.162-27(e)(2) of the Regulations.

f. "Incentive Bonus" shall mean, for each Eligible Executive, an annual bonus opportunity amount determined by the Committee pursuant to Section 3 below.

g. "Regulations" shall mean the Treasury Regulations promulgated under the Code, as amended from time to time.

Section 2. *Administration of the Plan.* The Plan shall be administered by the Committee, which shall have full power and authority to construe, interpret and administer the Plan and shall have the exclusive right to establish, adjust, pay or decline to pay the Incentive Bonus for each Eligible Executive. Such power and authority shall include the right to exercise discretion to reduce by any amount the Incentive Bonus payable to any Eligible Executive; provided, however, that the exercise of such discretion with respect to any Eligible Executive shall not have the effect of increasing the Incentive Bonus that is payable to any other Eligible Executive.

Section 3. *Eligibility.* Eligibility under this Plan is limited to Eligible Executives designated by the Committee in its sole and absolute discretion.

Section 4. *Awards.*

a. Not later than the 90th day of each fiscal year of the Company, the Committee, in its sole and absolute discretion, shall designate one or more Eligible Executives as participants in the Plan for such fiscal year and shall

specify the terms and conditions for the determination and payment of an Incentive Bonus to each such Eligible Executive for such fiscal year. After the end of such 90-day period, the Committee may designate additional Eligible Executives so long as, within 30 days following each such additional designation, the Committee specifies the terms and conditions for the determination and payment of an Incentive Bonus to such additional Eligible Executive.

b. The Committee shall condition the payment of an Incentive Bonus on the achievement of one or more performance measures, to the extent required by Code Section 162(m). The performance measures that may be used by the Committee for such Incentive Bonus shall be based on the attainment of any performance goals, as selected by the Committee, that are related to (i) sales increases (including comparable store sales), (ii) profits and earnings on a pre-tax or post-tax basis (including operation income, EBIT and EBITDA), (iii) cash (such as cash flow, cash generation or other cash measures), (iv) shareholder value or total shareholder return (such as stock price appreciation), (v) financial condition or liquidity; (vi) financial return measures (such as return on assets, capital, equity or sales), (vii) market share measures, (viii) improvements in capital structure, (ix) expenses (such as operating expense, expense management, expense ratio, expense efficiency ratios), (x) business expansion or consolidation (such as acquisitions and divestitures), (xi) internal rate of return or increase in net present value, (xii) working capital targets (such as those relating to inventory and/or accounts receivable), (xiii) productivity improvement, or (xiv) inventory measures (such as turns, reduction or shrink). Such goals may be stated in absolute terms, relative to comparison companies or indices, as increases over past time periods, as ratios (such as earnings per share), or as returns on any of the foregoing measures over a period of time. Such goals may be set with respect to one or more of an Eligible Executive, the Company as a whole, or a business unit of the Company. The Committee shall retain the discretion to reduce the amount of any Incentive Bonus that would otherwise be payable to an Eligible Executive (including a reduction in such amount to zero).

c. The Incentive Bonus payable to an Eligible Executive with respect to any fiscal year shall not exceed $1,000,000 for such fiscal year; provided, however, that the maximum Incentive Bonus payable to any individual who becomes an Eligible Executive after the end of the 90-day period referred to in subsection (a) of this Section shall be reduced on a pro rata basis for the number of days during the fiscal year that the individual was not designated as an Eligible Executive.

d. In the event any amount hereunder is subject to recovery under any law, government regulation or stock exchange listing requirement, it will be subject to such deductions and clawback as may be required to be made pursuant to such law, government regulation or stock exchange listing requirement (or any policy adopted by the Company pursuant to any such law, government regulation or stock exchange listing requirement).

Section 5. *Committee Certification.* As soon as reasonably practicable after the end of each fiscal year of the Company, the Committee shall determine whether the stated performance goal has been achieved and the amount of the Incentive Bonus to be paid to each Eligible Executive for such fiscal year and shall certify such determinations in writing.

Section 6. *Payment of Incentive Bonuses.* Subject to any election made by an Eligible Executive with respect to the deferral of all or a portion of his or her Incentive Bonus that complies with Section 409A of the Code, Incentive Bonuses shall be paid in cash at such times and on such terms as are determined by the Committee in its sole and absolute discretion; provided that any cash payment shall occur no later than the 15th day of the third month following the end of the calendar year during which the Committee certifies the achievement of the performance goals. Any Incentive Bonus payable to an Eligible Executive upon his or her termination of employment shall be paid no earlier than the first business day after the six month anniversary of termination if such Eligible Executive is a "specified employee" as provided in Section 409A(a)(2)(i) of the Code. Whether the Eligible Executive is a specified employee and whether an amount payable to the Eligible Executive hereunder is subject to Section 409A of the Code shall be determined by the Company.

Section 7. *No Right to Bonus or Continued Employment.* Neither the establishment of the Plan, the provision for or payment of any amounts hereunder nor any action of the Company, the Board or the Committee with respect to the Plan shall be held or construed to confer upon any person (a) any legal right to receive, or any interest in, an Incentive Bonus or any other benefit under the Plan or (b) any legal right to continue to serve as an officer or employee of the Company or any subsidiary or affiliate of the Company. The Company expressly reserves any and all rights to discharge any Eligible Executive without incurring liability to any person under the Plan or otherwise. Notwithstanding any other provision hereof and notwithstanding the fact that the stated performance goal has been achieved or the individual Incentive Bonus amounts have been determined, the Company shall have no obligation to

pay any Incentive Bonus hereunder unless the Committee otherwise expressly provides by written contract or other written commitment.

Section 8. *Withholding.* The Company shall have the right to withhold, or require an Eligible Executive to remit to the Company, an amount sufficient to satisfy any applicable federal, state, local or foreign withholding tax requirements imposed with respect to the payment of any Incentive Bonus.

Section 9. *Nontransferability.* Except as expressly provided by the Committee, the rights and benefits under the Plan are personal to an Eligible Executive and shall not be subject to any voluntary or involuntary alienation, assignment, pledge, transfer or other disposition.

Section 10. *Unfunded Plan.* The Company shall have no obligation to reserve or otherwise fund in advance any amounts that are or may in the future become payable under the Plan. Any funds that the Company, acting in its sole and absolute discretion, determines to reserve for future payments under the Plan may be commingled with other funds of the Company and need not in any way be segregated from other assets or funds held by the company. An Eligible Executive's rights to payment under the Plan shall be limited to those of a general creditor of the Company.

Section 11. *Adoption, Amendment, Suspension and Termination of the Plan.*

a. Subject to the approval of the Plan by the holders of the Company's common stock represented and voting on the proposal at the 2016 Annual Meeting of Company Stockholders, the Plan shall be effective for the fiscal year of the Company commencing January 31, 2016 and shall continue in effect until the end of the fiscal year of the Company commencing in 2026, unless earlier terminated as provided below. Upon such approval of the Plan by the Company's stockholders, all Incentive Bonuses awarded under the Plan on or after January 31, 2016 shall be fully effective as if the stockholders had approved the Plan on or before January 31, 2016.

b. Subject to the limitations set forth in this subsection, the Board may at any time suspend or terminate the Plan and may amend it from time to time in such respects as the Board may deem advisable; provided, however, that the Board shall not amend the Plan in any of the following respects without the approval of stockholders then sufficient to approve the Plan in the first instance:

(1) To increase the maximum amount of Incentive Bonus that may be paid under the Plan or otherwise materially increase the benefits accruing to any eligible Executive under the Plan;

(2) To materially modify the requirements as to eligibility for participation in the Plan;

(3) To change the material terms of the stated performance measures.

c. No Incentive Bonus may be awarded during any suspension or after termination of the Plan, and no amendment, suspension or termination of the Plan shall, without the consent of the person affected thereby, alter or impair any rights or obligations under any Incentive Bonus previously awarded under the Plan.

Section 12. *Application of Code Section 409A.* Notwithstanding anything in this Plan to the contrary, neither the Board nor the Committee nor any Eligible Executive shall take any action (or omit to take an action) that would, in the opinion of the Board, cause this Plan to become a "nonqualified deferred compensation plan" as defined in Section 409A of the Code.

Section 13. *Governing Law.* The validity, interpretation and effect of the Plan, and the rights of all persons hereunder, shall be governed by and determined in accordance with the laws of the State of Delaware, other than the choice of law rules thereof.

*End of Exhibit 10.10*

*Exhibit 10.11*

# HIBBETT, INC.
## EXECUTIVE VOLUNTARY DEFERRAL PLAN

**Effective January 1, 2010**

Hibbett, Inc.

## TABLE OF CONTENTS

| | Page |
|---|---|
| **ARTICLE I DEFINITIONS** | 4 |
| 1.01 Administrator | 4 |
| 1.02 Account | 4 |
| 1.03 Affiliate | 4 |
| 1.04 Beneficiary | 4 |
| 1.05 Board of Directors or Board | 4 |
| 1.06 Bonus Payment | 4 |
| 1.07 Cause | 4 |
| 1.08 Change in Control | 5 |
| 1.09 Code | 5 |
| 1.10 Committee | 5 |
| 1.11 Company | 5 |
| 1.12 Deferral Contribution | 5 |
| 1.13 Deferral Election | 5 |
| 1.14 Deferral Year | 5 |
| 1.15 Disability | 5 |
| 1.16 Employee | 6 |
| 1.17 ERISA | 6 |
| 1.18 Investment Fund | 6 |
| 1.19 Key Employee | 6 |
| 1.20 Participant | 6 |
| 1.21 Plan | 6 |
| 1.22 Plan Year | 6 |
| 1.23 Salary | 6 |
| 1.24 Termination of Employment | 6 |
| 1.25 Unforeseeable Emergency | 6 |
| **ARTICLE II ELIGIBILITY AND PARTICIPATION** | 7 |
| 2.01 Eligibility Requirements | 7 |
| 2.02 Participation in the Plan | 7 |
| **ARTICLE III DEFERRAL ELECTIONS** | 7 |
| 3.01 Election of Deferrals | 7 |
| 3.02 Election, Revocation and Modification of Deferrals; Initial Deferral Election | 7 |
| **ARTICLE IV ACCOUNTS** | 8 |
| 4.01 Establishment of Accounts | 8 |
| 4.02 Deferral Contributions | 8 |
| 4.03 Equitable Adjustment in Case of Error or Omission | 8 |

Hibbett, Inc.

|  | Page |
|---|---|
| **ARTICLE V INVESTMENTS AND VALUATION** | 8 |
| 5.01 Investment of Accounts | 8 |
| 5.02 Valuation of Bookkeeping Accounts | 8 |
| **ARTICLE VI DISTRIBUTIONS AND WITHDRAWALS** | 8 |
| 6.01 Fixed Payment Date | 8 |
| 6.02 Change in Control, Death, Disability, Termination of Employment | 9 |
| 6.03 Hardship | 9 |
| 6.04 Form of Distribution | 9 |
| 6.05 Federal Income Tax Withholding | 9 |
| 6.06 Benefit Determination and Payment Procedure | 9 |
| 6.07 Distribution of Benefit When Distributee Cannot be Located | 9 |
| 6.08 Acceleration of Benefits Prohibited | 10 |
| **ARTICLE VII FUNDING** | 10 |
| 7.01 Funding | 10 |
| **ARTICLE VIII ADMINISTRATION** | 10 |
| 8.01 Appointment of Administrator | 10 |
| 8.02 Duties | 10 |
| 8.03 Benefit Claims Review Procedure | 11 |
| 8.04 Fiduciary Discretion | 11 |
| **ARTICLE IX AMENDMENT OR TERMINATION OF THE PLAN** | 11 |
| 9.01 Amendment or Termination of the Plan | 11 |
| **ARTICLE X GENERAL PROVISIONS** | 12 |
| 10.01 No Guarantee of Employment | 12 |
| 10.02 Payments to Minors and Incompetents | 12 |
| 10.03 Non-Alienation of Benefits | 12 |
| 10.04 Heading and Subheadings | 12 |
| 10.05 Use of Masculine and Feminine; Singular and Plural | 12 |
| 10.06 Beneficiary Designation | 12 |
| 10.07 Errors and Omissions | 12 |
| 10.08 Governing Law | 12 |
| 10.09 Binding Effect | 13 |
| 10.10 Effect on Other Plans | 13 |
| 10.11 Other Benefits and Agreements | 13 |
| **ARTICLE XI ADOPTION OF PLAN** | 13 |

**Hibbett, Inc.**
**Executive Voluntary Deferral Plan**
**Effective January 1, 2010**

### INTRODUCTION

The Hibbett, Inc. Executive Voluntary Deferral Plan (the "Plan") is adopted effective January 1, 2010. The primary purpose of the Plan is to permit key executives of Hibbett, Inc. (the "Company") with the opportunity to defer, on a pre-tax basis, a portion of their compensation. The Company has determined that the adoption of the Plan will assist it in attracting and retaining those employees whose abilities and experience will contribute to the Company's continued success.

The Company intends for the Plan to be an employee pension benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 as amended. The Plan is unfunded and covers a select group of management or highly compensated employees. The Company also intends the Plan to comply with the requirements of Section 409A of the Internal Revenue Code of 1986. All questions arising in the construction and administration of the Plan must be resolved in a manner that is consistent with that intent.

### ARTICLE 1
### DEFINITIONS

**1.01   Administrator**

Administrator means the Director of Human Resources, or any other employee designated by the Director of Human Resources.

**1.02   Account**

Account means the account or bookkeeping record reflecting a Participant's interest in the Plan. A Participant may have several Accounts in the Plan.

**1.03   Affiliate**

Affiliate means any corporation which, when considered with Hibbett, Inc., would constitute a controlled group of corporations within the meaning of Code section 1563(a), determined without regard to Code sections 1563(a)(4) and 1563(e)(3)(C) or any entity, whether or not incorporated which, when considered with Hibbett, Inc., would constitute a controlled group in accordance with Code section 414(c) and regulations promulgated thereunder.

**1.04   Beneficiary**

Beneficiary means the person or entity specified by a Participant on forms prescribed by the Company for that purpose. If a Participant does not designate a Beneficiary or if the designated Beneficiary predeceases the Participant or is not in existence on the date of the Participant's death, then Beneficiary means the Participant's surviving spouse, or if there is no surviving spouse, the executor(s) or administrator(s) of the Participant's estate.

**1.05   Board of Directors or Board**

Board of Directors or Board means the Board of Directors of Hibbett, Inc.

**1.06   Bonus Payment**

Bonus Payment means a Participant's annual bonus earned with respect to the Company's fiscal year that commences during a Plan Year whether or not owed during such Plan Year.

**1.07   Cause**

-4-

Cause means the determination by the Board in the exercise of its reasonable judgment that the Participant has committed an act or acts constituting (a) a felony or other crime involving dishonesty, theft or embezzlement, or (b) fraud.

**1.08   Change in Control**

A Change in Control means a change in the ownership of the Company, a change in effective control of the Company, or a change in the ownership of a substantial portion of the assets of the Company. A change in the ownership of the Company occurs on the date that any one person, or more than one person, acting as a group, acquires ownership of stock of the Company that, together with stock held by such person or group constitutes more than 50% of the total fair market value or total voting power of the stock of the Company. A change in the effective control of the Company occurs only on (i) the date any one person or group acquires ownership of stock of the Company possessing 30% or more of the total voting power of the stock, or (ii) the date a majority of the members of the Company's Board is replaced during any 12 month period by directors whose appointment or election is not endorsed by a majority of the members of the Company's Board before the date of the appointment or election. A change in the ownership of a substantial portion of the assets of the Company occurs on the date that any one person or group acquires assets from the Company that have a total gross fair market value equal to or more than 40% of the total gross fair market value of all the assets of the Company immediately before such acquisition. This definition of Change in Control shall be interpreted in a manner that is consistent with Treasury Regulation section 1.409A-3(i)(5).

**1.09   Code**

Code means the Internal Revenue Code of 1986, as amended. References to specific sections of the Code includes those sections and any comparable sections of future legislation that modify, amend, supplement, supersede or recodify such sections.

**1.10   Committee**

Committee means the Compensation Committee of the Board.

**1.11   Company**

Company means Hibbett, Inc. and all of its Affiliates that have adopted the Plan.

**1.12   Deferral Contribution**

Deferral Contribution means a Participant's pre-tax deferrals made under the Plan in accordance with Plan Article III.

**1.13   Deferral Election**

Deferral Election means the Employee's election in writing to defer amounts under the Plan.

**1.14   Deferral Year**

Deferral Year means (i) the calendar year in which the Participant's salary is earned, and (ii) with respect to a Bonus Deferral, the calendar year in which the Company's fiscal year commences.

**1.15   Disability**

A Participant is considered disabled if the Participant is (a) unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months, or (b) by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months, receiving income replacement benefits for a period of not less than three months under an accident and health plan covering employees of the Company.

### 1.16   Employee

Employee means an individual who is an employee of Hibbett, Inc. or an Affiliate who has adopted the Plan and who is a member of a select group of management or highly compensated employees of the Company or an Affiliate.

### 1.17   ERISA

ERISA means the Employee Retirement Income Security Act of 1974, as amended. References to specific sections of ERISA shall include those sections and any comparable sections of future legislation that modify, amend, supplement, supersede or recodify such sections.

### 1.18   Investment Fund

Investment Fund means one or more of the investment funds selected by the Administrator.

### 1.19   Key Employee

Key Employee means an Employee who, as of December 31 of any Plan Year, satisfies the requirements of Code Section 416(i) (without regard to Code section 416(i)(5)). Such Employee will be considered a Key Employee for purposes of the Plan for the 12-month period commencing on the next following April 1; provided, however, that an individual will not be considered a Key Employee unless at the time of his or her Termination of Employment, the Company is considered a public company pursuant to Code section 409A.

### 1.20   Participant

Participant means an eligible Employee who satisfies the requirements of Article II. A Participant is considered an active Participant if such Participant has a Deferral Election in effect. A Participant who does not have a Deferral Election in effect or who is no longer an Employee is considered an inactive Participant.

### 1.21   Plan

Plan means the Hibbett, Inc. Executive Voluntary Deferral Plan.

### 1.22   Plan Year

Plan Year means the annual period beginning on January 1st and ending on the following December 31st.

### 1.23   Salary

Salary means a Participant's annual base salary.

### 1.24   Termination of Employment

Termination of Employment means a Participant's separation from service from the Company or any Affiliate, including by retirement or any other termination of employment, consistent with Code Section 409A and Treasury Regulations thereunder.

### 1.25   Unforeseeable Emergency

Unforeseeable Emergency means a Participant's severe financial hardship resulting from an illness or accident of the Participant, or the Participant's spouse or dependent (as defined in Code section 152), loss of the Participant's property due to casualty or other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the Participant. The amount of the distribution on account of an

-6-

Unforeseeable Emergency may not exceed the amounts necessary to satisfy such emergency plus amounts necessary to pay taxes reasonably anticipated as a result of the distribution. Payment may not be made to the extent an Unforeseeable Emergency is or may be relieved (a) through reimbursement or compensation by insurance or otherwise, or (b) by liquidation of the Participant's assets, to the extent the liquidation of such assets would not itself cause severe financial hardship. Any determination of the existence of an Unforeseeable Emergency and the amount to be distributed on account thereof shall be made by the Administrator (or such other person as may be required to make such decisions) in accordance with rules applied in a uniform and nondiscriminatory manner.

## ARTICLE II
## ELIGIBILITY AND PARTICIPATION

**2.01   Eligibility Requirements**

The Committee, in its sole discretion, shall designate the Employees who are eligible to participate in the Plan. The Committee shall notify an Employee of his or her eligibility to participate in the Plan in writing prior to his or her initial participation.

**2.02   Participation in the Plan**

(a)   An eligible Employee becomes a Participant upon his completion of a Deferral Election pursuant to Article III. Each Employee and Participant must correctly disclose to the Administrator all requested information necessary for the administration of the Plan.

(b)   A Participant shall continue to be a Participant of the Plan until the date that he is no longer entitled to benefits under the Plan.

## ARTICLE III
## DEFERRAL ELECTIONS

**3.01   Election of Deferrals**

(a)   In order to become a Participant, an eligible Employee must file with the Administrator a Deferral Election, in accordance with its terms and the terms and conditions of this Article III. Such Deferral Election must be filed no later than the December 31 preceding the first Plan Year for which the Participant's Salary or Bonus Payment will be deferred, or at such earlier time as may be set by the Administrator in its sole discretion.

(b)   The maximum Deferral Contribution for a Plan Year shall be fifty percent (50%) of the Participant's Salary earned during the Plan Year and one hundred percent (100%) of the Participant's Bonus Payments earned for the fiscal year that commences during the Plan Year. A Participant's election must be made in one percent (1%) increments.

(c)   Each Deferral Election shall be made on a form provided by the Administrator and shall specify any such information as the Administrator may require.

**3.02   Election, Revocation and Modification of Deferrals; Initial Deferral Election**

(a)   Except as provided in subsection (b) below, a Participant may make an election to defer Salary and/or Bonus Payments for a Plan Year only if such election is made no later than December 31 of the prior Plan Year, or by such earlier date as may be announced by the Administrator. Such election shall remain in effect for the entire Plan Year and for all subsequent Plan Years until the Participant timely revokes such election for a subsequent Plan Year or timely files a new election applicable to a subsequent Plan Year. Each Deferral Election shall be made on a form provided by the Administrator and shall specify such additional information as the Administrator may require.

(b)   In the case of individuals who become eligible to Participate on or after January 1, 2010, the individual must make an initial Deferral Election within thirty (30) days after he or she becomes eligible to participate in the Plan. Such election shall only be valid with respect to Salary and Bonus Payments paid for services rendered after the date of the initial Deferral Election.

(c)   All Deferral Elections are irrevocable after the last date permitted for making an election under Code Section 409A, or such earlier date specified by the Administrator.

## ARTICLE IV
## ACCOUNTS

**4.01   Establishment of Accounts**

The Administrator shall establish and maintain separate Accounts and for each Participant of the Plan to credit a Participant's Deferral Contributions. As required for appropriate record-keeping, the Administrator may establish and name additional Accounts or sub-accounts for each Participant.

**4.02   Deferral Contributions**

(a)   Deferral Contributions consisting of Salary shall be credited to the Participant's Account as of the last day of the payroll period in which such Salary would otherwise be paid to the Participant. Deferral Contribution consisting of Bonus Payments shall be credited as of the last day of the month in which the Bonus Payment would have been made to the Participant.

(b)   A Participant's interest in his Account attributable to Deferral Contributions and any earnings thereon shall be fully vested and nonforfeitable.

**4.03   Equitable Adjustment in Case of Error or Omission**

If an error or omission is discovered in the Account of a Participant, the Administrator shall make such equitable adjustment as the Administrator deems appropriate.

## ARTICLE V
## INVESTMENTS AND VALUATION

**5.01   Investment of Accounts**

(a)   A Participant may direct the investment of his Account among one or more of the Investment Funds. Such direction shall be in writing on a form provided by the Administrator and in accordance with procedures established by the Administrator. The investment of a Participant's Account is hypothetical and solely for the purpose of crediting earnings on such Account.

(b)   The investment of a Participant's Account shall be made in multiples of ten percent (10%). An investment election shall remain in force until changed. Participants may change the investment of their Account with respect to the balance in their Account and with respect to any future Deferral Contributions in accordance with procedures established by the Administrator.

**5.02   Valuation of Bookkeeping Accounts**

Each Participant's Account shall be valued as of the last day of each calendar quarter and adjusted as of such date to reflect any gains and losses in the Investment Funds and any other expenses or charges attributable to the Account or Investment Fund.

## ARTICLE VI
## DISTRIBUTIONS AND WITHDRAWALS

**6.01   Fixed Payment Date**

(a)   The Participant may elect, as part of his or her Deferral Election, to specify the date on which amounts subject to the Deferral Election for each Deferral Year, and deemed earnings and losses thereon, will be paid. Payment will be made to the Participant or his Beneficiary, as the case may be, within 60 days following the date specified by the Participant. The Participant may elect a single lump sum payment or annual installments as

provided in Section 6.04. If the Participant chooses not to make an election under this Section 6.01, payment of the Participant's Account will be governed by the other provisions of this Article VI.

(b)   Notwithstanding an election made under Section 6.01(a), the total value of a Participant's Account may be paid prior to that date in accordance with Section 6.02 or 6.03, below.

#### 6.02   Change in Control, Death, Disability, Termination of Employment

(a)   In the event of a Change in Control, or the Participant's death, Disability, or Termination of Employment, the Plan shall pay the Participant, or his Beneficiary, as the case may be, the total value of the Participant's Account, as of the Change in Control, or as of his death, determination of Disability by the Administrator, or Termination of Employment, within 60 days following the applicable event, to the extent not previously distributed under Section 6.01 and subject to Section 6.02(b), below. The Participant may elect to receive the total value of his Account in a single lump sum payment or annual installments as provided in Section 6.04. Payment under this Section 6.02 shall override a later fixed payment date elected under Section 6.01.

(b)   In the event the Participant is a Key Employee on the date of his Termination of Employment, the distribution of his Account on account of a Termination of Employment other than due to death or Disability shall be made on the first day of the month following the six-month anniversary of the Participant's Termination of Employment. Installments that would have been paid during such six month period had the Participant not been a Specified Employee will be included in the first payment. Such delay shall apply only to the extent required by Code Section 409A and, thus, generally shall not apply to payments due only upon a specified date.

#### 6.03   Hardship

A distribution of up to 50% of the vested portion of the Participant's Account because of an Unforeseeable Emergency will be permitted only to the extent required by the Participant to satisfy the emergency need. Whether an Unforeseeable Emergency has occurred will be determined solely by the Administrator. Distributions in the event of an Unforeseeable Emergency may be made by and with the approval of the Administrator upon written request by a Participant.

#### 6.04   Form of Distribution

Payment shall be made from the Plan to a Participant or Beneficiary in a single lump sum or in annual installments of two to five years.

#### 6.05   Federal Income Tax Withholding

The Company shall withhold from any payment made by it under the Plan such amount or amounts as may be required for purposes of complying with the tax withholding or other provisions of the Code, as amended, or any federal, state or local income or employment tax provision, or otherwise.

#### 6.06   Benefit Determination and Payment Procedure

The Administrator shall make all determinations concerning eligibility for benefits under the Plan, the time or terms of payment, and the form or manner of payment to the Participant or the Participant's Beneficiary, in the event of the death of the Participant. The Administrator shall promptly notify the Company of each such determination that benefit payments are due and provide to the Company all other information necessary to allow the Company to carry out such determination, whereupon the Company shall pay such benefits in accordance with the Administrator's determination.

#### 6.07   Distribution of Benefit When Distributee Cannot Be Located

The Administrator shall make all reasonable attempts to determine the identity and/or whereabouts of a Participant or a Participant's Beneficiary entitled to benefits under the Plan, including the mailing by certified mail of a notice to the last known address shown on the Company's or the Administrator's records. If the Administrator is unable to locate such a person entitled to benefits hereunder, or if there has been no claim made for such benefits,

the Company shall continue to hold the benefit due such person or take such other action needed to comply with applicable state escheat or similar laws.

**6.08   Acceleration of Benefits Prohibited**

Except as provided in Treasury Regulation section 1.409A-3(j), no acceleration in the time or schedule of any payment or amount scheduled to be paid from the Participant's Account is permitted.

<div align="center">

**ARTICLE VII**
**FUNDING**

</div>

**7.01   Funding**

(a)   All Participants and Beneficiaries are general unsecured creditors of the Company with respect to the benefits due hereunder and the Plan constitutes a mere promise by the Company to make benefit payments in the future. It is the intention of the Company that the Plan be considered unfunded for tax purposes.

(b)   The Company may, but is not required to, purchase life insurance in amounts sufficient to provide some or all of the benefits provided under this Plan or may otherwise segregate assets for such purpose.

(c)   The Company may, but is not required to establish a grantor trust which may be used to hold assets of the Company which are maintained as reserves against the Company's unfunded, unsecured obligations under the Plan. Such reserves shall at all times be subject to the claims of the Company's creditors and the creditors of Affiliates any of whose Employees are Participants. To the extent such trust or other vehicle is established, and assets contributed for the purpose of fulfilling the Company's obligation hereunder, then such obligation of the Company or an Affiliate shall be reduced to the extent such assets are utilized to meet its obligations hereunder.

<div align="center">

**ARTICLE VIII**
**ADMINISTRATION**

</div>

**8.01   Appointment of Administrator**

The Administrator shall be responsible for the operation and administration of the Plan except to the extent its duties are allocated to and assumed by persons or entities hereunder.

**8.02   Duties**

(a)   The Administrator shall make such rules and regulations as it deems necessary for operation of the Plan, shall determine all questions arising in the administration, interpretation and application of the Plan, review claims for benefits which have been denied, and shall perform all other functions which may be assigned to it by the Board.

(b)   The Administrator or its delegate shall maintain, on a plan or calendar year basis, employee and other such records as are necessary for the successful operation of the Plan and shall supply such full and timely information for all matters relating to the Plan as the Administrator may require for the effective discharge of its duties.

(c)   The Administrator or its delegate shall receive all applications for benefits and shall establish rules and procedures to be followed by Participants and Beneficiaries in filing such applications and for furnishing and verifying all data which may be required in order to establish their rights to benefits in accordance with the Plan. Upon receipt of an application for benefits, the Administrator or its delegate shall determine all facts which are necessary to establish the right of an applicant to benefits and the amount thereof. All approved benefits shall be paid at the direction of the Administrator or its delegate. Such payments shall be made in accordance with the Administrator's or its delegate's written directions setting forth the amount of such payments and the specific manner in which such payments are to be made.

<div align="center">

-10-

</div>

**8.03   Benefit Claims Review Procedure**

(a)   Claims for benefits under the Plan may be submitted to the Administrator or such person as the Administrator may designate in writing who shall have the initial responsibility for determining the eligibility of any Participant or Beneficiary for benefits. Such claims for benefits shall be made in writing and shall set forth the facts which such Participant or Beneficiary believes to be sufficient to entitle him to the benefit claimed. The Administrator may adopt forms for the submission of claims for benefits in which case all claims for benefits shall be filed on such forms.

(b)   Upon receipt of a claim, the Administrator or its delegate must respond in writing within 90 days. If necessary, the Administrator or its delegate's first notice must indicate any special circumstances requiring an extension of time for the Administrator or its delegate's decision.

The extension notice must indicate the date by which the Administrator or its delegate expects to give a decision. An extension of time for processing may not exceed 90 days after the end of the initial 90 day period.

(c)   If the written claim for a Plan benefit is wholly or partially denied or the claimant has had no response, the claimant or his duly authorized representative, at the sole expense of the claimant, may appeal the denial within 60 days of the date of the denial or the expiration of the time period provided in subsection (b) to the Administrator. An adverse notice must be written in a manner calculated to be understood by the claimant and must include (i) each reason for denial; (ii) specific references to the pertinent provisions of the Plan or related documents on which the denial is based; (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why that material or information is needed; and (iv) appropriate information about the steps to be taken if the claimant wishes to submit the claim for review.

(d)   In pursuing his appeal the claimant or his representative:

(i)   may request in writing that the Administrator review the denial;

(ii)   may review pertinent documents; and

(iii)   may submit issues and comments in writing.

(e)   The decision on review shall be made within 60 days; provided that the 60 day period may be extended for an additional 60 days by written notice to the claimant setting forth the reasons for the extension. The decision on review shall be made in writing, shall include specific reasons for the decision, shall be written in a manner calculated to be understood by the claimant and shall contain specific references to the pertinent Plan provisions on which the decision is based.

**8.04   Fiduciary Discretion**

In discharging the duties assigned to it under the Plan, the Administrator, and each other fiduciary with respect to the Plan has the discretion to interpret the Plan; adopt, amend and rescind rules and regulations pertaining to its duties under the Plan; and to make all other determinations necessary or advisable for the discharge of its duties under the Plan. Each fiduciary's discretionary authority is absolute and exclusive. The express grant in the Plan of any specific power to a fiduciary with respect to any duty assigned to it under the Plan must not be construed as limiting any power or authority of the fiduciary to discharge its duties. A fiduciary's decision is final and conclusive unless it is established that the fiduciary's decision constituted an abuse of its discretion.

**ARTICLE IX**
**AMENDMENT OR TERMINATION OF THE PLAN**

**9.01   Amendment or Termination of Plan**

The Plan may be terminated or amended at any time by the Board, effective as of any date specified provided, however, that any termination must comply with the requirements of Code section 409A. Any such action

taken by the Board shall be evidenced by a resolution. No amendment or termination shall decrease the value of a Participant's Account accrued prior to the effective date of the amendment or termination.

## ARTICLE X
## GENERAL PROVISIONS

**10.01   No Guarantee of Employment**

The Plan shall not be deemed to constitute a contract between the Company and any Participant or to be consideration or an inducement for the employment of any Participant of the Company. Nothing contained in the Plan shall be deemed to give any Participant the right to be retained in the service of the Company or to interfere with the rights of the Company to discharge or to terminate the service of any Participant at any time without regard to the effect such discharge or termination may have on any rights under the Plan.

**10.02   Payments to Minors and Incompetents**

If a Participant or Beneficiary entitled to receive any benefits hereunder is a minor or is deemed so by the Administrator or is adjudged to be legally incapable of giving valid receipt and discharge for such benefits, benefits will be paid to such person as the Administrator might designate. Such payments shall, to the extent made, be deemed a complete discharge of any liability for such payment under the Plan.

**10.03   Non-Alienation of Benefits**

To the extent permitted by law, no benefit payable under the Plan will be subject in any manner to anticipation, assignment, garnishment, or pledge; and any attempt to anticipate, assign, garnish or pledge the same will be void and no such benefits will be made in any manner liable for or subject to the debts, liabilities, engagements or torts of any Participants.

**10.04   Heading and Subheadings**

The headings and subheadings in this Plan have been inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

**10.05   Use of Masculine and Feminine; Singular and Plural**

In the construction of the Plan the masculine shall include the feminine and the singular the plural in all cases where such meanings are indicated by the context.

**10.06   Beneficiary Designation**

At the time of enrollment in the Plan, each Participant, if applicable, must designate a Beneficiary to receive settlement of his Plan account in the event of his death during employment. A Participant may, from time to time, change a Beneficiary or Beneficiaries under the Plan. In the event that no designated Beneficiary is surviving at the time of the Participant's death, settlement under the Plan will be made as provided in Plan section 1.04.

**10.07   Errors and Omissions**

It shall be the responsibility of those individuals and entities charged with the administration of the Plan to see that it is administered in accordance with its terms. In the event an innocent error or omission is discovered in the operation or administration of the Plan, then the Administrator may correct such error as it deems necessary or desirable in a manner consistent with the goodwill intended to be engendered by the Plan and to put Participants in the same relative position they would have been in but for such error or omission.

**10.08   Governing Law**

The Plan shall be construed, enforced and administered in accordance with the laws of the State of Alabama, except to the extent Alabama's choice-of-law provisions require application of other state law, and except as preempted by ERISA.

Hibbett, Inc.

**10.09  <u>Binding Effect</u>**

The Plan shall be binding upon and inure to the benefit of the Company, its successors and assigns, and the Participant and his heirs, executors, administrators and legal representatives.

**10.10  <u>Effect on Other Plans</u>**

The amount of compensation deferred under the Plan shall not be deemed to be earnings or compensation for the purpose of calculating a Participant's benefits or contribution under a retirement or deferral plan of the Company or the basis for determining benefits under any other benefit plan provided by the Company, except to the extent provided in any such plan. No amount distributed under this Plan shall be deemed to be earnings or a part of the Participant's total compensation when determining a Participant's benefit under any benefit plan established by a Company, unless otherwise provided in such plan.

**10.11  <u>Other Benefits and Agreements</u>**

The benefits provided for a Participant under the Plan are not intended to duplicate any other benefits available to such Participant under any other plan or program of the Company for its employees, and, except as may otherwise be expressly provided for, the Plan shall not duplicate, supersede, modify or amend any other plan or program of the Company in which a Participant is participating.

*End of Exhibit 10.11*

-13-

*Exhibit 10.12*

**HIBBETT, INC.**
**2015 EMPLOYEE STOCK PURCHASE PLAN**

ARTICLE 1
GENERAL

1.1    Purpose. The Hibbett, Inc. 2015 Employee Stock Purchase Plan (the "Plan") is intended to attract and retain employees of Hibbett, Inc. and its member companies (the "Company"). The Plan is intended to qualify as an employee stock purchase plan under Section 423 of the Internal Revenue Code of 1986, as amended, but is not intended to be subject to the Employee Retirement Income Security Act of 1974, as amended.

1.2    Effective Date. The Plan shall be effective on July 1, 2015, subject to approval of the shareholders of the Company at the annual meeting of shareholders on May 28, 2015.

ARTICLE 2
DEFINITIONS

For the purpose of this Plan, the following terms shall have the meaning set forth in this Article unless a different meaning is required by the context:

2.1    Administrator. The senior human resources officer of the Company or such other person as may be authorized from time to time pursuant to Section 3.4 hereof.

2.2    Board. Board of Directors of the Company.

2.3    Code. The Internal Revenue Code of 1986, as amended.

2.4    Committee. The Compensation Committee of the Board.

2.5    Common Stock. The Common Stock $0.01 per value of the Company or the number and kind of shares of stock or other securities into which such Common Stock may be changed in accordance with Section 10.6 of the Plan.

2.6    Compensation. Wages reported on Form W-2 before the deduction for elective deferrals to a Section 401(k) plan or Section 125 plan as those plans are defined in the Code.

2.7    Eligible Recipient. An Employee who satisfies the eligibility requirements contained in Section 4.1.

2.8    Employee. A common law employee of the Company or any Member Company.

2.9    Entry Dates. The first day on which an Employee may become a Participant as set forth in Section 4.2.

2.10   Exchange Act. The Securities Exchange Act of 1934, as amended.

2.11   Fair Market Value. The Fair Market Value of the Common Stock shall be:

2.11.1   If the Common Stock is listed or admitted to unlisted trading privileges on any national securities exchange or is not so listed or admitted but transactions in the Common Stock are reported on the NASDAQ National Market System, the last sale price of the Common Stock on such exchange or reported by the NASDAQ National Market System as of such date (or, if no shares were traded on such day, as of the next preceding day on which there was such a trade).

2.11.2  If the Common Stock is not so listed or admitted to unlisted trading privileges or reported on the NASDAQ National Market System, and bid and asked prices in the over-the-counter market are reported by the NASDAQ SmallCap Market® or the National Quotation Bureau, Inc. (or any comparable reporting service), the mean of the closing bid and asked prices as of such date, as so reported by the NASDAQ System, or, if not so reported thereon, as reported by the National Quotation Bureau, Inc. (or such comparable reporting service).

2.11.3  If the Common Stock is not so listed or admitted to unlisted trading privileges, or reported on the NASDAQ National Market System, and such bid and asked prices are not so reported, such price as the Committee determines in good faith in the exercise of its reasonable discretion.

2.12  Member Company. Any "parent corporation" or "subsidiary corporation" (within the meaning of Section 424 of the Code) of the Company, including a corporation that becomes a Member Company after the adoption of this Plan, that the Administrator designates as a participating employer in the Plan.

2.13  Offering. An offer made by the Company to the Participants for the purchase of shares of Common Stock, on a quarterly basis commencing on the Offering Commencement Date and ending on the Offering Termination Date, through payroll deductions subject to the terms and conditions of the Plan. The Committee shall have the power to change the duration of Offerings (including the Offering Commencement Date) with respect to future Offerings without shareholder approval is such change is announced at least five (5) days prior to the scheduled beginning of the first Offering to be affected thereafter.

2.14  Offering Commencement Date. The first day of each calendar quarter.

2.15  Offering Termination Date. The last day of each calendar quarter.

2.16  Option. The right of an Eligible Recipient to purchase Common Stock under the Plan.

2.17  Option Agreement. The Agreement described in Section 4.5.

2.18  Option Price. The purchase price for each share of Common Stock shall be the lower of: (i) 85% of the Fair Market Value of the Common Stock on the Offering Commencement Date; or (ii) 85% of the Fair Market Value of the Common Stock on the Offering Termination Date.

2.19  Participant. An Eligible Recipient who has elected to participate in the Plan in accordance with procedures established herein.

ARTICLE 3
PLAN ADMINISTRATION

3.1  The Committee. The Plan shall be administered by the Committee. Members of such a committee, if established, shall be appointed from time to time by the Board, shall serve at the pleasure of the Board and may resign at any time upon written notice to the Board. A majority of the members of such a committee shall constitute a quorum. Such a committee shall act by majority approval of the members, shall keep minutes of its meetings and shall provide copies of such minutes to the Board. Action of such a committee may be taken without a meeting if unanimous written consent is given. Copies of minutes of such a committee's meetings and of its actions by written consent shall be provided to the Board and kept with the corporate records of the Company.

3.2  Requirements of the Exchange Act or the Code. Notwithstanding Section 3.1 above, in the event that Rule 16b-3 of the Exchange Act or Section 162(m) of the Code or any successor provisions thereto provides specific requirements for the administrators of plans of this type, then the Plan shall only be administered

by such body and in such a manner as shall comply with the applicable requirements of Rule 16b-3 and Section 162(m).

3.3   <u>Authority of the Committee</u>. Subject to the express provisions of the Plan, the Committee shall have plenary authority in its discretion to interpret and construe any and all provisions of the Plan, to adopt rules and regulations for administering the Plan, and to make all other determinations deemed necessary or advisable for administering the Plan. The Committee's determination in the foregoing matters shall be conclusive.

3.4   <u>Delegation by Committee</u>. Except to the extent prohibited by applicable law or the applicable rules of a stock exchange, the Committee may allocate all or any portion of its responsibilities and powers to any person or persons selected by it. Any such allocation or delegation may be revoked by the Committee at any time.

<div align="center">

ARTICLE 4
ELIGIBILITY AND PARTICIPATION
</div>

4.1   <u>Conditions of Eligibility</u>. An Eligible Recipient is an Employee who (i) customarily works more than twenty (20) hours per week and (ii) has been employed by the Company and/or a Member Company for one (1) year.

4.2   <u>Effective Date of Participation</u>. An Eligible Recipient may become a Participant as of the first day of the January or July (or, if announced by the Administrator, the first day of January, April, July, or October) ("Entry Date") next following the date on which the Employee met the eligibility requirements contained in Section 4.1, provided that the Eligible Recipient remains employed on the Entry Date.

4.3   <u>Election to Participate</u>. An Eligible Recipient may become a Participant by completing an Option Agreement, which includes the authorization for a payroll deduction, on the form, including an electronic format, provided by the Company and filing it with the Administrator on or before the date set by such officer, which date shall be prior to the Offering Commencement Date for which participation is sought. Properly authorized payroll deductions for a Participant shall commence on the applicable Offering Commencement Date and shall end when terminated by the terms of the Option Agreement or when terminated by the Participant as provided in ARTICLE 8.

4.4   <u>Restrictions on Participation</u>. Notwithstanding any provision of the Plan to the contrary, no Employee shall be granted an Option to participate in the Plan:

4.4.1   if, immediately after the grant, such Employee would own stock, and/or hold outstanding Options to purchase stock, possessing 5% or more of the total combined voting power or value of all classes of stock of the Company (for purposes of this paragraph, the rules of Section 424(d) of the Code shall apply in determining stock ownership of any employee); or

4.4.2.   which permits an Employee's rights to purchase Common Stock under all employee stock purchase plans of the Company to accrue at a rate which exceeds $25,000 in fair market value of the Common Stock (determined at the time such Option is granted) for each calendar year in which such Option is outstanding.

4.5   <u>Option Agreement</u>. Each Eligible Recipient shall receive an Option Agreement. The Option Agreement shall contain the terms for the purchase of Common Stock pursuant to the provisions of the Plan and the discretion of the Committee where applicable. The Option Agreement shall also contain authorization for the payroll deduction. An Eligible Recipient may only become a Participant upon the timely completion and return of the Option Agreement according to the terms contained therein.

ARTICLE 5
OFFERINGS AND OPTION GRANTS

5.1  Duration of Offerings. The Plan shall be implemented in a series of quarterly Offerings which shall continue until all shares of Common Stock reserved for this Plan have been issued to the Participants. Notwithstanding anything to the contrary, this Plan shall terminate and there shall be no further Offerings upon the earlier of: (1) the issuance of all shares reserved under Section 9.1 of Common Stock or (2) the end of the fortieth (40th) quarterly Offering.

5.2  Number of Option Shares. On each Offering Commencement Date, a Participant shall be granted an Option to purchase on each Offering Termination Date up to a number of shares of Common Stock of the Company determined by dividing such Participant's accumulated payroll deductions as of the Offering Termination Date by the applicable Option Price; provided that in no event shall a Participant be permitted to purchase during each Offering more than 1,000 shares of Common Stock of the Company, and provided further that such purchase shall be subject to the limitations of Sections 4.4 and 10.1. The Committee may for future offerings, increase or decrease, in its absolute discretion, the maximum number of shares of Common Stock that a Participant may purchase during each Offering. Exercise of the Option shall occur as provided herein, unless the Participant has withdrawn pursuant to ARTICLE 8. The Option shall expire on the Offering Termination Date.

ARTICLE 6
PAYROLL DEDUCTIONS

6.1  Amount of Deduction. Upon filing the Option Agreement, the Participant shall elect to have deductions made from his paycheck on each payday during the time he is a Participant in an Offering at the rate of 1%, 2%, 3%, 4%, 5%, 6%, 7%, 8%, 9% or 10% of his compensation as determined for each applicable paycheck.

6.2  Participant's Account. The Company shall establish a bookkeeping account for each Participant and all payroll deductions made for a Participant shall be credited to his account under the Plan.

6.3  Changes in Payroll Deductions. A Participant may discontinue his participation in the Plan as Provided in ARTICLE 8, but no other change can be made during an Offering and, specifically, a Participant may not alter the amount of his payroll deductions for that Offering.

ARTICLE 7
EXERCISE OF OPTION

7.1  Automatic Exercise. Unless a Participant gives written notice to the Company as hereinafter provided, his Option for the purchase of Common Stock with payroll deductions made during any Offering will be deemed to have been exercised automatically on the Offering Termination Date applicable to such Offering, for the purchase of the number of full shares of Common Stock which the accumulated payroll deductions in his account at that time will purchase at the applicable Option Price (but not in excess of the number of shares for which Options have been granted to the employee pursuant to Section 5.2) and any excess in his account at that time will be returned to him, except as provided in Section 7.3.

7.2  Withdrawal of Account. By written notice to the Administrator, at any time prior to the Offering Termination Date applicable to any Offering, a Participant may elect to withdraw all the accumulated payroll deductions in his account at such time.

7.3  Fractional Shares. Fractional shares will not be issued under the Plan and any accumulated payroll deductions which would have been used to purchase fractional shares shall, unless otherwise requested by the Participant, be held in the Participant's account for the purchase of Common Stock during the next Offering.

7.4   Transferability of Option. During a Participant's lifetime, Options held by such Participant shall be exercisable only by that Participant.

7.5   Delivery of Stock. Subject to Section 7.6 below, as promptly as practicable after the Offering Termination Date of each Offering, the Company shall arrange the delivery to each Participant, as appropriate, of a record of the shares purchased. The Administrator may permit or require that such shares be deposited directly with a broker designated by such officer or to a designated agent of the Company, and the Administrator may utilize electronic or other automated methods of share transfer. Common Stock will be issued in the name of the Participant, or, if the Participant so directs by written notice to the Administrator prior to the Offering Termination Date applicable thereto, in the names of the Participant and one such other person as may be designated by the Participant, as joint tenants with rights of survivorship or as tenants by the entireties, to the extent permitted by applicable law. No Participant shall have any voting, dividend, or other shareholder rights with respect to shares of Common Stock subject to any Option granted under the Plan until such shares have been purchased and delivered to the Participant as provided in this Section 7.5.

7.6   Restriction on Resale. The Committee may require that shares purchased by a Participant pursuant to an Offering be held in escrow as provided in Section 7.6(a) and be subject to a holding period as provided in Section 7.6(b). The Committee may impose this requirement on any Offering and such requirement, if imposed, shall be imposed on all Options granted during such Offering.

(a)   As promptly as practicable after each Exercise Date on which a purchase of shares occurs, the Committee or its delegate may instruct its transfer agent to prepare and deliver to the Administrator or its designee, one or more certificates representing the shares purchased upon exercise by each Participant in the Plan, which shall be held in escrow by the Company for the benefit of each such Participant until the expiration of the holding period described in Section 7.6(b) below. As promptly as practicable after the termination of such holding period, the Company shall deliver to each Participant each certificate held in escrow by the Company for which the holding period has so terminated.

(b)   The Committee may, at its election, impose on any shares obtained under the Plan a holding period during which the sale, transfer or other disposition of such shares shall be prohibited. Such holding period shall terminate no later than (i) two years after the date on which the option to purchase such share of Common Stock was granted, and (ii) one year after the Exercise Date on which the option to purchase such share of Common Stock was exercised.

ARTICLE 8
WITHDRAWAL

8.1   In General. Under procedures established by the Committee, a Participant may withdraw all but not less than all the payroll deductions credited to his account and not yet used to exercise his or her Option under the Plan by submitting to the Administrator a notice of withdrawal in the form and manner prescribed by the Committee for such purpose. Unless otherwise determined by the Committee on a uniform and non-discriminatory basis, any election to withdraw from an Offering will be effective only with respect to the Offering Termination Dates that are at least five (5) business days after the properly completed election is received by the Administrator. All of the Participant's payroll deductions credited to his account shall be paid to such Participant as promptly as practicable after the effective date of his or her withdrawal and such Participant's Option for the Offering shall be automatically terminated, and no further payroll deductions for the purchase of shares shall be made for such Offering. Once a Participant has withdrawn from an Offering, the Participant may not re-enroll in the same Offering. Moreover, payroll deductions shall not resume at the beginning of the succeeding Offering unless the Participant re-enrolls in the Plan in accordance with provisions of Section 4.3.

8.2   <u>Effect on Subsequent Participation</u>. A Participant's withdrawal from any Offering will not have any effect upon his eligibility to participate in any succeeding Offering or in any similar plan which may hereafter be adopted by the Company.

8.3   <u>Termination of Employment</u>. Upon termination of the Participant's employment for any reason, including retirement or death, the Participant shall be deemed to have elected to withdraw from the Plan and the payroll deductions credited to such Participant's account during the Offering but not yet used to exercise the Option shall be returned to such Participant or, in the case of his death, to the person or persons entitled thereto under Section 10.2, and such Participant's Option shall be automatically terminated.

<div align="center">

ARTICLE 9
STOCK

</div>

9.1   <u>Maximum Shares</u>. The maximum number of shares of Common Stock which shall be issued under the Plan, subject to adjustment upon changes in capitalization of the Company as provided in Section 10.6, shall be three hundred thousand (300,000) shares. If the total number of shares of Common Stock for which Options are exercised are exercised on any Offering Termination Date in accordance with ARTICLE 5 exceeds the maximum number of shares reserved for this Plan, the Company shall make a pro rata allocation of the shares of Common Stock available for delivery and distribution in as nearly a uniform manner as shall be practicable and as it shall determine to be equitable, and the balance of payroll deductions credited to the account of each Participant under the Plan shall be returned to him as promptly as possible.

9.2   <u>Participant's Interest in Common Stock</u>. The Participant will have no interest in the Common Stock covered by his Option until such Option has been exercised on the applicable Offering Termination Date.

<div align="center">

ARTICLE 10
MISCELLANEOUS

</div>

10.1   <u>Compliance with Applicable Laws</u>. The Plan, the grant and exercise of Options to purchase shares under the Plan, and the Company's obligation to sell and deliver shares upon the exercise of Options to purchase shares shall be subject to compliance with all applicable federal, state and foreign laws, rules and regulations and the requirements of any stock exchange on which the shares may be listed. If the Company receives a determination from the Internal Revenue Service that the provisions of Section 7.6 adversely affect the plan's qualification under Section 423 of the Code, then Section 7.6 shall be deemed null and void or the Company may amend Section 7.6 in a manner acceptable to the Company that preserves qualification under Section 423 of the Code.

10.2   <u>Designation of Beneficiary</u>. The designated beneficiary pursuant to a qualified plan (as described in Section 401(a) of the Code) maintained by the Company shall be the designated beneficiary for the Plan, unless a Participant files a written designation of a beneficiary pursuant to this Plan. Such designation of beneficiary may be changed by the Participant at any time by written notice to the Administrator. Upon the death of a Participant and upon receipt by the Company of proof of identity and existence at the Participant's death of a beneficiary validly designated by him under the Plan, the Company shall deliver such Common Stock and/or cash to such beneficiary. In the event of the death of a Participant and in the absence of a beneficiary validly designated under the Plan who is living at the time of such Participant's death, the Company shall deliver such Common Stock and/or cash to the executor or administrator of the estate of the Participant, or if no such executor or administrator has been appointed (to the knowledge of the Company), the Company, in its discretion, may deliver such Common Stock and/or cash to the spouse or to any one or more dependents of the Participant as the Company may designate. No beneficiary shall, prior to the death of the Participant by whom he has been designated, acquire any interest in the stock or cash credited to the Participant under the Plan.

10.3   Transferability. Neither payroll deductions credited to a Participant's account nor any rights with regard to the exercise of an Option or to receive Common Stock under the Plan may be assigned, transferred, pledged, or otherwise disposed of in any way by the Participant other than by will or the laws of descent and distribution. Any such attempted assignment, transfer, pledge or other disposition shall be without effect, except that the Company may treat such act as an election to withdraw funds in accordance with Section 7.2.

10.4   Use of Funds. Any payroll deductions received or held by the Company under this Plan may be used by the Company for any corporate purpose and the Company shall not be obligated to segregate such payroll deductions.

10.5   Interest. No interest will be paid or allowed on any money paid into the Plan or credited to the account of any Participant.

10.6   Adjustment upon Changes in Capitalization.

   10.6.1   In the event of any reorganization, merger, consolidation, recapitalization, liquidation, reclassification, stock dividend, stock split, combination of shares, rights offering, extraordinary dividend or divesture (including a spin-off) or any other change in the corporate structure or shares of the Company, the Committee (or, if the Company is not the surviving corporation in any such transaction, the Board of Directors of the surviving corporation) shall make appropriate adjustment (which determination shall be conclusive) as to (i) the number and kind of securities which thereafter may be made subject to Options under the Plan, (ii) the number and kind of securities which are subject to outstanding Options or (iii) the purchase price with respect to the foregoing. Without limiting the generality of the foregoing, in the event that any of such transactions are effected in such a way that holders of Common Stock shall be entitled to receive stock, securities or assets, including cash, with respect to or in exchange for such Common Stock, all Participants holding outstanding Options shall upon the exercise of such Option receive, in lieu of any shares of Common Stock they may be entitled to receive, such stock securities or assets, including cash, as have been issued to such Participants if their Options had been exercised and such Participants had received Common Stock prior to such transaction.

   10.6.2   Upon: (a) the sale, lease, exchange or other transfer of all or substantially all of the assets of the Company (in one transaction or in a series of related transactions) to a corporation that is not controlled by the Company, (b) the approval by the shareholders of the Company of any plan or proposal for the liquidation or dissolution of the Company, (c) a successful tender offer for the Common Stock of the Company, after which the tendering party holds more than 30% of the issued and outstanding Common Stock of the Company, or (d) a merger, consolidation, share exchange, or other transaction to which the Company is a party pursuant to which the holders of all of the shares of the Company outstanding prior to such transaction do not hold, directly or indirectly, at least 70% of the outstanding shares of the surviving company after the transaction, the holder of each Option then outstanding under the Plan will thereafter be entitled to receive at the next Offering Termination Date upon the exercise of such Option for each share as to which such Option shall be exercised, as nearly as reasonably may be determined, the cash, securities and/or property which a holder of one share of Common Stock was entitled to receive upon and at the time of such transaction. The Board of Directors shall take such steps in connection with such transactions as the Board shall deem necessary to assure that the provisions of this Section 10.6 shall thereafter be applicable, as nearly as reasonably may be determined, in relation to the said cash, securities and/or property as to which such holder of such Option might thereafter be entitled to receive.

10.7   Amendment and Termination. The Board may suspend or terminate the Plan or any portion thereof at any time, and may amend the Plan from time to time in such respects as the Board may deem advisable in order that Options under the Plan shall conform to any change in applicable laws or regulations or in any other

respect the Board may deem to be in the best interests of the Company; provided, however, that no such amendment shall be effective, without approval of the shareholders of the Company, if shareholder approval of the amendment is then required to comply with or obtain exemptive relief under any tax or regulatory requirement the Board deems desirable to comply with or obtain exemptive relief under, including without limitation, pursuant to Rule 16b-3 under the Exchange Act or any successor rule or Section 423 of the Code or under the applicable rules or regulations of any securities exchange or the NASDAQ, and provided further that no such amendment shall change the terms, conditions or eligibility requirements of an Option granted under the Plan. No termination, suspension or amendment of the Plan shall alter or impair any outstanding Option without the consent of the Participant affected thereby; provided, however, that this sentence shall not impair the right of the Committee to take whatever action it deems appropriate under Section 10.6.1 or Section 10.6.2 of the Plan.

10.8   No Employment Rights. Nothing in the Plan shall interfere with or limit in any way the right of the Company or any Member Company to terminate the employment or service of any Eligible Recipient or Participant at any time, nor confer upon any Eligible Recipient or Participant any right to continue in the employ or service of the Company or any Member Company.

10.9   Effect of Plan. The provisions of the Plan shall, in accordance with its terms, be binding upon, and inure to the benefit of, all successors of each employee participating in the Plan, including, without limitation, such Employee's estate and the executors, administrators or trustees thereof, heirs and legatee, and any receiver, trustee in bankruptcy or representative of creditors of such Employee.

10.10   Governing Law. The place of administration of the Plan shall be conclusively deemed to be within the State of Delaware, and the rights and obligations of any and all persons having or claiming to have had an interest under the Plan or under any agreements evidencing Options shall be governed by and construed exclusively and solely in accordance with the laws of the State of Delaware without regard to conflict of laws or provisions of any jurisdictions. All parties agree to submit to the jurisdiction of the state and federal courts of Alabama with respect to matters relating to the Plan and agree not to raise or assert the defense that such forum is not convenient for such party.

10.11   Construction and Headings. The use of the masculine gender shall also include within its meaning the feminine, and the singular may include the plural and the plural may include the singular, unless the context clearly indicates to the contrary. The headings of the Articles and Sections of the Plan are for convenience of reading only and are not meant to be of substantive significance and shall not add or detract from the meaning of such Article or Section.

*End of Exhibit 10.12*

*Exhibit 10.13*

**HIBBETT, INC.**
**2015 DIRECTOR DEFERRED COMPENSATION PLAN**

ARTICLE 1
PLAN ADMINISTRATION AND ELIGIBILITY

1.1. Purpose. The Hibbett, Inc. 2015 Director Deferred Compensation Plan (the "Plan") is intended to advance the interests of Hibbett, Inc. (the "Company") and its shareholders by attracting and retaining the highest quality of experienced persons as Directors and to further align the interests of the Directors with the interests of the Company's shareholders. The Plan is an amendment and restatement of the Hibbett, Inc. 2005 Director Deferred Compensation Plan.

1.2. Eligibility. Each member of the Board of Directors (an "Eligible Director") of the Company is eligible to participate in the Plan.

1.3 Administration. The Plan shall be administered, construed and interpreted by the Board of Directors of the Company. Pursuant to such authorization, the Board of Directors shall have the responsibility for carrying out the terms of the Plan, including but not limited to the determination of the amount and form of payment of the annual retainer and any additional fees payable by the Company to an Eligible Director for his or her services as a director (the "Fees," which shall not include reimbursements or other payments not for services rendered). To the extent permitted under the securities laws applicable to compensation plans including, without limitation, the requirements of Section 16(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") or under the Internal Revenue Code of 1986, as amended (the "Code"), a committee of the Board of Directors, or a subcommittee of any committee, may exercise the discretion granted to the Board under the Plan, provided that the composition of such committee or subcommittee shall satisfy the requirements of Rule 16b-3 under the Exchange Act, or any successor rule or regulation. The Board of Directors may also designate a plan administrator to manage the record keeping and other routine administrative duties under the Plan.

ARTICLE 2
STOCK SUBJECT TO THE PLAN

2.1. Number of Shares. The maximum number of shares of the Company's $0.01 par value Common Stock ("Common Stock" or "Shares") which may be issued pursuant to amounts credited on and after July 1, 2015, under Article 3 and Article 4 shall be one hundred fifty thousand (150,000) Shares, subject to adjustment as provided in Section 5.4.

2.2. Share Issuance. To satisfy the requirements of Article 3, the Company may issue new Shares or reissue Shares previously repurchased by or on behalf of the Company.

2.3. General Restrictions. Delivery of Shares under Article 3 of the Plan shall be subject to the following:

a. Notwithstanding any other provision of the Plan, the Company shall have no liability to deliver any Shares under the Plan or make any other distribution of benefits under the Plan unless such delivery or distribution would comply with all applicable laws (including, without limitation, the requirements of the Securities Act of 1933), and the applicable requirements of any securities exchange or similar entity.

a. To the extent that the Plan provides for issuance of stock certificates to reflect the issuance of Shares, the issuance may be affected on a non-certificated basis, to the extent not prohibited by applicable law or the applicable rules of any stock exchange.

2.4. Tax Withholding. The Board may condition the delivery of any Shares or other benefits under the Plan on satisfaction of any applicable withholding obligations through cash payment by the participating Eligible Director ("Participant").

ARTICLE 3
DEFERRED COMPENSATION

3.1 Deferral of Fees. Any Eligible Director may elect to defer in either cash or Shares all or a portion of the Fees earned during any calendar year by delivering a deferral election (the "Deferral Election") to the Company not later than (i) December 31 of the year immediately preceding the year to which the Deferral Election relates, or (ii) with respect to an Eligible Director's first year or partial year of service as a director, thirty days following the date on which such director first became a director, but only for Fees earned after such election is made. The Deferral Election shall specify the amount or portion of the Fees to be deferred; whether and to what extent such Fees are to be deferred in cash or in Shares; the manner of payment with respect to such deferred amounts; and the date on which the deferred amounts shall be paid and whether paid in lump sum or in which installment payment shall commence. An election to defer Fees shall remain in force for such calendar year thereafter until changed or revoked by the director by written notice to the Company not later than December 31 immediately preceding the year to which such change or revocation relates. A Deferral Election to delay the timing or change the form of payment cannot take effect for at least twelve (12) months, shall be made at least twelve (12) months prior to the first scheduled payment, and must delay commencement for a minimum of five (5) years, in each case to the extent applicable under Code Section 409A. A Deferral Election may not be changed or revoked after the beginning of the year to which it relates.

3.2. Accounts; Interest and Dividend Credits. On the first day of each calendar quarter (the "Credit Date"), an Eligible Director who elects to defer his or her Fees shall receive a credit to his or her deferred compensation accounts (the "Deferred Compensation Accounts") under the Plan as hereinafter provided. Any portion of a Participant's Fees which are deferred in cash shall be credited to the Participant's Cash Deferral Account. The amount of the credit shall equal the amount of Fees deferred in cash by the Participant during the immediately preceding calendar quarter. Any portion of a Participant's Fees which are deferred in Shares shall be credited to the Participant's Deferred Stock Account. The amount of the credit to such Deferred Stock Account shall be the number of Shares (rounded to the nearest one hundredth of a Share) determined by dividing the amount of the Participant's Fees deferred in Shares during the immediately preceding quarter by the closing price of a Share as reported on the principal stock exchange where the Common Stock is listed on the Credit Date or, if there is no trading on such exchange on the Credit Date, on the immediately preceding trading day.

On the first day of each calendar quarter, an amount shall be credited to each Participant's Cash Deferral Account equal to the Interest Rate (as hereinafter defined) on the balance credited to the Cash Deferral Account during the immediately preceding calendar quarter. Interest shall accrue on the balance of each Participant's Cash Deferral Account commencing with the date the first payment is credited thereto and ending with the final payment therefrom. For this purpose, "Interest Rate" shall mean, with respect to any calendar quarter, 30-year Treasury Bond Rate then in effect.

Each time any dividend is paid on the Stock, a Participant who has a positive balance in his or her Deferred Stock Account shall receive a credit to such Account. The amount of the dividend credit shall be the number of Shares (rounded to the nearest one-hundredth of a Share) determined by multiplying the dividend amount per Share by the number of Shares credited to the Participant's Deferred Stock Account as of the record date for the dividend and dividing the product by the closing price per Share reported on the principal stock exchange where the Common Stock is listed on the dividend payment date.

3.3. Payment.

(a) An Eligible Director's Deferred Compensation Accounts shall be paid to the director (or, in the event of death, to his or her designated beneficiary or estate) according to his or her Deferral Election; provided however, notwithstanding the Deferral Election, distributions shall commence as soon as practicable following the date on which the director ceases to serve as a director of the Company (such elected date or the date the director ceases to serve, the "Distribution Date"). If an Eligible Director's Cash Deferral Account is paid in installments, the amount of each installment shall be (l) the balance of the Cash Deferral Account on the Distribution Date divided by the number of installments plus (2) interest credits. A cash payment will be made with the final installment for any fraction of a share of Common Stock credited to the Eligible Director's Deferred Stock Account.

(b) Upon the death of an Eligible Director, the Company shall pay any remaining benefits as a single lump sum within 90 days following the date of death.

(c) A lump sum payment and the first payment in a series of installment payments shall be paid no later than: (i) the end of the calendar year in which the Distribution Date occurs, or (ii) if later, the 15th day of the third month following the Distribution Date. Subsequent installment payments shall be paid on the anniversary date of the first payment.

(d) An Eligible Director's continued service as an employee of the Company is not taken into account in determining whether such director is entitled to a payment under this Plan upon his resignation from the Board.

(e) Except as provided in Treasury Regulation section 1.409A-3(j), no acceleration in the time or schedule of any payment or amount scheduled to be paid from an Eligible Director's Account is permitted.

3.4. Designation of Beneficiary. Each Eligible Director may designate in writing a beneficiary to receive such portion, if any, of the director's Deferred Compensation Accounts as remains unpaid at the director's death. In the absence of a valid beneficiary designation, that portion, if any, of an Account remaining unpaid at the director's death shall be paid to his or her estate.

3.5. Nature of Promise. The Company shall not be required to segregate or earmark any funds or Shares in respect of its obligations under Article 3 of the Plan. No Eligible Director or any other person shall have any rights to any assets of the Company by reason of amounts deferred or benefits accrued under this Plan, other than as a general unsecured creditor of the Company. The Plan constitutes a mere promise by the Company to make payments in the future and is unfunded for purposes of Title I of ERISA and for tax purposes. The Company shall make available as and when required a sufficient number of Shares of Common Stock to meet the requirements arising under the Plan.

3.6. No Assignment. Rights to benefits under this Article 3 of the Plan may not be assigned, sold, transferred, encumbered, pledged or otherwise alienated, attached, garnished, or anticipated, other than in accordance with the beneficiary designation provisions of Sections 3.4 above.

ARTICLE 4
STOCK OPTIONS

4.1. Election to Receive Options. An Eligible Director may elect that any portion of his or her Fees not deferred under Article 3 above shall be paid in the form of options to purchase the Company's Common Stock ("Options").

4.2. Time and Method of Election, Change or Revocation. An election pursuant to Section 4.1 or any decision to change or revoke such election shall be governed by the same timing and other requirements set forth in Article 3 with respect to deferral of Fees.

4.3. Option Terms. Options shall be "non-qualified" stock options subject to the terms and conditions of: (i) the Company's primary stock option plan for employees of the Company or a subsidiary Plan, for Eligible Directors who are such employees, and (ii) the Company's primary stock option plan for non-employee directors, for all other Eligible Directors, to the same extent as if originally issued under such plans. All of the provisions of the respective plan (e.g. terms, conditions, plan administration and otherwise) shall govern such Options, except that the issuance of Shares shall be debited from the amount authorized under this Plan in Section 2.1 hereof rather than the respective plan. Options shall be issued as of the Credit Date and reflect an exercise price and other terms established according to the provisions of such plans. The Options shall be fully vested when issued and the term of such Options shall be ten (10) years.

4.4. Determination of Option Amount. The number of Options issued to an Eligible Director under this Article 4 as of any Credit Date shall equal (i) the dollar amount of the portion of his or her Fee which is to be paid in Options on such Credit Date divided by (ii) thirty-three percent (33%) of the closing price of a Share as reported on

the principal stock exchange where the Common Stock is listed on the Credit Date or, if there is no trading on such exchange on the Credit Date, on the immediately preceding trading day.

<div align="center">

ARTICLE 5

GENERAL PROVISIONS
</div>

5.1. Effective Date of This Plan. This Plan is amended and restated, effective July 1, 2015, subject to approval of the shareholders of the Company at the annual meeting of shareholders on May 28, 2015.

5.2. Duration of This Plan. This Plan shall remain in effect, unless earlier terminated or superseded, until June 30, 2025.

5.3. Amendment of This Plan. The Board of Directors may suspend or discontinue this Plan or revise or amend it in any respect, provided, however, that: (i) without approval of the Company's shareholders, no revision or amendment shall (x) change the total number of Shares subject to this Plan (except as provided in Section 5.4), (y) change the designation of the class of directors eligible to participate in the Plan, or (z) materially increase the benefits accruing to participants under or the cost of this Plan to the Company and (ii) the Plan shall not be terminated unless such termination is permitted and administered in accordance with Treasury Regulation section 1.409A-3(j)(4)(ix). Moreover, in no event may Plan provisions be amended more than once every six (6) months, other than to comport with changes in the Internal Revenue Code, the Employee Retirement Income Security Act, or the rules and regulations thereunder.

5.4. Changes in Shares. To prevent the dilution or enlargement of benefits or potential benefits intended to be made available under the Plan, in the event of any corporate transaction or event such as a stock dividend, recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, spin-off, combination or other similar corporate transaction or event affecting the Shares which have been or may be issued under the Plan (any such transaction or event, a "Transaction"), then the Board shall, in such manner as the Board deems equitable: (A) make a proportionate adjustment in (1) the maximum number and type of securities which may be issued under this Plan, and (2) the number and type of securities subject to outstanding accounts (any such adjustment, an "Antidilution Adjustment"); provided, in each case, that the number of shares subject to any account denominated in shares shall always be a whole number; or (B) cause any right to receive Shares outstanding as of the effective date of the Transaction to be cancelled in consideration of a cash payment or alternate form of equity settlement (whether from the Company or another entity that is a participant in the Transaction) or a combination thereof made to the holder of such cancelled right substantially equivalent in value to the fair market value of such cancelled right. The determination of fair market value shall be made by the Board of Directors in their sole discretion. Any adjustments made hereunder shall be binding on all Participants. Notwithstanding the foregoing, any Antidilution Adjustments to be made to outstanding Options shall be as provided for in the terms of the appropriate plan. A cancellation of a stock right or shares in exchange for a cash payment or other settlement is only permitted if such payment or settlement does not result in an impermissible acceleration of benefits under Section 409A.

5.5. Change of Control. Upon a Change of Control (as defined below), any outstanding balance in an Eligible Director's Cash Deferral Account shall be paid in a lump sum and any outstanding balance in an Eligible Director's Deferred Stock Account shall be distributed in shares of Common Stock if the Eligible Director ceases to serve as a director of the Company or a surviving company after the date of the Change of Control. For purposes of the Plan, the term Change of Control includes: (i) a change in the ownership of the Company, (ii) a change in effective control of the Company, or (iii) a change in the ownership of a substantial portion of the assets of the Company. A change in the ownership of the Company occurs on the date that any one person, or more than one person, acting as a group, acquires ownership of stock of the Company that, together with stock held by such person or group constitutes more than 50% of the total fair market value or total voting power of the stock of the Company. A change in the effective control of the Company occurs only on (i) the date any one person or group acquires (or has acquired during the 12 month period ending on the date of the most recent acquisition) ownership of stock of the Company possessing 30% or more of the total voting power of the stock, or (ii) the date a majority of the members of the Company's Board is replaced during any 12 month period by directors whose appointment or election is not endorsed by a majority of the members of the Company's Board before the date of the appointment or election. A change in the ownership of a substantial portion of the assets of the Company occurs on the date that any one person or group acquires assets from the Company that have a total gross fair market value equal to or more than 70% of the total gross fair market value of all the assets of the Company immediately before such acquisition. This

definition of Change in Control shall be interpreted in a manner that is consistent with Treasury Regulation section 1.409A-3(i)(5).

5.6 <u>Limitation of Rights.</u>

a.   <u>No Right to Continue as a Director.</u> Neither this Plan, nor the granting of an Option under this Plan, nor any other action taken pursuant to this Plan shall constitute or be evidence of any agreement or understanding, express or implied, that the Company will retain a director for any period of time, or at any particular rate of compensation.

a.   <u>No Shareholders' Rights.</u> Except as specifically provided by the Plan, a participant in the Plan shall have no rights as a shareholder with respect to the Deferred Stock Account until the date of the issuance to him or her of a stock certificate therefore.

5.7. <u>Notice.</u> Any written notice to the Company required by any of the provisions of this Plan shall be addressed to the secretary of the Company and shall become effective when it is received.

5.8. <u>Shareholder Approval and Registration Statement.</u> This Plan shall be approved by the Board of Directors and submitted to the Company's shareholders for approval. Any options granted under this Plan prior to effectiveness of a registration statement filed with the Securities and Exchange Commission covering the Shares to be issued hereunder shall not be exercisable until, and are expressly conditional upon, the effectiveness of a registration statement covering the Shares.

5.9. <u>Governing Law.</u> This Plan and all determinations made and actions taken pursuant hereto shall be governed by and construed in accordance with the laws of the State of Delaware.

5.10. <u>Severability.</u> If any term or provision of this Plan or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, then the remainder of the Plan, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision hereof shall be valid and be enforced to the fullest extent permitted by applicable law.

5.11 <u>Section 409A of the Code.</u>

(a) Any benefit, payment or other right provided by the Plan shall be provided or made in a manner, and at such time, in such form and subject to such election procedures (if any), as complies with the applicable requirements of Code section 409A to avoid a plan failure described in Code section 409A(a)(1), including without limitation, deferring payment until the occurrence of a specified payment event described in Code section 409A(a)(2). Notwithstanding any other provision hereof or document pertaining hereto, the Plan shall be so construed and interpreted to meet the applicable requirements of Code section 409A to avoid a plan failure described in Code section 409A(a)(1).

(b) It is specifically intended that all elections, consents and modifications thereto under the Plan will comply with the requirements of Code section 409A (including any transition or grandfather rules thereunder). The Company is authorized to adopt rules or regulations deemed necessary or appropriate in connection therewith to anticipate and/or comply the requirements of Code section 409A (including any transition or grandfather rules thereunder and to declare any election, consent or modification thereto void if non-compliant with Code section 409A.

(c) Pursuant to Section 3.01(B)(1).02 of Internal Revenue Notice 2007-86 ("Transition Relief"), the Company shall permit Participants to modify their existing deferral elections previously made pursuant to the Plan to reflect new deferral elections regarding the time and form of payment of benefits under the Plan to the full extent permitted by, and in accordance with, the Transition Relief.

* * *

*End of Exhibit 10.13*

*Exhibit 10.14*

HIBBETT, INC.
STANDARD RESTRICTED STOCK UNIT AWARD AGREEMENT
*Effective March 2, 2021*

**NOTE: This document incorporates the accompanying Grant Letter, and together they constitute a single Agreement which governs the terms and conditions of your Award in accordance with the Hibbett, Inc. Amended and Restated 2015 Equity Incentive Plan.**

THIS AGREEMENT (Agreement) is effective as of the Grant Date specified in the accompanying Grant Letter, by and between the Participant and Hibbett, Inc. (together with its subsidiaries (Company)).

A. The Company maintains the Hibbett, Inc. Amended and Restated 2015 Equity Incentive Plan (EIP or Plan).

B. The Participant has been selected by the committee administering the EIP (Committee) to receive a Restricted Stock Unit Award under the Plan.

C. Key terms and important conditions of the Award are set forth in the cover letter (Grant Letter) which was delivered to the Participant at the same time as this document. This Agreement contains general provisions relating to the Award.

IT IS AGREED, by and between the Company and the Participant, as follows:

1. <u>Terms of Award</u>. The following terms used in this Agreement shall have the meanings set forth in this paragraph 1:

    (a) The Participant is the individual named in the Grant Letter.

    (b) The Grant Date is the date of the Grant Letter.

    (c) The Units means an award denominated in shares of the Company's Common Stock as specified in the Grant Letter.

    (d) The Restricted Period shall begin on the Grant Date and end on the third anniversary of the Grant Letter.

Other terms used in this Agreement are defined pursuant to paragraph 8 or elsewhere in this Agreement.

2. <u>Award</u>. Subject to the terms and conditions of this Agreement, the Participant is hereby granted the number of Units set forth in paragraph 1.

3. <u>Settlement of Awards</u>. The Company shall deliver to the Participant one share of Stock (or cash equal to the Fair Market Value of one share of Stock) for each vested Unit, as determined in accordance with the provisions of the Grant Letter and this Agreement. The Units payable to the Participant in accordance with the provisions of this paragraph 3 shall be paid solely in shares of Stock, solely in cash based on the Fair Market Value of the Stock (determined as of the closing price on the day preceding the last day of the Restricted Period, or if not a business day, the first business day preceding the day preceding the last day of the Restricted Period), or in a combination of the two, as determined by the Committee in its sole discretion, except that cash shall be distributed in lieu of any fractional share of Stock.

4. <u>Time of Payment</u>. Except as otherwise provided in this Agreement, payment of Units vested in accordance with the provisions of paragraph 5, will be delivered as soon as practicable after the end of the Restricted Period.

5. <u>Vesting and Forfeiture of Units</u>.

(a) Units shall vest, and the Participant shall be entitled to settlement on Units, when the Restricted Period has ended. Except in the situations described below, if the Participant's Date of Termination occurs during the Restricted Period, then Units shall be forfeited.

(b) Units shall vest prior to the end of the Restricted Period, and the Participant shall become entitled to settlement on Units, in the following situations:

(i) If the Participant's Date of Termination occurs by reason of the Participant's death, Disability or Retirement, then the Units vest as of the Participant's Date of Termination.

(ii) If (x) a Change in Control occurs prior to the end of the Restricted Period, (y) the Participant's Date of Termination does not occur before the Change in Control date, and (z) the Committee determines to accelerate such vesting, then the Units vest as of the date of the Change in Control.

(c) The Participant shall forfeit all unvested Units as of the date on which the Committee determines the Participant materially violated (A) the provisions of paragraph 10 below or (B) any non-competition agreement which the Participant may have entered into with the Company.

6. Withholding. All deliveries and distributions under this Agreement are subject to withholding of all applicable taxes. The Company is entitled to (a) withhold and deduct from future wages of the Participant (or from other amounts due to Participant) or make other arrangements for the collection of all legally required amounts necessary to satisfy such withholding or (b) require the Participant promptly to remit such amounts to the Company. Subject to such rules and limitations as may be established by the Committee from time to time, the withholding obligations described in this Section 6 may be satisfied through the surrender of shares of Stock which the Participant already owns, or to which the Participant is otherwise entitled under the Plan, including shares of Stock to be settled under this Agreement.

7. Transferability. Units may not be sold, assigned, transferred, pledged or otherwise encumbered until the expiration of the Restricted Period or, if earlier, until the Participant is vested in the Units. Transfers at death are governed by paragraph 9(c) below.

8. Definitions. For purposes of this Agreement, the terms used in this Agreement shall have the following meanings:

(a) Change in Control. The term Change in Control shall mean (a) the sale, lease, exchange or other transfer of all or substantially all of the assets of the Company (in one transaction or in a series of related transactions) to a corporation that is not controlled by the Company, (b) the approval by the shareholders of the Company of any plan or proposal for the liquidation or dissolution of the Company, (c) a successful tender offer for the Common Stock of the Company, after which the tendering party holds more than 30% of the issued and outstanding Common Stock of the Company, or (d) a merger, consolidation, share exchange, or other transaction to which the Company is a party pursuant to which the holders of all of the shares of the Company outstanding prior to such transaction do not hold, directly or indirectly, at least 70% of the outstanding shares of the surviving company after the transaction.

(b) Date of Termination. The Participant's Date of Termination shall be the day immediately prior to the first day on which the Participant is not employed by the Company or any Subsidiary, regardless of the reason for the termination of employment; provided that a termination of employment shall not be deemed to occur by reason of a transfer of the Participant between the Company and a Subsidiary or between two Subsidiaries; and further provided that the Participant's employment shall not be considered terminated while the Participant is on a leave of absence legally required or approved by the Participant's employer.

(c) Disability. Except as otherwise provided by the Committee, the Participant shall be considered to have a Disability during the period in which the Participant is unable, by reason of a medically determinable physical or mental impairment, to engage in any substantial gainful activity, which condition, in the opinion of a physician approved by the Committee, is expected to have a duration of not less than 120 days.

(d) Retirement. Retirement of the Participant shall mean the occurrence of the Participant's Date of Termination by reason of voluntary retirement on or after the date the Participant attains age sixty-five (65), following at least five (5) years of continuous service with the Company, or with the approval of the Committee, in conjunction with the pre-approved succession plan.

(e) Plan Definitions. Except where the context clearly implies or indicates the contrary, a word, term, or phrase used in the Plan is similarly used in this Agreement.

9. Binding Effect; Heirs and Successors.

(a) The terms and conditions of this Agreement shall be effective upon delivery to the Participant, with or without execution by the Participant.

(b) This Agreement shall be binding upon, and inure to the benefit of, the Company and its successors and assigns, and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Company's assets and business.

(c) If any rights exercisable by the Participant or benefits deliverable to the Participant under this Agreement have not been exercised or delivered, respectively, at the time of the Participant's death, such rights shall be exercisable by the Designated Beneficiary, and such benefits shall be delivered to the Designated Beneficiary, in accordance with the provisions of this Agreement and the Plan. The "Designated Beneficiary" shall be the beneficiary or beneficiaries designated by the Participant in a writing filed with the Committee in such form and at such time as the Committee shall require. If a deceased Participant fails to designate a beneficiary, or if the Designated Beneficiary does not survive the Participant, any rights that would have been exercisable by the Participant and any benefits distributable to the Participant shall be exercised by or distributed to the legal representative of the estate of the Participant. If a deceased Participant designates a beneficiary and the Designated Beneficiary survives the Participant but dies before the Designated Beneficiary's exercise of all rights under this Agreement or before the complete distribution of benefits to the Designated Beneficiary under this Agreement, then any rights that would have been exercisable by the Designated Beneficiary shall be exercised by the legal representative of the estate of the Designated Beneficiary, and any benefits distributable to the Designated Beneficiary shall be distributed to the legal representative of the estate of the Designated Beneficiary.

10. Disclosure of Information. The Participant recognizes and acknowledges that the Company's trade secrets, confidential information, and proprietary information, including customer and vendor lists and computer data and programs (collectively "Confidential Information"), are valuable, special and unique assets of the Company's business, access to and knowledge of which are essential to the performance of the Participant's duties. The Participant will not, before or after his Date of Termination, in whole or in part, disclose such Confidential Information to any person or entity or make such Confidential Information public for any purpose whatsoever, nor shall the Participant make use of such Confidential Information for the Participant's own purposes or for the benefit of any person or entity other than the Company under any circumstances before or after the Participant's Date of Termination; provided that this prohibition shall not apply after the Participant's Date of Termination to Confidential Information that has become publicly known through no action of the Participant. The Participant shall consider and treat as the Company's property all memoranda, books, records, papers, letters, computer data or programs, or customer lists, including any copies thereof in human- or machine-readable form, in any way relating to the Company's business or affairs, financial or otherwise, whether created by the Participant or coming into his or her possession, and shall deliver the same to the Company on the Date of Termination, or, on demand of the Company, at any earlier time.

11. Administration. The authority to manage and control the operation and administration of this Agreement shall be vested in the Committee, and the Committee shall have all powers with respect to this Agreement as it has with respect to the Plan. Any interpretation of the Agreement by the Committee and any decision made by it with respect to the Agreement are final and binding on all persons. Such powers or decision-making may be delegated, to the extent permitted by the Plan, to one or more of Committee members or any other person or persons selected by the Committee.

12. Plan Governs. Notwithstanding anything in this Agreement to the contrary, the terms of this Agreement shall wholly incorporate and be subject to the terms of the Plan, a copy of which may be obtained from

the Chief Financial Officer of the Company (or such other party as the Company may designate); and this Agreement is subject to all interpretations, amendments, rules and regulations promulgated by the Committee from time to time pursuant to the Plan.

13. No Implied Rights.

(a) The award of Units will not confer on the Participant any right with respect to continuance of employment or other service with the Company or any Subsidiary, nor will it interfere in any way with any right the Company or any Subsidiary would otherwise have to terminate or modify the terms of such Participant's employment or other service at any time.

(b) The Participant shall not have any rights of a shareholder with respect to the Units until shares of Stock have been duly issued following settlement of the Award as provided herein.

14. Notices. Any written notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, at the Company's principal executive office.

15. Amendment. This Agreement may be amended by written agreement of the Participant and the Company, without the consent of any other person.

16. Governing Law; Jurisdiction; Class Action Waiver. This Agreement shall be governed by the laws of the State of Alabama without giving effect to the choice-of-law provisions thereof. The Circuit Court of the City of Birmingham and the United States District Court, Northern District of Alabama, Birmingham Division shall be the exclusive courts of jurisdiction and venue for any litigation, special proceeding or other proceeding as between the parties that may be brought, or arise out of, in connection with, or by reason of this Agreement. The parties hereby consent to the jurisdiction of such courts. The Participant agrees to litigate any dispute only as an individual and agrees not to pursue or participate in any action as a class, collective, representative or group action, or that seeks to award relief to a group in a single proceeding. Notwithstanding the waiver of Participant's right to bring or participate in a class, collective or other representative proceeding, Participant may have a statutory right (for example, under the National Labor Relations Act) to act concertedly on behalf of themselves and others to challenge this Agreement in any forum, and if an employee acts concertedly to pursue any such proceeding, the Company will not retaliate against an employee for doing so. The Company is entitled, however, to enforce this Agreement, including Employee's agreement to forego pursuing any covered dispute on a class, collective or representative basis, and is entitled to seek dismissal of any such class, collective or representative action and otherwise assert this Agreement as a defense in any proceeding.

*End of Exhibit 10.14*

*Exhibit 10.15*

**HIBBETT, INC.**
**EXECUTIVE RESTRICTED STOCK UNIT AWARD AGREEMENT**

**NOTE: This document incorporates the accompanying Grant Letter, and together they constitute a single Agreement which governs the terms and conditions of your Award in accordance with the Hibbett, Inc. Amended and Restated 2015 Equity Incentive Plan.**

THIS AGREEMENT (Agreement) is effective as of the Grant Date specified in the accompanying Grant Letter, by and between the Participant and Hibbett Retail, Inc., a subsidiary of Hibbett, Inc. (together with its subsidiaries (Company)).

A.   The Company maintains the Hibbett, Inc. Amended and Restated 2015 Equity Incentive Plan (EIP or Plan).

B.   The Participant has been selected by the committee administering the EIP (Committee) to receive a Restricted Stock Unit Award under the Plan.

C.   Key terms and important conditions of the Award are set forth in the cover letter (Grant Letter) which was delivered to the Participant at the same time as this document. This Agreement contains general provisions relating to the Award.

IT IS AGREED, by and between the Company and the Participant, as follows:

1.   Terms of Award. The following terms used in this Agreement shall have the meanings set forth in this paragraph 1:

(a) The Participant is the individual named in the Grant Letter.

(b) The Grant Date is the date of the Grant Letter.

(c) The Units means an award denominated in shares of the Company's Stock as specified in the Grant Letter.

(d) The Restricted Period shall begin on the Grant Date and extend, with respect to successive installments of Units (if any), until the dates and/or events specified in the Grant Letter (including Schedule A).

Other terms used in this Agreement are defined pursuant to paragraph 8 or elsewhere in this Agreement.

2.   Award. Subject to the terms and conditions of this Agreement, the Participant is hereby granted the number of Units set forth in paragraph 1.

3.   Settlement of Awards. The Company shall deliver to the Participant one share of Stock (or cash equal to the Fair Market Value of one share of Stock) for each vested Unit, as determined in accordance with the provisions of Grant Letter and this Agreement. The Units payable to the Participant in accordance with the provisions of this paragraph 3 shall be paid solely in shares of Stock, solely in cash based on the Fair Market Value of the Stock (determined as of the first business day next following the last day of the Restricted Period), or in a combination of the two, as determined by the Committee in its sole discretion, except that cash shall be distributed in lieu of any fractional share of Stock.

4.   Time of Payment. Except as otherwise provided in this Agreement, payment of Units vested in accordance with the provisions of paragraph 5 will be delivered as soon as practicable after the end of the Restricted Period; provided that any cash payment or delivery of shares shall occur no later than the end of the

calendar year during which the Restricted Period ends. To the extent required by Section 409A of the Code, in the event the Participant is a "specified employee" as provided in Section 409A(a)(2)(i) on the Date of Termination (as defined below), any amounts payable hereunder shall be paid no earlier than the first business day after the six month anniversary of the Date of Termination. Whether the Participant is a specified employee and whether an amount payable to the Participant hereunder is subject to Section 409A of the Code shall be determined by the Company.

5. <u>Vesting and Forfeiture of Units</u>.

    (a)    Units shall vest, and the Participant shall be entitled to settlement on Units, when the Restricted Period has ended. Except in the situations described below, if the Participant's Date of Termination occurs during the Restricted Period, then Units shall be forfeited.

    (b)    Units shall vest prior to the end of the Restricted Period, in the following situations:

        (i)    Unless otherwise determined by the Committee in the Grant Letter, if the Participant's Date of Termination occurs by reason of the Participant's death, or Disability, then the Units vest as of the Participant's Date of Termination. Notwithstanding the foregoing, if the Award is conditioned on the achievement of one or more performance objectives set forth in the Grant Letter, then the Participant shall become vested under this paragraph 5(b)(i) only upon Committee certification that the performance objectives have been achieved.

        (ii)    Unless otherwise determined by the Committee in the Grant Letter, if the Participant's Date of Termination occurs by reason of the Participant's Retirement, then the Units vest upon the Committee's certification of the achievement of one or more performance objectives set forth in the Grant Letter; provided that the Participant remains employed through the end of the fiscal year during which the performance objectives are measured.

        (iii)    If (x) a Change in Control occurs prior to the end of the Restricted Period, (y) the Participant's Date of Termination does not occur before the Change in Control date, and (z) the Committee determines to accelerate such vesting, then the Units vest as of the date of the Change in Control.

    (c)    The Participant shall forfeit all unvested Units as of the date on which the Committee determines the Participant materially violated (A) the provisions of paragraph 10 below or (B) any non-competition agreement which the Participant may have entered into with the Company.

6.    <u>Withholding</u>. All deliveries and distributions under this Agreement are subject to withholding of all applicable taxes. The Company is entitled to (a) withhold and deduct from future wages of the Participant (or from other amounts due to Participant) or make other arrangements for the collection of all legally required amounts necessary to satisfy such withholding or (b) require the Participant promptly to remit such amounts to the Company.

Subject to such rules and limitations as may be established by the Committee from time to time, the withholding obligations described in this Section 6 may be satisfied through the surrender of shares of Stock which the Participant already owns, or to which the Participant is otherwise entitled under the Plan, including shares of Stock to be settled under this Agreement.

7.    <u>Transferability</u>. Units may not be sold, assigned, transferred, pledged or otherwise encumbered until the expiration of the Restricted Period or, if earlier, until the Participant is vested in the Units. Transfers at death are governed by paragraph 9(c) below.

8.  Definitions. For purposes of this Agreement, the terms used in this Agreement shall have the following meanings:

    (a)  Change in Control. The term Change in Control shall mean (a) the sale, lease, exchange or other transfer of all or substantially all of the assets of the Company (in one transaction or in a series of related transactions) to a corporation that is not controlled by the Company, (b) the approval by the shareholders of the Company of any plan or proposal for the liquidation or dissolution of the Company, (c) a successful tender offer for the Common Stock of the Company, after which the tendering party holds more than 30% of the issued and outstanding Common Stock of the Company, or (d) a merger, consolidation, share exchange, or other transaction to which the Company is a party pursuant to which the holders of all of the shares of the Company outstanding prior to such transaction do not hold, directly or indirectly, at least 50% of the outstanding shares of the surviving company after the transaction.

    (b)  Date of Termination. The Participant's Date of Termination shall be the day immediately prior to the first day on which the Participant is not employed by the Company or any Subsidiary, regardless of the reason for the termination of employment; provided that a termination of employment shall not be deemed to occur by reason of a transfer of the Participant between the Company and a Subsidiary or between two Subsidiaries; and further provided that the Participant's employment shall not be considered terminated while the Participant is on a leave of absence approved by the Participant's employer.

    (c)  Disability. The Participant shall be considered to have a Disability if he or she satisfies the definition contained in Section 409A(a)(2)(C) of the Internal Revenue Code and any applicable guidance issued thereunder.

    (d)  Retirement. Retirement of the Participant shall mean, with the approval of the Committee, the occurrence of the Participant's Date of Termination on or after the date the Participant attains age sixty-five (65), following at least five (5) years of service with the Company, or with the approval of the Committee, in conjunction with the pre-approved succession plan.

    (e)  Plan Definitions. Except where the context clearly implies or indicates the contrary, a word, term, or phrase used in the Plan is similarly used in this Agreement.

9.  Binding Effect; Heirs and Successors.

    (a)  The terms and conditions of this Agreement shall be effective upon delivery to the Participant, with or without execution by the Participant.

    (b)  This Agreement shall be binding upon, and inure to the benefit of, the Company and its successors and assigns, and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Company's assets and business.

    (c)  If any rights exercisable by the Participant or benefits deliverable to the Participant under this Agreement have not been exercised or delivered, respectively, at the time of the Participant's death, such rights shall be exercisable by the Designated Beneficiary, and such benefits shall be delivered to the Designated Beneficiary, in accordance with the provisions of this Agreement and the Plan. The "Designated Beneficiary" shall be the beneficiary or beneficiaries designated by the Participant in a writing filed with the Committee in such form and at such time as the Committee shall require. If a deceased Participant fails to designate a beneficiary, or if the Designated Beneficiary does not survive the Participant, any rights that would have been exercisable by the Participant and any benefits distributable to the Participant shall be exercised by or distributed to the legal representative of the estate of the Participant. If a deceased Participant designates a beneficiary and the Designated Beneficiary survives the Participant but dies before the Designated

Beneficiary's exercise of all rights under this Agreement or before the complete distribution of benefits to the Designated Beneficiary under this Agreement, then any rights that would have been exercisable by the Designated Beneficiary shall be exercised by the legal representative of the estate of the Designated Beneficiary, and any benefits distributable to the Designated Beneficiary shall be distributed to the legal representative of the estate of the Designated Beneficiary.

10.   Disclosure of Information. The Participant recognizes and acknowledges that the Company's trade secrets, confidential information, and proprietary information, including customer and vendor lists and computer data and programs (collectively "Confidential Information"), are valuable, special and unique assets of the Company's business, access to and knowledge of which are essential to the performance of the Participant's duties. The Participant will not, before or after his Date of Termination, in whole or in part, disclose such Confidential Information to any person or entity or make such Confidential Information public for any purpose whatsoever, nor shall the Participant make use of such Confidential Information for the Participant's own purposes or for the benefit of any person or entity other than the Company under any circumstances before or after the Participant's Date of Termination; provided that this prohibition shall not apply after the Participant's Date of Termination to Confidential Information that has become publicly known through no action of the Participant. The Participant shall consider and treat as the Company's property all memoranda, books, records, papers, letters, computer data or programs, or customer lists, including any copies thereof in human- or machine-readable form, in any way relating to the Company's business or affairs, financial or otherwise, whether created by the Participant or coming into his or her possession, and shall deliver the same to the Company on the Date of Termination or, on demand of the Company, at any earlier time.

11.   Administration. The authority to manage and control the operation and administration of this Agreement shall be vested in the Committee, and the Committee shall have all powers with respect to this Agreement as it has with respect to the Plan. Any interpretation of the Agreement by the Committee and any decision made by it with respect to the Agreement is final and binding on all persons. Such powers or decision-making may be delegated, to the extent permitted by the Plan, to one or more of Committee members or any other person or persons selected by the Committee.

12.   Plan Governs. Notwithstanding anything in this Agreement to the contrary, the terms of this Agreement shall wholly incorporate and be subject to the terms of the Plan, a copy of which may be obtained from the Chief Financial Officer of the Company (or such other party as the Company may designate); and this Agreement is subject to all interpretations, amendments, rules and regulations promulgated by the Committee from time to time pursuant to the Plan.

13.   No Implied Rights.

(a)   The award of Units will not confer on the Participant any right with respect to continuance of employment or other service with the Company or any Subsidiary, nor will it interfere in any way with any right the Company or any Subsidiary would otherwise have to terminate or modify the terms of such Participant's employment or other service at any time.

(b)   The Participant shall not have any rights of a shareholder with respect to the Units until shares of Stock have been duly issued following settlement of the Award as provided herein.

14.   Notices. Any written notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, at the Company's principal executive office.

15.   Amendment. This Agreement may be amended by written agreement of the Participant and the Company, without the consent of any other person.

16.   Governing Law; Jurisdiction. This Agreement shall be governed by the laws of the State of Alabama without giving effect to the choice-of-law provisions thereof. The Circuit Court of the City of Birmingham and the United States District Court, Northern District of Alabama, Birmingham Division shall be the exclusive courts of jurisdiction and venue for any litigation, special proceeding or other proceeding as between the parties that may be brought, or arise out of, in connection with, or by reason of this Agreement. The parties hereby consent to the jurisdiction of such courts.

*End of Exhibit 10.15*

*Exhibit 23.1*

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

1. Registration Statement (Form S-8 No. 333-238767) pertaining to the Amended and Restated 2015 Equity Incentive Plan of Hibbett, Inc.,

2. Registration Statement (Form S-8 No. 333-204896) pertaining to the 2015 Equity Incentive Plan, 2015 Employee Stock Purchase Plan, and 2015 Director Deferred Compensation Plan of Hibbett, Inc., and

3. Registration Statement (Form S-8 No. 333-182429) pertaining to the 2012 Non-employee Director Equity Plan of Hibbett, Inc.

of our reports dated March 25, 2022, with respect to the consolidated financial statements of Hibbett, Inc. and subsidiaries and the effectiveness of internal control over financial reporting of Hibbett, Inc. and subsidiaries included in this Annual Report (Form 10-K) of Hibbett, Inc. for the year ended January 29, 2022.

/s/ Ernst & Young LLP

Birmingham, Alabama
March 25, 2022

**End of Exhibit 23.1**

*Exhibit 23.2*

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the registration statements (Nos. 333-238767, 333-204896 and 333-182429) on Form S-8 of our report dated April 16, 2020, with respect to the consolidated financial statements of Hibbett, Inc. (formerly Hibbett Sports, Inc.).

/s/ KPMG LLP

Birmingham, Alabama
March 25, 2022

**End of Exhibit 23.2**

*Exhibit 31.1*

**Rule 13a-14(a)/15d-14(a) Certification of Principal Executive Officer**

I, Michael E. Longo, certify that:

1.      I have reviewed this annual report on Form 10-K of Hibbett, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

      (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

      (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      (d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      (b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

      Date:    <u>March 25, 2022</u>                            /s/ Michael E. Longo

                                                    Michael E. Longo

                                                    President and Chief Executive Officer

                                                    *(Principal Executive Officer)*

**End of Exhibit 31.1**

*Exhibit 31.2*

**Rule 13a-14(a)/15d-14(a) Certification of Principal Financial Officer**

I, Robert Volke, certify that:

1.      I have reviewed this annual report on Form 10-K of Hibbett, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

    Date:      March 25, 2022

                                                /s/ Robert Volke
                                                Robert Volke
                                                SVP and Chief Financial Officer
                                                *(Principal Financial and Accounting Officer)*

**End of Exhibit 31.2**

*Exhibit 32.1*

## CERTIFICATION PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report on Form 10-K of Hibbett, Inc. and subsidiaries (the "Company") for the period ended January 29, 2022, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), we, Michael E. Longo, President and Chief Executive Officer, and Robert Volke, SVP and Chief Financial Officer of the Company, certify, to the best of each of our knowledge, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

(1)  the Report fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934 as amended; and

(2)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:     March 25, 2022                                                    /s/ Michael E. Longo
                                                                           Michael E. Longo
                                                                           President and Chief Executive Officer
                                                                           *(Principal Executive Officer)*

Date:     March 25, 2022                                                    /s/ Robert Volke
                                                                           Robert Volke
                                                                           SVP and Chief Financial Officer
                                                                           *(Principal Financial and Accounting Officer)*


*A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.*

**End of Exhibit 32.1**

# Exhibit 'B'

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): June 23, 2021**

# HIBBETT, INC.

## Hibbett, Inc.
(Exact Name of Registrant as Specified in its Charter)

| | | |
|---|---|---|
| **Delaware** | **000-20969** | █████**9608** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**2700 Milan Court**
**Birmingham, Alabama 35211**
(Address of principal executive offices)

**(205) 942-4292**
(Registrant's telephone number, including area code)
**Hibbett Sports, Inc.**
(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.01 Par Value Per Share | HIBB | Nasdaq Global Select Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.
☐

**Item 5.03. Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

*Amendment to Certificate of Incorporation*

On June 23, 2021, the Board of Directors (the "Board") of Hibbett Sports, Inc., a Delaware corporation (the "Company"), approved a Certificate of Amendment (the "Certificate of Amendment") to the Company's Certificate of Incorporation, as amended (the "Certificate of Incorporation"), to change the Company's corporate name from "Hibbett Sports, Inc." to "Hibbett, Inc." (the "Corporate Name Change"). The Company filed the Certificate of Amendment with the Delaware Secretary of State's office on June 23, 2021, which became effective as of 12:01 a.m. (Eastern Time) on June 24, 2021.

The Certificate of Amendment is attached hereto as Exhibit 3.1 to this Current Report on Form 8-K and is incorporated herein by reference.

*Amendment to Bylaws*

The Board also approved on June 23, 2021, a conforming amendment to the Bylaws of the Company, as amended (the "Bylaws"), to reflect the Corporate Name Change, which was effective as of June 24, 2021. The Bylaws, as amended to reflect the Corporate Name Change, are attached hereto as Exhibit 3.2 to this Current Report on Form 8-K and are incorporated herein by reference.

**Item 7.01. Regulation FD Disclosure.**

On June 24, 2021, the Company issued a press release (the "Press Release") in respect of the Corporate Name Change. A copy of the Press Release is furnished as Exhibit 99.1 to this Current Report on Form 8-K.

The information in this Item 7.01 of this Current Report on Form 8-K, as well as Exhibit 99.1 attached hereto, shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such filing.

**Item 8.01. Other Events.**

On June 24, 2021, the Company issued a press release to announce that the Board has declared a cash dividend of $0.25 per share. The dividend is payable on July 20, 2021, to stockholders of record as of July 8, 2021. A copy of the press release is attached as Exhibit 99.2 to this Current Report on Form 8-K and is incorporated herein by reference.

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Certificate of Amendment to the Certificate of Incorporation of the Registrant |
| 3.2 | Bylaws of the Registrant (as amended on June 24, 2021) |
| 4.1 | Form of Stock Certificate |
| 99.1 | Press Release dated June 24, 2021 (Corporate Name Change) |
| 99.2 | Press Release dated June 24, 2021 (Dividend Declaration) |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

June 24, 2021

**HIBBETT, INC.**

By:    /s/ David M. Benck

David M. Benck
Senior Vice President and General Counsel

Exhibit 3.1

**CERTIFICATE OF AMENDMENT**
**OF**
**CERTIFICATE OF INCORPORATION**
**OF**
**HIBBETT SPORTS, INC.**

Pursuant to Section 242 of the General
Corporation Law of the State of Delaware

**HIBBETT SPORTS, INC.**, a corporation organized and existing under the General Corporation Law of the State of Delaware (the "*Corporation*"), does hereby certify as follows:

1.   ARTICLE FIRST of the Certificate of Incorporation of the Corporation is hereby amended in its entirety to read as follows:

"FIRST: The name of the Corporation is 'Hibbett, Inc.'"

2.   The forgoing amendment to the Certificate of Incorporation of the Corporation effected hereby has been duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

3.   This Certificate of Amendment will become effective as of 12:01 a.m., EDT, on June 24, 2021.

**IN WITNESS WHEREOF**, the Corporation has caused this certificate to be signed by its duly authorized officer this 23rd day of June, 2021.

**HIBBETT SPORTS, INC.**

| | |
|---|---|
| By: | /s/ Michael E. Longo |
| Name: | Michael E. Longo |
| Title: | President and Chief Executive Officer |

**End of Exhibit 3.1**

Exhibit 3.2

**AMENDED AND RESTATED BYLAWS**
**OF**
**HIBBETT, INC.**

(the "Corporation")

Adopted June 24, 2021

**ARTICLE I OFFICES**

Section 1. <u>Registered Office</u>. The registered office of the Corporation shall be in the City of Dover, County of Kent, State of Delaware.

Section 2. <u>Other Offices</u>. The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

Section 3. <u>Books</u>. The books of the Corporation may be kept within or without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

**ARTICLE II**

**MEETINGS OF STOCKHOLDERS**

Section 1. <u>Time and Place of Meetings</u>. All meetings of stockholders shall be held at such place, either within or without the State of Delaware, including, without limitation, solely by means of remote communication, on such date and at such time as may be determined from time to time by the Board of Directors (or the Chairman in the absence of a designation by the Board of Directors).

Section 2. <u>Annual Meetings</u>. At each annual meeting of stockholders, only such business shall be conducted as is proper to consider and has been brought before the meeting: (i) by or at the direction of the Board of Directors or (ii) by a stockholder who is a stockholder of record of a class of shares entitled to vote on the business such stockholder is proposing and who is such a stockholder of record, both at the time of the giving of the stockholder's notice hereinafter described in this Section 2 of Article II and on the record date for such annual meeting, and who complies with the notice procedures set forth in this Section 2 of Article II; provided that the nomination and the election of directors is exclusively governed by Section 3 of Article III.

In order to bring before an annual meeting of stockholders any business, which may properly be considered and which a stockholder has not sought to have included in the Corporation's proxy statement for the meeting, a stockholder who meets the requirements set forth in the preceding paragraph must give the Corporation timely written notice. To be timely, a stockholder's notice must be given, either by personal delivery to the Secretary or an Assistant Secretary at the principal office of the Corporation or by first class United States mail, with postage thereon prepaid, addressed to the Secretary at the principal office of the Corporation. Any such notice must be received (i) not less than 120 days nor more than 150 days before the first anniversary of the previous year's annual meeting of stockholders, if clause (ii) is not applicable, or (ii) not less than 90 days before the date of the meeting if the date of such meeting, as prescribed in these bylaws, has been changed by more than 30 days. In no event shall any adjournment or postponement of an annual meeting or the announcement thereof commence a new time period for the giving of a stockholder's notice as described above.

Each such stockholder's notice shall set forth as to each matter the stockholder proposes to bring before the annual meeting the following information, correct and complete as of the date of the notice:

Exhibit 3.2

(a) a brief description of the business desired to be brought before the annual meeting, including the complete text of any resolutions to be presented at the annual meeting, and the reasons for conducting such business at the annual meeting;

(b) as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the proposal is made:

(i) the name and address, as they appear on the Corporation's stock transfer books, of such stockholder proposing such business;

(ii) the name and address of such beneficial owner, if any;

(iii) a representation that the stockholder intends to appear in person or by proxy at such meeting to bring the business before the meeting specified in the notice;

(iv) the class and number of shares of stock of the Corporation beneficially owned, directly or indirectly, by the stockholder and, if any, by such beneficial owner;

(v) a description of the material characteristics of any of the following that may exist:

(1) any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of the Corporation or with a value derived in whole or in part from the value of any class or series of shares of the Corporation, whether or not such instrument or right shall be subject to settlement in the underlying class or series of capital stock of the Corporation or otherwise (a "Derivative Instrument") directly or indirectly owned beneficially by the stockholder or the beneficial owner, if any, and any other direct or indirect opportunity to profit or share in any profit derived from any increase or decrease in the value of shares of the Corporation;

(2) any proxy, contract, arrangement, understanding, or relationship pursuant to which the stockholder or the beneficial owner, if any, has a right to vote, directly or indirectly, any shares of any security of the Corporation;

(3) any short interest in any security of the Corporation (for purposes of this Section 2 of Article II a person shall be deemed to have a short interest in a security if such person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has the opportunity to profit or share in any profit derived from any decrease in the value of the subject security);

(4) any rights to dividends owned beneficially by the stockholder or the beneficial owner, if any, that are separated or separable from the underlying shares of the Corporation;

(5) any proportionate interest in shares of the Corporation or Derivative Instruments held, directly or indirectly, by a general or limited partnership in which the stockholder or the beneficial owner, if any, is a general partner or, directly or indirectly, beneficially owns an interest in a general partner;

(6) any performance-related fees (other than an asset-based fee) that the stockholder or the beneficial owner, if any, is entitled to based on any increase or decrease in the value of shares of the Corporation or Derivative Instruments, if any, as of the date of such notice, including without limitation any such interests held by members of the stockholder's or the beneficial owner's, if any, immediate family sharing the same household;

Exhibit 3.2

(c) a description of all agreements, arrangements and understandings between the stockholder and beneficial owner, if any, and any other person or persons (including their names) in connection with the proposal of such business by the stockholder;

(d) any other information relating to the stockholder and beneficial owner, if any, that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for the proposal pursuant to Section 14 of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder; and

(e) any interest of the stockholder or the beneficial owner, if any, in such business.

The information in the stockholder notice shall be updated with information current as of the record date by the stockholder and beneficial owner, if any, not later than 10 days after the record date of the applicable meeting.

The Secretary or Assistant Secretary shall deliver each stockholder's notice that has been timely received to the Chairman for review.

Notwithstanding the foregoing provisions of this Section 2 of Article II, a stockholder seeking to have a proposal included in the Corporation's proxy statement for an annual meeting of stockholders (other than the nomination of a director, which is exclusively governed by Section 3 of Article III) shall comply with the requirements, including but not limited to the notice requirements, of Regulation 14A under the Securities Exchange Act of 1934, as amended from time to time, or with any successor regulation.

Notwithstanding anything in the Bylaws to the contrary, with the exception of Section 3 of Article III, no business shall be conducted at an annual meeting except in accordance with the procedures set forth in this Section 2 of Article II. The chairman of an annual meeting shall, if the facts warrant, determine that the business was not brought before the meeting in accordance with the procedures prescribed by this Section 2 of Article II, declare such determination to the meeting and the business not properly brought before the meeting shall not be transacted.

Section 3. Special Meetings. Special meetings of stockholders may be called by the Board of Directors or the Chairman of the Board of Directors, or upon the demand of the holders of the majority of the total voting power of all outstanding securities of the corporation then entitled to vote at such special meetings and may not be called in any other manner. Such request shall state the purpose or purposes of the proposed meeting. Notwithstanding the foregoing, whenever holders of one or more classes or series of Preferred Stock shall have the right, voting separately as a class or series, to elect directors, such holders may call, pursuant to the terms of the resolution or resolutions adopted by the Board of Directors pursuant to ARTICLE FOURTH of the certificate of incorporation, special meetings of holders of such Preferred Stock.

Section 4. Notice of Meetings and Adjourned Meetings; Waivers of Notice.

(a) Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, date and hour of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Unless otherwise provided by the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("Delaware Law"), such notice shall be given not less than 10 nor more than 60 days before the date of the meeting to each stockholder of record entitled to vote at such meeting. Unless these bylaws otherwise require, when a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, or after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

(b) A written waiver of any such notice signed by the person entitled thereto, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a

Exhibit 3.2

waiver of notice of such meeting, except when the person attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 5. Quorum. Unless otherwise provided under the certificate of incorporation or these bylaws and subject to Delaware Law, the presence, in person or by proxy, of the holders of a majority of the outstanding capital stock of the Corporation entitled to vote at a meeting of stockholders shall constitute a quorum for the transaction of business.

Section 6. Voting.

(a) Unless otherwise provided in the certificate of incorporation and subject to Delaware Law, each stockholder shall be entitled to one vote for each outstanding share of capital stock of the Corporation held by such stockholder. Unless otherwise provided under Delaware Law, the certificate of incorporation or these bylaws, the affirmative vote of a majority of the shares of capital stock of the Corporation present, in person or by proxy, at a meeting of stockholders and entitled to vote on the subject matter shall be the act of the stockholders.

(b) Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to a corporate action in writing without a meeting may authorize another person or persons to act for him by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.

Section 7. Action by Consent.

(a) Unless otherwise provided in the certificate of incorporation, any action required to be taken at any annual or special meeting of stockholders, or any action which may be taken at any annual or special meeting of stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding capital stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

(b) Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered in the manner required by this Section and Delaware Law to the Corporation, written consents signed by a sufficient number of holders to take action are delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

Section 8. Organization. At each meeting of stockholders, the Chairman of the Board, if one shall have been elected, (or in his absence or if one shall not have been elected, the Chief Executive Officer) shall act as chairman of the meeting. The Secretary (or in his absence or inability to act, the person whom the chairman of the meeting shall appoint secretary of the meeting) shall act as secretary of the meeting and keep the minutes thereof.

Section 9. Order of Business. The order of business at all meetings of stockholders shall be as determined by the chairman of the meeting.

Exhibit 3.2

## ARTICLE III DIRECTORS

Section 1. General Powers. Except as otherwise provided in Delaware Law or the certificate of incorporation, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

Section 2. Number, Election and Term of Office. The Board of Directors shall consist of not less than seven nor more than ten directors, with the exact number of directors to be determined from time to time solely by resolution adopted by the affirmative vote of a majority of the entire Board of Directors. The directors shall be divided into three classes, designated Class I, Class II and Class III. Each class shall consist, as nearly as may be possible, of one-third of the total number of directors constituting the entire Board of Directors. Except as otherwise provided in the certificate of incorporation, each director shall serve for a term ending on the date of the third annual meeting of stockholders next following the annual meeting at which such director was elected. Notwithstanding the foregoing, each director shall hold office until such director's successor shall have been duly elected and qualified or until such director's earlier death, resignation or removal. Directors need not be stockholders.

Section 3. Director Nominations. Nominations for the election of directors may be made by the Board of Directors or by any stockholder entitled to vote in the election of directors generally. However, any such stockholder may nominate one or more persons for election as directors at a meeting only if written notice of such stockholder's intent to make such nomination or nominations has been given, either by personal delivery or by United States mail, postage prepaid, to the Secretary of the Corporation not later than (i) with respect to an election to be held at an annual meeting of stockholders 120 days in advance of the first anniversary of the previous year's annual meeting of stockholders or (ii) with respect to a special meeting of stockholders for the election of directors, the close of business on the seventh day following the date on which notice of such meeting is first given to stockholders. No person shall be eligible for election as a director unless nominated in accordance with the procedures set forth in this Section 3 of Article III. In no event shall any adjournment or postponement of a meeting or the announcement thereof commence a new time period for the giving of a stockholder's notice as described above.

Each such stockholder's notice shall set forth the following information, correct and complete as of the date of the notice:

(a) as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination is made:

(i) the name and address, as they appear on the Corporation's stock transfer books, of such stockholder;

(ii) the name and address of such beneficial owner, if any;

(iii) a representation that the stockholder and intends to appear in person or by proxy at such meeting to nominate the person or persons specified in the notice;

(iv) the class and number of shares of stock of the Corporation beneficially owned, directly or indirectly, by the stockholder and, if any, by such beneficial owner; and

(v) a description of the material characteristics of any of the following that may exist:

(1) any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of the Corporation or with a value derived in whole or in part from the value of any class or series of shares of the Corporation, whether or not such instrument or right shall be subject to settlement in the underlying class or series of capital stock of the Corporation or otherwise (a "Derivative Instrument") directly or indirectly owned beneficially by the stockholder or the beneficial owner, if any, and any other direct or indirect opportunity to

Exhibit 3.2

profit or share in any profit derived from any increase or decrease in the value of shares of the Corporation;

(2) any proxy, contract, arrangement, understanding, or relationship pursuant to which the stockholder or the beneficial owner, if any, has a right to vote, directly or indirectly, any shares of any security of the Corporation;

(3) any short interest in any security of the Corporation (for purposes of this Section 3 of Article III a person shall be deemed to have a short interest in a security if such person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has the opportunity to profit or share in any profit derived from any decrease in the value of the subject security);

(4) any rights to dividends owned beneficially by the stockholder or the beneficial owner, if any, that are separated or separable from the underlying shares of the Corporation;

(5) any proportionate interest in shares of the Corporation or Derivative Instruments held, directly or indirectly, by a general or limited partnership in which the stockholder or the beneficial owner, if any, is a general partner or, directly or indirectly, beneficially owns an interest in a general partner; and

(6) any performance-related fees (other than an asset-based fee) that the stockholder or the beneficial owner, if any, is entitled to based on any increase or decrease in the value of the shares of the Corporation or Derivative Instruments, if any, as of the date of such notice, including without limitation any such interests held by members of the stockholder's or the beneficial owner's, if any, immediate family sharing the same household.

(b) as to each person, if any, whom the stockholder proposes to nominate for election or reelection to the Board of Directors:

(i) the name, age, business address and, if known, residence address of such person;

(ii) the principal occupation or employment of such person;

(iii) the class and number of shares of stock of the Corporation which are beneficially owned by such person;

(iv) all information relating to such person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors in a contested election pursuant to Section 14 of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (including such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected); and

(v) a description of all direct and indirect compensation and other material monetary agreements, arrangements and understandings during the past three years, and any other material relationships, between or among such stockholder and beneficial owner, if any, and their respective affiliates and associates, or others acting in concert therewith, on the one hand, and each proposed nominee, and his or her respective affiliates and associates, or others acting in concert therewith, on the other hand, including, without limitation all information that would be required to be disclosed pursuant to Rule 404 promulgated under Regulation S-K if the stockholder making the nomination and any beneficial owner on whose behalf the nomination is made, if any, or any affiliate or associate thereof or person acting in concert therewith, were the "registrant" for purposes of such rule and the nominee were a director or executive officer of such registrant.

Exhibit 3.2

(c) a description of all agreements, arrangements and understandings between the stockholder and beneficial owner, if any, and any other person or persons (including their names) in connection with the nomination by the stockholder;

(d) any other information relating to the stockholder and beneficial owner, if any, that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for the election of directors in a contested election pursuant to Section 14 of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder; and

(e) any interest of the stockholder or the beneficial owner, if any, in such nomination.

The information in the stockholder notice shall be updated with information current as of the record date by the stockholder and beneficial owner, if any, not later than 10 days after the record date of the applicable meeting.

Any proposed nominee shall promptly furnish to the Corporation such other information as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve as an independent director of the Corporation or that could be material to a reasonable stockholder's understanding of the independence, or lack thereof, of such nominee.

Section 4. Quorum and Manner of Acting. Unless the certificate of incorporation or these bylaws require a greater number, a majority of the total number of directors shall constitute a quorum for the transaction of business, and the affirmative vote of a majority of the directors present at meeting at which a quorum is present shall be the act of the Board of Directors. When a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Board of Directors may transact any business which might have been transacted at the original meeting. If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting, from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 5. Time and Place of Meetings. The Board of Directors shall hold its meetings at such place, either within or without the State of Delaware, including, without limitation, solely by means of remote communication, and at such time as may be determined from time to time by the Board of Directors (or the Chairman in the absence of a determination by the Board of Directors).

Section 6. Annual Meeting. The Board of Directors shall meet for the purpose of organization, the election of officers and the transaction of other business, as soon as practicable after each annual meeting of stockholders, on the same day and at the same place where such annual meeting shall be held. Notice of such meeting need not be given. In the event such annual meeting is not so held, the annual meeting of the Board of Directors may be held at such place either within or without the State of Delaware, on such date and at such time as shall be specified in a notice thereof given as hereinafter provided in Section 7 of this Article III or in a waiver of notice thereof signed by any director who chooses to waive the requirement of notice.

Section 7. Regular Meetings. After the place and time of regular meetings of the Board of Directors shall have been determined and notice thereof shall have been once given to each member of the Board of Directors, regular meetings may be held without further notice being given.

Section 8. Special Meetings. Special meetings of the Board of Directors may be called by the Chairman of the Board or the Chief Executive Officer and shall be called by the Chairman of the Board, Chief Executive Officer or Secretary on the written request of three directors. Notice of special meetings of the Board of Directors shall be given to each director at least twenty four hours before the date and time of the meeting, either personally, by mail, by telephone or by electronic transmission.

Section 9. Committees. The Board of Directors may, by resolution passed by a majority of the whole Board, designate one or more committees, each committee to consist of one or more of the directors of the

Exhibit 3.2

Corporation. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to amending the certificate of incorporation, adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease or exchange of all or substantially all of the Corporation's property and assets, recommending to the stockholders a dissolution of the Corporation or a revocation of a dissolution, or amending the bylaws of the Corporation; and unless the resolution of the Board of Directors or the certificate of incorporation expressly so provide, no such committee shall have the power or authority to declare a dividend or to authorize the issuance of stock. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

Section 10. <u>Action by Consent</u>. Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or Committee.

Section 11. <u>Telephonic Meetings</u>. Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or such committee, as the case may be, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

Section 12. <u>Resignation</u>. Any director may resign at any time by giving written notice to the Board of Directors or to the Secretary of the Corporation. The resignation of any director shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 13. <u>Vacancies</u>. Unless otherwise provided in the certificate of incorporation, vacancies on the Board of Directors resulting from death, resignation, removal or otherwise and newly created directorships resulting from any increase in the number of directors may be filled solely by a majority of the directors then in office (although less than a quorum) or by the sole remaining director. Each director elected to fill a vacancy of a former director shall hold office for the remaining term of the former director. Each director elected to fill a newly created directorship shall hold office for a term that coincides with the term of Class to which the director has been assigned. If there are no directors in office, then an election of directors may be held in accordance with Delaware Law. Unless otherwise provided in the certificate of incorporation, when one or more directors shall resign from the Board, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have the power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in the filling of the other vacancies.

Section 14. <u>Removal</u>. No director may be removed from office by the stockholders except for cause with the affirmative vote of the holders of not less than a majority of the total voting power of all outstanding securities of the Corporation then entitled to vote generally in the election of directors, voting together as a single class.

Section 15. <u>Compensation</u>. Unless otherwise restricted by the certificate of incorporation or these bylaws, the Board of Directors shall have authority to fix the compensation of directors, including fees and reimbursement of expenses; provided that each non-employee director shall be entitled to annual cash compensation of not less than (a) $60,000, (b) an additional $10,000 for the Chair of the Audit Committee, (c) an additional $10,000 for the Chair of the Compensation Committee, and (d) an additional $35,000 for the lead director. The directors may also receive equity compensation in accordance with a duly approved plan.

Exhibit 3.2

Section 16. Preferred Directors. Notwithstanding anything else contained herein, whenever the holders of one or more classes or series of preferred Stock shall have the right, voting separately as a class or series, to elect directors, the election, term of office, filling of vacancies, removal and other features of such directorships shall be governed by the terms of the resolutions applicable thereto adopted by the Board of Directors pursuant to the certificate of incorporation, and such directors so elected shall not be subject to the provisions of Sections 2, 13 and 14 of this Article III unless otherwise provided therein.

Section 17. Indemnification of Officers, Directors, Employees and Agents; Insurance.

(a) (i) Each person (and the heirs, executors or administrators of such person) who was or is a party or is threatened to be made a party to, or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware Law. The right to indemnification conferred in this Section 17(a)(i) shall also include the right to be paid by the Corporation the expenses incurred in connection with any such proceeding in advance of its final disposition to the fullest extent authorized by Delaware Law. The right to indemnification conferred in this Section 17(a)(i) shall be a contractual right.

(ii) In addition, the Corporation may, by action of its Board of Directors, provide indemnification to such of the employees and agents of the Corporation to such extent and to such effect as the Board of Directors shall determine to be appropriate and authorized by Delaware Law.

(b) The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss incurred by such person in any such capacity or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under Delaware Law.

(c) The rights and authority conferred in this Section 17 shall not be exclusive of any other right which any person may otherwise have or hereafter acquire.

## ARTICLE IV

## OFFICERS

Section 1. Principal Officers. The principal officers of the Corporation shall be a Chief Executive Officer, President, one or more Vice Presidents (one or more of whom may be designated executive vice president or senior vice president), a Chief Financial Officer, a Treasurer, a Controller and a Secretary. The Secretary shall have the duty, among other things, to record the proceedings of the meetings of stockholders and directors in a book kept for that purpose. The Corporation may also have such other principal officers as the Board may in its discretion appoint. One person may hold the offices and perform the duties of any two or more of said offices.

Section 2. Election, Term of Office and Remuneration. The principal officers of the Corporation shall be elected annually by the Board of Directors at the annual meeting thereof. Each such officer shall hold office until his successor is elected and qualified, or until his earlier death, resignation or removal. The remuneration of all officers of the Corporation shall be fixed by the Board of Directors. Any vacancy in any office shall be filled in such manner as the Board of Directors shall determine.

Section 3. Subordinate Officers. In addition to the principal officers enumerated in Section 1 of this Article IV, the Corporation may have one or more Assistant Treasurers, Assistant Secretaries and Assistant Controllers and such other subordinate officers, agents and employees as the Board of Directors may deem necessary, each of whom shall hold office for such period as the Board of Directors may from time to time determine. The Board of Directors

Exhibit 3.2

may delegate to any principal officer the power to appoint and to remove any such subordinate officers, agents or employees.

Section 4. <u>Removal</u>. Except as otherwise permitted with respect to subordinate officers, any officer may be removed, with or without cause, at any time, by resolution adopted by the Board of Directors.

Section 5. <u>Resignations</u>. Any officer may resign at any time by giving written notice to the Board of Directors (or to a principal officer if the Board of Directors has delegated to such principal officer the power to appoint and to remove such officer).

The resignation of any officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 6. <u>Powers and Duties</u>. The officers of the Corporation shall have such powers and perform such duties incident to each of their respective offices and such other duties as may from time to time be conferred upon or assigned to them by the Board of Directors.

## ARTICLE V

### GENERAL PROVISIONS

Section 1. <u>Fixing the Record Date</u>.

(a) In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided that the Board of Directors may fix a new record date for the adjourned meeting.

(b) In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors and shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. Any stockholder seeking to have the stockholders authorize or take corporate action by written consent shall, by written notice to the secretary, request the Board of Directors to fix a record date. The Board of Directors shall promptly, but in all events within 10 days after the date on which such a request is received, adopt a resolution fixing the record date. If no record date has been fixed by the Board of Directors within 10 days of the date on which such a request is received, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by applicable law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or any officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by applicable law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

Exhibit 3.2

(c) In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 2. Dividends. Subject to limitations contained in Delaware Law and the certificate of incorporation, the Board of Directors may declare and pay dividends upon the shares of capital stock of the Corporation, which dividends may be paid either in cash, in property or in shares of the capital stock of the Corporation.

Section 3. Fiscal Year. The fiscal year of the Corporation shall commence on the Sunday following the Saturday nearest to January 31 and end on the Saturday nearest to January 31 of the following year.

Section 4. Corporate Seal. The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware". The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

Section 5. Voting of Stock Owned by the Corporation. The Board of Directors may authorize any person, on behalf of the Corporation, to attend, vote at and grant proxies to be used at any meeting of stockholders of any corporation (except this Corporation) in which the Corporation may hold stock.

Section 6. Amendments. The Board of Directors shall have the power to adopt, amend or repeal these bylaws. The stockholders may adopt, amend or repeal the bylaws only with the affirmative vote of the holders of not less than two-thirds of the total voting power of all outstanding securities of the Corporation then entitled to vote generally in the election of directors, voting together as a single class.

Section 7. Certificates of Stock and Uncertificated Shares. Shares of the Corporation's stock may be evidenced by certificates for shares of stock or may be issued in uncertificated form, as provided under Delaware Law. The issuance of shares in uncertificated form shall not affect shares already represented by a certificate until the certificate is surrendered to the Corporation. Except as expressly provided by law, there shall be no differences in the rights and obligations of stockholders based on whether their shares are represented by certificates or are in uncertificated form.

**End of Exhibit 3.2**



ZQ:CERT#|COY|CLS|RGSTRY|ACCT#|TRANSTYPE|RUN#|TRANS#

HIBBETT, INC.

COMMON STOCK

PAR VALUE $.01

COMMON STOCK

Certificate Number
ZQ00000000

Shares
[illegible]

# HIBBETT, INC.

HIBBETT, INC.

INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

THIS CERTIFIES THAT MR. SAMPLE & MRS. SAMPLE & MR. SAMPLE & MRS. SAMPLE

CUSIP 428567 10 1

is the owner of ZERO HUNDRED THOUSAND ZERO HUNDRED AND ZERO

THIS CERTIFICATE IS TRANSFERABLE IN CITIES DESIGNATED BY THE TRANSFER AGENT AVAILABLE ONLINE AT www.computershare.com

FULLY PAID AND NONASSESSABLE SHARES OF COMMON STOCK, $.01 PAR VALUE, OF

HIBBETT, INC. transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney, upon surrender of this certificate properly endorsed. This Certificate and the shares represented hereby are issued and shall be held subject to all of the provisions of the Certificate of Incorporation of the Corporation and amendments thereto, to all of which the holder by acceptance hereof assents. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

WITNESS the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

President and CEO

Secretary

HIBBETT, INC. CORPORATE SEAL EST 2001 DELAWARE

DATED [illegible]

COUNTERSIGNED AND REGISTERED:
COMPUTERSHARE TRUST COMPANY, N.A.
TRANSFER AGENT AND REGISTRAR,

By
AUTHORIZED SIGNATURE

[illegible]

1234567

HIBBETT, INC.

[illegible]

CUSIP XXXXXX XX X
Holder ID XXXXXXXXXX
Insurance Value 1,000,000.00
Number of Shares 123456
DTC 12345678 123456789012345

Certificate Numbers Num/No. Denom. Total

[illegible]

Total Transaction 7

Exhibit 4.1

Exhibit 4.1

**HIBBETT, INC.**
THE CORPORATION WILL FURNISH WITHOUT CHARGE TO EACH STOCKHOLDER WHO SO REQUESTS A STATEMENT OF THE POWERS, DESIGNATIONS, PREFERENCES AND RELATIVE, PARTICIPATING, OPTIONAL OR OTHER SPECIAL RIGHTS OF EACH CLASS OF STOCK OR SERIES THEREOF AND THE QUALIFICATIONS, LIMITATIONS OR RESTRICTIONS OF SUCH PREFERENCES AND/OR RIGHTS.

The following abbreviations, which used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM – as tenants in common

TEN ENT – as tenants by the entireties

JT TEN – as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT – .................... Custodian....................
(Cust)                                    (Minor)
under Uniform Gifts to Minors Act....................
(State)

UNIF TRF MIN ACT – .................... Custodian (until age....................)
(Cust)
.................... under Uniform Transfers to Minors Act....................
(Minor)                                    (State)

Additional abbreviations may also be used though not in the above list.

For value received,_____hereby sell, assign and transfer unto

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

[PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING POSTAL ZIP CODE, OF ASSIGNEE]

_____

_____ Shares

of the Common Stock represented by the within Certificate, and do hereby irrevocably constitute and appoint

_____ Attorney

to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.

Dated:_____ 20____

Signature:_____

Signature:_____

Notice: The signature to this assignment must correspond with the name as written upon the face of the certificate, in every particular, without alteration or enlargement, or any change whatever.

Signature(s) Guaranteed: Medallion Guarantee Stamp
THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION (Banks, Stockbrokers, Savings and Loan Associations and Credit Unions WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO S.E.C. RULE 17Ad-15).

End of Exhibit 4.1

*Exhibit 99.1*

# HIBBETT, INC.

Contact:     David Benck
Senior Vice President and General Counsel
(205) 942-4292

### HIBBETT CHANGES CORPORATE NAME

BIRMINGHAM, AL (June 24, 2021)—Hibbett, Inc. (Nasdaq/GS: HIBB) (the "Company"), an athletic-inspired fashion retailer, announced that it changed its corporate name from "Hibbett Sports, Inc." to "Hibbett, Inc.", effective today. The Company's ticker symbol, "HIBB", will remain unchanged.

Mike Longo, President and Chief Executive Officer, stated, "Over the past several years, we have transitioned our corporate strategy to emphasize the athletic-inspired fashion merchandise that our customers covet. Our new corporate name of Hibbett, Inc. better reflects our consumer centric Toe-to-Head focus that leads with in-demand footwear and provides cross-category connectivity to our apparel and accessory offerings. While we will continue to offer select products for customers that participate in individual and team sports in a number of stores and through our best-in-class omni-channel platform, providing a compelling assortment of athletic-inspired fashion footwear, apparel, and accessories to underserved neighborhoods and communities across the United States will remain our primary focus."

**About Hibbett**

Hibbett, headquartered in Birmingham, Alabama, is a leading athletic-inspired fashion retailer with 1,071 Hibbett and City Gear specialty stores located in 35 states nationwide. Hibbett has a rich history of convenient locations, personalized customer service and access to coveted footwear, apparel and equipment from top brands like Nike, Jordan and adidas. Consumers can browse styles, find new releases, shop looks and make purchases online or in their nearest store by visiting www.hibbett.com. Follow us @hibbettsports and @citygear on Facebook, Instagram, and Twitter.

**Disclosure Regarding Forward-Looking Statements**

*This press release contains forward-looking statements within the meaning of the federal securities laws. Actual future events or results may differ materially from these statements. Readers are referred to the documents filed by the Company with the Securities and Exchange Commission, including the Company's recent Annual Report on Form 10-K, current reports on Form 8-K and quarterly reports on Form 10-Q. These filings identify important risk factors and other uncertainties that could cause actual results to differ from those contained in the forward-looking statements. The Company undertakes no obligation to revise or update any forward-looking statements, or to make any other forward-looking statements, whether as a result of new information, future events or otherwise.*

**End of Exhibit 99.1**

*Exhibit 99.2*

# HIBBETT, INC.

Contact:   Robert Volke - SVP. Chief Financial Officer
Jason Freuchtel - Director. Investor Relations
(205) 380-7121

## HIBBETT INITIATES QUARTERLY CASH DIVIDEND

BIRMINGHAM, AL (June 24, 2021) — Hibbett, Inc. (Nasdaq/GS: HIBB) (the "Company"), an athletic-inspired fashion retailer, today announced that its Board of Directors has declared an initial quarterly dividend of $0.25 per share on the Company's common stock. The commencement of the Company's first ongoing dividend program is reflective of the Company's growth and commitment to delivering long-term shareholder value.

Anthony Crudele, Chairman of the Board of Directors, commented, "The decision to initiate a quarterly cash dividend is the result of the Board's confidence in the Company's financial strength and ability to generate strong cash flows from operations. A quarterly cash dividend, in addition to the recently expanded share repurchase authorization, demonstrates the Company's commitment to returning value to shareholders while managing the balance sheet in a prudent fashion."

Mike Longo, President and Chief Executive Officer, added, "We appreciate the Board's support in establishing a quarterly cash dividend program. We are confident in our ability to execute our strategic plan as we grow our store base and continue to deliver compelling products and excellent service to our customers. We have built a great deal of momentum and feel we have positioned the business very well for the future."

The declared $0.25 cash dividend will be paid on July 20, 2021, to stockholders of record at the close of business on July 8, 2021. The details of any future cash dividend declaration, including the amount of such dividend and the establishment of record and payment dates, will be determined by the Board of Directors, in its sole discretion, and will depend on the Company's results of operations, financial condition, business conditions and other factors deemed relevant by the Board.

**About Hibbett**

Hibbett, headquartered in Birmingham, Alabama, is a leading athletic-inspired fashion retailer with 1,071 Hibbett and City Gear specialty stores located in 35 states nationwide. Hibbett has a rich history of convenient locations, personalized customer service and access to coveted footwear, apparel and equipment from top brands like Nike, Jordan and adidas. Consumers can browse styles, find new releases, shop looks and make purchases online or in their nearest store by visiting www.hibbett.com. Follow us @hibbettsports and @citygear on Facebook, Instagram, and Twitter.

*Exhibit 99.2*

**Disclosure Regarding Forward-Looking Statements**

*This press release contains forward-looking statements within the meaning of the federal securities laws. Actual future events or results may differ materially from these statements. Readers are referred to the documents filed by the Company with the Securities and Exchange Commission, including the Company's recent Annual Report on Form 10-K, current reports on Form 8-K and quarterly reports on Form 10-Q. These filings identify important risk factors and other uncertainties that could cause actual results to differ from those contained in the forward-looking statements. The Company undertakes no obligation to revise or update any forward-looking statements, or to make any other forward-looking statements, whether as a result of new information, future events or otherwise.*

**End of Exhibit 99.2**

# Exhibit 'C'

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): April 7, 2022**

# HIBBETT, INC.

## Hibbett, Inc.
(Exact Name of Registrant as Specified in its Charter)

| | | |
|---|---|---|
| **Delaware** | **000-20969** | ████**9608** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**2700 Milan Court**
**Birmingham, Alabama 35211**
(Address of principal executive offices)

**(205) 942-4292**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.01 Par Value Per Share | HIBB | Nasdaq Global Select Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.
☐

**Item 1.01. Entry Into a Material Definitive Agreement.**

On April 7, 2022, Hibbett, Inc. (the "Company") executed a First Note Modification Agreement (the "Modification Agreement") between the Company and its subsidiaries and Regions Bank. The Modification Agreement increases the line of credit specified in the unsecured Credit Agreement (the "Agreement") dated July 9, 2021, from $100,000,000 to $125,000,000. The Modification Agreement does not impact the term of the Agreement which expires on July 9, 2026.

There were no origination fees paid by the Company as part of this modification. The annual commitment fee, payable quarterly in arrears in an amount between 15 and 20 basis points of the unused portion of the line of credit dependent on the amount of debt outstanding, as determined on a daily basis, remains unchanged. The financial covenants included in the Agreement, as summarized below, also remain unchanged.

- Advance limitation of 55% of the net book value of the Company's inventory;

- A Consolidated Lease-Adjusted Leverage Ratio comparing lease-adjusted funded debt (funded debt plus all lease liabilities) to EBITDAR (as defined in the Agreement) with a maximum of 3.5x; and

- A Consolidated Fixed Coverage Charge Ratio comparing EBITDAR to fixed charges and certain current liabilities (as defined in the Agreement) with a minimum of 1.2x.

In addition, on April 7, 2022, the Company executed a First Amendment to the Agreement (the "Amended Agreement") between the Company and its subsidiaries and Regions Bank. The Amended Agreement replaces LIBOR as the benchmark rate with the Bloomberg Short-Term Bank Yield ("BSBY") Index Rate. The Amended Agreement carries an interest rate of BSBY plus 1.0% to 1.8% depending on specified leverage levels.

The foregoing description of the Modification Agreement and the Amended Agreement does not purport to be complete and is qualified in its entirety by reference to the full text of these documents, which are filed herewith as Exhibits 10.2 and 10.3 and incorporated herein by reference.

**Item 2.03. Creation of a Direct Financial Obligation or an Obligation Under an Off-Balance Sheet Arrangement of a Registrant.**

The descriptions of the Modification Agreement and the Amended Agreement, set forth in Item 1.01, are incorporated by reference into this Item 2.03.

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

| | |
|---|---|
| 10.1 | Credit Agreement, dated as of July 9, 2021, among Hibbett, Inc. as Borrower, subsidiaries of Borrower, as Guarantors, and Regions Bank, as Lender; incorporated by reference to Exhibit 10.1 of the Registrant's Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission on September 7, 2021. |
| 10.2 | First Note Modification Agreement, dated as of April 7, 2022, among Hibbett, Inc., as Borrower, and Regions Bank, as Lender. |
| 10.3 | First Amendment to Credit Agreement, dated as of April 7, 2022, among Hibbett, Inc., as Borrower, subsidiaries of Borrower, as Guarantors, and Regions Bank, as Lender. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**HIBBETT, INC.**

April 12, 2022

By:   /s/ Robert Volke
      Robert Volke
      Senior Vice President and Chief Financial Officer

## FIRST NOTE MODIFICATION AGREEMENT

**THIS FIRST NOTE MODIFICATION AGREEMENT** dated as of April 7, 2022 ("this Agreement"), is entered into by **HIBBETT, INC.**, a Delaware corporation (the "Borrower"), and **REGIONS BANK**, an Alabama banking corporation (the "Lender").

### Recitals

A. The Borrower has executed a certain Revolving Note in favor of the Lender dated July 9, 2021 (the "Note").

B. The Borrower has requested the Lender to consent to modifications of the Note as provided below.

C. The Lender has agreed to such modifications of the Note, provided the Borrower executes this Agreement.

### Agreement

**NOW, THEREFORE,** in consideration of the foregoing recitals and of the mutual agreement of the parties hereto, the parties hereto hereby agree as follows:

1. All references in the Note to "One Hundred Million and No/100 Dollars" and "$100,000,000" as the maximum amount of principal that may be advanced by the Lender to the Borrower under the terms of the Note are hereby deleted and replaced with "One Hundred Twenty-Five Million and No/100 Dollars" and "$125,000,000" respectively.

2. Notwithstanding the execution of this Agreement, the Note shall remain in full force and effect, as modified hereby; and nothing herein contained and nothing done pursuant hereto shall be construed to release, satisfy, discharge, terminate or otherwise affect or impair in any manner whatsoever (a) the validity or enforceability of the indebtedness evidenced by the Note, except as expressly modified hereby; (b) the lien, security interest, security title, assignment or conveyance of any collateral securing the Note, or the priority thereof; (c) the liability of any maker, endorser, surety, guarantor or any party or parties whatsoever who may now or hereafter be liable under or on account of the Note; or (d) any other security or instrument held by the Lender now or hereafter as security for or evidence of the above-described indebtedness or any thereof.

3. This Agreement shall be binding upon the successors and assigns of the parties hereto.

4. This Agreement shall be governed by and construed in accordance with the laws of the State of Alabama.

5. This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed an original, but all such counterparts shall together constitute but one and the same agreement.

**IN WITNESS WHEREOF**, the Lender and the Borrower have executed this Agreement all as of the day and year first above written.

**HIBBETT, INC.**

By:      /s/ Robert J. Volke
Name:  Robert J. Volke
Its:      Senior Vice President and
         Chief Financial Officer

**REGIONS BANK**

By:      /s/ Murray Statham
Name:  Murray Statham
Its:      Vice President

## FIRST AMENDMENT TO CREDIT AGREEMENT

**THIS FIRST AMENDMENT TO CREDIT AGREEMENT** ("this Amendment") dated as of April 7, 2022 (the "Effective Date"), is entered into by **HIBBETT, INC.**, a Delaware corporation (the "Borrower"), certain Subsidiaries of the Borrower from time to time party hereto, as Guarantors, and **REGIONS BANK**, an Alabama banking corporation (the "Lender").

### Recitals

A. The Borrower and the Lender are parties to a certain Credit Agreement dated as of July 9, 2021 (as amended from time to time, the "Credit Agreement").

B. The Borrower has requested that the Lender make a certain modification to the Credit Agreement as set forth herein.

C. The Lender has agreed to make such modifications, provided that the Borrower and the Lender enter into this Amendment.

### Agreement

**NOW, THEREFORE**, in consideration of the foregoing recitals and in further consideration of the mutual agreements set forth herein, the Borrower and the Lender hereby agree as follows, with such agreements to become effective as of the Effective Date:

1. **Rules of Construction**. This Amendment is subject to the rules of construction set forth in Section 1 of the Credit Agreement.

2. **Definitions**. Capitalized terms used in this Amendment and not otherwise defined herein have the meanings defined for them in the Credit Agreement.

3. **Representations and Warranties of Borrower**. The Borrower represents and warrants to Lender as follows:

   (a) **Representations and Warranties in Credit Documents**. All of the representations and warranties set forth in the Credit Documents are true and correct on and as of the Effective Date, except to the extent that such representations and warranties expressly relate to an earlier date.

   (b) **No Default**. As of the Effective Date, the Borrower is in compliance with all the terms and provisions set forth in the Credit Documents on its part to be observed or performed, and no Default or Event of Default, nor any event that upon notice or lapse of time or both would constitute such a Default or Event of Default, has occurred and is continuing.

   (c) **No Misleading Information**. To the best knowledge of the Borrower, neither this Amendment nor any certificate, written statement or other document furnished to Lender by or on behalf of the Borrower in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading, and there is no fact known to the Borrower that the Borrower has not disclosed to Lender that materially adversely affects or, so far as the Borrower can now reasonably foresee, will materially adversely affect the properties, or financial or other condition of the Borrower or the ability of the Borrower to perform its obligations hereunder and under the other Credit Documents.

(d)   **Borrower's Organizational Documents**. The Borrower's organizational documents have not been amended since July 9, 2021.

4.   **Amendments to the Credit Agreement**.

(a)   The following definitions shall be added, in alphabetical order, to Section 1.1 of the Credit Agreement and shall read, in their entirety, as follows:

"BSBY Index Rate" means, for any BSBY Loan and at any time of determination, a per annum rate equal to the BSBY Rate at such time. The BSBY Index Rate shall be determined on the Effective Date and the first Business Day of each calendar month thereafter and shall be increased or decreased, as applicable, automatically and without notice to any Person on the date of each such determination. Each calculation by Lender of the BSBY Index Rate shall be conclusive and binding for all purposes, absent manifest error.

"BSBY Loan" means a Loan or portion thereof, during any period in which it bears interest at a rate based on the BSBY Index Rate.

"BSBY Rate" means that rate of interest per annum which equals the BSBY Screen Rate that is two (2) SIFMA Business Days (or such lesser or greater number of "look back" days as Lender, in its discretion, may elect to use at any time or from time to time) preceding the determination date; *provided* that if the rate is not published on such determination date then BSBY Rate means the BSBY Screen Rate on the first SIFMA Business Day immediately prior thereto on which such rate is so published, subject to any corrections published by Bloomberg Index Services Limited (or any successor administrator). In any event, the BSBY Rate, as so determined, will not be less than zero percent (0%) per annum.

"BSBY Screen Rate" means the U.S. Dollar wholesale funding rate known as the Bloomberg Short-Term Bank Yield Index for a term of one month administered by Bloomberg Index Services Limited (or any successor administrator) and published on the applicable Bloomberg screen page (or by such successor administrator or such other commercially available source providing such quotations as may be designated by Lender in its sole discretion from time to time).

"Conforming Changes" means, with respect to the BSBY Index Rate or any implementation of a Replacement Index, any technical, administrative or operational changes to terms, matters or any conventions associated with the BSBY Index Rate or any Replacement Index, as applicable (including, any changes to the definition of the BSBY Index Rate, BSBY Rate, Replacement Index, BSBY Screen Rate, SIFMA Business Days, timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices and length of lookback periods or observation shifts and any other technical, administrative operational matters) as may be appropriate, in the discretion of Lender, to reflect the adoption and implementation of such applicable rate, and to permit the administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such rate exists, in such other manner of administration as Lender determines is reasonably necessary in connection with the administration of this Agreement and any other Credit Document).

"Item" means any "item" as defined in Section 4-104 of the UCC, and shall also mean and include checks, drafts, money orders or other media of payment.

"SOFR" means a rate per annum equal to the secured overnight financing rate administered by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) (the "Administrator").

"Term SOFR Administrator" means the CME Group Benchmark Administration Limited (CBA) (or a successor administrator of Term SOFR selected by Lender in its sole discretion).

(b)   The definitions in Section 1.1 of the Credit Agreement of "Conversion/Continuation Date," "Conversion/Continuation Notice," "Early Opt-In Election," "Index Rate Determination Date," "Interest Rate Determination Date," "Interest Period," "LIBOR," "LIBOR Index Rate," "LIBOR Loan," "LIBOR Rate," "LIBOR Rate Loan," "LIR Loans," and "Relevant Governmental Body" are hereby deleted in their entirety.

(c)   The reference to "LIBOR Loans" in the definition of "Applicable Margin" in Section 1.1 of the Credit Agreement shall be deleted and replaced with "BSBY Loans."

(d)   Section 1.5 of the Credit Agreement is hereby deleted in its entirety.

(e)   The following definitions set forth in Section 1.1 of the Credit Agreement shall be amended and restated, in their entirety, to read as follows:

"Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of one percent (0.5%) and (c) the BSBY Rate in effect on such day plus one percent (1.0%), and if the Base Rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the BSBY Rate shall be effective on the effective day of such change in the Prime Rate, the Federal Funds Effective Rate or the BSBY Rate, respectively.

"Business Day" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of Alabama or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close.

"Commitments" means the Revolving Commitment.

"Default Rate" means an interest rate equal to (a) with respect to Obligations other than BSBY Loans and the Letter of Credit Fees, the Base Rate plus the Applicable Margin, if any, applicable to such Loans plus two percent (2%) per annum, (b) with respect to BSBY Loans, the BSBY Rate plus the Applicable Margin, if any, applicable to BSBY Loans plus two percent (2%) per annum, and (c) with respect to the Letter of Credit Fees, the Applicable Margin plus two percent (2%) per annum.

"First Amendment Effective Date" means April 7, 2022.

"Interest Payment Date" means with respect to any Base Rate Loan or BSBY Loan, the last Business Day of each month, commencing on the first such date to occur after the Effective Date and the Maturity Date.

"Revolving Commitment" means the commitment of the Lender to make Revolving Loans and issue Letters of Credit hereunder. The amount of the Revolving Commitment as of the First Amendment Effective Date is $125,000,000.

"Term SOFR" means the forward-looking term rate based on SOFR for a one-month period as published by the Term SOFR Administrator (or as published by such other comparable financial information reporting service used by Lender, in its sole discretion, at the time such rate is determined) on the day that is two (2) SIFMA Business Days prior to the first day of such one-month period (or if not so reported, then as determined by Lender from another recognized source, in Lender's sole discretion), subject to any corrections published by the Term SOFR Administrator. In any event, Term SOFR will not be less than zero percent (0%) per annum.

"Type of Loan" means whether such Loan is a BSBY Loan or, if required by Section 2.5(g), a Base Rate Loan.

(f)     Section 2.1 of the Credit Agreement is hereby amended and restated to read, in its entirety, as follows:

Section 2.1 Loans.

(a) Revolving Loans. Subject to the terms and conditions set forth herein, the Lender agrees to make revolving loans ("Revolving Loans") in Dollars to the Borrower from time to time during the Revolving Commitment Period. The Lender shall have no obligation to make any Revolving Loan or issue any Letter of Credit if doing so would, after giving effect thereto, cause the Total Revolving Outstandings to exceed the lesser of (i) the Revolving Commitment and (ii) the Inventory Availability Amount. Amounts borrowed pursuant to this Section 2.1(a) may be repaid without premium or penalty and, subject to the terms and conditions set forth herein, re-borrowed during the Revolving Commitment Period.

(b) Deemed Requests for Revolving Loans. Revolving Loans shall be deemed requested pursuant to the following clauses (i) and (ii) or when requested pursuant to the following clause (iii):

(i) Subject to Section 2.1(c), the becoming due of any Obligation (whether as principal, accrued interest, fees, or other charges owed to Lender or any Affiliate of Lender and whether payable on demand or otherwise) shall in all respects be deemed to constitute Borrower's irrevocable request for a Revolving Loan in an amount equal to such Obligations, and Lender may (but shall not be obligated to) make such Revolving Loan and apply the proceeds thereof to the payment of such Obligations.

(ii) Subject to Section 2.1(c), the presentment for payment of any Item drawn on, or request for any wire or other transfer from, a Funding Account at a time when there are insufficient funds in such Funding Account to cover such Item shall in all respects be deemed to constitute Borrower's irrevocable request for a Revolving Loan in an amount equal to the amount payable on such Item to be made by Lender, and Lender may make such Revolving Loan and apply the proceeds thereof to such Funding Account for payment of such Item.

(iii) For all other Revolving Loans, Borrower shall provide Lender with a written request for borrowing pursuant to a Funding Notice in accordance with Section 2.1(d).

(c) Provisions Regarding Deemed Requests for Revolving Loans. Lender shall have no obligation to honor any deemed request for a Revolving Loan under clauses (i) or (ii) of Section 2.1(b), if (i) such request is deemed made after the Maturity Date, or (ii) Lender

determines that any condition precedent in Section 5.2 hereof or any other condition precedent to the making of such Loan is not then satisfied or will not be satisfied when such Loan is to be made; provided, that, notwithstanding the foregoing, Lender may make such Revolving Loan in its discretion and without regard to the existence of, and without being deemed to have waived, any Default or Event of Default which may then exist or arise from the making of such Revolving Loan and without regard to the absence of satisfaction of any condition precedent, whether set forth in Section 5.2 or otherwise. Lender may make Revolving Loans under clauses (i) and (ii) of Section 2.1(b) without Borrower having submitted a Funding Notice in regard thereto. Subject to Section 2.5(g), as applicable, all Revolving Loans made pursuant to clauses (i) and (ii) of Section 2.1(b) shall be made as BSBY Loans.

(d) Making Requests for New Revolving Loans. Each request for the making of a new Revolving Loan shall be in writing, and Borrower shall submit a Funding Notice in respect thereof. Each such request shall specify (i) the date for the making of the applicable Loan, which date must be a Business Day; (ii) the principal amount of the applicable Loan to be made; (iii) instructions for the disbursement of the proceeds of such Loan (provided that, if such instructions for the disbursement of such proceeds are not included in the notice, the proceeds will be deposited by Lender into a Funding Account); and (iv) such other information as Lender may require from time to time in connection with, or to facilitate, such request. Requests for the making of a new Revolving Loan made under this Section 2.1(d) are irrevocable. Requests under this Section 2.1(d) that Lender receives after 11:00 a.m. (Birmingham, Alabama, time) on any Business Day shall be deemed received on the next Business Day. Lender's acceptance of a request for the making of a Loan under this Section 2.1(d) shall be indicated by its making the Loan requested, and Lender shall not be obliged to give Borrower any other notice of acceptance (or rejection). Lender shall make any such Loans in immediately available funds on the same Business Day it receives or is deemed to have received a request for such borrowing in accordance herewith and subject hereto.

(g)   Section 2.5 of the Credit Agreement is hereby amended and restated to read, in its entirety, as follows:

Section 2.5 Interest on Loans.

(a) Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment thereof as follows: (i) if a Base Rate Loan, at the Base Rate plus the Applicable Margin; or (ii) if a BSBY Loan, at the BSBY Index Rate plus the Applicable Margin.

(b) [Reserved].

(c) [Reserved].

(d) Interest payable pursuant to this Section 2.5 shall be computed on the basis of (i) for interest at the Base Rate (including Base Rate Loans determined by reference to the BSBY Rate), a year of three hundred sixty-five (365) or three hundred sixty-six (366) days, as the case may be, and (ii) for all other computations of fees and interest, a year of three hundred sixty (360) days, in each case for the actual number of days elapsed in the period during which it accrues.

(e) If, as a result of any restatement of or other adjustment to the financial statements of the Borrower or for any other reason, the Borrower or the Lender determines that (i) the Consolidated Lease-Adjusted Leverage Ratio as calculated by the Borrower as of any applicable date was inaccurate and (ii) a proper calculation of the Consolidated Lease-Adjusted Leverage

Ratio would have resulted in higher pricing for such period, the Borrower shall immediately and retroactively be obligated to pay to the Lender promptly on demand by the Lender (or, after the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under Debtor Relief Laws, automatically and without further action by the Lender) an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of interest and fees actually paid for such period. This subsection (e) shall not limit the rights of the Lender under any other provision of this Agreement. The Borrower's obligations under this paragraph shall survive the termination of the Commitments and the repayment of all other Obligations for a period of one (1) year.

(f) Except as otherwise set forth herein, interest on each Loan shall accrue on a daily basis and shall be payable in arrears on and to (i) each Interest Payment Date applicable to that Loan; (ii) upon any prepayment of that Loan (other than a voluntary prepayment of a Revolving Loan which interest shall be payable in accordance with clause (i) above), to the extent accrued on the amount being prepaid; and (iii) the Maturity Date.

(g) The Borrower agrees to pay to the Lender, with respect to drawings honored under any Letter of Credit issued by the Lender, interest on the amount paid by the Lender in respect of each such honored drawing from the date such drawing is honored to but excluding the date such amount is reimbursed by the Borrower (including with the proceeds of a Revolving Loan) at a rate equal to (i) for the period from the date such drawing is honored to but excluding the applicable Reimbursement Date, the rate of interest otherwise payable hereunder with respect to Revolving Loans that are Base Rate Loans, and (ii) thereafter, a rate which is the lesser of (x) two percent (2%) per annum in excess of the rate of interest otherwise payable hereunder with respect to Revolving Loans that are Base Rate Loans, and (y) the Highest Lawful Rate.

(h) The rate of interest on any BSBY Loan shall be adjusted as provided in the definition of the BSBY Index Rate. If any BSBY Loan is converted into a Base Rate Loan because of Section 2.5(i), the rate of interest on such Base Rate Loan shall be adjusted automatically and without notice on and as of the date of any change in the Base Rate as provided in the definition thereof.

(i) Any provision of this Agreement to the contrary notwithstanding, if Lender at any time or from time to time determines that (i) the BSBY Rate is unavailable, (ii) the BSBY Rate cannot be determined, (iii) the BSBY Rate does not adequately reflect the cost to Lender of making, funding, or maintaining any Loan, (iv) the use of the BSBY Rate has become impracticable or unreliable, (v) the BSBY Rate is no longer representative of the underlying market or economic reality, (vi) it is no longer lawful for Lender to lend at an interest rate based on the BSBY Rate, or (vii) an Event of Default exists and at any time during its continuation Lender shall so elect, then, in each case, unless and except to the extent otherwise provided in subsection (j) below, (A) all affected BSBY Loans shall automatically and without notice be converted into Base Rate Loans and (B) all obligations of Lender to make BSBY Loans shall cease until such time as Lender shall have determined that it is able to determine the BSBY Rate or that such illegality or other condition described above shall have been reversed, or that such Event of Default shall have been waived, as applicable.

(j) Notwithstanding anything to the contrary contained in this Agreement or any other Credit Document, but without limiting subsection (i) above, if Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto), that any of the circumstances described in clauses (i), (ii), (iii), (iv), (v) or (vi) of subsection (i) above have arisen, and that such circumstances are unlikely to be temporary, Lender may elect, in lieu of exercising its rights under subsection (i) above, to designate in place of the BSBY Rate a

substitute interest rate index applicable to all BSBY Loans, which may be Term SOFR, Daily Simple SOFR, or an alternative rate index that has been selected by the Lender as a replacement for the BSBY Rate (the "Replacement Index"). If Lender so designates a Replacement Index, Lender may also determine at such time or at any time or from time to time thereafter that an index adjustment is necessary to produce a comparable interest rate to the interest rate that would have applied to the BSBY Loans based on the BSBY Index Rate. Upon such determination, Lender will designate the amount of such index adjustment (which may be a positive or a negative number) and adjust the Replacement Index by that amount (the result being the "Adjusted Replacement Index"). Lender will provide notice to Borrower of the Replacement Index and any Adjusted Replacement Index, as applicable, and their respective effective dates. Thereafter, the Replacement Index or, as applicable, the Adjusted Replacement Index shall be deemed to be and shall become the operative interest rate index instead of the BSBY Index Rate for purposes of making (or continuing) BSBY Loans under this Agreement and any other Credit Documents, and all BSBY Loans shall continue to bear interest on the unpaid principal amount thereafter from the effective date of such designation(s) through repayment thereof at the Replacement Index (or the Adjusted Replacement Index, as applicable) plus the Applicable Margin (subject to increase to the Default Rate, as applicable). The Replacement Index or, as applicable, Adjusted Replacement Index will not be less than zero percent (0%) per annum in any event. The Replacement Index or, as applicable, the Adjusted Replacement Index, may not necessarily be Lender's most favorable lending rate or interest rate index. Any determination or designation made by Lender under this subsection (j) shall be made in Lender's discretion and shall be conclusive and binding absent manifest error, and any such determination or designation shall become effective at 5:00 p.m. on the fifth Business Day after Lender shall have notified Borrower of such determination or designation. For avoidance of any doubt, the institution (or adjustment) of any Replacement Index or any Adjusted Replacement Index, as applicable, by Lender shall not require the consent of, or consultation with, Borrower.

(k) Lender does not warrant, nor does Lender accept responsibility for, nor shall the Lender have any liability with respect to, the administration, submission or any other matter related to the rates in the definition of "BSBY Rate" (or "BSBY Index Rate") or with respect to any interest rate (including, for the avoidance of doubt, the selection of such rate and any related spread or other adjustment) that is an alternative or replacement for or successor to any of such rates or the effect of any of the foregoing (including, without limitation, (i) any such alternative, successor or replacement rate implemented pursuant to subsection (j) above, and (ii) the implementation of any conforming changes pursuant to subsection (l) below), including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the BSBY Rate or have the same volume or liquidity as did the BSBY Rate prior to its discontinuance, unavailability, illegality or impracticability of use.

(l) With respect to the BSBY Rate (and BSBY Index Rate), Lender will have the continuing right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document; provided that, with respect to any such amendment effected, Lender shall post each such amendment implementing such Conforming Changes to Borrower reasonably promptly after such amendment becomes effective.

(h) Section 2.6 of the Credit Agreement is hereby deleted in its entirety.

(i) Subsection (c) of Section 2.7 of the Credit Agreement is hereby deleted in its entirety.

(j)     The first sentence of subsection (c) of Section 2.8 of the Credit Agreement is hereby amended and restated to read, in its entirety, as follows:

The Borrower shall pay to the Lender a Letter of Credit fee for each standby Letter of Credit equal to the Applicable Margin applicable to Revolving Loans that are BSBY Loans multiplied by the daily maximum amount available to be drawn under such Letter of Credit (the "Letter of Credit Fees").

(k)     Subsection (a)(i) of Section 2.9 of the Credit Agreement is hereby amended and restated to read, in its entirety, as follows:

(i) Any time and from time to time, the Borrower may prepay the Loans in whole or in part.

(l)     The first sentence of Section 2.10 of the Credit Agreement is hereby amended and restated to read, in its entirety, as follows:

Within each Loan, prepayments will be applied first to Base Rate Loans, then to BSBY Loans.

(m)     Subsection (f) is hereby added to Section 2.11 of the Credit Agreement and shall read, in its entirety, as follows:

(f) If (i) any Change in Law or (ii) compliance with any guideline or request from any central bank or comparable agency or other Governmental Authority (whether or not having the force of law), in respect of capital or liquidity ratios or requirements has or would have the effect of reducing the rate of return on the capital of, or has affected or would affect the amount of capital required to be maintained by the Lender or any Person owning or controlling the Lender as a consequence of, or with reference to, the Revolving Commitment, below the rate which the Lender or such other Person could have achieved but for such Change in Law or compliance, then within five (5) Business Days after the Lender's written demand for payment, the Borrower shall pay the Lender from time to time as specified by the Lender additional amounts sufficient to compensate the Lender or such other Person for such reduction; provided that the Lender shall only exercise its rights under this Section if and to the extent that it exercises any similar rights it may have under other similar transactions to which it is a party. The Lender's accounting of such amounts submitted in writing to the Borrower shall be presumed conclusive absent manifest error. The Borrower agrees that the Lender's determination of such additional amounts and increased costs will be made in the Lender's discretion and shall be conclusive absent manifest error.

(n)     Sections 3.1 and 3.2 of the Credit Agreement are hereby deleted in their entirety.

5.     **Fees and Legal Expenses.** The Borrower hereby agrees to pay all legal costs and expenses incurred in connection with the review, analysis and preparation of this Amendment. Such expenses and legal costs shall be payable upon the execution of this Amendment and shall be non-refundable.

6.     **References in Credit Documents**. All references in the Credit Documents to the "Credit Agreement" shall mean the Credit Agreement as amended by this Amendment.

7.   **Credit Documents to Remain in Effect**. Except as specifically modified by this Amendment, the Credit Agreement and the other Credit Documents shall remain in full force and effect in accordance with their respective terms.

8.   **No Novation, etc.** Nothing contained in this Amendment shall be deemed to constitute a novation of the terms of the Credit Documents, nor impair any Liens granted to Lender thereunder, nor release any obligor from liability for any of the Obligations, nor affect any of the rights, powers or remedies of Lender under the Credit Documents, nor constitute a waiver of any provision thereof, except as specifically set forth in this Amendment.

9.   **Governing Law, Successors and Assigns, etc.** This Amendment shall be governed by and construed in accordance with the laws of the State of Alabama and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

10.   **Headings**. The descriptive headings of the sections of this Amendment are for convenient reference only and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

11.   **Entire Agreement**. This Amendment constitutes the entire understanding to date of the parties hereto regarding the subject matter hereof and supersedes all prior and contemporaneous oral and written agreements of the parties thereto with respect to the subject matter hereof.

12.   **Severability**. If any provision of this Amendment shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

13.   **Counterparts**. This Amendment may be executed in any number of counterparts, each of which so executed shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument. Delivery of an executed counterpart of a signature page of this Amendment by facsimile or in electronic format (e.g., "pdf," "tif" or similar file formats) shall be effective as delivery of a manually executed counterpart of this Amendment.

14.   **No Waiver**. Nothing contained herein shall be construed as a waiver or acknowledgement of, or consent to any breach of or Default or Event of Default under the Credit Agreement and the Credit Documents not specifically mentioned herein, and the waivers and consents granted herein are effective only in the specific instance and for the purposes for which given.

15.   **Effect of this Amendment**. This Amendment amends and supplements the Credit Agreement and shall be construed as if it were a part thereof for all purposes. Any representation or warranty contained herein that is determined by Lender to have been misleading or untrue in any material respect at the time made shall constitute a Default or Event of Default under the Credit Agreement and the other Credit Documents in accordance with the Credit Agreement as if such representation or warranty had been contained in the Credit Agreement, and any default by the Borrower in the performance or observance of any provision of this Amendment shall constitute a Default or Event of Default under that section as if such provision had been contained in the Credit Agreement.

*[remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, Borrower and Lender have executed this Amendment to be made effective as of the Effective Date.

**BORROWER:**

**HIBBETT, INC.**

By: /s/ Robert J. Volke

Name: Robert J. Volke

Title: Senior Vice President and Chief Financial Officer

**GUARANTORS:**

**HIBBETT RETAIL, INC.**

By: /s/ Robert J. Volke

Name: Robert J. Volke

Title: Senior Vice President and Chief Financial Officer

**HIBBETT WHOLESALE, INC.**

By: /s/ Robert J. Volke

Name: Robert J. Volke

Title: Senior Vice President and Chief Financial Officer

**HIBBETT DIGITAL MANAGEMENT, INC.**

By: /s/ Robert J. Volke

Name: Robert J. Volke

Title: Senior Vice President and Chief Financial Officer

**GIFT CARD SERVICES, LLC**

By: /s/ Robert J. Volke

Name: Robert J. Volke

Title: Senior Vice President and Chief Financial Officer

**HIBBETT HOLDINGS, LLC**

By: /s/ Robert J. Volke

Name: Robert J. Volke

Title: Senior Vice President and Chief Financial Officer

**CITY GEAR, LLC**

By: /s/ Robert J. Volke

Name: Robert J. Volke

Title: Senior Vice President and Chief Financial Officer

**LENDER:**

**REGIONS BANK**

By:      /s/ Murray Statham

Name:     Murray Statham

Title:       Vice President

*[Signature Page to First Amendment to Credit Agreement]*

John R. Habashy, Esq. (SBN 236708)
*john@lexiconlaw.com*
**LEXICON LAW, PC.**
633 W. 5th Street, 28th Floor,
Los Angeles, CA 90071
Tel: (213) 223-5900
Fax: (888) 373-2107

*Additional Counsel for Plaintiff and the*
*Proposed Class listed on the following page.*

Attorney for Plaintiff and the Proposed Class

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

| | |
|---|---|
| **ANTHONY KAMEL**, an individual;<br><br>Plaintiff,<br><br>vs.<br><br>**HIBBETT RETAIL, INC., a Delaware corporation**; et al.,<br><br>Defendants. | Case No.: 30-2022-01257316-CU-NP-CXC<br><br>**MOTION AND DECLARATION OF JOHN HABASHY REGARDING PEREMPTORY CHALLENGE TO JUDICIAL OFFICER**<br><br>**CLASS ACTION**<br><br>*Assigned for all purposes to the Hon. Peter Wilson, Dept. CX 102*<br><br>Hearing Date: None Set |

Motion and Declaration re: Peremptory Challenge; *Kamel v. Hibbett Retail et al.*

<u>Additional Counsel for Plaintiff and the Proposed Class:</u>
Scott D. Owens (FL 0597651)
*Scott@scottdowens.com*
(pending admission *pro hac vice*)
SCOTT D. OWENS, P.A.
2750 N. 29th Avenue, Suite 209A
Hollywood, Florida 33020
Telephone: (954) 589-0588
Facsimile: (954) 337-0666

Christopher W. Legg (FL 44460)
*Chris@theconsumerlawyers.com*
(pending admission *pro hac vice*)
Christopher W. Legg, P.A.
499 E. Palmetto Park Blvd. #228
Boca Raton, FL 33432
Telephone: (954) 962-2333
Facsimile: (954) 960-6565

## <u>MOTION AND DECLARATION OF JOHN HABASHY REGARDING PEREMPTORY</u>

## <u>CHALLENGE TO JUDICIAL OFFICER (Code Civ. Proc. § 170.6)</u>

Name of judicial officer: Hon. Peter Wilson, Dept. CX102

I am an attorney for a party to this action or special proceeding. The judicial officer named above, before whom the trial of, or a hearing in, this case is pending, or to whom it has been assigned, is prejudiced against the party (or his or her attorney) or the interest of the party (or his or her attorney), so that declarant cannot, or believes that he or she cannot, have a fair and impartial trial or hearing before the judicial officer.

Dated: May 9, 2022                          Respectfully submitted,

                                            **LEXICON LAW, PC**


                                            /s/ John R. Habashy
                                            John R. Habashy (SBN 236708)
                                            *Counsel for Plaintiff Anthony Kamel*

---

## DECLARATION OF JOHN HABASHY IN SUPPORT OF PEREMPTORY
## CHALLENGE TO JUDICIAL OFFICER (Code Civ. Proc. § 170.6)

I, John Habashy, declare:

1.    I have personal knowledge of all of the facts set forth in this declaration, and if called upon to do so, I could and would competently testify thereto in a court of law or administrative proceeding.

2.    I believe in good faith that Hon. Peter Wilson is prejudiced against me, to the effect that my client Anthony Kamel would not be able to have a fair and impartial hearing in the proceeding and trial of the above-captioned civil action.

3.    I hereby declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


DATED this 9th day of May, 2022.


/s/ John R. Habashy
John R. Habashy, declarant

Motion and Declaration re: Peremptory Challenge; *Kamel v. Hibbett Retail et al.*

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen (18) years and not a party to the within action.  My business address is: **633 W. 5th Street, 28th Floor, Los Angeles, CA 90071.**

On the date below I served the foregoing document(s) as **MOTION AND DECLARATION OF JOHN HABASHY REGARDING PEREMPTORY CHALLENGE TO JUDICIAL OFFICER** in the matter of *Kamel v. Hibbett, et al.* on the interested parties in this action:

| | |
|---|---|
| HIBBETT RETAIL, INC. c/o CSC 251 Little Falls Dr. Wilmington, DE 19808 | Agent for Service of Process for Defendant Hibbet Retail, Inc. |
| HIBBETT INC. c/o CSC 251 Little Falls Dr. Wilmington, DE 19808 | Agent for Service of Process for Defendant Hibbet Retail, Inc. |

(X)     (BY MAIL) I placed said copy(ies) in a sealed envelope(s), postage thereon fully prepaid, and placed for collection and processing for mailing following the business's ordinary practice, with which I am readily familiar. Under that practice it would be deposited with U.S. postal service on that same day with postage fully prepaid in the city indicated below in the ordinary course of business.

Executed on May 9, 2022 at Los Angeles, California.

(X )     (STATE) I declare under penalty of perjury under the la ws of the State of California that the above is true and correct.

_____
Jackeline Valiente, declarant

---

4

Motion and Declaration re: Peremptory Challenge; *Kamel v. Hibbett Retail et al.*

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 05/12/2022                    TIME: 10:38:00 AM          DEPT:  C12

JUDICIAL OFFICER PRESIDING:   Supervising Judge Layne H. Melzer
CLERK: L. Mendez
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT: None

CASE NO: **30-2022-01257316-CU-NP-CXC**  CASE INIT.DATE: 04/29/2022
CASE TITLE: **KAMEL vs. HIBBETT, INC., a Delaware corporation,**
CASE CATEGORY: Civil - Unlimited       CASE TYPE: Non-PI/PD/WD tort - Other

---

EVENT ID/DOCUMENT ID: 73759600
**EVENT TYPE:** Chambers Work

---

**APPEARANCES**

---

There are no appearances by any party.

A Peremptory Challenge under C.C.P. 170.6 as to the Honorable Peter Wilson having been filed on 05/09/22, by Plaintiff, and this matter having been transferred to C12 for reassignment, the Court now rules as follows:

This case is reassigned to the Honorable William Claster in Department CX104 for all purposes.

All pending hearings are ordered vacated.

Counsel to contact clerk in Department CX104 within 15 days of receipt of this order to reschedule any pending hearings.

The Court determines that for purposes of exercising C.C.P. 170.6 rights, there are two sides to this matter unless the contrary is brought to the attention of the Court, by Ex-Parte motion.  Counsel has 15 days from the date of the enclosed certificate of mailing in which to exercise any rights under C.C.P. 170.6.

Court orders Clerk to give notice. Plaintiff is to give notice to any party not listed on the Clerk's Certificate of Mailing/Electronic Service.

---

## CERTIFICATE OF SERVICE

*Anthony Kamel, et al. v. Hibbett, Inc., et al*.

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am a citizen of the United States and employed in Los Angeles, California, at the office of a member of the bar of this Court at whose direction this service was made.  I am over the age of 18 and not a party to the within actions; my business address is 10100 Santa Monica Blvd., Ste. 550, Los Angeles, CA 90067.

On **June 1, 2022**, I served the document(s) entitled, DECLARATION OF OPHIR JOHNA IN SUPPOT OF DEFENDANTS' NOTICE OF REMOVAL on the interested parties in this action by placing true copies thereof enclosed in a sealed envelope(s) addressed as stated below:

☒ **(BY MAIL)**:  I deposited such envelope in the mail at Los Angeles, California with postage fully prepaid.  I am readily familiar with this firm's practice of collection and processing correspondence for mailing.  Under that practice it would be placed for collection and mailing, and deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States that the above is true and correct and was executed on **June 1, 2022**, at Los Angeles, California.

_____
Lea Borys

## <u>SERVICE LIST</u>

*Kamel, et al. v. Hibbett, Inc., et al.*

John R. Habashy, Esq.
LEXICON LAW, PC
633 West Fifth Street, 28th Floor
Los Angeles, CA 90071
Tel: (213) 223-5900
Fax: (888) 373-2107
Email: John@lexiconlaw.com
*Attorneys for Plaintiff and the Proposed Class*

Scott D. Owens, Esq.
(pending admission *pro hac vice*)
SCOTT D. OWENS, P.A.
2750 N. 29th Avenue, Ste. 209A
Hollywood, FL 33020
Tel: (954) 589-0588
Fax: (954) 337-0666
Email: Scott@scottdowens.com
*Attorneys for Plaintiff and the Proposed Class*

Christopher W. Legg, Esq.
(pending admission *pro hac vice*)
CHRISTOPHER W. LEGG, P.A.
499 E. Palmetto Park Blvd., Ste. 228
Boca Raton, FL 33432
Tel: (954) 962-2333
Fax: (954) 960-6565
Email Chris@theconsumerlawyers.com
*Attorneys for Plaintiff and the Proposed Class*

1020793\304578071.v1